# No. 22-1374

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

NATIONAL SHOOTING SPORTS FOUNDATION, INC., BERETTA U.S.A. CORP., DAVIDSON'S, INC., GLOCK INC., CENTRAL TEXAS GUN WORKS, HORNADY MANUFACTURING COMPANY, LIPSEY'S LLC, OSAGE COUNTY GUNS LLC, RSR GROUP, INC., SHEDHORN SPORTS, INC., SIG SAUER, INC., SMITH & WESSON INC., SPORTS SOUTH LLC, SPRAGUE'S SPORTS INC., STURM, RUGER & COMPANY, INC.,
*Plaintiffs-Appellants*,

v.

LETITIA JAMES, in her official capacity as New York Attorney General,
*Defendant-Appellee.*

On Appeal from the United States District Court for the
Northern District of New York, No. 21-cv-1348

### BRIEF FOR PLAINTIFFS-APPELLANTS

PAUL D. CLEMENT
ERIN E. MURPHY
 *Counsel of Record*
MATTHEW D. ROWEN*
TREVOR W. EZELL*
NICHOLAS M. GALLAGHER*
CLEMENT & MURPHY, PLLC
706 Duke Steet
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com
*Supervised by principals of the firm who are members
of the Virginia bar

*Counsel for Plaintiffs-Appellants*

October 7, 2022

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Plaintiffs certify as follows:

**National Shooting Sports Foundation, Inc.** has no parent company, and no publicly held corporation owns 10% or more of NSSF stock.

Beretta Holdings S.A. is the parent company of plaintiff **Beretta U.S.A. Corp.** and owns more than 10% of Beretta U.S.A. Corp. **Beretta U.S.A. Corp.** is not publicly traded, and therefore there is no publicly held corporation that owns 10% or more of **Beretta U.S.A. Corp.** stock.

**CTCHGC LLC d/b/a Central Texas Gun Works** has no parent company. **CTCHGC LLC d/b/a Central Texas Gun Works** is not publicly traded, and therefore there is no publicly held corporation that owns 10% or more of **CTCHGC LLC d/b/a Central Texas Gun Works** stock.

**Davidson's, Inc.** has no parent company. **Davidson's, Inc.** is not publicly traded, and there therefore is no publicly held corporation that owns 10% or more of Davidson's, Inc. stock.

**GLOCK, Inc.** has no parent corporation, and there is no publicly held corporation owning 10% or more of **GLOCK, Inc.** stock.

i

**Hornady Manufacturing Company** has no parent company, and there is no publicly held corporation that owns 10% or more of **Hornady Manufacturing Company** stock.

**Lipsey's, LLC** has no parent company. **Lipsey's, LLC** is not publicly traded, and therefore there is no publicly held corporation that owns 10% or more of **Lipsey's, LLC** stock.

**Osage County Guns** has no parent company, and there is no publicly held corporation that owns 10% or more of **Osage County Guns** stock.

**RSR Group, Inc.** has no parent company. **RSR Group, Inc.** is not publicly traded, and therefore there is no publicly held corporation that owns 10% or more of **RSR Group, Inc.** stock.

**Shedhorn Sports Inc.** has no parent company. **Shedhorn Sports Inc.** is not publicly traded, and therefore there is no publicly held corporation that owns 10% or more of **Shedhorn Sports Inc.** stock.

**SIG Sauer, Inc.** is a wholly owned subsidiary of SIG SAUER US Holding LP. No publicly held corporation owns 10% or more of **SIG Sauer, Inc.** stock.

**Smith & Wesson Inc.** is a wholly owned subsidiary of Smith & Wesson Brands, Inc. Smith & Wesson Brands, Inc. is publicly traded.

**Sports South LLC** has no parent company. **Sports South LLC** is not publicly traded, and therefore there is no publicly held corporation that owns 10% or more of **Sports South LLC** stock.

**Sprague's Sports Inc.** has no parent company. **Sprague's Sports Inc.** is not publicly traded, and therefore there is no publicly held corporation that owns 10% or more of **Sprague's Sports Inc.** stock.

**Sturm, Ruger & Company, Inc.** has no parent company, and no publicly held corporation owns 10% or more of **Sturm, Ruger & Company, Inc.** stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES.................................................................................... vi

INTRODUCTION .................................................................................................. 1

STATEMENT OF JURISDICTION ...................................................................... 4

STATEMENT OF THE ISSUES ........................................................................... 4

STATEMENT OF THE CASE................................................................................. 4

      A.     Legal and Factual Background............................................................ 4

      B.     Procedural History.............................................................................. 15

SUMMARY OF ARGUMENT............................................................................... 18

STANDARD OF REVIEW ................................................................................... 21

ARGUMENT .......................................................................................................... 21

I.      Section 898 Is Preempted By The PLCAA. .................................................. 21

      A.     Section 898 Authorizes Civil Actions That Do Not Fall Within Any Exception to the PLCAA's Broad Preemptive Scope. ............... 22

      B.     At a Minimum, §898 Is Preempted to the Extent it Authorizes Suits That Require Neither Knowing Violations Nor Proximate Cause.................................................................................. 33

II.     Section 898 Violates The Commerce Clause. ................................................ 39

      A.     Section 898 Discriminates Against Interstate Commerce................... 39

      B.     Section 898 Unconstitutionally Regulates Transactions That Take Place Entirely in Other States and Are Lawful Where they Occur......................................................................................... 43

      C.     Section 898 Unduly Burdens Interstate Commerce........................... 49

III.    Section 898 Violates The Due Process Clause. ............................................. 51

CONCLUSION ....................................................................................................... 56

iv

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Adames v. Sheahan*,
909 N.E.2d 742 (Ill. 2009) ................................................................9

*Am. Booksellers Found. v. Dean*,
342 F.3d 96 (2d Cir. 2003) ......................................................... 18, 48

*Am. Civil Liberties Union v. Johnson*,
194 F.3d 1149 (10th Cir. 1999) ......................................................49

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) ........................................................................21

*Baldwin v. G. A. F. Seelig, Inc.*,
294 U.S. 511 (1935) .................................................................. 46, 48

*Bank of Am. Corp. v. City of Miami*,
137 S.Ct. 1296 (2017) .....................................................................36

*Briggs v. Bremby*,
792 F.3d 239 (2d Cir. 2015) ...........................................................21

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*,
476 U.S. 573 (1986) ...................................................... 39, 43, 47, 48

*Burrage v. United States*,
571 U.S. 204 (2014) ........................................................................37

*C & A Carbone, Inc. v. Town of Clarkstown*,
511 U.S. 383 (1994) ........................................................................41

*Camden Cnty. Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp.*,
273 F.3d 536 (3d Cir. 2001) .............................................................5

*Camps Newfound/Owatonna, Inc. v. Town of Harrison*,
520 U.S. 564 (1997) .................................................................. 39, 50

*Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am., Inc.*,
492 F.3d 484 (4th Cir. 2007) ..........................................................48

*Chem. Waste Mgmt., Inc. v. Hunt*,
  504 U.S. 334 (1992)......................................................................... 40, 41

*City of Chicago v. Beretta U.S.A. Corp.*,
  821 N.E.2d 1099 (Ill. 2004)..................................................................6

*City of Cincinnati v. Beretta U.S.A. Corp.*,
  768 N.E.2d 1136 (Ohio 2002)...............................................................5

*City of Gary ex rel. King v. Smith & Wesson Corp.*,
  801 N.E.2d 1222 (Ind. 2003) ................................................................5

*City of N.Y. v. Beretta U.S.A. Corp.*,
  524 F.3d 384 (2d Cir. 2008) ....................................................... *passim*

*City of Philadelphia v. New Jersey*,
  437 U.S. 617 (1978)............................................................................41

*CSX Transp., Inc. v. McBride*,
  564 U.S. 685 (2011)............................................................................36

*Daniels Sharpsmart, Inc. v. Smith*,
  889 F.3d 608 (9th Cir. 2018)...............................................................46

*Delana v. CED Sales, Inc.*,
  486 S.W.3d 316 (Mo. 2016)..................................................................9

*District of Columbia v. Beretta U.S.A. Corp.*,
  940 A.2d 163 (D.C. 2008).............................................................8, 9, 11

*Exxon Co., U.S.A. v. Sofec, Inc.*,
  517 U.S. 830 (1996)............................................................................54

*FCC v. Fox Television Stations, Inc.*,
  567 U.S. 239 (2012)............................................................................51

*Hamilton v. Beretta U.S.A. Corp.*,
  750 N.E.2d 1055 (N.Y. 2001) ......................................... 5, 52, 53, 54

*Healy v. Beer Inst., Inc.*,
  491 U.S. 324 (1989)..................................................................... 17, 43

*Hillman v. Maretta*,
   569 U.S. 483 (2013)........................................................................28

*Holmes v. Secs. Inv. Prot. Corp.*,
   503 U.S. 258 (1992)........................................................................36

*Ileto v. Glock, Inc.*,
   565 F.3d 1126 (9th Cir. 2009) ............................................... 9, 10, 30

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
   725 F.3d 65 (2d Cir. 2013) ..............................................................33

*Int'l Paper Co. v. Ouellette*,
   479 U.S. 481 (1987)........................................................................33

*Jam v. Int'l Fin. Corp.*,
   139 S.Ct. 759 (2019) ......................................................................36

*James v. Arms Tech., Inc.*,
   820 A.2d 27, (N.J. Super. Ct. App. Div. 2003) ....................................5

*Kansas v. Garcia*,
   140 S.Ct. 791 (2020)......................................................................21

*Legato Vapors, LLC v. Cook*,
   847 F.3d 825 (7th Cir. 2017)...........................................................46

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014)........................................................................36

*Lopez v. United States*,
   514 U.S. 549 (1995)................................................................. 39, 40

*NextEra Energy Cap. Holdings, Inc. v. Lake*,
   48 F.4th 306 (5th Cir. 2022).............................................................50

*People v. Sturm, Ruger & Co., Inc.*,
   761 N.Y.S.2d 192 (N.Y. App. Div. 2003) .................................. *passim*

*Pike v. Bruce Church, Inc.*,
   397 U.S. 137 (1970)................................................................. 17, 49

*SPGGC, LLC v. Blumenthal*,
   505 F.3d 183 (2d Cir. 2007) .................................................................46

*Steur v. Glock*,
   No. 1:22-cv-3192 (E.D.N.Y. filed May 31, 2022) ...................................... 24, 45

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas*,
   139 S.Ct. 2449 (2019) ................................................................. 38, 50

*Testa v. Becker*,
   910 F.3d 677 (2d Cir. 2018) ................................................................21

*Town of Southold v. Town of E. Hampton*,
   477 F.3d 38 (2d Cir. 2007) .............................................................. 41, 42, 50

*W. & Atl. R.R. v. Henderson*,
   279 U.S. 639 (1929).......................................................................53

*Wash. State Dep't of Soc. & Health Servs.*
   *v. Guardianship Est. of Keffeler*,
   537 U.S. 371 (2003).......................................................................26

