# No. 22-1374

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

NATIONAL SHOOTING SPORTS FOUNDATION, INC., BERETTA U.S.A.
CORP., DAVIDSON'S, INC., GLOCK INC., CENTRAL TEXAS GUN WORKS,
HORNADY MANUFACTURING COMPANY, LIPSEY'S LLC, OSAGE COUNTY
GUNS LLC, RSR GROUP, INC., SHEDHORN SPORTS, INC.,
SIG SAUER, INC., SMITH & WESSON INC., SPORTS SOUTH LLC,
SPRAGUE'S SPORTS INC., STURM, RUGER & COMPANY, INC.,

*Plaintiffs-Appellants*,

v.

LETITIA JAMES, in her official capacity as
New York Attorney General,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF NEW YORK, NO. 21-CV-1348

**BRIEF OF AMICI CURIAE STATE OF MONTANA AND 19
OTHER STATES SUPPORTING PLAINTIFFS-APPELLANTS
AND REVERSAL**

AUSTIN KNUDSEN
*Attorney General of Montana*

DAVID M.S. DEWHIRST
*Solicitor General*

MONTANA DEPARTMENT OF JUSTICE
P.O. Box 201401
Helena, MT 59620-1401
(406)-444-2026
david.dewhirst@mt.gov
kathleen.smithgall@mt.gov

KATHLEEN L. SMITHGALL
*Assistant Solicitor General*

*Attorneys for Amicus Curiae State of Montana*

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................... i

TABLE OF AUTHORITIES ................................................................ ii

INTERESTS OF AMICI CURIAE ........................................................ 1

SUMMARY OF ARGUMENT ............................................................ 2

ARGUMENT ................................................................................... 3

I. The PLCAA's predicate exception doesn't swallow the preemptive
   rule. ........................................................................................ 3

   A. The PLCAA's purpose informs the preemption analysis. .............. 5

   B. The predicate exception has a limited application. ...................... 9

     1. The plain meaning of "applicable to" limits the predicate
        exception. ........................................................................... 9

     2. Canons of construction mandate a narrow reading of the
        predicate exception ........................................................... 13

     3. The district court's interpretation allows the predicate exception
        to swallow the rule ........................................................... 16

II. The Statute Violates the Dormant Commerce Clause ..................... 18

   A. New York's law controls commerce outside of New York ............. 21

   B. New York can't justify its law under strict scrutiny ..................... 23

CONCLUSION ................................................................................ 26

CERTIFICATE OF COMPLIANCE ....................................................... 29

i

# TABLE OF AUTHORITIES

## Cases

*Air Transport Ass'n of Am., Inc. v. Cuomo,*
520 F.3d 218 (2d Cir. 2008) ................................................................. 5

*American Booksellers Found. v. Dean,*
342 F.3d 96 (2d Cir. 2003) ................................................................. 21

*AT&T Mobility LLC v. Concepcion,*
563 U.S. 333 (2011) ................................................................. 17

*City of New York v. Beretta U.S.A. Corp.,*
524 F.3d 384 (2d Cir. 2008) ....................................................... *passim*

*Medtronic, Inc. v. Lohr,*
518 U.S. 470 (1996) ................................................................. 5

*Gulf Ins. Co. v. James,*
185 S.W.2d 966 (Tex. 1945) ................................................................. 14

*Healy v. The Beer Institute,*
491 U.S. 324 (1989) ................................................................. 21, 22

*Hunt v. Wash. State Apple Adver. Comm'n,*
432 U.S. 333 (1977) ................................................................. 23, 25

*Ileto v. Glock, Inc.,*
565 F.3d 1126 (9th Cir. 2009) ................................................................. 18

*Jones v. Rath Packing Co.,*
430 U.S. 519 (1977) ................................................................. 5

*Kassel v. Consol. Freightways Corp.*
*of Delaware,* 450 U.S. 662 (1981) ................................................................. 24, 25

*Maine v. Taylor,*
477 U.S. 131 (1986) ................................................................. 24

*Selevan v. New York Thruway Auth.,*
584 F.3d 82 (2d Cir. 2009) ................................................................. 20

*Springfield Hosp., Inc. v. Guzman*,
  28 F.4th 403 (2d Cir. 2022) ................................................................. 9

*Wyoming v. Oklahoma*,
  502 U.S. 437 (1992) .......................................................................... 24