**Constitutional Provisions**

U.S. Const. art. I, §8, cl. 3............................................................................38

U.S. Const. art. VI, cl. 2 .............................................................................. 21

U.S. Const. amend. V, cl. 1 .......................................................................... 32

**Statutes**

15 U.S.C. §7901(a) .................................................................................6, 7

15 U.S.C. §7901(a)(4)............................................................................ 28, 31

15 U.S.C. §7901(a)(5)........................................................................ 1, 15, 28, 35

15 U.S.C. §7901(a)(6)......................................................................... 7, 50, 54

15 U.S.C. §7901(a)(7)......................................................................... 6, 28, 30, 52

15 U.S.C. §7901(a)(8)...............................................................................6

ix

15 U.S.C. §7901(b) ................................................................ 32

15 U.S.C. §7901(b)(1) ............................................................. 7

15 U.S.C. §7902(a) ....................................................... 1, 7, 22

15 U.S.C. §7903(3) ........................................................... 7, 22

15 U.S.C. §7903(4) ............................................... 7, 14, 17, 40

15 U.S.C. §7903(5)(A) .................................................... *passim*

15 U.S.C. §7903(5)(B) ............................................................ 8

15 U.S.C. §7903(6) ................................................................ 7

2021 Sess. Law News of N.Y., ch.237 (S. 7196) (McKinney's) ............... 15, 23, 45

N.Y. Gen. Bus. Law §898-a(2) ................................... 13, 23, 37

N.Y. Gen. Bus. Law §898-a(4) ......................................... 23, 43

N.Y. Gen. Bus. Law §898-a(5) .................................................34

N.Y. Gen. Bus. Law §898-a(6) .................................. 4, 14, 17, 39

N.Y. Gen. Bus. Law §898-b ................................... 23, 26, 27, 39

N.Y. Gen. Bus. Law §898-b(1) ........................................ *passim*

N.Y. Gen. Bus. Law §898-b(2) ..................................... 13, 34, 44

N.Y. Gen. Bus. Law §898-c(1) ........................................ 12, 13

N.Y. Gen. Bus. Law §898-c(2) ........................................... 14, 34

N.Y. Gen. Bus. Law §898-d ....................................... 14, 22, 44

N.Y. Gen. Bus. Law §898-e ....................................... 14, 22, 37

N.Y. Penal Law §15.05(2)-(3) ...............................................34

N.Y. Penal Law §240.45 .....................................................9

Protection of Lawful Commerce in Arms Act in 2005,
Pub. L. No. 109-92, 119 Stat. 2095 (2005)..........................................................7

**Rule**

Fed. R. App. P. 4(a)(1)(A)................................................................. 4

**Other Authorities**

Gov. Andrew M. Cuomo, *Governor Cuomo Signs First-in-the-Nation Gun Violence Disaster Emergency to Build a Safer New York*, YouTube (July 6, 2021), https://bit.ly/3UyZoSx .................................... 2, 12, 23

W. Page Keeton et al., *Prosser and Keeton on Law of Torts* (5th ed. 1984) .......................................................................... 36

Recent Legislation, *Protection of Lawful Commerce in Arms Act*, 119 Harv. L. Rev. 1939 (2006) .............................................................6

Sharon Walsh, *Gun Industry Views Accord as Dangerous Crack in Its Unity*, Wash. Post (Mar. 18, 2000), https://wapo.st/2Zcp5KS.............................6

xi

## INTRODUCTION

Rarely will this Court encounter a preemption case more straightforward than this one. In 2005, Congress passed the Protection of Lawful Commerce in Arms Act ("PLCAA") to stamp out state and local efforts to hold law-abiding members of the firearms industry liable for crimes committed by third parties involving firearms. That is neither a matter of speculation nor a matter of debate. Congress explicitly stated the PLCAA's objective in the statute's lengthy enumerated findings and purposes: to prevent businesses engaged in lawful commerce in firearms and ammunition from being held "liable for the harm caused by those who criminally or unlawfully misuse firearm products or ammunition products that function as designed and intended." 15 U.S.C. §7901(a)(5). To that end, the law broadly preempts any "civil action" "against a manufacturer or seller of a [firearm or related product]" for injuries "resulting from the … misuse of [such product] by … a third party." *Id.* §§7902(a), 7903(5)(A). That rule is subject to only a narrow set of exceptions, all for suits involving misconduct by the manufacturer or seller itself.

The PLCAA does not mince words about its preemptive scope. But that did not stop lawmakers in Albany from acting in defiance of federal law and the Supremacy Clause. Displeased with Congress' judgment, New York passed a law in 2021 to, in the Governor's own words, "reinstate the public nuisance liability for gun manufacturers" that states tried to impose two decades ago, in an avowed effort

to "right the wrong done 16 years [earlier]" when Congress enacted the PLCAA. Gov. Andrew M. Cuomo, *Governor Cuomo Signs First-in-the-Nation Gun Violence Disaster Emergency to Build a Safer New York* at 35:00-38:15, YouTube (July 6, 2021), https://bit.ly/3UyZoSx. True to the Governor's word, General Business Law §§898-a-e ("§898") does exactly what the PLCAA prohibits, creating a civil action under which "gun industry members" may be held liable for criminals' misdeeds simply for having "unreasonably" made, sold, or marketed a firearm that is later misused in New York. If the Supremacy Clause means anything, that undisguised state effort to "reinstate" what federal law expressly forbids cannot stand.

The district court concluded otherwise only by reading one of the PLCAA's exceptions so broadly as to defeat the statute's core mission. According to the court, by exempting lawsuits alleging that a manufacturer or seller "knowingly violated a State or Federal statute applicable to the sale or marketing of the product," 15 U.S.C. §7903(5)(A)(iii), the PLCAA empowered states to reinstate exactly the same kinds of novel public nuisance suits—including one brought by New York itself—that led Congress to enact the PLCAA, through the simple expedient of codifying the same amorphous theories in statutes that "expressly" apply to firearms commerce. That implausible reading of the so-called "predicate exception" would make nonsense of the PLCAA, sneaking in through the back door what Congress kicked out the front. In reality, text, structure, context, and common sense—not to mention this Court's

2

precedent—foreclose reading the "predicate exception to swallow the statute." *City of N.Y. v. Beretta U.S.A. Corp.*, 524 F.3d 384, 403 (2d Cir. 2008).

That is reason enough to invalidate §898. But it is not the only reason. In its haste to countermand Congress' judgment in the PLCAA, New York acted in ways that are reserved for our national legislature. On its face, §898 applies *only* to commerce involving firearms and related products that have moved in *inter*state commerce. The law therefore discriminates against interstate commerce by its very terms, in violation of the Commerce Clause. Making matters worse, §898 regulates not just firearms commerce in New York, but firearms commerce *anywhere*, so long as it has some ultimate effect in New York. Thus, if a manufacturer operating in New Hampshire complies with all federal and New Hampshire laws but fails to employ what New York deems to be "reasonable" theft-protection controls, then it could be held be liable under §898 based entirely on its commercial activities *in New Hampshire* if one of its firearms later finds its way into the hands of someone who uses it to commit a crime in New York. That is no accident; the legislative findings accompanying §898 acknowledge that §898 is designed to project New York law into other states—yet another violation of the Commerce Clause. And on top of all that, §898 gives zero guidance as to what it means to conduct lawful commerce in firearms "unreasonably," thus rendering the statute void for vagueness.

For any and all of those reasons, this Court should reverse.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §1331 and §1343(a)(3). It entered final judgment dismissing plaintiffs' complaint on May 25, 2022. Dkt.47. Plaintiffs timely filed a notice of appeal on June 24, 2022. Dkt.24; *see* Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

1.      Whether the PLCAA, which prohibits any "civil action … against a manufacturer or seller of a [firearms] product" for injuries "resulting from the criminal or unlawful misuse of a qualified product by … a third party," 15 U.S.C. §7903(5)(A), preempts §898, which authorizes such actions.

2.      Whether §898, which applies only to interstate commerce, *see* N.Y. Gen. Bus. Law §898-a(6), and imposes state-law liability for commercial transactions that take place entirely out of state, violates the Commerce Clause's prohibitions on state laws that discriminate against or regulate interstate commerce.

3.      Whether §898 violates the Due Process Clause by imposing sweeping liability via vague terms based on the conduct of unrelated third parties.

## STATEMENT OF THE CASE

### A.      Legal and Factual Background

1. In the 1990s, state and local governments initiated a series of lawsuits in response to concerns about violent crimes involving firearms. Yet rather than train their sights on the criminals responsible for those acts, they sued federally licensed

4

manufacturers and distributors of legal firearms that were lawfully manufactured, lawfully sold, and functioned as intended. In 2003, for instance, the New York Attorney General brought a sweeping lawsuit against "handgun manufacturers, wholesalers and retailers," alleging that their (highly regulated and lawful) "manufacturing, distributing and marketing practices" had "created, contributed to, and maintained a public nuisance," on the theory that they should be held liable for the acts of criminals who "illegally" use their products in a manner that "endanger[ed] the health and safety" of New Yorkers. *People v. Sturm, Ruger & Co., Inc.*, 761 N.Y.S.2d 192, 194 (N.Y. App. Div. 2003). The New York courts rejected that and similar efforts to saddle law-abiding industry participants with liability for criminals' misconduct. *Id.* at 195-204; *see also Hamilton v. Beretta U.S.A. Corp.*, 750 N.E.2d 1055 (N.Y. 2001). But similar suits proliferated, and some courts were more solicitous of these novel theories. *See, e.g.*, *City of Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1143-47 (Ohio 2002) (allowing, *inter alia*, public nuisance claims); *James v. Arms Tech., Inc.*, 820 A.2d 27, 50-53 (N.J. Super. Ct. App. Div. 2003) (same); *City of Gary ex rel. King v. Smith & Wesson Corp.*, 801 N.E.2d 1222, 1231-32 (Ind. 2003) (same).

Not all such suits succeeded on the merits. *See, e.g.*, *Camden Cnty. Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp.*, 273 F.3d 536, 540 (3d Cir. 2001) (per curiam); *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1147-48 (Ill.

5

2004). But winning in court was not the only, or even the principal, objective; the real goal was to hobble the firearms industry. Recognizing that "[t]he legal fees" needed to defend against a rising tide of similar suits "alone" would have been "enough to bankrupt the industry," Sharon Walsh, *Gun Industry Views Accord as Dangerous Crack in Its Unity*, Wash. Post (Mar. 18, 2000), https://wapo.st/2Zcp5KS, state and local governments "pressed on" with their novel suits "regardless of their chance of success, spending taxpayers' money in a war of attrition against the firearms industry," Recent Legislation, *Protection of Lawful Commerce in Arms Act*, 119 Harv. L. Rev. 1939, 1940 (2006).