## Statutory Authorities

15 U.S.C. § 7901 ............................................................................ 4, 5, 8
15 U.S.C. § 7902............................................................................... 4, 9
15 U.S.C. § 7903.......................................................................... 2, 4, 14
N.Y. Gen. Bus. Law §§ 898-a–e ................................................. 2, 12, 17

## Other Authorities

Allen Rostron, *Shooting Stories: The Creation of Narrative and Melo-
drama in Real and Fictional Litigation Against the Gun Industry*,
  73 UMKC L. Rev. 1047 (2005) ........................................................... 7

Andrew Jay McClurg, *The Tortious Marketing of Handguns: Strict
Liability Is Dead, Long Live Negligence*,
  19 Seton Hall Legis. J. 777 (1995) ..................................................... 6

Black's Law Dictionary (10th ed. 2014) ................................................ 11

iii

## INTERESTS OF AMICI CURIAE

Amici Curiae States of Montana, Alabama, Alaska, Arizona, Arkansas, Georgia, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Missouri, New Hampshire, Ohio, Oklahoma, South Carolina, Texas, Utah, West Virginia, and Wyoming (the "States"), represented by their respective Attorneys General, submit this brief in support of Petitioners.

The States are home to 54,536 federal firearms licensees.[1] The States have strong interests in preserving the Protection of Lawful Commerce in Arms Act ("PLCAA"), both to protect the lawful firearms industry within their borders and to protect the rights of their citizens to keep

---

[1] This constitutes 40% of all active firearms licenses. *See Report of Active Firearms Licenses – License Type by State Statistics*, Bureau of Alcohol, Tobacco, Firearms and Explosives (Feb. 10, 2022), https://www.atf.gov/file/163816/download.

and bear arms under the Second Amendment of the United States Constitution.

For these reasons, the States urge this Court to reverse the decision below.

## SUMMARY OF ARGUMENT

The PLCAA, Pub. L. No. 109-92, 119 Stat. 2095 (2005) (codified at 15 U.S.C. §§ 7901–7903), preempts tort lawsuits against gun manufacturers and distributors premised on the "criminal or unlawful misuse" of their products. *Id.* § 7903(5)(A). For years, anti-gun groups have challenged the PLCAA's constitutionality, and for years—without exception—federal courts across the Nation have uniformly declared it constitutional. So now anti-gun groups have trained upon a new strategy: pass laws to circumvent the PLCAA. New York passed one such law. N.Y. Gen. Bus. Law §§ 898-a–e purports to empower States and individuals alike to bring public nuisance lawsuits against gun industry members for contributing to a "condition in New York state that endangers the safety or health of the public through the sale, manufacturing, importing or marketing of a qualified product." N.Y. Gen. Bus. Law § 898-b(1). It

2

further requires these members to "establish and utilize reasonable controls and procedures" to prevent the misuse of firearms in New York.

Plaintiffs challenged the law, arguing, in part, that the law is preempted by the PLCAA and violates the Dormant Commerce Clause. The district court disagreed, dismissing Plaintiffs' claims and concluding that New York's statute falls within the predicate exception of the PLCAA and is a lawful exercise of New York's legislative power. But that decision was wrong. Permitting this type of lawsuit stands in conflict with the PLCAA's precise purpose, which Congress passed to limit this type of nuisance liability. More problematic still, New York can reach beyond its own boundaries and regulate the "controls and procedures" of gun industry members nationwide, including in the Amici States.

## ARGUMENT

### I. The PLCAA's predicate exception doesn't swallow the preemptive rule.

Congress passed the PLCAA to protect the firearms industry from liability stemming solely from the criminal volitional acts of others. In doing so it recognized that "imposing liability on an entire industry for harm that is solely caused by others is an abuse of the legal system [and]

3

threatens the diminution of a basic constitutional right …." 15 U.S.C. § 7901(a)(6).

But the PLCAA did not completely immunize gun sellers and manufacturers. Under its "predicate exception," the PLCAA allows States and municipalities to impose liability on the firearms industry for knowingly violating laws related to the sale or marketing of firearms (*i.e.*, for knowingly violating a "predicate statute). § 7902(a). Congress then provided two specific examples of "predicate" statutory violations: (1) knowing violations of firearm-sales record-keeping laws (*id.* at § 7903(5)(A)(iii)(I)), and (2) knowingly aiding in an illegal sale to a person the seller knows is not qualified to possess or receive a firearm (*id.* at § 7903(5)(A)(iii)(III)).