Congress saw these lawsuits for what they were: a coordinated effort to saddle the firearms industry with liability for the acts of criminals. The state and local government plaintiffs not only pressed "theories without foundation in hundreds of years of the common law and jurisprudence of the United States," but also threatened interstate comity, as much of the commercial conduct they sought to penalize took place in another state where it was fully lawful. 15 U.S.C. §7901(a)(7)-(8). Their novel suits also came at a substantial cost to individual rights, including the Second Amendment right to keep and bear arms and industry members' right to pursue their trade. *Id.* §7901(a)(2), (6)-(7). And Congress found it simply unfair for state and local governments to try to hold highly regulated and lawful businesses liable "for

the harm caused by those who criminally or unlawfully misuse firearm products or ammunition products that function as designed and intended." *Id.* §7901(a)(5).

To put an end to such efforts, Congress passed the Protection of Lawful Commerce in Arms Act in 2005, Pub. L. No. 109-92, 119 Stat. 2095 (codified at 15 U.S.C. §§7901-7903). The PLCAA leaves no doubt about its objectives. The statute begins by declaring that "imposing liability on an entire industry for harm that is solely caused by others is an abuse of the legal system, … threatens the diminution of a basic constitutional right and civil liberty, … and constitutes an unreasonable burden on interstate and foreign commerce." 15 U.S.C. §7901(a)(6). And it makes its *raison d'être* explicit: The statute's primary "purpose[]" is "[t]o prohibit causes of action against manufacturers, distributors, dealers, and importers of firearms or ammunition products, and their trade associations, for the harm solely caused by the criminal or unlawful misuse of firearm products or ammunition products by others when the product functioned as designed and intended." *Id*. §7901(b)(1).

To that end, the PLCAA broadly prohibits "any person," "including any governmental entity," from bringing any "civil action" in federal or state court against any licensed "manufacturer or seller" of a firearm, ammunition, or component part thereof seeking any "relief[] resulting from the criminal or unlawful misuse of a qualified product by … a third party." *Id.* §§7902(a), 7903(3)-(6). That sweeping express preemption is subject to only a limited handful of exceptions for

7

actions in which the manufacturer or seller itself engaged in some well-defined type of wrongful conduct. For example, the PLCAA exempts actions against licensed sellers of firearms for negligence per se and negligent entrustment, 15 U.S.C. §7903(5)(A)(ii), the latter of which is defined as supplying a firearm to someone "the seller knows, or reasonably should know, … is likely to, and does, use the product in a manner involving unreasonable risk of physical injury to the person or others," *id.* §7903(5)(B). It also exempts actions for breach of contract or warranty and product defect, as well as actions brought by the U.S. Attorney General to enforce certain specified federal laws. *Id.* §7903(5)(A)(iv)-(vi).

Finally, the PLCAA exempts actions in which a licensed manufacturer or seller is alleged to have "knowingly violated a State or Federal statute applicable to the sale or marketing of [a firearm or related] product" and where "the violation was a proximate cause of the harm for which relief is sought." *Id.* §7903(5)(A)(iii). This provision has come to be known as the "predicate exception" because, "to take effect, it requires that the manufacturer or seller have committed an underlying (or predicate) statutory violation." *District of Columbia v. Beretta U.S.A. Corp.*, 940 A.2d 163, 168 (D.C. 2008). Congress made clear, however, that not just any statutory violation will suffice. By its terms, the exception covers only actions that require a "knowing" violation that was "a proximate cause" of the plaintiff's alleged injury. And it includes two illustrative examples of the types of statutes that suffice,

8

each of which imposes specific obligations on how firearms may be sold: a law imposing record-keeping requirements on the firearms industry; and a law prohibiting firearms suppliers from aiding, abetting, or conspiring in straw purchases of their products. 15 U.S.C. §7903(5)(A)(iii)(I)-(II).

2. In the wake of the PLCAA, state and local governments raised various challenges to its constitutionality. But nearly every court—including this Court—to confront such a challenge to the PLCAA has upheld the statute as consistent with both the Constitution's structural provisions and the Bill of Rights. *See, e.g.*, *City of N.Y.*, 524 F.3d at 393-98; *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1139-40 (9th Cir. 2009); *Delana v. CED Sales, Inc.*, 486 S.W.3d 316, 323-24 (Mo. 2016); *Adames v. Sheahan*, 909 N.E.2d 742, 765 (Ill. 2009); *District of Columbia*, 940 A.2d at 172-73.

Courts have also confronted—and repeatedly rejected—a variety of efforts to read the PLCAA's predicate exemption so broadly as to allow states to escape the statute's preemptive force through the simple expedient of codifying the kinds of novel theories the statute was enacted to stamp out. Indeed, this Court rejected one such effort shortly after the PLCAA was enacted. After the law took effect, New York City sought to salvage the sweeping pre-PLCAA suit that it had brought under the state's general criminal nuisance statute, New York Penal Law §240.45. The City argued (among other things) that its action fell within the predicate exception "because [§240.45] is a statute 'applicable to the sale or marketing of [firearms].'"

9

*City of N.Y.*, 524 F.3d at 399. This Court rejected that argument in no uncertain terms. As the Court explained, "[t]he meaning of the term 'applicable' must be determined here by reading that term in the context of the surrounding language and of the statute as a whole." *Id.* at 400. And reading "applicable" to encompass literally any statute capable of being applied to the firearms industry not only would be inconsistent with the much more specific laws in the illustrative examples that inform the term's meaning, but "would allow the predicate exception to swallow the statute." *Id.* at 403. The Court accordingly "constru[ed] the term 'applicable to' to mean statutes that clearly can be said to regulate the firearms industry"—a test that Penal Law §240.45 did not satisfy. *Id.* at 402, 404.

The Ninth Circuit rejected a comparable argument in *Ileto v. Glock*, where the plaintiffs argued that their suit against gun manufacturers and distributors satisfied the predicate exception because "California's general tort law is codified in its civil code," which (they said) meant that all California tort actions alleging that firearms manufacturers and sellers are responsible for third-party-caused injuries are actions under a "statute applicable to the sale or marketing of [a firearm]." 565 F.3d at 1132-33. The court disagreed, reasoning that statutory text, structure, and purpose all compel the conclusion "that Congress intended to preempt general tort law claims" even when a state "codifie[s] those claims in its civil code." *Id.* at 1138.

The D.C. Court of Appeals reached a similar conclusion in *District of Columbia v. Beretta*. There, the District sued "various gun manufacturers, importers, or distributors of firearms" for (among other things) alleged violations of D.C.'s Assault Weapon Manufacturing Strict Liability Act ("SLA"), "which by its terms would make these defendants 'strictly liable in tort' for death or injuries resulting from the discharge of an assault weapon or machine gun they manufactured or sold." 940 A.2d at 167, 170. The District argued that the SLA satisfies the predicate exception simply because it is a "statute" that is "applicable to the sale or marketing of [a firearm]," *see* 15 U.S.C. §7903(5)(A)(iii). The D.C. high court disagreed. As the court explained, the SLA did not actually regulate how firearms were sold or marketed; it "merely" "impose[d] a duty to pay compensation" if "a person is killed or injured by the discharge of an assault weapon manufactured or sold by a named defendant—an injury that may occur years after the manufacture or sale and despite the utmost care taken in the manufacture or sale." 940 A.2d at 170. That made the SLA entirely unlike the illustrative "statutory 'violations'" that Congress provided in §7903(5)(A)(iii)(I)-(II), and instead exactly like the claims Congress enacted the PLCAA to stamp out. *Id.* at 172-73.

3. The PLCAA accomplished Congress' goal of deterring intrepid state and local governments from seeking to hold firearms manufacturers and sellers liable for criminals' misdeeds for a while. But not forever. In 2021, New York jumped back

11

into the fray, enacting General Business Law §§898-a-e, a law specifically crafted to try to circumvent the PLCAA.  Indeed, the Governor openly touted §898 as an avowed effort to "reinstate the public nuisance liability for gun manufacturers" that the PLCAA was enacted to eliminate, so as to "right the wrong done 16 years" earlier by Congress when it enacted the PLCAA.  Cuomo, *supra*, at 35:00-38:15.

To that end, §898 does two things.  First, it reproduces, largely verbatim, the text of Penal Law §240.45, the general criminal nuisance statute that this Court held in *City of New York v. Beretta* is *not* a predicate statute under the PLCAA.  The only differences are (1) whereas §240.45 applies to acts and "person[s]" generally, §898 applies only to "the sale, manufacturing, importing[,] or marketing" of firearms or related products by "gun industry members," and (2) whereas §240.45 prohibits only creating or maintaining a condition that "endangers the safety or health of the public," §898 prohibits "contribut[ing]" to such a condition too:

> **No gun industry member**, by conduct either unlawful in itself or unreasonable under all the circumstances shall knowingly or recklessly create, maintain **or contribute to** a condition in New York state that endangers the safety or health of the public **through the sale, manufacturing, importing or marketing of a qualified product**.

N.Y. Gen. Bus. Law §898-b(1) (bolded type showing alterations from the general statute, Penal Law §240.45).  Any failure to comply with that command "that results in harm to the public" is "declared to be a public nuisance."  *Id.* §898-c(1).

12

Second, §898 requires "[a]ll gun industry members who manufacture, market, import or offer for wholesale or retail sale any qualified product in New York state [to] establish and utilize reasonable controls and procedures to prevent its qualified products from being possessed, used, marketed or sold unlawfully in New York state." *Id.* §898-b(2). With one exception, §898 does not tie "reasonable controls and procedures" to any of the many federal, state, and local laws with which firearms manufacturers and sellers must already comply.[1] Nor does it in any other way identify what controls and procedures are or are not "reasonable." Instead, §898 offers only the singularly unhelpful guidance that "reasonable controls and procedures" are "policies that include, but are not limited to[,] … instituting screening, security, inventory and other business practices to prevent thefts of qualified products as well as sales of qualified products to straw purchasers, traffickers, persons prohibited from possessing firearms under state or federal law, or persons at risk of injuring themselves or others." *Id.* §898-a(2). Failure to abide by the command to employ this unspecified universe of "controls and procedures" is likewise "declared to be a public nuisance" if it "results in harm to the public." *Id.* §898-c(1).

---

[1] The statute does define "reasonable controls and procedures" to include "preventing deceptive acts and practices and false advertising and otherwise ensuring compliance with all provisions of article twenty-two-A of this chapter." N.Y. Gen. Bus. Law §898-a(2).

13

Both the state attorney general and any city corporation may bring suit "to enjoin and restrain" and "obtain restitution and damages" for violations of §898. *Id.* §898-d. And "[a]ny person, firm, corporation[,] or association that has been damaged as a result of" a violation of §898 may sue for damages. *Id.* §898-e. Section 898 makes clear that a defendant's intent is not relevant to liability: "The existence of a public nuisance shall not depend on whether the gun industry member acted for the purpose of causing harm." *Id.* §898-c(2).