The district court determined that the predicate exception applies here because New York's statute expressly regulates firearms. But this holding eviscerates the PLCAA by finding that any time a State includes the magic word "firearm" in a statute, the statute falls within the predicate exception. In other words, the PLCAA can only ever preempt State common law causes of action. As soon as the State makes this common law cause of action statutory, the State successfully evades the PLCAA.

This statutory workaround does not comport with the purpose of the PLCAA, nor does it follow from the text of the predicate exception or canons of statutory construction.

### A. The PLCAA's purpose informs the preemption analysis.

The Supremacy Clause of the United States Constitution preempts State laws "that interfere with, or are contrary to federal law." *Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 220 (2d Cir. 2008) (internal quotations omitted). In express preemption cases, the "ultimate touchstone" is "the purpose of Congress." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 494 (1996). Congress' intent or purpose may be "explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977). Here, Congress' purpose in passing the PLCAA shows that it preempts New York's law despite the district court's finding that the statute "expressly regulates firearms." ECF 46, at 8.

When Congress passed the PLCAA, it made clear that it sought to "preserve a citizen's access to a supply of firearms and ammunition for all lawful purposes" by putting an end to these predatory tort suits. 15 U.S.C. § 7901(b)(2). Congress didn't mince words with its goals for the

5

PLCAA.  It found that that the firearms industry "should not, be liable for the harm caused by those who … misuse firearm products" and "prohibit[ed] causes of action … for the harm solely caused by the criminal or unlawful misuse of firearm products …."  *Id.* at (a)(5); *id.* at (b)(1).  It further noted that "[t]he possibility of imposing liability on an entire industry for harm that is solely caused by others is an abuse of the legal system, erodes public confidence in our Nation's laws, [and] threatens the diminution of a basic constitutional right and civil liberty …."  *Id.* at (a)(6).  Congress cautioned that holding the firearms industry liable would "expand civil liability in a manner never contemplated by the framers of the Constitution, by Congress, or by the legislatures of the several States."  *Id.* at (a)(7).  In short, Congress could not have been more explicit in its repudiation of State laws precisely like the one at issue in this case.

The political context in which the PLCAA arose provides further evidence of Congress' purpose.  In the 1980s, anti-gun plaintiffs attacked the firearms industry by bringing strict liability claims against it.  The courts rejected these lawsuits.  *See* Andrew Jay McClurg, *The Tortious Marketing of Handguns: Strict Liability Is Dead, Long Live Negligence*,

6

19 SETON HALL LEGIS. J. 777 (1995) ("Courts have rejected strict liability. Legislatures have rejected it. Influential commentators have rejected it."). Undeterred, innovative legal theorists pivoted to novel theories of negligence—attacking the design, marketing, and sale of firearms. *Id.* at 796–18.

In the late 1990s, more than 30 local governments joined the anti-gun advocates in a coordinated strategy to bankrupt the firearms industry. Allen Rostron, *Shooting Stories: The Creation of Narrative and Melodrama in Real and Fictional Litigation Against the Gun Industry*, 73 UMKC L. REV. 1047, 1054 (2005). For the most part, plaintiffs lost in court, but that doesn't mean that their lawsuits were unsuccessful. The lawsuits imposed massive litigation costs on the firearms industry, costing the industry upward of $1 million *per day* in legal fees. *See* Peter Boyer, *Big Guns*, NEW YORKER, May 19, 1999. The anti-gun lobby kept bringing the suits because they knew that "the costs alone of defending these suits [would] eat up the gun companies." Fox Butterfield, *Lawsuits Lead Gun Maker to File for Bankruptcy*, NEW YORK TIMES, Jun 24, 1999.

The suits did just that. One of the ten largest firearm manufacturers in the country declared bankruptcy in 1999. *Id.* Another company

7

couldn't secure financing because of the lawsuits and abandoned "its 144-year-old retail gun business in an effort to limit its liability." Mike Allen, *Colt's to Curtail Sale of Handguns*, NEW YORK TIMES, Oct. 11, 1999.