Underscoring New York's goal of nullifying the PLCAA, §898 defines "[q]ualified product" to have the "the same meaning" that it has in the PLCAA, *id.* §898-a(6), which in turn defines the term to mean "a firearm, … ammunition …, or a component part [thereof], that has been shipped or transported in interstate or foreign commerce," 15 U.S.C. §7903(4). Section 898 thus oddly applies *only* if the "qualified product" has at some point traveled in interstate commerce—a restriction that is sensible and restrained when adopted by Congress, but is constitutionally verboten when copied by a state. Conversely, while the "reasonable controls and procedures" obligation (but not the prohibition on "creat[ing], maintain[ing] or contribut[ing]" to a public nuisance) applies only to "gun industry members" that *operate* in New York, nothing in the statute limits its application to their *conduct* in New York. "Gun industry members" throughout the nation (indeed, the world) thus now have an obligation to refrain from conduct *anywhere* that is lawful where it

14

occurs if it might be deemed to "create, maintain or contribute" to a public nuisance in New York. And any member that operates in New York can be held liable for failing to employ *in some other state* what New York deems to be "reasonable controls and procedures," even if federal, state or local law in that other place does not impose whatever requirements New York deems "reasonable." That extraterritorial effect is not an accident; the findings accompanying the law specifically tout it as an effort to address statistics indicating that most firearms used in crimes in New York were purchased elsewhere. 2021 Sess. Law News of N.Y., ch.237, §1 (S. 7196) (McKinney's).

In short, both by design and in effect, §898 authorizes exactly what the PLCAA prohibits: lawsuits holding members of the firearms industry liable "for the harm caused by those who criminally or unlawfully misuse firearm products or ammunition products that function as designed and intended." 15 U.S.C. §7901(a)(5).

## B.    Procedural History

Plaintiffs are the National Sports Shooting Foundation, Inc. (the trade association for the firearm, ammunition, and hunting and shooting sports industry) and 14 of its members, all of which are federal firearms licensees that manufacture and/or sell firearms. Plaintiffs filed this lawsuit in the Northern District of New York shortly after §898 took effect, seeking a preliminary injunction and a declaration that

15

the statute is preempted by the PLCAA and unconstitutional under the Commerce Clause and the Fourteenth Amendment. Dkts.1-2. The state moved to dismiss, Dkt.35, and the district court granted the state's motion to dismiss and denied plaintiffs' motion for preliminary injunction. A42.

The district court first rejected plaintiffs' claim that the PLCAA preempts §898. The court acknowledged (with considerable understatement) that "[t]he general public nuisance statute from *City of New York* and §898 here are generally similar in content, except that §898 substitutes the term 'gun industry member' for 'person.'" A49. But it concluded that substituting "gun industry member" for "person" sufficed to make §898 "a State … statute applicable to the sale or marketing of [firearms]" within the meaning of the predicate exception. *Id.* In reaching that conclusion, the court made no mention of the two exemplar predicate statutes Congress provided in the text. *See* 15 U.S.C. §7903(5)(A)(iii)(I)-(II). The court likewise said nothing about the predicate exception's explicit limitation to statutes imposing only "knowing[]" liability or its requirement that "the violation" of a predicate statute be "a proximate cause of the harm for which relief is sought." *See id.* §7903(5)(A)(iii). And while the court did not deny that §898 imposes liability merely for lawfully selling, manufacturing, or marketing legal firearms, it made no effort to explain how such a scheme could be consistent with the PLCAA, which—as this Court recognized in *City of New York*—"Congress clearly intended to protect

16

from vicarious liability members of the firearms industry who engage in the lawful design, manufacture, marketing, distribution, importation, or sale of firearms." 524 F.3d at 402. Nevertheless, the court concluded that PLCAA's predicate exception saves §898 from preemption. A46-50.

The district court likewise rejected plaintiffs' Commerce Clause claims. The court acknowledged that §898 incorporates the PLCAA's definition of "[q]ualified product," N.Y. Gen. Bus. Law §898-a(6), which is limited to firearms products "shipped or transported *in interstate or foreign commerce*," 15 U.S.C. §7903(4) (emphasis added). A54. Section 898 thus by its terms applies only to *inter*state, not *intra*state, commerce. Yet the court still rejected the argument that §898 discriminates against interstate commerce, reasoning that there cannot be any discrimination against *inter*state commerce because it did not believe that any purely "in-state commerce exists" to be favored in comparison. A55-56. The court also rejected plaintiffs' arguments under the *Pike* balancing test, *see generally Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970), on the same ground. A56-57.

The court next turned to whether §898 "directly controls commerce occurring wholly outside the boundaries of a State." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989). In the district court's view, only state laws "controlling in-state and out-of-state pricing of goods going into the state" can run afoul the extraterritoriality principle enforced in the *Healy* line of cases. A58. The court therefore deemed the

extraterritoriality principle irrelevant solely because §898 does not deal with pricing. A58-59. In reaching that conclusion, the court made no mention of this Court's precedent squarely contradicting that aberrant theory. *See, e.g.*, *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99-104 (2d Cir. 2003) (invalidating, under the Commerce Clause extraterritoriality principle, a Vermont law prohibiting distribution of explicit materials to minors even in other states, because it "*directly regulated* commerce" beyond Vermont's borders).

Finally, the court rejected plaintiffs' vagueness claim on the ground that "[t]he statute closely tracks the language of New York's current general public nuisance law, N.Y. Penal Law §240.45, which has been good law since 1965." A64. The court did not address §898-b(2), which imposes sweeping liability for failure to "establish and utilize reasonable controls and procedures to prevent its qualified products from being possessed, used, marketed or sold unlawfully in New York," and which has no historical pedigree whatsoever.

## SUMMARY OF ARGUMENT

New York enacted §898 for an undenied and undeniable reason: to subvert the central promise of PLCAA by "reinstating" the state-law litigation that it preempts. And §898 does exactly that, authorizing suits materially indistinguishable from the novel efforts to hold manufacturers and sellers liable for the criminal misuse of their firearms that Congress enacted the PLCAA to stamp out. New York claims

18

the power to accomplish this blatant end-run around federal law through the PLCAA's so-called "predicate exception," which exempts suits alleging that a manufacturer or seller "knowingly violated a State or Federal statute applicable to the sale or marketing of the product" if "the violation was a proximate cause of the harm for which relief is sought." 15 U.S.C. §7903(5)(A)(iii). But statutory text, structure, and context—not to mention common sense—foreclose the state's effort to "allow the predicate exception to swallow the statute." *City of N.Y.*, 524 F.3d at 403. The point of the PLCAA was most certainly not to prompt states to codify the nuisance theories the PLCAA aimed to eradicate.

In reality, the predicate exemption does not, as the district court held, exempt from preemption any lawsuit involving a statute that expressly applies to commerce in firearms. It exempts only statutes that impose concrete regulatory obligations and prohibitions on such commerce, not statutes that (like §898) simply impose a generic duty to conduct lawful commerce in firearms "reasonably." That is clear from the predicate exception's requirement that a violation be committed "knowingly," which presupposes an obligation or prohibition sufficiently concrete that one can know what suffices to comply; from the illustrative examples Congress provided, which all involve violations of unambiguous obligations or prohibitions; from Congress' statutorily enumerated findings, which make clear that the kinds of laws Congress had in mind are laws imposing concrete regulations; and from Congress' statutorily

19

enumerated findings, which make clear that slapping a different label on the same novel public nuisance lawsuits would defeat the PLCAA's central mission. Simply put, the PLCAA aimed to stamp out nuisance suits altogether, not to encourage states to codify them. At a bare minimum, §898 is preempted to the extent it does not even require a "knowing" violation or proximate cause.

And preemption is just one of the statute's problems. In its zeal to override Congress' judgment, lawmakers in Albany purported to exercise powers reserved for the national legislature. In fact, §898 violates the Commerce Clause three times over. It does so first by discriminating against interstate commerce on its face, as the state sought to countermand the PLCAA so directly that it enacted a definition of "qualified product" that renders §898 applicable if *and only if* a firearm, ammunition, or constituent part has traveled in *interstate* commerce. It does so next by directly regulating commerce that occurs entirely outside New York's borders— an impermissible extraterritorial operation that the legislative findings confirm was no mistake. And it does so finally by burdening interstate commerce in ways that Congress has already declared to be too unreasonable to sustain. Moreover, the statute leaves industry members guessing as to what conduct will or will not violate it, rendering it void for vagueness, and extends liability far beyond what traditional notions of fair play and proximate causation permit. In short, §898 is a compendium of constitutional problems that should not be permitted to stand.

20

## STANDARD OF REVIEW

"[A] district court's grant of a motion to dismiss" is "review[ed] *de novo*," *Testa v. Becker*, 910 F.3d 677, 682 (2d Cir. 2018), as is a decision denying a motion for a preliminary injunction when, as here, the "allegations of error … involve questions of law," *Briggs v. Bremby*, 792 F.3d 239, 241 (2d Cir. 2015).

## ARGUMENT

### I.    Section 898 Is Preempted By The PLCAA.

The Supremacy Clause provides that the Constitution, federal statutes, and treaties are "the supreme Law of the Land." U.S. Const. art. VI, cl. 2. The Constitution thus establishes "a rule of decision" for determining whether federal or state law applies. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015). When a federal law "imposes restrictions" and "a state law confers rights … that conflict with the federal law, the federal law takes precedence and the state law is preempted." *Kansas v. Garcia*, 140 S.Ct. 791, 801 (2020).

That is exactly the situation here. The PLCAA imposes a clear restriction: Courts may not entertain any "civil action … against a manufacturer or seller of a [firearms] product … for damages … or other relief, resulting from the criminal or unlawful misuse of a qualified product by … a third party." 15 U.S.C. §7903(5)(A). Section 898 in turn confers rights that conflict with the PLCAA: It explicitly authorizes both public and private parties to sue "gun industry members" for damages and other relief resulting from a third party's misuse of an industry

21

member's lawfully sold product. N.Y. Gen. Bus. Law §§898-c, -d, -e. Indeed, the Governor candidly acknowledged that the whole point of §898 is to try to "reinstate" the kind of suits that the PLCAA was enacted to stamp out. That effort is preempted at every turn.

> ### A. Section 898 Authorizes Civil Actions That Do Not Fall Within Any Exception to the PLCAA's Broad Preemptive Scope.

1. Under the PLCAA, a "qualified civil liability action may not be brought in any Federal or State court." 15 U.S.C. §7902(a). The suits §898 authorizes plainly fit that bill. The PLCAA defines a "qualified civil liability action" as a "[1] civil action … [2] brought by any person" ("including any governmental entity") "[3] against a manufacturer or seller of a qualified product, or a trade association, [4] for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, [5] resulting from the criminal or unlawful misuse of a qualified product by the person or a third party." *Id.* §7903(3), (5)(A).

Section 898 suits satisfy every element. They clearly are civil actions that can be brought by persons (individuals and New York officials alike) for damages and other relief. *See, e.g.*, N.Y. Gen. Bus. Law §§898-d, -e (authorizing, *inter alia*, "the attorney general" and private "person[s]" to "bring an action" for, *inter alia*, "damages" and "restitution"). They just as clearly can be brought "against a manufacturer or seller of a qualified product, or a trade association." 15 U.S.C.