Amidst this abuse of the legal system, Congress stepped in, passing the PLCAA to protect the firearms industry from these abusive and manipulative lawsuits. But the challenged law here does exactly what Congress sought to avoid by passing the PLCAA in the first place. It imposes nuisance liability on businesses all across the country that make, sell, or advertise firearms or ammunition products that are later misused or illegally possessed in New York. In other words, it (1) imposes liability "for the harm caused by those who … misuse firearm products;" (2) permits "causes of action … for the harm solely caused by the criminal or unlawful misuse of firearm products;" and (3) "expand[s] civil liability" in a manner never contemplated by Congress or the Framers. *But see* 15 U.S.C. § 7901 (expressly prohibiting this type of liability). New York's statute fundamentally contravenes the PLCAA's purpose, and the PLCAA must, therefore, preempt laws like the one in New York.

### B. The predicate exception has a limited application.

Congress, importantly, withheld blanket civil immunity from the firearms industry. Relevant here, Congress limited immunity where a manufacturer or seller violates certain State laws applicable to the sale or marketing of the product. 15 U.S.C. § 7902(A)(iii). Congress provided two examples of the types of statutes it includes in this exception: "statutes regulating record-keeping and those prohibiting participation in direct illegal sales." *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 402 (2d Cir. 2008).

New York's law doesn't fit. It is not "applicable to the sale or marketing of a firearm" as understood by a plain reading of the statute. And the district court's conclusion runs counter to canons of construction and permits the exception to swallow the rule.

### 1. The plain meaning of "applicable to" limits the predicate exception.

Courts give statutory terms their plain, ordinary meaning, with a view to their place in the overall statutory scheme. *Springfield Hosp., Inc. v. Guzman*, 28 F.4th 403, 418 (2d Cir. 2022). Here, Congress only exempted actions predicated on a statute *applicable* to the sale or marketing of the firearm. Therefore, the plain meaning of "applicable" and

9

its modification of "statute" necessarily limit States' authority to impose potential liability on the firearms industry under the predicate exception. Congress' use of "applicable" is instructive.

"Applicable" is an adjective that invokes a close nexus between two nouns. Etymologically, the word comes from the old French word "aploiier," meaning "apply, use, or attach" and the Latin word "applicare," which means "attach to, join, or connect."[2] The English word "applicable" joined these two concepts into a single word—one that invokes both use and proximity. This original definition of the word largely holds today, albeit with some linguistic drift. Webster's Second International Dictionary, for example, endorsed the proximity view, defining "applicable" as "[c]apable of being applied; fit, suitable, or right to be applied; having relevance; as, this observation is *applicable* to the case under consideration." *Applicable*, WEBSTER'S SECOND NEW INTERNATIONAL DICTIONARY (1940). Webster's controversially took a descriptive, rather than prescriptive, approach in its Third International Dictionary, which allowed it to reflect changing definitions of words as society used them

---

[2] *Online Etymology Dictionary*, https://www.etymonline.com/word/applicable.

10

differently over time.[3] But even that dictionary largely retained the original meaning of "applicable" describing it as both "[c]apable of being applied: having relevance" and describing a condition of being "fit, suitable, or right to be applied." *Applicable*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1993). Black's Law dictionary likewise endorses the proximity requirement of "applicable." There, it defines the word's use in rules, laws, and regulations as "affecting or relating to a particular person, group, or situation; having *direct* relevance." *Applicable*, BLACK'S LAW DICTIONARY (10th ed. 2014) (emphasis added).[4]

---

[3] This change led to a public dispute between the late Justice Antonin Scalia and Merriam-Webster over the meaning of the word "modify." Justice Scalia criticized the dictionary company for including "incorrect" definitions that reflected common uses of words in Webster's Third. Justice Scalia not only wrote a majority opinion that denounced Webster's Third for its descriptive approach in a footnote, but also featured Webster's Second in his official portrait out of apparent spite to Webster's Third. *Antonin Scalia v. Merriam-Webster: The Time Scalia Took on the Dictionary*, MERRIAM-WEBSTER (last accessed Sept. 30, 2022), https://www.merriam-webster.com/words-at-play/antonin-scalia-v-merriam-webster. Suffice it to say, definitions that capture linguistic drift are unpopular among textualists.

[4] "Applicable" didn't appear in Black's until its Tenth addition in 2014. Although that addition appears after Congress passed the PLCAA in 2005, it is included here to note that the watering down of "applicable" to mean "anything *capable* of being applied" is not a universally adopted definition even today.