§7903(5)(A).  In fact, a suit under §898 can be brought *only* against such a party, as the statute's operative provisions apply only to "gun industry members."  N.Y. Gen. Bus. Law §898-b; *see id.* §898-a(4) (defining "Gun industry member" to include manufacturers and sellers of "firearms, ammunition, … and firearms accessories").

Finally, §898 authorizes recovery against "gun industry members" for injuries "resulting from" third parties' misuse of their products.  That is the whole point of the statute.  As its codified "[l]egislative findings and intent" explain, §898 is designed to facilitate efforts to hold those engaged in the "sale, manufacture, distribution, importing or marketing of firearms … liable for" harms caused by "the illegal use of firearms."  2021 N.Y. Sess. Law ch.237, §1 (S. 7196) (McKinney).  The Governor likewise explained that §898 would "right the wrong done" by the PLCAA by effectively "reinstat[ing]" lawsuits attempting to hold "gun manufacturers" liable for the criminal misuse of their products.  Cuomo, *supra*, at 35:00-38:15.  And §898 does just that, subjecting a gun industry member to liability for harm caused by criminal misuse of its products if (1) its "sale, manufacturing, importing[,] or marketing" "create[s], maintain[s] or contribute[s] to a condition … that endangers the safety or health of the public," or (2) it fails to employ "reasonable controls and procedures" to keep firearms out of the hands of third parties who misuse them.  N.Y. Gen. Bus. Law §§898-a(2), -b.  Indeed, the very first lawsuit brought under §898 seeks to hold a manufacturer liable for a third party's criminal

23

misuse of a handgun that it manufactured. *See Steur v. Glock*, No. 1:22-cv-3192 (E.D.N.Y. filed May 31, 2022). Section 898 suits are "qualified civil liability actions" under the PLCAA.

2. The only question, then, is whether suits under §898 fall within one of the PLCAA's exceptions. The answer is no. The state has never even tried to argue that §898 suits fall within five of those six exceptions; it has invoked only the predicate exception, which exempts "an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought." 15 U.S.C. §7903(5)(A)(iii). But as this Court has already recognized—as have other courts to consider the question—the predicate exception cannot sensibly be read to exempt from the PLCAA's reach any and all statutes that apply to the firearms industry, as such a capacious reading "would allow the predicate exception to swallow the statute, which was intended to shield the firearms industry from vicarious liability for harm caused by firearms that were lawfully distributed into primary markets." *City of N.Y.*, 524 F.3d at 403. Simply put, the predicate exception cannot be read to exempt the very lawsuits that the PLCAA was enacted to foreclose.

The exception instead exempts only actions under statutes that impose concrete obligations or prohibitions directly on industry members (and that could be

24

tested for consistency with the Second Amendment), not statutes that (like §898) impose only duties of care vis-à-vis the misconduct of third parties. That conclusion follows directly from text, structure, context, and common sense. Starting with the statutory text, this Court has already held that the term "applicable" in §7903(5)(A)(iii) cannot be given its most capacious dictionary reading, but rather must be read "in the context of the surrounding language and of the statute as a whole." *Id.* at 400. And both the immediately surrounding text and the language that immediately follows provide clear indications that the predicate exception applies only to laws that impose concrete obligations and prohibitions directly on manufacturers and sellers with respect to manufacturing and sales.

For one thing, the predicate exception by its terms exempts only civil actions that require proof that the defendant "*knowingly* violated" the relevant statute. 15 U.S.C. §7903(5)(A)(iii) (emphasis added). That presumes some requirement or obligation sufficiently concrete that a gun industry member can actually knowingly violate it at the time of manufacture or sale. A manufacturer can knowingly comply (or not comply) with a command to manufacture in certain ways, and a seller can do the same with a command to conduct a background check, or to keep specified records, or to not sell a firearm to someone known to be prohibited from possessing one. But it is hard to fathom how a gun industry member who complies with the multitude of federal, state, and local laws that explicitly state what it may and may

25

not do would "know" that it nonetheless has failed to employ "reasonable controls and procedures," or has conducted its lawful business in a manner so "unreasonable under all the circumstances" that it can be said to have "create[d], maintain[ed] or contribute[d] to a condition in New York state that endangers the safety or health of the public." N.Y. Gen. Bus. Law §898-b.

The illustrative examples Congress supplied of "a State or Federal statute applicable to the sale or marketing of the product," 15 U.S.C. §7903(5)(A)(iii), likewise contemplate statutes that impose concrete and discrete obligations and prohibitions on manufacture and sales, not statutes that impose broad duties of care that could be alleged have been violated years after the manufacture or sale. "The general language … []providing that predicate statutes are those 'applicable to' the sale or marketing of firearms[] is followed by the more specific language referring to statutes imposing record-keeping requirements on the firearms industry, 15 U.S.C. §7903(5)(A)(iii)(I), and statutes prohibiting firearms suppliers from conspiring with or aiding and abetting others in selling firearms directly to prohibited purchasers, 15 U.S.C. §7903(5)(A)(iii)(II)." *City of N.Y.*, 524 F.3d at 402. "Thus," under basic principles of interpretation, the general "applicable to" language must be "construed to embrace only objects similar to those enumerated by" the two specific examples that follow. *Id.* (quoting *Wash. State Dep't of Soc. & Health Servs. v. Guardianship*

26

*Est. of Keffeler*, 537 U.S. 371, 384 (2003)).  And each of those examples requires a violation of a concrete obligation or prohibition.

The first requires a knowing violation of a recordkeeping requirement, *e.g.*, knowingly entering false information, knowingly failing to enter appropriate information required at the time of the sale, or aiding, abetting, or conspiring with someone to make a false statement material to the lawfulness of a sale.  15 U.S.C. §7903(5)(A)(iii)(I).  The second requires a knowing violation of the obligation not to knowingly facilitate straw purchases, *e.g.*, by aiding, abetting, or conspiring to sell a firearm to someone the seller knows or has reasonable cause to believe is buying it for a prohibited person.  *Id.* §7903(5)(A)(iii)(II).  Those examples look nothing like §898, which effectively just commands gun industry members to conduct their operations "reasonably," without giving any guidance as to which controls and procedures are "reasonable" or what conduct is "unreasonable under all the circumstances," and which could cover circumstances that become evident only long after the manufacture or sale.  *See* N.Y. Gen. Bus. Law §898-b.

The PLCAA's expressly enumerated findings reinforce the conclusion that the predicate exception applies only to laws that impose concrete obligations or prohibitions, not duties of care.  As the statute explains, its chief aim is to foreclose efforts to hold those engaged in "the lawful design, manufacture, marketing, distribution, importation, or sale to the public of firearms or ammunition products"

27

"liable for the harm caused by those who criminally or unlawfully misuse firearm products or ammunition products that function as designed and intended." 15 U.S.C. §7901(a)(5). And as this Court explained in *City of New York*, the term "lawful" there is best understood in light of statutory context to mean "activities having been done in compliance with statutes like those described in" the immediately preceding finding—*i.e.*, "the Gun Control Act of 1968, the National Firearms Act, and the Arms [Export] Control Act." 524 F.3d at 402; *see* 15 U.S.C. §7901(a)(4). Those statutes do not impose amorphous commands to manufacture and sell firearms "reasonably." They are comprehensive regulatory regimes that impose concrete obligations and prohibitions with which industry members can confidently ensure compliance (or, conversely, can sensibly be said to violate *knowingly*) in real time.

Finally, reading the predicate exception to exempt statutes like §898 would effectively gut the PLCAA. This is not a case in which one must comb through obscure legislative history to divine "Congress' purposes and objectives." *Hillman v. Maretta*, 569 U.S. 483, 491 (2013). Congress enshrined them right there in the statute. The unambiguous objective of the PLCAA is to foreclose efforts to impose liability on those engaged in lawful commerce in firearms through novel and expansive "theories without foundation in hundreds of years of the common law and jurisprudence of the United States," 15 U.S.C. §7901(a)(7), like New York's then-pending effort to declare the lawful sale and manufacturing of firearms a public

28

nuisance, *see Sturm, Ruger*, 761 N.Y.S.2d at 194. The problem Congress had with the pre-PLCAA nuisance suits thus was not that they were common-law suits. It was that they would have held manufacturers and sellers liable for the criminal conduct of others under vague standards with no historical pedigree. Congress' aim in enacting the PLCAA was not to prompt states to codify those same vague standards in statute and "reinstate" the same unbounded liability. Instead, Congress wanted to prohibit such liability, while creating a narrow exception for clear requirements that could be complied with—or knowingly violated—in real-time, and also could be tested for their compliance with the Second Amendment. Yet New York has, by its own telling, empowered the state, cities, and private parties alike to bring exactly the kinds of suits that the PLCAA was enacted to foreclose. Any reading of the predicate exception that would allow states to sneak in through the back door the very claims that Congress tossed out the front would put the PLCAA at war with itself.

3. The district court reached a contrary conclusion only by employing an exceptionally wooden reading of both the predicate exception and this Court's decision in *City of New York*. The court did not deny that §898 purports to authorize exactly the types of "actions" that this Court read the predicate exception not to cover in *City of New York*. But according to the district court, that does not matter, as "the only question … is whether §898 expressly regulates firearms." A50. Thus, in the

29

district court's view, a lawsuit based on exactly the same theory of liability as the public nuisance suit this Court already found *could not* be sustained after the PLCAA somehow *can* be sustained if a state just declares its general public nuisance laws to apply to the firearms industry in particular. Nothing in *City of New York* compels that nonsensical result, and the PLCAA squarely forecloses it.

The goal of the PLCAA is not to draw some arbitrary distinction between actions that invoke statutes versus common-law or equitable actions. It is to protect members of the firearms industry from efforts to subject them to liability, "based on theories without foundation in hundreds of years of the common law and jurisprudence of the United States [that] do not represent a bona fide expansion of the common law," for the criminal acts of those who misuse their products. 15 U.S.C. §7901(a)(7). In other words, the point is to preempt the kinds of novel claims, grounded in radical deviations from traditional common-law principles, that were being brought against the firearms industry. To be sure, the kinds of theories those suits were invoking may "traditionally have been embodied in the common law" rather than codified in statutes. *Ileto*, 565 F.3d at 1135-36. But the threat did not come from the form of the lawsuit. The threat that Congress redressed came from targeting the firearms industry with novel liability theories designed to hold them liable for the criminal misconduct of third parties. And that threat does not turn on whether the claims are brought based on purported common-law principles (as they

30

were before the PLCAA), a generally applicable statute codifying the common law (as they were in *City of New York* and *Ileto*), or a statute that codifies a novel common-law theory exclusively as to the firearms industry (as they would be under §898). Indeed, if anything, a statute like §898 poses the most obvious threat because there is no pretense that the liability principles being applied are grounded in the common law or would apply to any other industry.