But the district court misses this analysis, holding instead "that § 898 expressly regulates firearms" and thus falls within the predicate exception. ECF 46, at 9. But it does not follow that every statute regulating *firearms* necessarily applies to the *sale* or *marketing* of the firearm. Instead, statutes applicable to sale or marketing must set limitations at the point of sale or marketing, thus meeting the causal nexus requirement that the word "applicable" invokes. That is not what § 898 does. Instead, it waits for a criminal, volitional act of a third party and—only then—will courts retroactively examine the reasonableness of the actions that a firearms seller took to prevent that bad act from occurring—no matter how far removed from the sale of that firearm.

This of course, does not regulate the sale or marketing of firearms, but instead creates uncertain liability for the firearms industry every time a gun ends up in New York. That's exactly what Congress passed the PLCAA to prevent.

A plain reading of the PLCAA's predicate exception, limited to "statutes applicable to the sale or marketing of a firearm," only allows States to directly regulate those sales and not their downstream, attenuated effects. Of course, this result makes complete sense, given the

12

backdrop under which Congress passed the PLCAA. While States sought to establish liability on the firearms industry for misuse of those guns—several layers removed from their actual sale—Congress foreclosed States from doing so, ceding to them only the authority to set laws *applicable* to the *sale* and *marketing* of those guns.

### 2. Canons of construction mandate a narrow reading of the predicate exception.

The *noscitur a sociis* and *ejusdem generis* canons demand a limited reading of the predicate exception. *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 195 (2012) ("When several … words … are associated in a context suggesting that the words have something in common, they should be assigned a permissible meaning that makes them similar."); *id.* at 199 ("Where general words follow an enumeration of two or more things, they apply only to persons or things of the same general kind or class specifically

13

mentioned.").[5]  The predicate exception first says that it is "applicable to the sale or marketing of [firearms]."  Even if this were a general phrase, covering a range of potential State laws, it is immediately followed by specific examples that limit its scope.  Those examples are statutes regulating recordkeeping and statutes prohibiting illegal purchases.  This Court previously concluded that the general phrase "is to be construed to embrace only objects similar to those enumerated" later.  *City of New York*, 524 F.3d at 402.  That is, the types of statutes covered by the predicate exception are those similar to statutes regulating recordkeeping and statutes prohibiting illegal purchases.

But the district court rejected the use of these canons, distinguishing *City of New York* by stating that this Court was "engaged in a narrow

---

[5] While *ejusdem generis* usually applies when a general term follows a specific one, some courts have still applied the doctrine when specific words follow general words.  *Compare id.* at 204 ("The vast majority of cases … follow the species–genus pattern.") *with Gulf Ins. Co. v. James*, 185 S.W.2d 966 (Tex. 1945) (When "specific words follow[] general ones, the doctrine is equally applicable …").  Importantly, this Court adopted the latter view for the predicate exception.  *City of New York*, 524 F.3d at 402 ("Thus, the general term—'applicable to'—is to be 'construed to embrace only objects similar to those enumerated by' sections 7903(5)(A)(iii)(I) and (II).").

question of statutory interpretation." ECF 46, at 8. The district court said there was no ambiguity in the predicate exception and that the sole question was whether the statute expressly regulates firearms. *Id.* This misapplies *City of New York*.

This Court in *City of New York* answered the question of ambiguity in the words "applicable to." 524 F.3d at 400–01. This Court clarified that the use of the words "applicable to" narrows the scope of the predicate exception, as explained more thoroughly above. *Id.*; *see also supra* Section I.B.1. Its statutory analysis applying the canons of construction, therefore, is critical to understanding how the predicate exception applies. The district court here seemed to conclude that because there was no ambiguity (because, of course, this Court resolved it in *City of New York*), the canons of construction are irrelevant to the present analysis. Wrong. *City of New York* confirms that the predicate exception applies narrowly and must only apply to certain statutes regulating the sale or marketing of firearms, like ones that regulate recordkeeping or prohibit illegal purchases.