This Court certainly did not embrace such a topsy-turvy reading of the PLCAA in *City of New York*. To the contrary, the Court there *rejected* the argument that whether a statute falls within the predicate exception turns on whether it "*expressly* regulate[s] the firearms industry." 524 F.3d at 400. The Court instead "constru[ed] the term 'applicable to' to mean statutes that clearly can be said to *regulate* the firearms industry," *id.* at 402 (emphasis added), which it described as meaning "statutes like those described in subsection (a)(4)" of the PLCAA's findings—*i.e.*, "the Gun Control Act of 1968, the National Firearms Act, and the Arms Export Control Act," 15 U.S.C. §7901(a)(4). What makes those statutes different from a statute that simply codifies the common law is not that they single out firearms, but that they actually *regulate* firearms (and/or commerce in them) in concrete ways that the regulated community can understand and follow (or violate knowingly).

31

The district court likewise adopted a deeply flawed view of the PLCAA when determining whether its reading of the predicate exception conflicts with the "purpose and objective" of the statute. None of the provisions in 15 U.S.C. §7901(b), titled "Purposes," appears in the court's analysis of the objectives against which the statute must be interpreted, not even in passing. *See* A50-53. In place of Congress' explicit statement of its purposes in enacting the PLCAA as a whole, the court looked to *the predicate exception* to divine Congress' intent. A52. That gets matters backward. One cannot look to an exception to understand the objective of the statute as a whole. *See City of N.Y.*, 524 F.3d at 403. Such an approach would deem the purpose of the Grand Jury Clause to be denying servicemembers the protection of the Grand Jury, rather than securing that right for the rest of us. *See* U.S. Const. amend. V, cl. 1 ("No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger[.]"). That approach is even more misguided when, as here, Congress made its objectives express. Simply put, no valid interpretive principle allows courts to stretch exceptions so broadly as to make the general rule an afterthought—let alone to give exceptions primacy over statutorily enumerated "findings" and "purposes" elucidating the rule's primary operation.

Had the district court faithfully followed Congress' own statement of purpose, the inexorable conflict between the PLCAA's prime directive and §898 would have followed ineluctably. Indeed, that conclusion would have followed all the same had the district court simply faithfully followed precedent. This Court has made clear that the PLCAA is "intended to shield the firearms industry from vicarious liability for harm caused by firearms that were lawfully distributed into primary markets." *City of N.Y.*, 524 F.3d at 403. *That* is the PLCAA's "overriding" purpose, which must inform the scope of both its preemptive reach and its exceptions. *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 101 (2d Cir. 2013). And §898 unabashedly frustrates that purpose by design and in effect. That not only is an independent basis for preemption, *see Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987), but underscores that the predicate exception simply cannot be read so broadly as to exempt efforts to "reinstate" the very litigation that the PLCAA was enacted to inter.

## B. At a Minimum, §898 Is Preempted to the Extent it Authorizes Suits That Require Neither Knowing Violations Nor Proximate Cause.

Even assuming §898 qualified as "a State or Federal statute applicable to the sale or marketing of the product," that alone would not be enough to rescue §898 actions from the preemptive force of the PLCAA. The predicate exception exempts only "an action in which a manufacturer or seller of a qualified product *knowingly* violated a State or Federal statute applicable to the sale or marketing of the product,

33

*and the violation was a proximate cause of the harm for which relief is sought*."  15 U.S.C. §7903(5)(A)(iii) (emphases added).  Yet §898 authorizes actions that do not comply with either of the italicized requirements.

First, by its terms, §898 does not require a violation of either of its two categories of "prohibited activities" to be "knowing."  As to the first category—*i.e.*, "creat[ing], maintain[ing] or contribut[ing] to a condition in New York state that endangers the safety or health of the public through the sale, manufacturing, importing or marketing of a qualified product"—§898 explicitly permits liability for violating that command *either* "knowingly" *or* "recklessly."  N.Y. Gen. Bus. Law §898-b(1).  The statute expressly adopts New York's definitions of those two terms, *id.* §898-a(5), which make crystal clear that the latter does not require knowledge that conduct violates the law, *see* N.Y. Penal Law §15.05(2)-(3).  As for §898's second category of "[p]rohibited activities," that provision does not contain any *mens rea* at all; it just requires gun industry members to "establish and utilize reasonable controls and procedures to prevent its qualified products from being possessed, used, marketed or sold unlawfully in New York state."  N.Y. Gen. Bus. Law §898-b(2).  Industry members thus can be sued for mere failure to abide by that amorphous command, without regard to whether they knew their "controls and procedures" to be "unreasonable."  And lest there be any doubt about what role intent has to play in such suits, the statute makes clear that the answer is none:  "The

34

existence of a public nuisance shall not depend on whether the gun industry member acted for the purpose of causing harm." *Id.* §898-c(2).

Those are no minor deviations. The predicate exception makes a defendant's state of mind an essential element of the underlying substantive claim for a reason. While the PLCAA is unquestionably designed to protect the firearms industry from *some* types of lawsuits, Congress did not want to give industry participants blanket immunity to violate the law or to preempt all state efforts to regulate them. But Congress did very much want to ensure that those engaged in "the lawful design, manufacture, marketing, distribution, importation, or sale to the public of firearms or ammunition products" could not be held "liable for the harm caused by those who criminally or unlawfully misuse firearm products or ammunition products that function as designed and intended." 15 U.S.C. §7901(a)(5). And one of the central features of the lawsuits that led to the PLCAA was that they sought to impose liability for the criminal acts of third parties based on generic theories of "reckless" or "unreasonable" practices, even if the manufacturer or seller fully complied with all applicable laws. *See City of N.Y.*, 524 F.3d at 399, 403. By exempting only those state laws that impose liability only if a manufacturer or seller "knowingly" violates them, Congress ensured that the predicate exception would not enable states to evade the PLCAA's core command by sneaking the same sweeping "recklessness" or

35

"unreasonableness" theories into their statutes. That is exactly what New York has tried to accomplish through §898.

Making matters worse, §898 does not appear to require proximate causation. The predicate exception requires the conduct that violates the underlying statute to be "a proximate cause of the harm" for which redress is sought. 15 U.S.C. §7903(5)(A)(iii). Courts "ordinarily presume that 'Congress intends to incorporate the well-settled meaning of the common-law terms it uses,'" *Jam v. Int'l Fin. Corp.*, 139 S.Ct. 759, 769-70 (2019), and "proximate cause" is a familiar common-law term. "The term 'proximate cause' is shorthand for a concept: Injuries have countless causes, and not all should give rise to legal liability." *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 692 (2011) (emphasis omitted) (citing W. Page Keeton et al., *Prosser and Keeton on Law of Torts* §42, p.273 (5th ed. 1984)). To distinguish proximate cause from cause-in-fact, courts have set down several guidelines: "[F]oreseeability alone is not sufficient to establish proximate cause," *Bank of Am. Corp. v. City of Miami*, 137 S.Ct. 1296, 1305 (2017), and there must be a "direct relation between the injury asserted and the injurious conduct alleged," *Holmes v. Secs. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992). A proper "[p]roximate-cause analysis" therefore entails asking "whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014).

36

Section 898 does not appear to require any such inquiry. To the contrary, the whole point of the statute is to enable lawsuits based on the criminal misuse of (or even mere illegal possession of) firearms by third parties, even if the defendant did no business with the criminal, has no relation to the criminal, and had no control, either factually or legally, over the criminal or the gun. For example, say a licensed manufacturer sells a legal gun to a distributor who lawfully sells it to a retailer, who lawfully sells it to a law-abiding consumer after conducting a background check and complying with all other federal and state law requirements, yet the retailer does not, in New York's estimation, have adequate inventory controls. *See* N.Y. Gen. Bus. Law §898-a(2)(a). If, years later, the gun is stolen from the lawful purchaser's home and illegally brought into and used in New York, the goal of §898 is to allow the manufacturer, distributor, and retailer to all be sued. To that end, §898 allows "[a]ny person … that has been damaged *as a result of* a gun industry member's acts or omissions in violation of this article … to bring an action for recovery of damages." N.Y. Gen. Bus. Law §898-e (emphasis added). The phrase "as a result of" is a classic descriptor of "a but-for causal relationship," not proximate cause. *Burrage v. United States*, 571 U.S. 204, 213-14 (2014).

Indeed, it is hard to see how §898 could *not* be intended to do away with proximate cause given the history of the state's efforts to treat the lawful sale and manufacture of handguns as a public nuisance. Before the PLCAA was enacted,

New York sued "handgun manufacturers, wholesalers and retailers," claiming that these gun industry members had "created, contributed to, and maintained a public nuisance by their respective manufacturing, distributing and marketing practices." *Sturm, Ruger*, 761 N.Y.S.2d at 194. The state's theory was that "illegally possessed handguns are a common-law public nuisance," and that "because [the defendants] manufacture, distribute and market handguns allegedly in a manner that knowingly places a disproportionate number of handguns in the possession of people who use them unlawfully," they "contributed to this public nuisance." *Id.* The New York courts rejected that theory because it "summarily ignore[d] … proximate cause and the significance of the indisputable intervention of unlawful and frequently violent acts of criminals—over whom defendants have absolutely no control—who actually, directly, and most often intentionally, cause the cited harm." *Id.* at 198-99. Section 898 thus *must* be intended to do away with proximate cause, as New York courts have already concluded that the kinds of public nuisance suits §898 was enacted to enable—*i.e.*, suits seeking to impose "a 'duty to control the conduct of third persons so as to prevent them from harming others,'" *id.* at 196—would fail under proximate-cause principles. For that reason, too, §898 is preempted.

II.     **Section 898 Violates The Commerce Clause.**

    A.     **Section 898 Discriminates Against Interstate Commerce.**

The Constitution vests in Congress the "Power" to "regulate Commerce … among the several States."  U.S. Const. art. I, §8, cl. 3.  "Although the [Commerce] Clause is framed as a positive grant of power to Congress," the Supreme Court has "long held that this Clause also prohibits state laws that unduly restrict interstate commerce."  *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S.Ct. 2449, 2459 (2019).  Applying that principle, the Court has consistently "struck down [state] statute[s]" that "discriminate[] against interstate commerce."  *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986).  Indeed, "[s]tate laws discriminating against interstate commerce on their face are 'virtually per se invalid.'"  *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 575 (1997).  That is precisely what §898 does.  By its terms, the statute imposes its new burdens *only* on interstate, not wholly intrastate, commerce.