After the district court rejected the arguments about statutory construction, the court then analyzed whether the challenged statute

15

"expressly regulates firearms." But analyzing this question in a vacuum misses the point of *City of New York*. Simply because the statute mentions the word "firearms" does not mean that it is applicable to the sale or marketing of firearms within the predicate exception. This is where the *ejusdem generis* canon of construction, which the district court rejected, applies. The question is not whether the statute uses the word "firearm"—that's simplistic in the extreme. The question, instead, is whether the statute in question—one codifying the common law tort of nuisance—is similar to a statute regulating recordkeeping or prohibiting illegal purchases. It is not. *See* ECF 2-1, at 6–7; ECF 43, at 5–6. Magic words neither save nor condemn statutes.

### 3. The district court's interpretation allows the predicate exception to swallow the rule.

As stated in *City of New York*, courts must avoid absurdity when analyzing the predicate exception. Statutory exceptions must "be construed narrowly in order to preserve the primary operation of the general rule." 524 F.3d at 403 (cleaned up). Under the district court's reading, the PLCAA's predicate exception destroys the very act itself. *Id.* ("Such a result would allow the predicate exception to swallow the statute");

16

*AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 343 (2011) (An "act cannot be held to destroy itself.").

As explained above, the purpose of the PLCAA was to prevent States from imposing liability on the firearms industry for the criminal acts of third parties. *See* I.A. This Circuit has affirmed that principle. *See City of New York*, 24 F.3d at 402–03 ("We think Congress clearly intended to protect from vicarious liability members of the firearms industry …."). It even went so far to observe that a broad reading of "applicable" "would allow the predicate exception to swallow the statute, which was intended to shield the firearms industry from vicarious liability for harm caused by firearms that were lawfully distributed into primary markets." *Id.* at 403. Such a result would be absurd, so the Court declined to give the word that meaning. *Id.*

Changing a single word in the text of New York's law does not change the absurd result that the State asks this Court to adopt. Instead, upholding § 898 would still read the predicate exception as creating a complete workout to the PLCAA's demands. The PLCAA's stated purpose—ending vicarious liability lawsuits against the gun industry—would be destroyed. Upholding § 898 would embolden anti-Second

17

Amendment States to pass similar statutes and wreak havoc on the lawful firearms industry in America. Such a result would fly in the face of Congress' "inten[tion] to preempt common-law claims, such as general tort theories of liability. *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1135 (9th Cir. 2009).

## II. The Statute Violates the Dormant Commerce Clause

Before constitutional ratification, the thirteen States freely imposed tariffs and trade restrictions on the goods and services of the other States. "The want of uniformity in the regulations of commerce was a source of perpetual strife and dissatisfaction, of inequality, and rivalries, and retaliations among the states." 2 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION § 1078 (1833). Doing so sometimes advanced a comparable commercial interest of the belligerent State, but not always. In fact, the history prior to ratification shows that the varied nature of the States' commercial interests created significant turmoil, which led to the federal commerce power.

During the constitutional convention, Pennsylvania delegate George Clymer observed that "[t]he diversity of commercial interests, of necessity creates difficulties, which ought not be increased by

18

unnecessary restrictions" in advocating for the power that became the Commerce Clause. 2 *The Records of the Federal Convention of 1787*, at 449 (Max Farrand ed., 1937). The difficulties largely took the form of excessive taxes or impost duties on goods that originated from outside a State's borders. Unchecked, this system created "bur[d]ens which might be imposed by some of the states, on others, whose exports, and imports must necessarily pass through them." St. George Tucker, *Blackstone's Commentaries: With Notes of Reference to the Constitution and Laws of the Federal Government of the United States and of the Commonwealth of Virginia* 248–54 (1803).

To fix this problem, the Framers lodged the power to regulate interstate commerce with the new federal government. *See* U.S. Const. art. I, § 8, cl. 3. "A very material object of this power was the relief of the States which import and export through other States, from the improper contributions levied on them by the latter." The Federalist No. 42, at 264 (James Madison) (Charles Kessler ed., 1961). Besides an affirmative grant of power to the federal government, the Commerce Clause "was intended as a negative and preventive provision against injustice among the States themselves …." *3 The Records of the Federal Convention of*

19

*1787*, at 478 (M. Farrand ed.1911) (reprinting letter from James Madison to J.C. Cabell, Feb. 13, 1829). This is known as the Dormant Commerce Clause.