Section 898's operative provisions make it unlawful for gun industry members (1) to "contribute to a condition in New York state that endangers the safety or health of the public through the sale, manufacturing, importing or marketing *of a qualified product*" and (2) to fail to "utilize reasonable controls and procedures to prevent [their] *qualified products* from being possessed, used, marketed or sold unlawfully in New York state."  N.Y. Gen. Bus. Law §898-b (emphases added).  The statute

operates, in other words, only on commerce that involves "qualified products." The state legislature was so fixated on countermanding the PLCAA that it adopted the PLCAA's own definition of that term, defining "'[q]ualified product' [to] have the same meaning as … in 15 U.S.C. section 7903(4)." *Id.* §898-a(6). But because the PLCAA is a federal statute, and Congress has only limited power to regulate wholly *intra*state commerce, *see, e.g.*, *Lopez v. United States*, 514 U.S. 549 (1995), the PLCAA applies only to products that have moved in interstate commerce: Under §7903(4), the term "qualified product" means "a firearm, … ammunition …, or a component part [thereof] *that has been shipped or transported in interstate or foreign commerce*." 15 U.S.C. §7903(4) (emphasis added).[2]

By it terms, then, §898 imposes obligations *only* when gun industry members engage in commerce involving firearms products that have traveled in interstate commerce. Section 898 thus effectively carves out all commerce involving products made and sold entirely in New York while imposing severe burdens on commerce

---

[2] That limitation is why this Court rejected a Commerce Clause challenge to the PLCAA in *City of New York*. As the Court explained, "the PLCAA only reaches suits that 'have an explicit connection with or effect on interstate commerce,'" 524 F.3d at 394 (quoting *Lopez*, 514 U.S. at 562), in large part because its provisions "apply to actions 'brought … against a manufacturer or seller of a qualified product' for relief from injuries 'resulting from the criminal or unlawful misuse of a qualified product,' 15 U.S.C. §7903(5)(A)[,] where 'qualified product means a firearm … or a component part of a firearm or ammunition, *that has been shipped or transported in interstate or foreign commerce*," §7903(4)," *id.* (ellipses in original).

40

involving products that were made in or shipped from another state. That is a textbook Commerce Clause violation. *See, e.g.*, *Chem. Waste Mgmt., Inc. v. Hunt*, 504 U.S. 334, 342 (1992) (holding that a state may not burden a transaction more heavily "when it crosses state lines than when it occurs entirely within the State"). While a limitation to interstate commerce may be necessary for a *federal* enactment, it is verboten for a *state* law, as states lack to the power to single out interstate commerce for special burdens. "Whatever New [York]'s ultimate purpose, it may not be accomplished by discriminating against articles of commerce coming from outside the State unless there is some reason, apart from their origin, to treat them differently." *City of Philadelphia v. New Jersey*, 437 U.S. 617, 626-27 (1978). And New York has never even tried to offer any justification for its intrastate commerce carveout. Section 898 unconstitutionally discriminates against interstate commerce.

The district court did not deny that §898 means what it says, or that what it says is facially discriminatory. Instead, the court concluded that the statute's facial discrimination somehow escapes invalidation because the court could not identify any purely intrastate market to favor, since it assumed that most firearms and ammunition have moved in interstate commerce at some point. *See* A56 ("Because there is no in-state competitor, the state of New York cannot discriminate against out-of-state commerce and in favor of in-state commerce."). That is a non-sequitur. When, as here, a state law facially discriminates against interstate commerce by

41

imposing burdens on regulated entities *unless their commerce takes place wholly in-state*, the state necessarily incentivizes the creation of an intrastate market. Whether such a market has materialized yet is beside the point; incentivizing in-state commerce at the expense of interstate commerce is one of the chief evils the Commerce Clause seeks to prevent. *See C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 390 (1994); *Chem. Waste Mgmt.*, 504 U.S. at 339-40.

*Town of Southold v. Town of East Hampton*, 477 F.3d 38 (2d Cir. 2007), cited at A53, in no ways supports the district court's contrary conclusion (and neither does any other case). In *Southold*, a town in the Hamptons banned all ferries from docking at its docks but allowed in-state excursion boats to operate out of them. *Id.* at 42. This Court held that the law was not discriminatory even though ferries operate in interstate commerce but excursion boats do not because the excursion-boat business is an entirely separate industry from the ferry business. *Id.* at 49. Put another way, treating different things differently is not discriminatory. But this case concerns an apples-to-apples comparison. The exact same conduct is either regulated or not based solely on whether it involves a product that has traveled in interstate commerce. That is textbook discrimination against interstate commerce.

In all events, even if it mattered, the district court's assumption that "there is no in-state competitor," A56, was manifestly inappropriate at this stage of the litigation. The court decided this case on a motion to dismiss. As the court

42

acknowledged, "Plaintiffs allege[d] that of the 131,952 federal firearms licensees in the country, 3,827 of them operate in the state of New York," A55 (citing Dkt.1 ¶58)—in other words, that there *is* commerce in firearms taking place in New York. Yet the district court simply assumed, without even purporting to identify any factual support for its (faulty) assumption, that every firearm in New York either was manufactured out of state or contains some "component part" that "originated out-of-state." If that is a question that really matters, then at a bare minimum it should be resolved on a complete record that actually helps answer it.

### B. Section 898 Unconstitutionally Regulates Transactions That Take Place Entirely in Other States and Are Lawful Where they Occur.

The shortcomings of the Articles of Confederation left the Framers with "special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States within their respective spheres." *Healy*, 491 U.S. at 335-36 (footnote omitted). Consistent with that concern, the Commerce Clause not only prohibits discrimination against interstate commerce, but also precludes states from regulating transactions that take place wholly outside their borders. A "statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority." *Id.* at 336.

That rule admits of no exceptions. Even a state law that says nothing about out-of-state commerce cannot stand if the law's "'practical effect' [is] regulating

commerce occurring wholly outside th[e] State's borders." *Id.* at 332. Indeed, such a statute "is invalid under the Commerce Clause" even if it facially "is addressed only to" in-state conduct, and "whether or not the regulated [out-of-state] commerce has effects within the State." *Id.* at 332, 336; *Brown-Forman*, 476 U.S. at 579.

Section 898 flatly violates that bedrock principle. Section 898 does not define "gun industry member" to require that the entity do business in New York. *See* N.Y. Gen. Bus. Law §898-a(4). And §898-b(1) by its terms prohibits *any* "gun industry member," not just one that operates in New York, from "knowingly or recklessly creat[ing], maintain[ing] or contribut[ing] to a condition in New York state that endangers the safety or health of the public through the sale, manufacturing, importing or marketing of a qualified product." *Id.* §898-b(1). A manufacturer that does not engage in *any* commerce in New York therefore still could be held liable under §898 for manufacturing, selling, or marketing its products *in other states* in ways that meet with New York's disapproval. Imposing state-law liability (and damages and other relief) on out-of-state actors for actions taken entirely out of state is the definition of unconstitutional extraterritorial state regulation.

That is not §898's only extraterritoriality problem. While §898-b(2) at least applies only to "gun industry members who manufacture, market, import or offer for wholesale or retail sale any qualified product *in New York state*," its command that such members employ "reasonable controls and procedures" is *not* limited to their

44

commercial activities in New York. *Id.* §898-b(2) (emphasis added). Thus, if a gun industry member who sells firearms in New York also sells them in Ohio, and it sells a firearm in Ohio that later finds its way into the hands of someone who criminally misuses it in New York, then §898 would appear to allow that seller to be sued *for the Ohio sale* on the theory that it failed to use *in Ohio* what *New York* deems to be "reasonable controls and procedures." Making matters worse, §898 authorizes state courts in New York to enjoin practices that violate its commands *even if those practices took place entirely out of state. See id.* §898-d.

Those are no mere hypotheticals. Section 898 has already been invoked to try to hold an out-of-state manufacturer liable for the criminal misuse of one of its firearms even though there is no allegation that the manufacturer manufactured, marketed, sold, or imported the firearm in New York. *See Steur v. Glock*, No. 1:22-cv-3192 (E.D.N.Y. filed May 31, 2022). The only evident connection that lawsuit appears to have to New York is that New York is where a criminal illegally used the firearm to perpetrate his crimes on a subway train. But, of course, §898 does not regulate criminal misuse of a firearm. While criminal misuse (including illegal possession) in New York may be a condition precedent to a lawsuit under §898, the statute imposes liability only on gun industry members for their lawful commerce.

Nor is the extraterritorial reach of §898 an accident. To the contrary, the legislative findings accompanying §898 explicitly justify the statute on the basis that

45

"74% of firearms used in crimes in New York are purchased outside of New York," hence making clear the legislature's express desire to regulate the "unreasonable sale, manufacture, distribution, importing or marketing of firearms" *outside of New York*. 2021 N.Y. Sess. Law ch.237, §1. There is thus no denying that §898 regulates commerce that takes place in other states, in plain violation of the constitutional prohibition on extraterritorial state regulation.

The district court did not dispute that §898 has "the practical effect of requiring out-of-state commerce to be conducted at the regulating state's direction." *SPGGC, LLC v. Blumenthal*, 505 F.3d 183, 193 (2d Cir. 2007). Instead, the court insisted that it does not matter that §898 directly regulates out-of-state commerce. The court first posited that "compliance with regulations regarding the safe manufacturing, marketing, or selling of a product ... is wholly outside the concerns of the extraterritoriality-dormant Commerce Clause doctrine." A58. That could not be more wrong. The state law in the very first of the Supreme Court's extraterritoriality cases, *Baldwin v. G. A. F. Seelig, Inc.*, 294 U.S. 511 (1935), was all about product safety. *Baldwin* invalidated the New York Milk Control Act under the Commerce Clause even though "the end to be served by the" act was "the maintenance of a regular and adequate supply of pure and wholesome milk," *id.* at 522-23, because the law directly regulated transactions in other states, *id.* at 521. Numerous cases in the intervening decades have followed suit. *See, e.g.*, *Daniels*

*Sharpsmart, Inc. v. Smith*, 889 F.3d 608, 612-16 (9th Cir. 2018) (enjoining California law that purported to "dictate the method by which" medical-waste companies treat medical waste "outside of California" because it "reach[ed] beyond the borders of California [to] control transactions that occur wholly outside of the State"); *Legato Vapors, LLC v. Cook*, 847 F.3d 825 (7th Cir. 2017) (invalidating Indiana law that imposed requirements on manufacturing of vapor liquids used in e-cigarettes sold in Indiana because it regulated manufacturing that took place out of state).

The district court brushed aside these and other similar cases on the theory that "Section 898 in no way differs from the extraterritorial effect of the myriad of safety state laws and regulations with which every industry must comply." A59. That claim elides the critical distinction between a law that indirectly *impacts* out-of-state commerce and a law that directly *regulates* it. Laws that regulate conduct occurring in one state of course will often have upstream or downstream impacts in another, at least when it comes to companies that conduct activities in multiple states. But the mine-run state law impacts out-of-state commerce only by virtue of how it regulates *in-state* commerce. Section 898, by contrast, regulates the out-of-state commerce itself. If a Missouri gun manufacturer is deemed to have failed to institute sufficient theft-protection processes *in Missouri* to prevent criminals from obtaining its products and using them in New York, then the manufacturer can be held be liable under §898 based entirely on its commercial activities *in Missouri*.