A statute violates the Dormant Commerce Clause if it (1) "clearly discriminates against interstate commerce in favor of intrastate commerce"; (2) "imposes a burden on interstate commerce incommensurate with the local benefits secured"; or (3) "has the practical effect of extraterritorial control of commerce occurring entirely outside the boundaries of the state in question." *Selevan v. New York Thruway Auth.*, 584 F.3d 82, 90 (2d Cir. 2009). As Plaintiffs noted below, the New York law does all three. ECF 2-1, at 14.

The district court disagreed. The court determined that there is no in-state competitor, so New York's law cannot facially discriminate against out-of-state competition. ECF 46, at 13–15. And because there are no in-state competitors or commercial interests, it survives the *Pike* balancing test. *Id.* at 15–16. Of particular concern to the States, the court also determined that the statute does not directly, or as a practical matter, control commerce outside of New York. *Id.* at 16–18.

20

The Commerce Clause "reflect[s]" the Constitution's special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States within their respective spheres." *Healy v. Beer Inst.*, 491 U.S. 324, 335–36 (1989). New York's law clearly attempts to regulate and restrict commerce extraterritorially, so it violates the Commerce Clause.

### A. New York's law controls commerce outside of New York.

New York's law controls commerce outside of New York. *See Healy*, 491 U.S. at 336. The law imposes a requirement that gun industry members everywhere establish and utilize reasonable controls and procedures to prevent misuse of firearms in New York. Failure to do so subjects gun industry members to liability. The law, though, only applies to makers and sellers outside of New York. This regulation, therefore, applies "wholly outside of the State's borders," applying to every product that is from out of State and that has moved in State. *Id.* at 336. In addition, the practical effect forces out-of-state makers and sellers to comply with New York's law. *Id.*; *see also American Booksellers Found. v. Dean*, 342 F.3d 96 (2d Cir. 2003) (concluding that the Dormant Commerce Clause

21

"protects against inconsistent legislation arising from the project of one state regulatory regime into the jurisdiction of another State"). Finally, if other States adopted similar laws, the effect would be to force gun manufacturers and sellers to comply with the laws of the State with the strictest liability requirement. This is precisely the patchwork regulatory system that the Dormant Commerce Clause protects against. *Healy*, 491 U.S. at 336. Because New York's law has the practical effect of burdening interstate sales of firearms and component parts, it violates the Dormant Commerce Clause.

The New York law also has the practical effect of discriminating against gun industry members. First and foremost, the law raises the cost of doing business everywhere except New York. Every maker or seller of firearms must not only be knowledgeable about compliance requirements in its home State, but it also must ensure that it meets New York's standard for establishing and utilizing "reasonable controls and procedures." Failure to meet this standard results in liability. And it is this threat—the threat of increased liability—that raises the cost of doing business for the 97% of the federal firearms licensees in 49 other States. *See* ECF 2-1, at 16.

22

The law additionally discriminates against out-of-state gun industry members by effectively forcing these members to cease doing business entirely. Because the law *only* applies to products in interstate commerce, not intrastate commerce, only out-of-state merchants are subject to this increased liability. And these out-of-state merchants are in a position least able to control the actions of third parties misusing or illegally using firearms in New York. Thus, even if the out-of-state manufacturers and sellers adopt reasonable controls and procedures, they cannot guarantee compliance with the law as individuals could still illegally use or possess these firearms in New York. The only way to avoid liability, then, is for these manufacturers and sellers to halt all operations altogether. And that's of course the point. The New York law expressly and impliedly disadvantages out-of-state gun industry members.

### B. New York can't justify its law under strict scrutiny.

Because the law has the practical effect of controlling commerce and discriminates against gun industry members located in the 49 other States, the burden is on New York to justify the law "both in terms of the local benefits flowing from the statute and the unavailability of nondiscriminatory alternatives." *Hunt v. Wash. State Apple Advert. Comm'n*,

432 U.S. 333, 353 (1977); *see also Wyoming v. Oklahoma*, 502 U.S. 437, 456–57 (1992); *Maine v. Taylor*, 477 U.S. 131 (1986). Even if New York is not engaging in explicit economic protectionism, its law still runs afoul of the Commerce Clause's negative implications if it fails to survive this scrutiny. Put another way, "the incantation of a purpose to promote the public health or safety does not insulate a state law from Commerce Clause attack." *Kassel v. Consol. Freightways Corp.*, 450 U.S. 662, 670 (1981).