47

To be sure, a suit cannot be brought under §898 unless some harmful condition exists or harmful conduct occurs in New York.  But as the Supreme Court made clear in *Brown-Forman*, "[t]he mere fact that the effects of" a state's law "are triggered only by" something that ultimately happens "within" the state "does not validate the law if it regulates … out-of-state transactions."  476 U.S. at 580.  Indeed, it does not even matter if (unlike here) a state limits its law to transactions in goods that are ultimately destined to be sold in state.  The statute at issue in *Baldwin*, for instance, "applied only to milk that would eventually be sold to New York consumers." *Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am., Inc.*, 492 F.3d 484, 491 (4th Cir. 2007) (discussing *Baldwin*); *see Baldwin*, 294 U.S. at 518-20.  Yet the Court still held it unconstitutional because, under the Commerce Clause, "New York has no power to project its legislation into [other states] by regulating [commerce] there."  *Baldwin*, 294 U.S. at 521.  New York's effort to impose liability on out-of-state transactions that do not comply with §898 makes all the difference—and it makes §898 patently unconstitutional under the extraterritoriality doctrine.

The district court alternatively claimed that this Court has limited the extraterritoriality doctrine to state laws regulating the price of goods sold out of state.  A58-59.  In fact, this Court has squarely applied the doctrine to invalidate laws having nothing to do with pricing.  In *American Booksellers Foundation v. Dean*, 342 F.3d 96 (2d Cir. 2003), for instance, the Court invalidated a Vermont law that

48

prohibited distribution of explicit materials to minors because it regulated what people could distribute in other states, and thus "[i]n practical effect … 'projected [Vermont law] into other States, and *directly regulated* commerce therein,' in violation of the dormant Commerce Clause." *Id.* at 104 (quoting *Brown-Forman*, 476 U.S. at 584). That Vermont law manifestly did not regulate pricing, yet this Court still struck it down under the Commerce Clause extraterritoriality principle. And *American Booksellers* is no outlier. *See, e.g.*, *Am. Civil Liberties Union v. Johnson*, 194 F.3d 1149, 1161 (10th Cir. 1999) (invalidating similar New Mexico law on the same grounds). The extraterritoriality doctrine thus plainly prohibits states from regulating out-of-state *commerce*, not just out-of-state *pricing*. And by attempting to subject wholly out-of-state conduct to state-law liability based solely on its purported effects in New York, §898 runs afoul of that command.

### C.    Section 898 Unduly Burdens Interstate Commerce.

Even apart from its explicit discrimination against interstate commerce and its impermissible extraterritorial application, §898 cannot survive *Pike* balancing. A state law that does not clearly discriminate against interstate commerce can still violate the Commerce Clause if the burdens it imposes on interstate commerce clearly exceed the putative local gains. *See Pike*, 397 U.S. at 142. Section 898 flunks that test by any measure. By design, the burdens §898 imposes fall disproportionately—indeed, by the district court's estimation, entirely—on interstate

(and mostly out-of-state) commerce. And Congress' own findings in the PLCAA eliminate any doubt that any putative benefits to New York could outweigh the costs it would inflict on the rest of the nation to green-light novel lawsuits that "erode[] public confidence in our Nation's laws, threaten[] the diminution of a basic constitutional right and civil liberty, invite[] the disassembly and destabilization of other industries and economic sectors lawfully competing in the free enterprise system of the United States, and constitute[] an unreasonable burden on interstate and foreign commerce of the United States." 15 U.S.C. §7901(a)(6). At a bare minimum, the fact-intensive inquiry that the *Pike* test entails makes the district court's "pleadings-stage dismissal of" this claim "premature." *NextEra Energy Cap. Holdings, Inc. v. Lake*, 48 F.4th 306, 327 (5th Cir. 2022); *see also, e.g.*, *Town of Southold*, 477 F.3d at 52.

*     *     *

The flaws in the district court's Commerce Clause analysis are not just doctrinal missteps; they threaten the entire edifice of our federal constitutional system. If the absence of an in-state market empowers a state to regulate interstate markets, and the extraterritoriality doctrine has nothing to say about such efforts even when they are expressly designed to reach wholly out-of-state conduct, then states have carte blanche to impose their regulatory preferences on other states. A state that lacks coal mines could freely craft tort laws that regulate coal mining in

West Virginia, or a state that has no abortion clinics could target clinics in other states.  That would be chaos, and it would bring about the very Balkanization the Commerce Clause exists to prevent.  *See Tenn. Wine*, 139 S.Ct. at 2461; *Camps Newfound*, 520 U.S. at 577.  None of that makes sense, least of all in a context where Congress has explicitly found that the very kind of regulation a state seeks to project into its sister states "constitutes an unreasonable burden on interstate and foreign commerce of the United States."  15 U.S.C. §7901(a)(6).

## III. Section 898 Violates The Due Process Clause.

Section 898 violates due process in two related respects.  First, it is void for vagueness, as it fails to "give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  A gun industry member can be held to violate §898 merely for, among other things, "recklessly … contribut[ing] to a condition in New York state that endangers the safety or health of the public."  N.Y. Gen. Bus. Law §898-b(1).  Such conditions ostensibly include crimes involving firearms.  But how does a gun industry member "contribute" to such a crime "through the sale, manufacturing, importing or marketing of [one of its] product[s]"?  The statute provides no direction on what a gun industry member is supposed to do to avoid the risk of being saddled with such liability.  The statute also requires a gun industry member to "establish and utilize reasonable controls and procedures to prevent its qualified products from being possessed, used, marketed

51

or sold unlawfully in New York," *id.* §898-b(1), yet it gives no guidance whatsoever as to what controls are or are not reasonable, thus once again leaving industry members to guess at what will be deemed sufficient to avoid being saddled with liability for the independent decisions of criminals to misuse their products. All of that leaves the distinct impression that the only truly viable option to avoid liability under §898 is to get out of the industry altogether. That is the definition of a vague law.

The district court rejected plaintiffs' vagueness claim on the theory that §898 is no different in substance from New York's longstanding "general public nuisance law." A64. That, of course, begs the question how the PLCAA could preempt the latter but not the former. It also completely ignores §898-b(2) and its "reasonable controls and procedures" language, which has no historical pedigree whatsoever. But setting all of that aside, as Congress explained in the PLCAA, the whole problem with trying to employ public nuisance doctrine (or any other common-law doctrine, even if codified) to hold the firearms industry liable for the criminal misuse of their products is that such efforts are "based on theories without foundation in hundreds of years of the common law and jurisprudence of the United States and do not represent a bona fide expansion of the common law." 15 U.S.C. §7901(a)(7).

Indeed, the New York courts themselves have already recognized that "gun manufacturers" generally "do *not* owe a 'duty to control the conduct of third persons

so as to prevent them from harming others'" under New York's public nuisance law. *Sturm, Ruger*, 761 N.Y.S.2d at 196 (emphasis added) (quoting *Hamilton*, 750 N.E.2d at 1061). And the First Department expressly rejected New York's prior efforts "to widen the range of common-law public nuisance claims in order to reach the legal handgun industry." *Id.* at 196, 198; *see also Hamilton*, 750 N.E.2d at 1060-61 (refusing to extend a duty to gun industry members, in suit by private parties on a negligent marketing theory, because it would result in "limitless liability to an indeterminate class of persons"). Yet the whole point of §898 is to impose liability in just such cases. Section 898 thus cannot plausibly be understood as merely codifying some known and knowable body of law.

Making matters worse, §898 is textually different—and, as a result, broader and less clear—than preexisting New York public nuisance law. Section 898 imposes liability merely for "*contribut*[*ing*] to a condition in New York state that endangers the safety or health of the public." N.Y. Gen. Bus. Law §898-b(1) (emphasis added). Neither New York common law nor Penal Law §240.45 stretches that far, and there is no settled common-law understanding of what it means to "contribute" to remote, far-downstream conditions created by third parties over which a defendant has no legal or factual control. That is unsurprising, as the common law has never permitted the imposition of such freewheeling liability.

53

That points to the second due process problem with §898. As the *Sturm, Ruger* and *Hamilton* courts discussed at length, attempts to use negligence law to reach gun industry members stretch traditional notions of proximate cause well past the breaking point and violate basic notions of fairness. *See Sturm, Ruger*, 761 N.Y.S.2d at 198-99; *Hamilton*, 750 N.E.2d at 1061-62. It has long been established that "a presumption that is arbitrary, or that operates to deny a fair opportunity to repel it, violates the due process clause." *W. & Atl. R.R. v. Henderson*, 279 U.S. 639, 642 (1929). And the Supreme Court has recognized that eliminating proximate cause "would produce extreme results" that would be fundamentally unfair. *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 838 (1996). "Somewhere a point will be reached when courts will agree that the link has become too tenuous—that what is claimed to be consequence is only fortuity." *Id.* Section 898 enshrines in law the idea that courts ought to reach that point and cross it. The statute is designed to assign blame where "the connection between defendants, the criminal wrongdoers and plaintiffs is remote, running through several links in a chain consisting of at least the manufacturer, the federally licensed distributor or wholesaler, and the first retailer [and] … often … numerous subsequent legal purchasers or even a thief." *Hamilton*, 96 N.Y.2d at 234. None of that comports with due process or basic notions of fair play.

\*     \*     \*

54

Ultimately, it is little surprise that §898 suffers from so many fatal defects. That is what happens when a state unabashedly sets out to reinstate litigation that Congress has declared "an abuse of the legal system" that "erodes public confidence in our Nation's laws, threatens the diminution of a basic constitutional right and civil liberty, invites the disassembly and destabilization of other industries and economic sectors lawfully competing in the free enterprise system of the United States, and constitutes an unreasonable burden on interstate and foreign commerce of the United States." 15 U.S.C. §7901(a)(6). New York is certainly free to disagree with Congress' judgment. But it is not free to override it. By endeavoring to do so, §898 runs afoul of the Constitution several times over. The district court's contrary conclusion should be reversed.[3]

---

[3] The district court denied plaintiffs' motion for a preliminary injunction as moot. A67. If the Court resolves this appeal in a way that renders the propriety of preliminary injunctive relief relevant, it should remand with instructions that plaintiffs are free to pursue such relief once again.

## CONCLUSION

For the reasons set forth above, this Court should reverse.

Respectfully submitted,

s/Erin E. Murphy
PAUL D. CLEMENT
ERIN E. MURPHY
 *Counsel of Record*
MATTHEW D. ROWEN[*]
TREVOR W. EZELL[*]
NICHOLAS M. GALLAGHER[*]
CLEMENT & MURPHY, PLLC
706 Duke Steet
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Supervised by principals of the firm who are members of the Virginia bar

*Counsel for Plaintiffs-Appellants*

October 7, 2022

**CERTIFICATE OF COMPLIANCE
WITH TYPE-VOLUME LIMITATION**

I hereby certify that:

1. This brief complies with the type-volume limitation of Local Rule 32.1(a)(4)(A) because it contains 13,594 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), as determined by the word counting feature of Microsoft Word 2016.

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

October 7, 2022

s/Erin E. Murphy
Erin E. Murphy

**CERTIFICATE OF SERVICE**

I hereby certify that, on October 7, 2022, an electronic copy of the foregoing was filed with the Clerk of Court using the ECF system and thereby served upon all counsel appearing in this case.


<u>s/Erin E, Murphy</u>
Erin E. Murphy