In *Maine v. Taylor*, 477 U.S. 131 (1986), for example, the Supreme Court considered Maine's ban on the importation of live bait fish into its State. The Supreme Court considered both the local purpose of the law and whether other nondiscriminatory means were available to serve this purpose. *Id.* at 140. Because the Supreme Court determined that no less restrictive means were available, the Court upheld the ban. By comparison, the Supreme Court applied a similar framework in *Wyoming v. Oklahoma*, but it enjoined an Oklahoma law requiring ten percent of electric utilities' coal purchases to be from Oklahoma coal sources. 502 U.S. at 457. The Supreme Court determined that because the law discriminated both on its face and in practical effect, Oklahoma had to justify its laws

24

under the standard set forth in *Hunt* and applied in *Taylor*. The Court determined that Oklahoma failed to provide a sufficient local purpose such that the law was necessary. *Id*. The Court, therefore, enjoined Oklahoma's law. *Id*.

Under the framework set forth in *Hunt*, the New York statute fails to survive constitutional muster. New York passed the law for the purpose of "protect[ing] its citizens from gun violence." Attorney General James' Statement on New Law That Allows NYS to Hold Gun Manufacturers Responsible for Gun Violence (July 6, 2021), *available at* https://ag.ny.gov/press-release/2021/attorney-general-james-statement-new-law-allows-nys-hold-gun-manufacturers. But this general concern for public health and safety does not save New York's far-reaching law. *See Kassel*, 450 U.S. at 670. New York must put forth affirmative evidence about the local benefits this law addresses—benefits beyond just sweeping policy preferences—as well as an explanation for why nothing short of regulating firearm commerce in all 49 other States will achieve this goal. New York has not met—and cannot meet—this burden.

25

CONCLUSION

The PLCAA is an important and valid exercise of Congress' Commerce Clause power that protects an enumerated constitutional right. It was created to prevent this precise type of power grab from the anti-gun lobby, and New York's law directly contradicts the PLCAA's core purpose. New York doesn't get to make policy for businesses operating in the Amici States any more than the Amici States get to make policy for businesses operating in New York. This Court must reverse.

DATED this 14th day of October, 2022.

AUSTIN KNUDSEN
Montana Attorney General

DAVID M.S. DEWHIRST
  *Solicitor General*

*/s/ Kathleen L. Smithgall*
KATHLEEN L. SMITHGALL
  *Assistant Solicitor General*
MONTANA DEPARTMENT OF JUSTICE
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
p. 406.444.2026
david.dewhirst@mt.gov
kathleen.smithgall@mt.gov

*Attorneys for Amicus Curiae*
*State of Montana*

## ADDITIONAL COUNSEL

Steve Marshall
ALABAMA
ATTORNEY GENERAL

Treg Taylor
ALASKA
ATTORNEY GENERAL

Mark Brnovich
ARIZONA
ATTORNEY GENERAL

Leslie Rutledge
ARKANSAS
ATTORNEY GENERAL

Chris Carr
GEORGIA
ATTORNEY GENERAL

Todd Rokita
INDIANA
ATTORNEY GENERAL

Derek Schmidt
KANSAS
ATTORNEY GENERAL

Daniel Cameron
KENTUCKY
ATTORNEY GENERAL

Jeff Landry
LOUISIANA
ATTORNEY GENERAL

Lynn Fitch
MISSISSIPPI
ATTORNEY GENERAL

Eric Schmitt
MISSOURI
ATTORNEY GENERAL

John Formella
NEW HAMPSHIRE
ATTORNEY GENERAL

Dave Yost
OHIO
ATTORNEY GENERAL

John M. O'Connor
OKLAHOMA
ATTORNEY GENERAL

Alan Wilson
SOUTH CAROLINA
ATTORNEY GENERAL

Ken Paxton
TEXAS
ATTORNEY GENERAL

27

Sean D. Reyes
UTAH
ATTORNEY GENERAL

Bridget Hill
WYOMING
ATTORNEY GENERAL

Patrick Morrisey
WEST VIRGINIA
ATTORNEY GENERAL

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, Kathleen Smithgall, an employee in the Office of the Attorney General of the Montana, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 4,938 words, excluding the parts of the document exempted by Rule 32(f), and complies with the typeface requirements and length limits of Rules 29 and 32(a)(5)–(7), and Circuit Rule 29-2(c)(2).

/s/ *Kathleen L. Smithgall*
KATHLEEN L. SMITHGALL