# 22-1374

## United States Court of Appeals for the Second Circuit

NATIONAL SHOOTING SPORTS FOUNDATION, INC., BERETTA U.S.A. CORP., DAVIDSON'S, INC., GLOCK INC., CENTRAL TEXAS GUN WORKS, HORNADY MANUFACTURING COMPANY, LIPSEY'S LLC, OSAGE COUNTY GUNS LLC, RSR GROUP, INC., SHEDHORN SPORTS, INC., SIG SAUER, INC., SMITH & WESSON INC., SPORTS SOUTH LLC, SPRAGUE'S SPORTS INC., STURM, RUGER & COMPANY, INC.,

*Plaintiffs-Appellants,*

v.

LETITIA JAMES, in her official capacity as New York Attorney General,

*Defendant-Appellee.*

On Appeal from the United States District Court for the Northern District of New York

## BRIEF FOR APPELLEE

BARBARA D. UNDERWOOD
 *Solicitor General*
ESTER MURDUKHAYEVA
 *Deputy Solicitor General*
DENNIS FAN
 *Senior Assistant Solicitor General*
 *of Counsel*

LETITIA JAMES
 *Attorney General*
 *State of New York*
Attorney for Appellee
28 Liberty Street
New York, New York 10005
(212) 416-8921

Dated: January 6, 2023

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................iii

PRELIMINARY STATEMENT ................................................................ 1

ISSUES PRESENTED ................................................................................ 4

STATEMENT OF THE CASE ................................................................... 5

    A.   Protection of Lawful Commerce in Arms Act (PLCAA) ........... 5

    B.   New York's Gun-Related Public Nuisance Statute ................. 9

    C.   Factual and Procedural Background .................................... 11

SUMMARY OF ARGUMENT ................................................................ 14

ARGUMENT ........................................................................................... 18

POINT I

PLCAA DOES NOT PREEMPT NEW YORK'S GUN-RELATED
PUBLIC NUISANCE STATUTE ................................................................. 19

    A.   PLCAA Does Not Expressly Preempt New York's Statute. ..... 21

    B.   PLCAA Does Not Impliedly Preempt New York's Statute. ...... 30

    C.   Appellants' Request for an Advisory Opinion on As-Applied
        Preemption Defenses Is Improper and Without Merit. ......... 33

POINT II

NEW YORK'S GUN-RELATED PUBLIC NUISANCE STATUTE
IS CONSISTENT WITH THE DORMANT COMMERCE CLAUSE .................... 36

**Page**

A.   PLCAA's Predicate Exception Forecloses Appellants' Dormant Commerce Clause Challenge. ..................................36

B.   New York's Statute Is Consistent with the Dormant Commerce Clause..................................................38

    1.   New York's statute does not discriminate against or unduly burden interstate commerce..........................38

    2.   New York's statute does not improperly regulate extraterritorial conduct. .................................................46

POINT III

NEW YORK'S GUN-RELATED PUBLIC NUISANCE STATUTE COMPORTS WITH DUE PROCESS ..........................................51

CONCLUSION ........................................................56

# TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*,
404 F.3d 566 (2d Cir. 2005) ............................................................ 48

*Alabama v. North Carolina*,
560 U.S. 330 (2010).......................................................................... 27

*Alliance of Auto. Mfrs., Inc. v. Currey*,
610 F. App'x 10 (2d Cir. 2015) ........................................................ 18

*American Booksellers Found. v. Dean*,
342 F.3d 96 (2d Cir. 2003) .............................................................. 51

*American Civil Liberties Union v. Johnson*,
194 F.3d 1149 (10th Cir. 1999).........................................................51

*American Trucking Ass'ns v. New York State Thruway Auth.*,
886 F.3d 238 (2d Cir. 2018) ............................................................. 38

*Arriaga v. Mukasey*,
521 F.3d 219 (2d Cir. 2008) ............................................................. 53

*Ashcroft v. Mattis*,
431 U.S. 171 (1977)........................................................................... 34

*Baldwin v. G.A.F. Seelig, Inc.*,
294 U.S. 511 (1935)........................................................................... 50

*Becker v. Poling Transp. Corp.*
356 F.3d 381 (2d Cir. 2004) ............................................................. 24

*Bond v. United States*,
572 U.S. 844 (2014)........................................................................... 19

*Brown-Forman Distillers Corp. v. New York State Liquor Auth.*,
476 U.S. 573 (1986)........................................................................... 50

*Cantero, v. Bank of Am., N.A.*
49 F.4th 121 (2d Cir. 2022)............................................................... 35

**Cases** **Page(s)**

*Carroll v. Trump,*
49 F.4th 759 (2d Cir. 2022).............................................................. 27

*Chamber of Com. v. Whiting,*
563 U.S. 582 (2011)............................................................ 25, 30, 39

*Cipollone v. Liggett Grp., Inc.,*
505 U.S. 504 (1992).......................................................................... 30

*City of New York v. Beretta U.S.A. Corp.,*
524 F.3d 384 (2d Cir. 2008) ...................................................... passim

*Comptroller of the Treasury of Md. v. Wynne,*
575 U.S. 542 (2015)........................................................................... 36

*Copart Indus., Inc. v. Consolidated Edison Co. of N.Y., Inc.,*
41 N.Y.2d 564 (1977) ...................................................................... 55

*Copeland v. Vance,*
893 F.3d 101 (2d Cir. 2018) .............................................. 18–19, 44, 54

*Daniels Sharpsmart, Inc. v. Smith,*
889 F.3d 608 (9th Cir. 2018)............................................................ 50

*Department of Revenue of Ky. v. Davis,*
553 U.S. 328 (2008)................................................................... 41, 44

*Dickerson v. Napolitano,*
604 F.3d 732 (2d Cir. 2010) ............................................................ 18

*Encino Motorcars, LLC v. Navarro,*
138 S. Ct. 1134 (2018)...................................................................... 21

*Energy & Env't Legal Inst. v. Epel,*
793 F.3d 1169 (10th Cir. 2015)........................................................ 46

*FMC Corp. v. Holliday,*
498 U.S. 52 (1990)............................................................................ 21

| Cases | Page(s) |
|---|---|

*Freedom Holdings, Inc. v. Cuomo,*
  624 F.3d 38 (2d Cir. 2010) ............................................... 46

*Freedom Holdings Inc. v. Spitzer,*
  357 F.3d 205 (2d Cir. 2004) ....................................... 46, 49

*Geier v. American Honda Motor Co.,*
  529 U.S. 861 (2000) ......................................................... 20

*General Motors Corp. v. Tracy,*
  519 U.S. 278 (1997) ........................................ 41, 44–45, 49

*Green Mountain R.R. v. Vermont,*
  404 F.3d 638 (2d Cir. 2005) ............................................ 18

*Ileto v. Glock, Inc.,*
  565 F.3d 1126 (9th Cir. 2009) ......................................... 31

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.,*
  725 F.3d 65 (2d Cir. 2013) .............................................. 30

*In re Motors Liquidation Co.,*
  829 F.3d 135 (2d Cir. 2016) ............................................ 45

*Kucana v. Holder,*
  558 U.S. 233 (2010) ......................................................... 28

*Legato Vapors, LLC v. Cook,*
  847 F.3d 825 (7th Cir. 2017) ........................................... 50

*Maine v. Taylor,*
  477 U.S. 131 (1986) ................................................... 43–45

*McDonald v. City of Chicago,*
  561 U.S. 742 (2010) ......................................................... 52

*Medtronic, Inc. v. Lohr,*
  518 U.S. 470 (1996) ......................................................... 20

**Cases**                                                           **Page(s)**

*Mid-Atlantic Bldg. Sys. Council v. Frankel,*
  17 F.3d 50 (2d Cir. 1994) .................................................. 37

*Monserrate v. New York State Senate,*
  599 F.3d 148 (2d Cir. 2010) ............................................. 52

*New York State Rifle & Pistol Ass'n v. Bruen,*
  142 S. Ct. 2111 (2022) ...................................................... 52

*New York State Rifle & Pistol Ass'n v. City of New York,*
  883 F.3d 45 (2d Cir. 2018) ............................................... 45

*New York State Rifle & Pistol Ass'n v. Cuomo,*
  804 F.3d 242 (2d Cir. 2015) ...................................... 18, 52

*Northeast Bancorp, Inc. v. Board of Governors*
  *of the Fed. Reserve Sys.,*
  472 U.S. 159 (1985) ................................................... 36–37

*Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.,*
  469 U.S. 189 (1985) .......................................................... 20

*People v. Sturm, Ruger & Co.,*
  309 A.D.2d 91 (N.Y. App. Div., 1st Dep't 2003) ................ 55

*Pharmaceutical Research & Mfrs. of Am. v. Walsh,*
  538 U.S. 644 (2003) .......................................................... 50

*Pike v. Bruce Church, Inc.,*
  397 U.S. 137 (1970) .......................................................... 43

*Reynolds v. Quiros,*
  25 F.4th 72 (2d Cir. 2022) ............................................... 51

*Rogoz v. City of Hartford,*
  796 F.3d 236 (2d Cir. 2015) ............................................ 26

*Rush Prudential HMO, Inc. v. Moran,*
  536 U.S. 355 (2002) .......................................................... 21

vi

## Cases                                                 Page(s)

*Soto v. Bushmaster Firearms International, LLC*,
331 Conn. 53 (2019) ................................................................. 28–29

*South Dakota v. Wayfair, Inc.*,
138 S. Ct. 2080 (2018) ..................................................................... 36

*SPGGC, LLC v. Blumenthal*,
505 F.3d 183 (2d Cir. 2007) ............................................................ 51

*Sprietsma v. Mercury Marine*,
537 U.S. 51 (2002) ........................................................................... 21

*Tennessee Wine & Spirits Retailers Ass'n v. Thomas*,
139 S. Ct. 2449 (2019) .............................................................. 39, 42

*United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*,
438 F.3d 150 (2d Cir. 2006) ............................................................ 45

*United States v. Gomez*,
877 F.3d 76 (2d Cir. 2017) .............................................................. 33

*United States v. Hon*,
904 F.2d 803 (2d Cir. 1990) ............................................................ 54

*United States v. Lopez*,
514 U.S. 549 (1995) ......................................................................... 19

*United States v. Scotti*,
47 F.3d 1237 (2d Cir. 1995) ............................................................ 35

*United States v. Sicignano*,
78 F.3d 69 (2d Cir. 1996) ................................................................ 34

*United States v. Smith*,
No. 95-cr-154, 2022 WL 1538706 (D.D.C. May 16, 2022) ................. 34

*Village of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
455 U.S. 489 (1982) ......................................................................... 52

**Cases**                                                                  **Page(s)**

*VIZIO, Inc. v. Klee,*
886 F.3d 249 (2d Cir. 2018) .............................................................. 46

*Washington State Grange v. Washington State*
*Republican Party,*
552 U.S. 442 (2008).................................................... 14, 19, 33, 41, 48

*Western & S. Life Ins. Co. v. State Bd. of Equalization of Cal.,*
451 U.S. 648 (1981).................................................................... 16, 36

*White v. Massachusetts Council of Constr. Emps., Inc.,*
460 U.S. 204 (1983).......................................................................... 36

**Laws**

*Federal*

15 U.S.C.
§ 7901 et seq.......................................................................... 1
§ 7901 ...................................................... 5–6, 16, 31
§ 7902 ............................................................ 5, 21
§ 7903 ........................................................ passim

18 U.S.C.
§ 921 et seq.............................................................. 7
§ 923 ......................................................... 11–12

26 U.S.C. § 5801 et seq............................................................. 7

47 U.S.C. § 414 ............................................................... 32

*Connecticut*

Conn. Gen. Stat. § 42-110b ..................................................... 28

*New York*

Ch. 237, 2021 McKinney's N.Y. Laws 898......................................... 9, 43

**Laws**                                                   **Page(s)**

*New York (cont'd)*

General Business Law
§ 898-a et seq .................................................................. 1
§ 898-a ................................................................... passim
§ 898-b ................................................................... passim
§ 898-c ............................................... 11, 14, 35, 43, 45
§ 898-d .................................................................... 11
§ 898-e .................................................................... 11

Multiple Dwelling Law § 309 ................................................ 53

Penal Law
§ 15.05 .................................................................... 34
§ 240.45 .................................................................. 53
§ 400.05 .................................................................. 53

Public Health Law
§ 1300-b .................................................................. 53
§ 1320 .................................................................... 53

## Miscellaneous Authorities

151 Cong. Rec. (2005) ................................................. 5–7, 31

*Applicable*, *Black's Law Dictionary* (11th ed. 2019) ............... 22

H.R. Rep. No. 108-59 (2003) ............................................. 31

*Hearing Before the Subcomm. on Com. & Admin. L. of the
H. Comm. on the Judiciary*, 109th Cong. (Mar. 15, 2005) ............. 7

Senate Introducer's Mem. for ch. 237 (2021) ...................... 9, 23

## PRELIMINARY STATEMENT

Plaintiffs-appellants National Shooting Sports Foundation (NSSF) and various firearms manufacturers and sellers brought this facial preenforcement challenge to the constitutionality of New York's gun-related public nuisance statute. *See* N.Y. Gen. Bus. Law § 898-a et seq. (*reproduced at* Addendum (Add.) 7–8). Enacted in 2021, the statute seeks to alleviate New York's statewide gun-violence crisis. In doing so, the statute regulates certain conduct of gun industry members—those who are "engaged in the sale, manufacturing, distribution, importing or marketing" of firearms or ammunition, *id.* § 898-a(4). Specifically, the statute prohibits a gun industry member from knowingly or recklessly creating, maintaining, or contributing to dangerous conditions in the State through unlawful or unreasonable conduct in the sale and marketing of firearms. The statute also requires a gun industry member that partici-pates in New York's firearms market to establish and utilize reasonable controls to prevent the misuse of its products in the State.

Appellants contend in this facial challenge that New York's new gun-related public nuisance statute is preempted by the federal Protection of Lawful Commerce in Arms Act of 2005 (PLCAA), 15 U.S.C. § 7901 et seq.

(*reproduced at* Add. 1–6), and violates the dormant Commerce Clause and Due Process Clause of the United States Constitution. The U.S. District Court for the Northern District of New York (D'Agostino, J.) correctly rejected those arguments, granted the State's motion to dismiss, and denied as moot appellants' motion for a preliminary injunction. This Court should affirm.

First, New York's gun-related public nuisance statute is not barred by PLCAA. Although PLCAA preempts many civil causes of actions, it expressly allows suits predicated on knowing violations of a state "statute applicable to the sale or marketing of" firearms and related products, 15 U.S.C. § 7903(5)(A)(iii), a provision that in plain terms encompasses New York's statute. PLCAA's "predicate exception" reflects Congress's intent to vest the primary authority to regulate the gun industry in federal and state legislatures acting in their representative capacities, rather than federal and state judiciaries acting in their common law capacities.

In contending that PLCAA preempts New York's statute, appellants fundamentally misunderstand both legislative enactments. Appellants wrongly criticize the New York Legislature for codifying a cause of action, when Congress specifically preserved the authority of state legislatures

to enact such provisions. Appellants' further arguments reduce to the amorphous contention that New York's statute is not the *kind* of state statute that PLCAA envisioned because the liability imposed is not concrete enough or not direct enough. But that contention depends on imagined limitations on the predicate exception that are found neither in PLCAA's text nor in this Court's precedents.

Second, New York's gun-related public nuisance statute easily survives a facial dormant Commerce Clause challenge. As an initial matter, the fact that New York's statute comports with PLCAA forecloses any argument that New York has interfered with Congress's exercise of its Commerce Clause powers. Moreover, New York's statute has ample constitutional applications to economic conduct reaching into the State. For instance, the statute would prohibit sales into New York of untraceable firearms designed to thwart law enforcement and could require dealers to prevent sales to New York consumers who cannot possess firearms on account of past violent conduct. Appellants' contentions that the statute advantages intrastate commerce or regulates purely out-of-state transactions are speculative and insufficient to invalidate the statute on a facial basis.

3

Finally, New York's gun-related public nuisance statute readily survives appellants' due process challenge. Among other things, the statute tracks legal standards from preexisting public nuisance statutes, contains numerous illustrative examples, and otherwise uses terms that have a readily comprehensible meaning.

## ISSUES PRESENTED

1. Whether appellants failed to state a claim that the federal Protection of Lawful Commerce in Arms Act preempts New York's gun-related public nuisance statute.

2. Whether appellants failed to state a claim that New York's gun-related public nuisance statute violates the Commerce Clause of the United States Constitution.

3. Whether appellants failed to state a claim that New York's gun-related public nuisance statute violates the Due Process Clause of the United States Constitution.

# STATEMENT OF THE CASE

## A.    Protection of Lawful Commerce in Arms Act (PLCAA)

Congress enacted PLCAA in 2005 in response to gun industry lobbying, following a series of lawsuits filed by individuals, cities, and States that sought relief under various common law theories for harms caused by gun violence. 15 U.S.C. § 7901(a)–(b) (congressional findings and purposes). In exercising its Commerce Clause powers, Congress established a statutory framework governing liability for manufacturing and selling "qualified products," defined as any firearms, ammunition, or component parts that were shipped in interstate or foreign commerce. *See id.* § 7903(4).

PLCAA prohibits the filing of federal or state civil actions against gun industry members for harms "resulting from the criminal or unlawful misuse of a qualified product," subject to several enumerated exceptions. *Id.* §§ 7902(a), 7903(5)(A)(i)–(vi). The purpose of these exceptions was "to make the narrow scope of [PLCAA] clear by listing specific kinds of lawsuits that are not prohibited." 151 Cong. Rec. 18,085 (2005) (statement of Sen. Larry Craig).

5

In enacting PLCAA, Congress sought to ensure that regulation of the gun industry would be left to federal and state legislatures rather than to the respective judiciaries. Specifically, Congress was concerned that the then-pending suits were improper "attempt[s] to use the judicial branch to circumvent the Legislative branch of government," 15 U.S.C. § 7901(a)(8), and permitted "a maverick judicial officer or petit jury" to hold the "entire industry" liable based on "expansion[s] of the common law" that were not supported by legislative action. *id.* § 7901(a)(6)–(7). Congress therefore stressed that the authority to "expand civil liability" for the gun industry belongs, in the first instance, to "Congress" and "the legislatures of the several States." *Id.* § 7901(a)(7). As PLCAA's principal sponsor reiterated, Congress sought to "protect" "state sovereignty" by ensuring that such "State power" is exercised through "the legislative process." 151 Cong. Rec. at 18,096 (statement of Sen. Craig).

PLCAA's statutory exceptions make clear Congress's intent to preserve statutory causes of action. As its sponsors emphasized, PLCAA "does not shield" manufacturers and sellers "if in any way they violate State or Federal law." *Id.* at 18,086 (statement of Sen. Craig); *see id.* at 18,059 (statement of Sen. Tom Coburn) (confirming that the gun industry

6

must "operate entirely within the Federal and State laws"); *id.* at 18,073 (statement of Sen. Orrin Hatch) (same). Indeed, NSSF and several of the appellants here urged Congress at the time that "policy choices" in this area "are for Congress and state legislatures to make," and that under PLCAA "[a]ny company or dealer that breaks the law can be sued." *Hearing Before the Subcomm. on Com. & Admin. L. of the H. Comm. on the Judiciary*, 109th Cong. 41 (Mar. 15, 2005) (statement of NSSF).

For example, PLCAA permits suits against manufacturers and sellers that transfer firearms or ammunition with at least reasonable cause to believe that the product is going to be used to commit a felony (or other listed crime), either under a federal criminal statute (18 U.S.C. § 924(h)) or under "a comparable or identical State felony law." 15 U.S.C. § 7903(5)(A)(i). PLCAA also permits suits against sellers based on a "negligence per se" theory of tort liability, which requires a violation of a relevant federal or state statute. *See id.* § 7903(5)(A)(ii). And PLCAA permits the U.S. Attorney General to sue for violations of the Gun Control Act of 1968, 18 U.S.C. § 921 et seq., and National Firearms Act of 1934, 26 U.S.C. § 5801 et seq. *See* 15 U.S.C. § 7903(5)(A)(vi).

As relevant here, PLCAA further respects the primary role of federal and state legislatures by permitting suits against gun industry members that have knowingly violated a predicate "State or federal statute applicable to the sale or marketing of [a qualified] product," where such violations are alleged to be a proximate cause of a plaintiff's injury. *Id.* § 7903(5)(A)(iii). PLCAA's predicate exception provides several illustrative examples of conduct that might give rise to such a suit, including: improper entries into "any record required to be kept under Federal or State law"; materially "false or fictitious oral or written statements" as to whether a sale is lawful under federal or state law; and sales to persons who are prohibited from possessing firearm or ammunition under federal law. *Id.* § 7903(5)(A)(iii)(I)–(II).

In *City of New York v. Beretta U.S.A. Corporation*, this Court held that the predicate exception's reference to statutes "applicable to the sale or marketing" of firearms includes any of three types of statutes: those "(a) that expressly regulate firearms, or (b) that courts have applied to the sale and marketing of firearms," or (c) "that do not expressly regulate firearms but that clearly can be said to implicate the purchase and sale of firearms." 524 F.3d 384, 404 (2d Cir. 2008). Applying this interpreta-

tion of PLCAA, the court concluded that the *Beretta* plaintiffs' claim under
New York's general nuisance statute does not qualify for the predicate
exception because the general nuisance statute does not expressly apply
to firearms, has never been interpreted to apply to firearms, and could
not be interpreted to cover an alleged failure to monitor, supervise, or
regulate the sale or distribution of guns to illegal downstream channels,
which was the conduct challenged by the *Beretta* plaintiffs. *See id.* at 400.

## B.    New York's Gun-Related Public Nuisance Statute

In 2021, the New York State Legislature enacted a public nuisance
statute expressly governing the gun industry to serve as a "'predicate
statute' that is applicable to the sale or marketing of firearms." Senate
Introducer's Mem. for ch. 237 (2021) (S.B. 7196). The Legislature deter-
mined that such a statute was necessary because gun manufacturers' and
sellers' "illegal or unreasonable sale, manufacture, distribution, import-
ing or marketing of firearms" and "failure to implement reasonable safety
measures" had resulted in a "public health crisis of gun violence in this
state." Ch. 237, § 1, 2021 McKinney's N.Y. Laws 898, 898.

First, the statute provides that "[n]o gun industry member, by
conduct either unlawful in itself or unreasonable under all the circum-

9

stances shall knowingly or recklessly create, maintain or contribute to a condition in New York state that endangers the safety or health of the public through the sale, manufacturing, importing or marketing of a qualified product." N.Y. Gen. Bus. Law § 898-b(1). That statutory prohibition incorporates PLCAA's definition of "qualified product," *id.* § 898-a(6) (incorporating 15 U.S.C. § 7903(4)), and the New York Penal Law's criminal law definitions of "knowingly" and "recklessly," *id.* § 898-a(5) (incorporating N.Y. Penal Law § 15.05).

Second, the statute requires "[a]ll gun industry members who manufacture, market, import or offer for wholesale or retail sale any qualified product in New York state [to] establish and utilize reasonable controls and procedures to prevent its qualified products from being possessed, used, marketed or sold unlawfully in New York state." *Id.* § 898-b(2). The statute provides examples of reasonable controls, such as: "instituting screening, security, inventory and other business practices to prevent thefts"; establishing practices to guard against "sales of qualified products to straw purchasers, traffickers, persons prohibited from possessing firearms under state or federal law, or persons at risk of injuring themselves

10

or others"; and preventing deceptive acts and practices and false advertising under New York's consumer protection laws. *Id.* § 898-a(2).

A violation of either provision is deemed a public nuisance if it "results in harm to the public," regardless of whether "the gun industry member acted for the purpose of causing harm to the public." *Id.* § 898-c. The statute may be enforced by the New York Attorney General, a corporation counsel of a city in New York, or by any person, firm, corporation, or association that has been damaged by the underlying violations. *Id.* §§ 898-d, 898-e.

## C.  Factual and Procedural Background

Appellants are NSSF (a gun industry trade association) and fourteen of its members, including several of the nation's largest firearms manufacturers and distributors. (Appendix (A.) 16–19; Supplemental Appendix (S.A.) 13.) Under federal law, a person or entity—such as NSSF's members—wishing to "engage in the business of importing, manufacturing, or dealing" in firearms or ammunition must obtain a license from the federal Bureau of Alcohol, Tobacco, Firearms and Explosives. *See* 18 U.S.C. § 923(a). Appellants allege that they are federal firearms licensees (FFLs) located outside of New York. (A. 26; *see* A. 17–19.) However, all FFLs are

11

entitled "to transport, ship, and receive firearms and ammunition covered by such license in interstate or foreign commerce," 18 U.S.C. § 923(c), and there is no serious dispute that appellants' products are "shipped or transported into New York" (A. 27). See *infra* at 47-48 (addressing appellants' connections to New York).

In December 2021 (approximately five months after New York's gun-related public nuisance statute took effect), appellants sued New York Attorney General Letitia James in her official capacity, seeking declaratory and injunctive relief against any future enforcement of the statute (A. 12, 37–38), as well as a preliminary injunction (*see* Pls.' Mot. for Prelim. Inj. (Dec. 16, 2021), Dist. Ct. ECF No. 2). The complaint asserted that the statute is preempted by PLCAA, violates the dormant Commerce Clause, and is unconstitutionally vague in violation of the Due Process Clause. (A. 30–37.)

In May 2022, the U.S. District Court for the Northern District of New York (D'Agostino, J.) dismissed the complaint for failure to state a claim and denied the preliminary injunction motion as moot. (A. 42–67.)

First, in rejecting appellants' preemption challenge, the court concluded that PLCAA's predicate exception "authorized lawsuits against

gun industry members" based on statutes that governed the sale or marketing of firearms and that "Congress specifically preserved such authority for the States" to enact such statutes. (A. 49, 52 (quotation marks omitted).) The court held that New York's statute here "expressly regulates firearms," and therefore qualifies as a predicate statute under PLCAA. (A. 50; *see* A. 52.)

Second, the court determined that New York's statute does not unconstitutionally infringe upon Congress's commerce powers. The court concluded that the statute's incorporation of PLCAA's definition of "qualified product" was immaterial because appellants failed to allege the existence of an in-state gun industry member that does not transact in firearms, ammunition, or components transported in interstate or foreign commerce. Accordingly, appellants failed to allege the existence of an in-state competitor to which the statute would not apply and that would by virtue of that fact be given preferential treatment. (A. 54–57.) The court further rejected appellants' argument that the statute impermissibly regulates the wholly extraterritorial conduct of out-of-state businesses, as the statute "in no way differs from" other state laws that protect the

13

health and safety of residents through regulation that has incidental effects on interstate commerce. (A. 59.)

Finally, the court concluded that New York's statute is not unconstitutionally vague. Rather, the statute comports with "decades of applications" of public nuisance principles and includes a specific "list of required conduct" for the gun industry. (A. 64–65.)

## SUMMARY OF ARGUMENT

The New York Legislature enacted its gun-related public nuisance statute to hold gun industry members accountable for their own conduct in the sale and marketing of firearms when such conduct "results in harm to the public." N.Y. Gen. Bus. Law § 898-c. In this facial preenforcement challenge, appellants erroneously contend that the statute is preempted by PLCAA and that it violates the dormant Commerce Clause and Due Process Clause. To succeed in those facial constitutional challenges, appellants must show that the statute is "unconstitutional in all its applications." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008). Appellants come nowhere close to meeting this exacting standard. This Court should therefore affirm the dismissal of the complaint.

14

1. Congress did not preempt New York's gun-related nuisance statute by enacting PLCAA, because PLCAA specifically authorizes civil suits under state statutes "applicable to the sale or marketing of [a qualified] product." *See* 15 U.S.C. § 7903(5)(A)(iii). As this Court held in *Beretta*, PLCAA's predicate exception permits claims under statutes that "expressly regulate firearms" or "clearly can be said to implicate the purchase and sale of firearms." 524 F.3d at 404. On its face, New York's gun-related public nuisance statute regulates the sale and marketing of firearms and therefore falls well within the text of the predicate exception as conclusively interpreted by this Court.

Appellants' arguments to the contrary turn on an invented element of the predicate exception that appears nowhere in PLCAA or this Court's decision in *Beretta*. Specifically, appellants argue (Br. for Appellants (Br.) at 25) that the exception applies only to "laws that impose concrete obligations and prohibitions" pertaining to the sale and marketing of firearms. Appellants' argument misunderstands New York's statute, which imposes direct obligations on manufacturers' and sellers' own conduct. And the argument is entirely inconsistent with *Beretta* and subsequent case law interpreting the predicate exception to preemption contained in PLCAA.

15

Appellants thus altogether disregard Congress's express intent to reinforce principles of "State sovereignty" by empowering States to regulate the sale and marketing of firearms through legislation, while limiting the States' ability to do so through common law adjudication. *See* 15 U.S.C. § 7901(a)(7)–(8). Appellants' alternative argument that PLCAA preempts certain applications of the New York's statute was never raised below, is improper in a facial challenge, and is without merit in any event.

2. New York's statute is likewise in accord with the Commerce Clause. As the Supreme Court has explained, "any action taken by a State within the scope of the congressional authorization is rendered invulnerable to Commerce Clause challenge." *Western & S. Life Ins. Co. v. State Bd. of Equalization of Cal.*, 451 U.S. 648, 653 (1981). Here, New York's statute fits squarely within the realm of state authority preserved by PLCAA, which was enacted pursuant to Congress's commerce powers.

Even if New York's statute were subject to dormant Commerce Clause review, appellants' facial challenge would fail for several reasons. At the outset, appellants fail to demonstrate that the statute facially discriminates against or unduly burdens interstate commerce. Appellants principally contend that the statute disfavors out-of-state businesses

16

because it applies only to the sale and marketing of "qualified products," which are defined as having an interstate element. However, appellants fail to identify any in-state business transacting in firearms, ammunition, or component parts that would *not* satisfy the definition of "qualified product"—to the contrary, each of the approximately 3,800 FFLs located in New York is expressly authorized by federal law to engage in interstate commerce. A statute that applies equally to all regulated businesses is nondiscriminatory.

Likewise, appellants incorrectly contend that the statute regulates wholly extraterritorial conduct. To the contrary, the statute is aimed at remediating and recompensing public nuisances in the State. *See* N.Y. Gen. Bus. Law § 898-b. Any number of unquestionably local suits can be brought under this statute—for example, actions challenging the sale of untraceable "ghost gun" kits into New York or claims alleging that New York distributors failed to impose controls aimed at preventing straw purchasers. Appellants' hypotheticals about the potential application of the law to out-of-state businesses engaging in wholly out-of-state conduct with no known connection to the State are plainly insufficient to challenge the enforcement of the statute on a facial basis.

17

3. Finally, New York's statute comports with due process. As the district court correctly held, the statute is not unconstitutionally vague because it builds on established public nuisance principles and specifies forms of regulated conduct, while offering illustrative examples of impermissible conduct. Appellants alternatively contend that the statute impermissibly eliminates a proximate cause requirement, an argument that was never raised below and is without merit.

## ARGUMENT

In this preenforcement action, each of appellants' constitutional claims is properly construed as a "'facial,' rather than 'as-applied,' challenge." *See New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 265 (2d Cir. 2015); *see also Green Mountain R.R. v. Vermont*, 404 F.3d 638, 643 (2d Cir. 2005) (preemption); *Alliance of Auto. Mfrs., Inc. v. Currey*, 610 F. App'x 10, 13 (2d Cir. 2015) (summary order) (dormant Commerce Clause); *Dickerson v. Napolitano*, 604 F.3d 732, 741 (2d Cir. 2010) (void for vagueness). Such a facial constitutional challenge to a statute is "'the most difficult challenge to mount successfully.'" *Copeland v. Vance*, 893 F.3d 101, 110 (2d Cir. 2018) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Facial constitutional "claims are disfavored because

18

they often rest on speculation, flout the fundamental principle of judicial restraint that courts should avoid unnecessary constitutional adjudication, and threaten to short circuit the democratic process." *Id.* at 111 (quotation marks and citation omitted). To prevail, appellants must demonstrate that "the law is unconstitutional in all of its applications," and that it thus lacks "a plainly legitimate sweep." *Washington State Grange*, 552 U.S. at 449 (quotation marks omitted).

Appellants' constitutional challenges fail for a number of reasons, including that appellants come nowhere close to meeting the demanding standard for facial relief as to any of their claims. This Court should affirm the district court's judgment dismissing the complaint.

## POINT I

### PLCAA DOES NOT PREEMPT NEW YORK'S GUN-RELATED PUBLIC NUISANCE STATUTE

In our federal system, the "States have broad authority to enact legislation for the public good." *Bond v. United States*, 572 U.S. 844, 854 (2014). In contrast to the federal government's enumerated and defined powers, the States' powers "'are numerous and indefinite.'" *United States*

*v. Lopez*, 514 U.S. 549, 552 (1995) (quoting *The Federalist* No. 45, at 292–93 (James Madison) (Clinton Rossiter ed., 1961)).

Preemption "fundamentally is a question of congressional intent." *Geier v. American Honda Motor Co.*, 529 U.S. 861, 884 (2000) (quotation marks omitted). Courts must therefore "begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *See Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985). "[B]ecause the States are independent sovereigns in our federal system," courts must presume that Congress has intended to preserve state law—a presumption that is overcome only where Congress demonstrates a "clear and manifest" preemptive purpose. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quotation marks omitted).

Appellants assert (Br. at 21–33) that PLCAA expressly preempts New York's gun-related public nuisance statute or, alternatively, that New York's statute is impliedly preempted because it is inconsistent with PLCAA's purposes and objectives. Neither argument has merit because PLCAA's predicate exception expressly preserves causes of action based on violations of state statutes that are "applicable to the sale or market-

20

ing of" firearms, 15 U.S.C. § 7903(5)(A)(iii), and the New York gun-related public nuisance law is just such a statute. Appellants also miss the mark in arguing (Br. at 33–38) that New York's statute should be preempted to the extent it is applied in hypothetical future cases to allow suits absent a showing of knowledge or proximate causation. This argument is unpreserved, improper in a facial preenforcement challenge, and fundamentally misunderstands New York's statute.

### A.   PLCAA Does Not Expressly Preempt New York's Statute.

Like many other federal statutes, PLCAA contains an express preemption provision and several savings clauses. *See* 15 U.S.C. §§ 7902(a) (barring "qualified civil liability action[s]" in federal or state court), 7903(5)(A) (defining "qualified civil liability action" together with seven exceptions). In those circumstances, courts must interpret the express preemption provisions and savings clauses together to ascertain congressional intent. *See, e.g.*, *Sprietsma v. Mercury Marine*, 537 U.S. 51, 63 (2002); *FMC Corp. v. Holliday*, 498 U.S. 52, 56–57 (1990). In other words, a statutory preemption exception is as indicative of congressional intent as the express preemption provision itself. *See Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 365 (2002); *see also Encino Motorcars, LLC*

21

*v. Navarro*, 138 S. Ct. 1134, 1142 (2018) (holding that statute's "exemptions are as much a part of the [statute's] purpose as the [principal] requirement").

As relevant here, PLCAA exempts from preemption any "action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the [qualified] product, and the violation was a proximate cause of the harm for which relief is sought." 15 U.S.C. § 7903(5)(A)(iii). The phrase "applicable to" identifies the object of regulation—here, the gun industry's sale and marketing of firearms. *Beretta*, 524 F.3d at 402; *see also Applicable*, *Black's Law Dictionary* (11th ed. 2019) ("affecting or relating to a *particular person, group, or situation*" (emphasis added)). Accordingly, this Court in *Beretta* interpreted the words "statute applicable to the sale or marketing" of qualified products to include statutes that "expressly regulate firearms" or "clearly can be said to implicate the purchase and sale of firearms," or otherwise have been interpreted by a court to apply to the sale and marketing of firearms. 524 F.3d at 404.

The district court correctly held that New York's gun-related public nuisance statute satisfies the plain text of the predicate exception as

interpreted by *Beretta*. (*See* A. 46–50.) Among other things, the statute expressly regulates the "sale, manufacturing, importing or marketing of a qualified product" and persons that "manufacture, market, import or offer for wholesale or retail sale any qualified product in New York." N.Y. Gen. Bus. Law § 898-b. The bill introducer's memorandum confirms that the basic purpose of the statute is to regulate "the sale or marketing of firearms." Senate Introducer's Mem. for ch. 237.

Appellants agree (Br. at 19) that New York's statute "expressly applies to commerce in firearms" but nonetheless urge that PLCAA's predicate exception contains additional extratextual limitations that remain unsatisfied. Specifically, appellants contend (*id.* at 24–25) that the phrase "statute applicable to the sale or marketing" of firearms refers to particular kinds of statutes that impose "concrete obligations or prohibitions" on gun industry members' own conduct, rather than statutes that "impose only duties of care vis-à-vis the misconduct of third parties."

Appellants' argument fails at the outset because New York's statute in fact directly regulates specific aspects of gun industry members' own conduct. For example, the statute proscribes the "conduct" of gun industry members, by prohibiting them from engaging in the unlawful or unreason-

23

able "sale, manufacturing, importing or marketing of a qualified product" where it would "create, maintain, or contribute" to a dangerous condition in New York. N.Y. Gen. Bus. Law § 898-b(1). And the statute requires all gun industry members participating in the New York firearms market to "establish and utilize reasonable controls and procedures" to prevent the misuse of their products in the State. *Id.* § 898-b(2). Appellants thus misunderstand New York's statute in arguing that it imposes a form of "'vicarious liability'" that falls outside the scope of the predicate exception. Br. at 24 (quoting *Beretta*, 524 F.3d at 403). The statute unambiguously regulates gun industry members' own conduct in the sale and marketing of firearms, rather than imposing duties of care or liability arising only from the misconduct of other persons. When a statute governs a person's "own acts or omissions," it imposes "direct, not vicarious, liability." *Becker v. Poling Transp. Corp.* 356 F.3d 381, 390 (2d Cir. 2004).

Nor is it improper for a State to enact a statute that requires firearms manufacturers and sellers to take steps to reduce the risk that their product will be later misused. Although appellants repeatedly contend (Br. at 2, 18, 23–24) that PLCAA bars liability for the unlawful or criminal misuse of firearms, Congress did not offer the gun industry

24

such blanket immunity. PLCAA preempts suits by an injured person against a manufacturer or seller for harms that result from "the criminal or unlawful misuse of a qualified product by the person or a third party"—such as the purchaser or other ultimate user of the firearm. 15 U.S.C. § 7903(5)(A). But PLCAA also exempts from that preemption, and thus authorizes such suits when based on a violation of a state statute that applies to the sale or marketing of firearms. *Id.* § 7903(5)(A)(iii).

Appellants are mistaken in suggesting (Br. at 26) that a predicate statute must set forth "concrete and discrete" prohibitions pertaining to specific acts. The text of PLCAA imposes no such requirement, and the Supreme Court has cautioned against judicially amending statutes to add requirements that were not placed there by Congress. *See Chamber of Com. v. Whiting*, 563 U.S. 582, 599 (2011).

Nor can such a requirement be inferred, as appellants suggest (Br. at 25–26), from the fact that PLCAA exempts only suits charging that a manufacturer or seller "knowingly violated" a predicate statute. The knowledge requirement limits the types of cases that may be brought pursuant to a qualifying predicate statute, not the nature of the predicate statute itself. *See* 15 U.S.C. § 7903(5)(A)(iii) (exempting from preemption

25

"an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product"). Appellants are simply wrong to argue (Br. at 27–28), moreover, that there can be no knowing violation of a statute that contains a reasonableness standard, as New York's statute does. *Cf. Rogoz v. City of Hartford*, 796 F.3d 236, 246–47 (2d Cir. 2015) (inquiring under qualified immunity whether officer knowingly violated constitutional limitation on unreasonable force). And even if PLCAA had required state legislatures to include a knowledge requirement in the predicate statute itself (which it did not), New York's statute requires a degree of *criminal* recklessness that is tantamount to knowledge. *See* N.Y. Gen. Bus. Law § 898-a(5). See *infra* at 34.

Likewise, appellants are mistaken in contending (Br. at 26) that, because PLCAA's predicate exception states that it "includ[es]" several illustrative examples, Congress intended for qualifying predicates to be limited to statutes that closely resemble those examples. *See* 15 U.S.C. § 7903(5)(A)(iii)(I)–(II) (describing statutes that involve recordkeeping, false statements, and sales to prohibited persons). The term "including" does not "exclude other things otherwise within the meaning" of a statu-

26

tory standard. *Carroll v. Trump*, 49 F.4th 759, 768–69 (2d Cir. 2022) (quotation marks omitted). The term denotes that a statute's examples are merely "illustrative application[s] of the general principle" embodied in the statute. *Alabama v. North Carolina*, 560 U.S. 330, 341 (2010) (quotation marks omitted). Here, this Court was clear in *Beretta* about that general principle: the relevant point of similarity is whether a statute "clearly can be said to regulate the firearms industry," not whether a statute regulates the gun industry in ways that are substantively similar to the illustrative examples offered by Congress. 524 F.3d at 402.

Indeed, had Congress intended to limit the predicate exception to federal and state statutes involving recordkeeping, false statements, and sales to prohibited persons, it would have narrowed the predicate exception to suits based on statutes that are "comparable or identical" to the illustrative examples, as it did in a different PLCAA exception, *see* 15 U.S.C. § 7903(5)(A)(i) (exempting from preemption an "action brought against a transferor convicted under [18 U.S.C. § 924(h)], or a comparable or identical State felony law"). As Congress used no such language in the exception at issue here, *id.* § 7903(5)(A)(iii), the Court should not read it in. "[W]here Congress includes particular language in one section of a

27

statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Kucana v. Holder*, 558 U.S. 233, 249 (2010) (quotation marks omitted).

Finally, appellants' express preemption arguments have been rejected by the Connecticut Supreme Court in *Soto v. Bushmaster Firearms International, LLC*, which carefully applied PLCAA's predicate exception and this Court's decision in *Beretta* to another state statute. *See* 331 Conn. 53, *cert. denied*, 140 S. Ct. 513 (2019). In particular, *Soto* held that the predicate exception allowed a claim under Connecticut's Unfair Trade Practices Act, a generally applicable unfair business practices statute. *Id.*; *see* Conn. Gen. Stat. § 42-110b(a) (prohibiting "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce").

In *Soto*, the plaintiffs contended that the defendant manufacturers and sellers in that case had marketed the assault rifle used in the Sandy Hook shooting "in an unethical, oppressive, immoral and unscrupulous manner," including "by extolling the militaristic and assaultive qualities" of the weapon and suggesting to consumers that the gun is "a combat

weapon that is intended to be used for the purposes of waging war and killing human beings." *Soto*, 331 Conn. at 73. The Connecticut Supreme Court explained that "[r]eading the predicate exception to encompass actions brought to remedy illegal and unscrupulous marketing practices under state consumer protection laws is consistent with" *Beretta*, because unfair practices statutes have previously been applied to gun sales and marketing and because the Connecticut statute's broad reference to "any trade or commerce" encompasses advertising and marketing by gun manufacturers and sellers.[1] *Id.* at 124–25; *see Beretta*, 524 F.3d at 404 (holding that predicate exception covers statutes that "courts have applied to the sale and marketing of firearms").

Appellants ignore *Soto*, perhaps because they cannot grapple with its reasoning. *Soto*—which concluded that the predicate exception is applicable to actions under a generally applicable Connecticut statute—presents sound reasoning that necessarily supports an exemption of New

---

[1] The U.S. Supreme Court denied the gun manufacturers' petition for a writ of certiorari, which had been supported by an amicus brief from NSSF, among others. *See* Amicus Curiae Br. of NSSF, *Remington Arms Co. v. Soto*, 140 S. Ct. 513 (2019) (No. 19-168).

York's gun-related public nuisance statute from preemption, as New York's statute expressly governs the firearm industry.

## B. PLCAA Does Not Impliedly Preempt New York's Statute.

Appellants also erroneously argue (Br. at 28–33) that New York's statute is inconsistent with PLCAA's purposes and objectives and is therefore impliedly preempted. "The burden of establishing obstacle preemption" is a "heavy" one. *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 725 F.3d 65, 101 (2d Cir. 2013). This theory demands more than the "mere fact of tension between federal and state law," as any conflict must be "so direct and positive that the two acts cannot be reconciled or consistently stand together." *Id.* at 101–02 (quotation marks omitted).

As the Supreme Court has instructed, principles of implied preemption provide no basis to invalidate a state law where, as here, the plain text of a savings clause permits the state law at issue. Where "Congress specifically preserve[s]" authority for States to regulate in an area, "it stands to reason that Congress did not intend to prevent the States from using appropriate tools to exercise that authority." *Whiting*, 563 U.S. at 600–01; *see Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992).

30

Appellants improperly dismiss (Br. at 2, 19–20, 29, 31) the States' efforts to enact causes of action that qualify for PLCAA's predicate exception and characterize (*id.* at 29) the representative democratic process as "back door" lawmaking. But Congress itself made the judgment that the States' legislatures—as opposed to their courts—could engage in "a bona fide expansion of the common law." 15 U.S.C. § 7901(a)(7). PLCAA's legislative history is replete with references to the importance of the States' "consideration of these issues in a democratic manner," H.R. Rep. No. 108-59, at 54 (2003), through "the legislative process," 151 Cong. Rec. at 18,096 (statement of Sen. Craig). And although appellants argue (Br. at 30–31) that the Ninth Circuit held that PLCAA preempted causes of action based on California's codification of common law theories, the California statute at issue in that case generally applied to all industries and did not clearly apply to the sale or marketing of firearms. *See Ileto v. Glock, Inc.*, 565 F.3d 1126, 1136 (9th Cir. 2009) (distinguishing "statutes that regulate manufacturing, importing, selling, marketing, and using firearms" from those "that regulate the firearms industry").

There is no indication in PLCAA's text or legislative history that Congress intended to prevent States from enacting new statutes to satisfy

PLCAA's exceptions. Congress did not, for example, provide that PLCAA's exceptions were limited to causes of action that existed at the time PLCAA was enacted in 2005. *Compare* 15 U.S.C. § 7903(5)(A)(iii) (PLCAA exception for violations of "a State or Federal statute applicable to the sale or marketing" of firearms), *with* 47 U.S.C. § 414 (federal Communications Act preserving "the remedies *now existing* at common law or by statute" (emphasis added)). Nor is there any textual indication that Congress intended to limit PLCAA's exceptions to "traditional" or "historical" causes of action. *See* Br. at 29–30. To the contrary, PLCAA expressly permits suits based on the violation of statutes like the Gun Control Act of 1968, that have not been around for "hundreds of years," as appellants would require (*id.* at 30 (quotation marks omitted)). *See* 15 U.S.C. § 7903(5)(A)(i), (iii)(II), (vi).

Appellants insist that upholding New York's statute against a claim of federal preemption would allow "'the predicate exception to swallow'" PLCAA. Br. at 3, 19, 24 (quoting *Beretta*, 524 F.3d at 403). This is untrue. The exception is limited to certain suits for violations of certain statutes pertaining to the sale and marketing of firearms—namely, those suits that also meet the additional federal requirements of knowledge and

proximate causation. 15 U.S.C. § 7903(5)(A)(iii). It is up to Congress, and not the courts, to determine whether to add further restrictions on either the scope of qualifying predicate statutes or the suits that may be brought under the predicate exception.

## C. Appellants' Request for an Advisory Opinion on As-Applied Preemption Defenses Is Improper and Without Merit.

Finally, appellants spend (Br. at 33–38) a substantial portion of their opening brief seeking an advisory opinion that New York's statute is preempted as applied to cases where plaintiffs cannot demonstrate knowledge or proximate causation, both of which are separately required by PLCAA's predicate exception. As an initial matter, this argument is forfeited because appellants failed to raise it below. *See United States v. Gomez*, 877 F.3d 76, 95 (2d Cir. 2017).

Moreover, appellants' argument is improper in this facial challenge, because it cannot be seriously disputed that a plaintiff could bring an action under New York's statute that meets PLCAA's separate federal requirements of knowledge and proximate causation. *See Washington State Grange*, 552 U.S. at 449 (requiring a plaintiff to demonstrate that statute is "unconstitutional in all of its applications"). This Court may

not offer its theory on whether appellants would have viable preemption defenses in future suits, as such a ruling would amount to "an advisory opinion upon a hypothetical basis," and not "an adjudication of present right upon established facts." *See Ashcroft v. Mattis*, 431 U.S. 171, 172 (1977) (quotation marks omitted).

Appellants' argument is also without merit as it rests on the faulty assumption that New York's statute altogether excuses a plaintiff from demonstrating knowledge and proximate causation. For example, as to knowledge, § 898-b(1) requires a minimum of criminal recklessness, *see* N.Y. Gen. Bus. Law §§ 898-a(5), 898-b(1), which is tantamount to knowledge as interpreted by federal courts. Recklessness under the New York Penal Law requires "aware[ness]" of a substantial and unjustifiable risk of a specified harm. N.Y. Penal Law § 15.05(3); *see also United States v. Sicignano*, 78 F.3d 69, 71–72 (2d Cir. 1996) (holding that "knowledge" can be based on "awareness" of relevant facts). And § 898-b(2)'s requirement for "establish[ing] and utiliz[ing]" reasonable controls and procedures to prevent unlawful sales or possession, N.Y. Gen. Bus. Law § 898-b(2), readily permits a demonstration of knowledge of the relevant risks. *See generally United States v. Smith*, No. 95-cr-154, 2022 WL 1538706,

at *13 (D.D.C. May 16, 2022) (surveying dictionaries to hold that "active, intentional nature" of particular verb reflects a "degree of direct, knowing involvement").

Similarly, appellants' focus (Br. at 34–35) on the statute's statement that "[t]he existence of a public nuisance shall not depend on whether the gun industry member acted for the purpose of causing harm to the public" is misplaced. *See* N.Y. Gen. Bus. Law § 898-c(2). This provision eliminates any requirement of specific intent but does not displace the statute's requirement of at least general intent to take on a substantial and unjustifiable risk of harm. *See United States v. Scotti*, 47 F.3d 1237, 1245–46 (2d Cir. 1995) (holding that the term "knowingly" indicates general, not specific, intent).

With respect to causation, New York's statute requires a potential plaintiff to demonstrate that a violation "results in harm to the public." N.Y. Gen. Bus. Law § 898-c(1). New York courts have not interpreted the meaning of this phrase, but, on its face, it leaves room for notions of proximate causation and reasonably foreseeable harms. Accordingly, preemption is improper as the federal and state enactments are, by no means, in "'irreconcilable conflict.'" *See Cantero*, *v. Bank of Am., N.A.* 49 F.4th 121,

35

130 (2d Cir. 2022) (quoting *Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 31 (1996)).

## POINT II

### NEW YORK'S GUN-RELATED PUBLIC NUISANCE STATUTE IS CONSISTENT WITH THE DORMANT COMMERCE CLAUSE

### A. PLCAA's Predicate Exception Forecloses Appellants' Dormant Commerce Clause Challenge.

The dormant aspect of the Commerce Clause contains a "negative command" that prohibits the States from "discriminating against or imposing excessive burdens on interstate commerce." *Comptroller of the Treasury of Md. v. Wynne*, 575 U.S. 542, 548–49 (2015). But this command operates only where Congress's commerce powers are in fact dormant and have not been "exercised by that body." *Northeast Bancorp, Inc. v. Board of Governors of the Fed. Reserve Sys.*, 472 U.S. 159, 174 (1985). "[W]hen Congress exercises its power to regulate commerce by enacting legislation, the legislation controls." *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2089 (2018). And "any action taken by a State within the scope of the congressional authorization is rendered invulnerable to Commerce Clause challenge." *Western & S. Life Ins.*, 451 U.S. at 653; *see White v.*

36

*Massachusetts Council of Constr. Emps., Inc.*, 460 U.S. 204, 213 (1983); *Mid-Atlantic Bldg. Sys. Council v. Frankel*, 17 F.3d 50, 52 (2d Cir. 1994).

This principle bars appellants' claim under the dormant Commerce Clause at the outset. In *Northeast Bancorp v. Board of Governors*, the Supreme Court considered the federal Bank Holding Company Act, which required the Federal Reserve Board to review any interstate acquisitions of banks and in effect prohibited such an acquisition except when "'specifically authorized by the statute laws of the State in which such bank is located.'" 472 U.S. at 162–63 (discussing 12 U.S.C. § 1842(d)). The Court concluded that several state statutes authorizing interstate acquisitions were "consistent with" the federal statute, *id.* at 168–73, and held on that basis that such statutes were therefore "invulnerable" to a dormant Commerce Clause challenge, *id.* at 174.

So too here. PLCAA—enacted as an exercise of Congress's Commerce Clause powers—restricts the ability of the States to impose liability on gun manufacturers and sellers, except when a state legislature enacts a predicate statute that authorizes that liability. And as established above (*supra* at 19–36), New York's statute is "consistent with" PLCAA's predicate exception. *See Northeast Bancorp*, 472 U.S. at 168. Because Congress

37

has restricted state conduct in this area, but has specifically excepted statutes like the one at issue from that bar, New York's statute is invulnerable to a dormant Commerce Clause challenge.[2] In any event, and as detailed below, appellants' dormant Commerce Clause arguments fail on their own terms.

## B. New York's Statute Is Consistent with the Dormant Commerce Clause.

### 1. New York's statute does not discriminate against or unduly burden interstate commerce.

Appellants erroneously contend (Br. at 39–43, 49–50) that New York's gun-related public nuisance statute either discriminates on its face against interstate commerce or imposes an undue burden on interstate commerce. Each contention is wrong.

---

[2] Appellants seem to agree (Br. at 51) that their dormant Commerce Clause challenge depends on their antecedent argument that Congress, in enacting PLCAA, has "explicitly found that the very kind of regulation" here should be prohibited. And the district court recognized that these two challenges were linked. (A. 50.) In these circumstances, this Court has discretion to consider whether the dormant Commerce Clause applies in the first place. *See American Trucking Ass'ns v. New York State Thruway Auth.*, 886 F.3d 238, 248 (2d Cir. 2018).

38

First, New York's statute does not facially discriminate against "out-of-state economic interests." *See Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2471 (2019) (emphasis and quotation marks omitted). The statute applies equally to any "gun industry member," without regard to the State where they reside. *See* N.Y. Gen. Bus. Law § 898-a(4). And the statute applies to the sale, manufacturing, importing, or marketing of firearms and related products in New York, whether engaged in by an in-state or out-of-state business. *See id.* § 898-b.

Appellants argue (Br. at 39–42) that New York's statute is facially discriminatory because it regulates the sale and marketing of "qualified products," which are defined as firearms, ammunition, or components that are "shipped or transported in interstate or foreign commerce" by reference to PLCAA's definition, 15 U.S.C. § 7903(4). *See* N.Y. Gen. Bus. Law § 898-a(6).[3] But that argument is misplaced because New York's

---

[3] PLCAA has an interstate commerce requirement to ensure that the legislation falls within Congress's commerce power. The New York statute incorporates PLCAA's definition to ensure that it falls within an exception authorized by PLCAA. The Supreme Court has recognized that States may adopt federal statutory definitions and track a federal statute to ensure consistency with, and avoid preemption by, the federal statute. *See Whiting*, 563 U.S. at 601.

statute regulates in-state and out-of-state businesses alike, as both cate-
gories of businesses may engage in commercial conduct with respect to
qualified products.

As the district court correctly concluded, moreover, appellants failed
to allege that there is any in-state commerce favored by this definition—
i.e., any in-state commerce relating to firearms that does *not* involve quali-
fied products and that is therefore exempt from New York's statute. (*See*
A. 55–56.) The complaint's sole arguably relevant allegation is that there
are approximately 3,800 federal firearms licensees in New York. (*See*
A. 26.) But those in-state businesses are equally able to engage in the
interstate market. And the complaint does not—and could not with these
appellants—allege that there are FFLs based in New York who do not
participate in the interstate market. As this Court previously recognized,
"the firearms industry is interstate . . . in nature," *Beretta*, 524 F.3d at
394, and in-state firearms businesses are governed by New York's statute
as long as they transact in any firearm, ammunition, or component part
that is sold or marketed in interstate commerce.

Appellants' pleading failure is fatal because "any notion of discrimi-
nation assumes a comparison of substantially similar entities" to demon-

40

strate local favoritism. *See Department of Revenue of Ky. v. Davis*, 553 U.S. 328, 342 (2008) (quotation marks omitted). Appellants nonetheless contend (Br. at 41–43) that litigation on "a complete record" is appropriate and speculate that the statute "necessarily incentivizes the creation of an intrastate market. But in this facial challenge, it is appellants' burden in the first instance to establish that New York's statute does not have a "plainly legitimate sweep," which would be to evenhandedly regulate similarly situated in-state and out-of-state businesses that transact in qualified products. *See Washington State Grange*, 552 U.S. at 449 (quotation marks omitted). It is not enough for a challenger to contend that there "might well" be differential treatment of out-of-state and in-state comparators, as the "'hypothetical possibility of favoritism'" does not "'constitute discrimination that transgresses constitutional commands.'" *General Motors Corp. v. Tracy*, 519 U.S. 278, 310–11 (1997) (quoting *Associated Indus. of Mo. v. Lohman*, 511 U.S. 641, 654 (1994)).

Moreover, even if there did exist a New York business that operated entirely in intrastate commerce, without transacting in qualified products, appellants fail to explain how that business would be favorably treated here. Such a business would not benefit from PLCAA's general prohibi-

41

tion on certain civil suits because PLCAA preempts only those causes of action against "a manufacturer or seller of a qualified product." *See* 15 U.S.C. § 7903(5)(A). Therefore, that business would be subject to *all* civil causes of action, including liability based on New York's general nuisance statute (N.Y. Penal Law § 240.45) and any available common law negligence theories. That hypothetical business is hardly a proper comparator, as it would be utterly unaffected by the scope of the PLCAA exception or by New York's statute tailored to fit within that exception.

The facial discrimination claim independently fails because appellants make no effort to argue that any purported discrimination violates the governing constitutional standard. As the Supreme Court has recognized, a state statute that discriminates against out-of-state goods or nonresident economic actors is constitutional if it "is narrowly tailored to advance a legitimate local purpose." *Tennessee Wine & Spirits*, 139 S. Ct. at 2461 (alteration and quotation marks omitted). In such instances, courts assess "whether the challenged requirement can be justified as a public health or safety measure," or whether the state statute's "predominant effect" is economic protectionism. *Id.* at 2474.

42

Here, the New York Legislature made plain that its statute targets only conduct that creates harm to the public. *See* N.Y. Gen. Bus. Law § 898-c. And in enacting public nuisance legislation to alleviate those harms, the Legislature specifically found that the gun industry's "illegal or unreasonable sale, manufacture, distribution, importing or marketing of firearms" and "failure to implement reasonable safety measures" had resulted in a "public health crisis of gun violence in this state." Ch. 237, § 1, 2021 McKinney's N.Y. Laws at 898. Appellants, on the other hand, cite no evidence of economic protectionism for in-state businesses, and the "abstract possibility" of legislative alternatives that would be less protectionist is altogether insufficient to mount a facial challenge. *See Maine v. Taylor*, 477 U.S. 131, 147 (1986) (quotation marks omitted).

Second, appellants offer only a cursory argument (Br. at 49–50) that New York's statute poses an undue burden on interstate commerce under the balancing test set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). The district court properly determined that appellants' *Pike* challenge was similarly without merit because appellants had not identified "'any in-state commercial interest that is favored, directly or indirectly,'" as this Court requires. (A. 57 (quoting *Freedom Holdings Inc.*

43

*v. Spitzer,* 357 F.3d 205, 218 (2d Cir. 2004)).) And because the statute satisfies the "more demanding scrutiny" applied to facially discriminatory statutes, it necessarily satisfies *Pike*, as well. *See Taylor*, 477 U.S. at 138.

Appellants miss the mark in contending (Br. at 50) that dismissal was inappropriate because their undue burden challenge requires a "fact-intensive inquiry." Where appellants have identified no in-state business that is favored, it is not the Court's role "to develop Commerce Clause doctrine" based on "predictive judgments" regarding the potential economic costs to unknown businesses and benefits to the State. *See Tracy*, 519 U.S. at 309. Appellants are free to press case-specific *Pike*-related arguments in response to specific suits. But in the context of this facial challenge, appellants merely invite this Court to engage in impermissible "speculation" about the putative costs and benefits of numerous potential applications of the statute. *See Copeland*, 893 F.3d at 111 (quotation marks omitted).

In any case, appellants fail to demonstrate that "'the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits'" under *Pike*. *See Davis*, 553 U.S. at 338–39 (quoting *Pike*, 397 U.S. at 142). "State laws frequently survive this *Pike* scrutiny." *Id.*

44

at 339 (collecting cases). Here, New York's statute accords with the "traditional recognition of the need to accommodate state health and safety regulation in applying dormant Commerce Clause principles." *Tracy*, 519 U.S. at 306; *see Taylor*, 477 U.S. at 151. The statute prevents "harm to the public" in the State. *See* N.Y. Gen. Bus. Law § 898-c(1). And the statute reasonably targets conduct that is already "unlawful," *id.* § 898-b(1), requires "compliance" with existing laws, *see id.* § 898-a(2)(b), and properly prohibits unreasonable conduct that either endangers health and safety or results in unlawful sales and possession, *see id.* § 898-b. The mere fact that the statute may place compliance "costs on merchants who do business" here does not amount to an undue burden. *See United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 438 F.3d 150, 160 (2d Cir. 2006), *aff'd*, 550 U.S. 330 (2007).[4]

---

[4] This Court has recognized that because firearms pose a "public safety risk[]" and endanger "public health," the dormant Commerce Clause permits States to enact statutes that focus on "minimizing the risks of gun violence and preventing armed mayhem in public places." *New York State Rifle & Pistol Ass'n v. City of New York*, 883 F.3d 45, 65 (2d Cir. 2018) (alteration and quotation marks omitted), *vacated as moot*, 140 S. Ct. 1525 (2020). Although a decision that was vacated as moot is "no longer controlling precedent," it nonetheless should be treated as "persuasive authority." *In re Motors Liquidation Co.*, 829 F.3d 135, 155 & n.23 (2d Cir. 2016) (quotation marks omitted).

45

### 2. New York's statute does not improperly regulate extraterritorial conduct.

Appellants further err in contending (Br. at 43–48) that New York's gun-related public nuisance statute unconstitutionally governs conduct that is entirely extraterritorial. The extraterritoriality doctrine is considered "the most dormant" doctrine "in all of dormant commerce clause jurisprudence." *Energy & Env't Legal Inst. v. Epel*, 793 F.3d 1169, 1175 (10th Cir. 2015) (Gorsuch, J.). Numerous state enactments have some "extraterritorial effect," which on its own does not constitute an unconstitutional "'application of a state statute to extraterritorial commerce.'" *Freedom Holdings Inc. v. Spitzer,* 357 F.3d 205, 220 (2d Cir. 2004) (alteration marks omitted) (quoting *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989)). This Court has therefore cautioned that the extraterritoriality doctrine "must be applied carefully," *Freedom Holdings, Inc. v. Cuomo*, 624 F.3d 38, 68 n.19 (2d Cir. 2010), and precludes the application of state law only "to commerce that takes place *wholly* outside of the State's borders." *VIZIO, Inc. v. Klee*, 886 F.3d 249, 254 (2d Cir. 2018) (emphasis added) (quotation marks omitted).

New York's statute, on its face, is aimed at conduct that results in unsafe conditions "in New York state" or unlawful sales or possession of

46

firearms "in New York state." N.Y. Gen. Bus. Law § 898-b. A claim under this statute could be stated on New York-based conduct alone (i.e., a New York retailer knowingly selling firearms to straw purchasers in New York). And suits have been brought under the statute targeting manufacturers and retailers that ship illegal firearm products "directly to New York customers." Compl. ¶¶ 5, 468, *New York v. Arm or Ally, LLC*, No. 22-cv-6124 (S.D.N.Y. July 19, 2022), ECF No. 1-1 (ghost guns components); *see* Compl. ¶ 54, *City of New York v. Arm or Ally, LLC*, No. 22-cv-5525 (S.D.N.Y. June 29, 2022), ECF No. 1 (alleging defendants' shipment of "ghost gun components straight to their New York City customers"). Such plainly constitutional applications foreclose appellants' facial extraterritoriality challenge.

Appellants discuss (Br. at 44–45, 47) hypothetical applications of the statute to manufacturers and sellers that conduct no commerce in New York. But appellants' sworn declarations submitted in support of their preliminary injunction motion establish their own role as federal firearms licensees whose firearms and ammunition are "shipped or transported into New York." (*See* A. 27.) For example, one appellant operates a storefront in Manhattan (S.A. 74–75), while other appellants operate a

marketing department in the State or build firearms from component parts from the State (S.A. 2, 29). A number of appellants either engage New York distributors or distribute their products into New York themselves (S.A. 46, 61–62, 64–65), while others do business in New York as wholesalers (S.A. 35, 51, 56, 70). And various appellants are online retailers that sell firearms or ammunition directly to consumers in New York. (S.A. 8, 10, 17, 19, 23, 25.)[5]

Even setting aside their own declarations, it is insufficient for appellants to "speculate about 'hypothetical' or 'imaginary' cases" involving parties and conduct not present before the Court in the context of a facial challenge. *See Washington State Grange*, 552 U.S. at 450. Appellants argue (Br. at 45) that the plaintiffs in a separate suit brought under New York's statute have failed to allege that the defendants there have adequate New York connections, but appellants' argument only underscores that their constitutional concerns are properly raised on an as-applied

_____

[5] This Court may consider appellants' own declarations because they "flesh out the substance of [the] complaint," and thus show that no further facts "'consistent with the allegations' in the complaint" would be available to support appellants' claims. *See Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 575 (2d Cir. 2005) (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984)).

basis in that proceeding, as the defendants there have done. *See* Def.'s Pre-Mot. Conf. Letter at 3, *Steur v. Glock, Inc.*, No. 22-cv-3192 (E.D.N.Y. July 5, 2022), ECF No. 7.

Even if potential claims under this statute might involve some out-of-state conduct, that fact alone is far from dispositive. As the Supreme Court has repeatedly instructed, the dormant Commerce Clause was "never intended to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country." *Tracy*, 519 U.S. at 306–07 (quoting *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 443–44 (1960)). The fact that out-of-state businesses transacting with New York residents may need to modify their conduct is, at most, nothing more than the permissible "upstream" effect of a state statute that safeguards what occurs in the State. *See Freedom Holdings*, 357 F.3d at 220. As the district court recognized, New York's statute in that manner "in no way differs from" state laws that protect public safety in other industries. (A. 59.)

Appellants' broader contentions about the extraterritoriality doctrine are also unavailing. Appellants rely on (Br. at 46, 48) Supreme Court

precedents invalidating state statutes that, on their face, based their restrictions on economic conduct "outside of the state," *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 519 n.1 (1935) (quotation marks omitted), or in "other state[s] of the United States," *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 576 (1986) (quotation marks omitted). Those cases—each regarding a statute that directly regulated "out-of-state transaction[s], either by its express terms or by its inevitable effect"—have no bearing here on New York's statute that undisputedly has numerous applications to direct transactions with New York residents. *See Pharmaceutical Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 669 (2003) (quotation marks omitted). Indeed, even appellants' cited out-of-circuit decisions (Br. at 46–47) approve of States' authority to regulate dangerous "products that are brought into or are otherwise within the borders of the State." *See Daniels Sharpsmart, Inc. v. Smith*, 889 F.3d 608, 615 (9th Cir. 2018); *see also Legato Vapors, LLC v. Cook*, 847 F.3d 825, 828 (7th Cir. 2017) (finding "unremarkable and uncontroversial" the regulation of actual "in-state sales").

Appellants' analogy (Br. at 48–49) to cases enjoining the state regulation of internet-based activity is further afield. The constitutional

defect in those internet-related statutes was that they did not, on their face, qualify that they targeted in-state conduct, persons, or conditions. *See American Booksellers Found. v. Dean*, 342 F.3d 96, 103 (2d Cir. 2003) (faulting Vermont statute for not stating that it applies "in Vermont"); *American Civil Liberties Union v. Johnson*, 194 F.3d 1149, 1161 (10th Cir. 1999) (faulting New Mexico statute that "contains no express limitation confining it to communications which occur wholly within its borders"). By contrast, even in the *sui generis* context of internet regulation, this Court has found constitutional a state statute that properly qualified that it applies to circumstances in the State itself (as New York's statute does here). *See SPGGC, LLC v. Blumenthal*, 505 F.3d 183, 195 (2d Cir. 2007) (upholding Connecticut statute's application to "Connecticut consumers").

## POINT III

### NEW YORK'S GUN-RELATED PUBLIC NUISANCE STATUTE COMPORTS WITH DUE PROCESS

The Due Process Clause prohibits a statute that "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits or authorizes or even encourages arbitrary and discriminatory enforcement." *Reynolds v. Quiros*, 25 F.4th 72, 96 (2d Cir.)

51

(quotation marks omitted), *cert. denied*, 143 S. Ct. 199 (2022). Under that

standard, "economic regulation is subject to a less strict vagueness test

because its subject matter is often more narrow, and because businesses,

which face economic demands to plan behavior carefully, can be expected

to consult relevant legislation in advance of action." *Village of Hoffman*

*Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982) (footnotes

omitted). As this Court has held, "[l]aws with civil consequences receive

less exacting vagueness scrutiny."[6] *Monserrate v. New York State Senate*,

599 F.3d 148, 158 (2d Cir. 2010).

Here, the district court properly concluded that New York's gun-

related public nuisance statute readily satisfies due process. (*See* A. 59–

---

[6] The National Rifle Association of America, Inc. (NRA), as amicus curiae, contends that statutes regulating the sale or marketing of firearms deserve heightened vagueness review because of Second Amendment considerations. *See* Br. of Amicus Curiae NRA (NRA Amicus Br.) at 17–20. However, New York's statute regulates only harmful commercial conduct and is not concerned with the lawful possession of firearms. *See McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (holding that the Supreme Court's Second Amendment precedents do not "cast doubt" on "laws imposing conditions and qualifications on the commercial sale of arms" (quotation marks omitted)); *see also New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2162 (2022) (Kavanaugh, J., joined by Roberts, C.J., concurring) (similar). In any event, the statute would survive scrutiny even under a "heightened" standard. *See New York State Rifle & Pistol Ass'n*, 804 F.3d at 265.

66.) The statute, like many other New York laws, incorporates well-worn legal concepts surrounding state public nuisance law and therefore accords with "common understanding and practices."[7] *See Arriaga v. Mukasey*, 521 F.3d 219, 224 (2d Cir. 2008) (quotation marks omitted). Moreover, the statute is specific in proscribing categories of conduct. In particular, the statute prohibits conduct relating to the sale or marketing of firearms that is "either unlawful in itself or unreasonable under all the circumstances," where the manufacturer or seller "create[s], maintain[s] or contribute[s]" to conditions that endanger public health or safety. N.Y. Gen. Bus. Law § 898-b(1). And the statute provides numerous illustrative examples of the required "reasonable controls and procedures." *Id.* § 898-a(2). Those examples include "screening, security, inventory and other business practices to prevent thefts of qualified products as well as sales of qualified products to straw purchasers, traffickers, persons prohibited from possessing firearms . . . , or persons at risk of injuring themselves

---

[7] *See* N.Y. Penal Law §§ 240.45 (general nuisance statute), 400.05 (nuisance in relation to certain weapons); N.Y. Multiple Dwelling Law § 309(1)(a) (nuisance in apartment buildings); N.Y. Public Health Law §§ 1300-b (nuisance in industrial waste), 1320 (nuisance in growing noxious plants).

53

or others," and measures to ensure compliance with New York's consumer protection statutes. *Id.*

Appellants come nowhere close to meeting their burden in a facial challenge to demonstrate that the statute is "so fatally indefinite that it cannot constitutionally be applied to anyone." *See Copeland*, 893 F.3d at 110. Indeed, appellants take no issue with most of the statute's provisions (Br. at 51–55), and even the NRA seemingly agrees that States can impose liability based on deceptive trade practices to protect consumers, as New York does here (*see* NRA Amicus Br. at 24–25 (citing *Soto*, 331 Conn. 53)). *See also* N.Y. Gen. Bus. Law §§ 898-a(2), 898-b(2).

Appellants nonetheless contend (Br. at 52) that the statute is unconstitutional because it fails to define the term "reasonable." Such an argument, if accepted, would render countless statutes and standards unconstitutionally vague. But this Court has been clear that legal commands are sufficiently definite even when they are based on an implied reasonableness standard. *See United States v. Hon*, 904 F.2d 803, 809 (2d Cir. 1990). By extension, it must be the case that an express reasonable-ness standard is constitutionally permissible.

54

Appellants also dwell on the statute's reference to "contribut[ing]" to a public nuisance, N.Y. Gen. Bus. Law § 898-b(1), and allege that the term could be read to promote liability for "remote, far-downstream conditions" (*see* Br. at 51, 53–54). However, existing judicial precedents govern the meaning of the term "contribute" in the context of a public nuisance statute. For example, appellants' own cases demonstrate (*id.* at 52–53) that the concept of contributing to a nuisance does not in fact permit liability where the relationship between the complained-of conduct and the nuisance is "too tenuous and remote," *People v. Sturm, Ruger & Co.*, 309 A.D.2d 91, 104 (N.Y. App. Div., 1st Dep't 2003); *see, e.g.*, *Copart Indus., Inc. v. Consolidated Edison Co. of N.Y., Inc.*, 41 N.Y.2d 564, 570 (1977) (inquiring whether defendant's conduct was "origin" of the nuisance).

Finally, appellants insist (Br. at 54) that the statute violates due process because it allegedly "eliminat[es] proximate cause" as a requirement to bring suit. Appellants did not raise this claim in their complaint (*see* A. 35–37), and they cannot do so for the first time on appeal. In any event, as explained above (*supra* at 35-36), appellants have not established that the statute in fact fails to require a demonstration of proximate causation.

55

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's

judgment.

Dated:  New York, New York
        January 6, 2023

                                   Respectfully submitted,

                                   LETITIA JAMES
                                     *Attorney General*
                                     *State of New York*
                                   Attorney for Appellee


                            By:   */s/ Dennis Fan*
                                   DENNIS FAN
                                   Senior Assistant Solicitor General

BARBARA D. UNDERWOOD              28 Liberty Street
  *Solicitor General*             New York, NY 10005
ESTER MURDUKHAYEVA                (212) 416-8921
  *Deputy Solicitor General*
DENNIS FAN
  *Senior Assistant Solicitor General*
      *of Counsel*

56

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Kelly Cheung, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 10,989 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

_/s/ Kelly Cheung_

# STATUTORY ADDENDUM

# TABLE OF CONTENTS

**Page**

15 U.S.C. § 7901 ..................................................................ADD1

15 U.S.C. § 7902 ..................................................................ADD4

15 U.S.C. § 7903 ..................................................................ADD4

N.Y. General Business Law § 898-a .................................ADD7

N.Y. General Business Law § 898-b .................................ADD8

N.Y. General Business Law § 898-c..................................ADD8

N.Y. General Business Law § 898-d .................................ADD8

N.Y. General Business Law § 898-e..................................ADD8

# STATUTORY ADDENDUM

**Protection of Lawful Commerce in Arms Act, Pub. L. No. 109-92, 119 Stat. 2095 (2005) (codified at 15 U.S.C. §§ 7901–7903).**

**15 U.S.C. § 7901. Findings; purposes.**

(a)   Findings

Congress finds the following:

(1)   The Second Amendment to the United States Constitution provides that the right of the people to keep and bear arms shall not be infringed.

(2)   The Second Amendment to the United States Constitution protects the rights of individuals, including those who are not members of a militia or engaged in military service or training, to keep and bear arms.

(3)   Lawsuits have been commenced against manufacturers, distributors, dealers, and importers of firearms that operate as designed and intended, which seek money damages and other relief for the harm caused by the misuse of firearms by third parties, including criminals.

(4)   The manufacture, importation, possession, sale, and use of firearms and ammunition in the United States are heavily regulated by Federal, State, and local laws. Such Federal laws include the Gun Control Act of 1968, the National Firearms Act, and the Arms Export Control Act.

(5)   Businesses in the United States that are engaged in interstate and foreign commerce through the lawful design, manufacture, marketing, distribution, importation, or sale to the public of firearms or ammunition products that have been shipped or transported in interstate or foreign commerce are not, and should not, be liable for the harm caused by those who criminally or unlawfully misuse firearm products or ammunition products that function as designed and intended.

**ADD1**

(6)     The possibility of imposing liability on an entire industry for
        harm that is solely caused by others is an abuse of the legal
        system, erodes public confidence in our Nation's laws,
        threatens the diminution of a basic constitutional right and
        civil liberty, invites the disassembly and destabilization of
        other industries and economic sectors lawfully competing in
        the free enterprise system of the United States, and
        constitutes an unreasonable burden on interstate and
        foreign commerce of the United States.

(7)     The liability actions commenced or contemplated by the
        Federal Government, States, municipalities, and private
        interest groups and others are based on theories without
        foundation in hundreds of years of the common law and
        jurisprudence of the United States and do not represent a
        bona fide expansion of the common law. The possible
        sustaining of these actions by a maverick judicial officer or
        petit jury would expand civil liability in a manner never
        contemplated by the framers of the Constitution, by
        Congress, or by the legislatures of the several States. Such
        an expansion of liability would constitute a deprivation of
        the rights, privileges, and immunities guaranteed to a
        citizen of the United States under the Fourteenth
        Amendment to the United States Constitution.

(8)     The liability actions commenced or contemplated by the
        Federal Government, States, municipalities, private interest
        groups and others attempt to use the judicial branch to
        circumvent the Legislative branch of government to regulate
        interstate and foreign commerce through judgments and
        judicial decrees thereby threatening the Separation of
        Powers doctrine and weakening and undermining important
        principles of federalism, State sovereignty and comity
        between the sister States.

(b)    Purposes

The purposes of this chapter are as follows:

(1)    To prohibit causes of action against manufacturers, distributors, dealers, and importers of firearms or ammunition products, and their trade associations, for the harm solely caused by the criminal or unlawful misuse of firearm products or ammunition products by others when the product functioned as designed and intended.

(2)    To preserve a citizen's access to a supply of firearms and ammunition for all lawful purposes, including hunting, self-defense, collecting, and competitive or recreational shooting.

(3)    To guarantee a citizen's rights, privileges, and immunities, as applied to the States, under the Fourteenth Amendment to the United States Constitution, pursuant to section 5 of that Amendment.

(4)    To prevent the use of such lawsuits to impose unreasonable burdens on interstate and foreign commerce.

(5)    To protect the right, under the First Amendment to the Constitution, of manufacturers, distributors, dealers, and importers of firearms or ammunition products, and trade associations, to speak freely, to assemble peaceably, and to petition the Government for a redress of their grievances.

(6)    To preserve and protect the Separation of Powers doctrine and important principles of federalism, State sovereignty and comity between sister States.

(7)    To exercise congressional power under article IV, section 1 (the Full Faith and Credit Clause) of the United States Constitution.

## 15 U.S.C. § 7902. Prohibition on bringing of qualified civil liability actions in Federal or State court.

(a)  In general

A qualified civil liability action may not be brought in any Federal or State court.

(b)  Dismissal of pending actions

A qualified civil liability action that is pending on October 26, 2005, shall be immediately dismissed by the court in which the action was brought or is currently pending.

## 15 U.S.C. § 7903. Definitions.

In this chapter:

. . .

(4)  Qualified product

The term "qualified product" means a firearm (as defined in subparagraph (A) or (B) of section 921(a)(3) of title 18), including any antique firearm (as defined in section 921(a)(16) of such title), or ammunition (as defined in section 921(a)(17)(A) of such title), or a component part of a firearm or ammunition, that has been shipped or transported in interstate or foreign commerce.

(5)  Qualified civil liability action

(A)  In general

The term "qualified civil liability action" means a civil action or proceeding or an administrative proceeding brought by any person against a manufacturer or seller of a qualified product, or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party, but shall not include—

**ADD4**

(i)  an action brought against a transferor convicted under section 924(h) of title 18, or a comparable or identical State felony law, by a party directly harmed by the conduct of which the transferee is so convicted;

(ii)  an action brought against a seller for negligent entrustment or negligence per se;

(iii)  an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought, including—

(I)  any case in which the manufacturer or seller knowingly made any false entry in, or failed to make appropriate entry in, any record required to be kept under Federal or State law with respect to the qualified product, or aided, abetted, or conspired with any person in making any false or fictitious oral or written statement with respect to any fact material to the lawfulness of the sale or other disposition of a qualified product; or

(II)  any case in which the manufacturer or seller aided, abetted, or conspired with any other person to sell or otherwise dispose of a qualified product, knowing, or having reasonable cause to believe, that the actual buyer of the qualified product was prohibited from possessing or receiving a firearm or ammunition under subsection (g) or (n) of section 922 of title 18;

(iv)  an action for breach of contract or warranty in connection with the purchase of the product;

(v)  an action for death, physical injuries or property damage resulting directly from a defect in design or manufacture of the product, when used as intended or in a reasonably foreseeable manner, except that where

**ADD5**

the discharge of the product was caused by a volitional act that constituted a criminal offense, then such act shall be considered the sole proximate cause of any resulting death, personal injuries or property damage; or

(vi)  an action or proceeding commenced by the Attorney General to enforce the provisions of chapter 44 of title 18 or chapter 53 of title 26.

(B)    Negligent entrustment

As used in subparagraph (A)(ii), the term "negligent entrustment" means the supplying of a qualified product by a seller for use by another person when the seller knows, or reasonably should know, the person to whom the product is supplied is likely to, and does, use the product in a manner involving unreasonable risk of physical injury to the person or others.

(C)    Rule of construction

The exceptions enumerated under clauses (i) through (v) of subparagraph (A) shall be construed so as not to be in conflict, and no provision of this chapter shall be construed to create a public or private cause of action or remedy.

(D)    Minor child exception

Nothing in this chapter shall be construed to limit the right of a person under 17 years of age to recover damages authorized under Federal or State law in a civil action that meets 1 of the requirements under clauses (i) through (v) of subparagraph (A).

. . .

**ADD6**

**N.Y. General Business Law, Article 39-DDDD.
Sale, Manufacturing, Importing and Marketing of Firearms.**

**N.Y. General Business Law § 898-a. Definitions.**

For purposes of this article, the following terms shall have the following meanings:

1.  "Deceptive acts or practices" shall have the same meaning as defined in article twenty-two-A of this chapter.

2.  "Reasonable controls and procedures" shall mean policies that include, but are not limited to: (a) instituting screening, security, inventory and other business practices to prevent thefts of qualified products as well as sales of qualified products to straw purchasers, traffickers, persons prohibited from possessing firearms under state or federal law, or persons at risk of injuring themselves or others; and (b) preventing deceptive acts and practices and false advertising and otherwise ensuring compliance with all provisions of article twenty-two-A of this chapter.

3.  "False advertising" shall have the same meaning as defined in article twenty-two-A of this chapter.

4.  "Gun industry member" shall mean a person, firm, corporation, company, partnership, society, joint stock company or any other entity or association engaged in the sale, manufacturing, distribution, importing or marketing of firearms, ammunition, ammunition magazines, and firearms accessories.

5.  The terms "knowingly" and "recklessly" shall have the same meaning as defined in section 15.05 of the penal law.

6.  "Qualified product" shall have the same meaning as defined in 15 U.S.C. section 7903(4).

**N.Y. General Business Law § 898-b. Prohibited activities.**

1.  No gun industry member, by conduct either unlawful in itself or unreasonable under all the circumstances shall knowingly or recklessly create, maintain or contribute to a condition in New York state that endangers the safety or health of the public through the sale, manufacturing, importing or marketing of a qualified product.

2.  All gun industry members who manufacture, market, import or offer for wholesale or retail sale any qualified product in New York state shall establish and utilize reasonable controls and procedures to prevent its qualified products from being possessed, used, marketed or sold unlawfully in New York state.

**N.Y. General Business Law § 898-c. Public nuisance.**

1.  A violation of subdivision one or two of section eight hundred ninety-eight-b of this article that results in harm to the public shall hereby be declared to be a public nuisance.

2.  The existence of a public nuisance shall not depend on whether the gun industry member acted for the purpose of causing harm to the public.

**N.Y. General Business Law § 898-d. Enforcement.**

Whenever there shall be a violation of this article, the attorney general, in the name of the people of the state of New York, or a city corporation counsel on behalf of the locality, may bring an action in the supreme court or federal district court to enjoin and restrain such violations and to obtain restitution and damages.

**N.Y. General Business Law § 898-e. Private right of action.**

Any person, firm, corporation or association that has been damaged as a result of a gun industry member's acts or omissions in violation of this article shall be entitled to bring an action for recovery of damages or to enforce this article in the supreme court or federal district court.

# SUPPLEMENTAL APPENDIX

# TABLE OF CONTENTS

**PAGE**

Declaration of Kevin B. Reid, Sr., Sturm, Ruger & Company, Inc., dated Dec. 1, 2021 ...........................................................................SA1

Declaration of Edward Pepper, Osage County Guns, dated Nov. 30, 2021 ...........................................................................SA7

Declaration of Joseph H. Bartozzi, National Shooting Sports Foundation, Inc., dated Dec. 2, 2021 .............................................SA13

Declaration of Michael Cargill, Central Texas Gun Works, dated Nov. 30, 2021 .........................................................................SA16

Declaration of Richard Sprague, Sprague's Sports Inc., dated Nov. 30, 2021 .........................................................................SA22

Declaration of Ron Goslin, SIG Sauer, Inc., dated Dec. 1, 2021 ......................SA28

Declaration of Tripper Dickson, Sports South LLC, dated Dec. 2, 2021 ........SA34

Declaration of Melissa Glaser, Shedhorn Sports, dated Dec. 2, 2021 ........SA40

Declaration of Carlos Guevara, GLOCK, Inc., dated Dec. 3, 2021 .............SA45

Declaration of John Slogar, RSR Group, Inc., dated Dec. 6, 2021 .............SA50

Declaration of Bryan L. Tucker, Davidson's, Inc., dated Dec. 3, 2021 .......SA55

Declaration of Steve Hornady, Hornady Manufacturing Company, dated Dec. 6, 2021 ...........................................................................SA60

Declaration of Susan Cupero, Smith & Wesson Inc., dated Dec. 6, 2021 ......SA64

Declaration of Laurie Lipsey Aronson, Lipsey's, LLC, dated Dec. 7, 2021 ...........................................................................SA69

Declaration of Francesco Valente, Beretta U.S.A. Corp., dated Dec. 9, 2021 ...........................................................................SA74

i

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NATIONAL SHOOTING SPORTS FOUNDATION, Inc., et al., <br><br>         Plaintiffs, <br><br>    v. <br><br> KATHY HOCHUL, in her official capacity as Governor of New York, and LETITIA JAMES, in her official capacity as New York Attorney General, <br><br>         Defendants. | 1:21-cv-1348 (MAD/CFH) |

<u>DECLARATION OF KEVIN B. REID, SR. ON BEHALF OF
STURM, RUGER & COMPANY, INC.</u>

I, Kevin B. Reid, Sr., hereby declare as follows:

1.   I am over the age of 18 years, and I am qualified to submit this declaration on behalf of Sturm, Ruger & Company, Inc. ("Ruger").

2.   I am the Vice President, General Counsel, and Corporate Secretary at Ruger.

3.   I have personal knowledge of the facts set forth in this declaration through direct involvement and by personally reviewing Ruger's records and information.

4.   Ruger is a Delaware corporation with its principal place of business in Connecticut. Ruger was founded in 1949 and has grown to one of the largest firearms manufacturers in the United States, principally for the consumer market.

5.   Ruger is a federal firearms licensee ("FFL") licensed by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").

6.    Ruger is a corporation engaged in the manufacture of firearms and so is a "gun industry member" as defined in New York's Act ("the Act") codified at N.Y. Gen. Bus. Law §§ 898-a–e.

7.    Ruger is also a "manufacturer" as defined in the Protection of Lawful Commerce in Arms Act ("PLCAA").  15 U.S.C. § 7903(2).

8.    Ruger manufactures firearms for civilian use in New Hampshire, Arizona, and North Carolina.  Ruger does not have any manufacturing operations in New York.  Ruger utilizes certain vendors in New York that manufacture certain component parts in that state for Ruger. Ruger's marketing department also is located in New York.

9.     Ruger utilizes a two-step distribution system in the domestic market. This means that Ruger sells firearms for domestic civilian use to a small number of independent, federally licensed distributors in accordance with all applicable state, federal and local laws. These independent, federally licensed distributors, in turn, sell the firearms throughout the United States to independent, federally licensed retailers in accordance with applicable federal, state, and local laws. These independent, federally licensed retailers then sell the firearms to consumers in accordance with applicable federal, state, and local laws. Thus, a Ruger-branded firearm destined for the domestic, consumer market typically is subject to three, federally regulated transactions before it reaches the hands of a consumer.  Ruger does not sell firearms directly to civilians.

10.    I understand the Act's preamble states that, "despite stringent state and local laws against the illegal possession of firearms [in New York] according to the Bureau of Alcohol, Tobacco, Firearms and Explosives statistics, 74% of firearms used in crimes in New York are purchased outside of New York."  NY LEGIS 237 (2021), 2021 Sess. Law News of N.Y. Ch. 237 (S. 7196).

11.     I understand the Act seeks to address "the ease at which legal firearms flow into the illegal market" and the criminal misuse of firearms in New York. *Id.*

12.     The firearms industry is heavily regulated.  All firearms industry members must comply with multiple federal, state, and local laws and regulations that govern the manufacture, export, import, sale, and acquisition of firearms including:  the National Firearms Act, 26 U.S.C. §§ 5801 *et seq.*; the Federal Gun Control Act of 1968, 18 U.S.C. §§ 921 *et seq.*; the Arms Export Control Act, 22 U.S.C. § 2778; Importation of Arms, Ammunition and Implements of War, 27 C.F.R § 447; Commerce in Firearms and Ammunition, 27 C.F.R § 478; as well as numerous state and local laws and regulations.

13.     The Act declares "No gun industry member, by conduct either unlawful in itself or unreasonable under all the circumstances shall knowingly or recklessly create, maintain or contribute to a condition in New York state [*i.e.*, a public nuisance] that endangers the safety or health of the public through the sale, manufacturing, importing or marketing of a qualified product."  N.Y. Gen. Bus. Law § 898-b(1).

14.     I understand that "qualified products" are only those that have "been shipped or transported in interstate or foreign commerce."  15 U.S.C. § 7903(4).

15.     The Act also declares that "All gun industry members who manufacture, market, import or offer for wholesale or retail sale any qualified product in New York state shall establish and utilize reasonable controls and procedures to prevent its qualified products from being possessed, used, marketed or sold unlawfully in New York state."  N.Y. Gen. Bus. Law § 898-b(2).  "Reasonable controls and procedures" are defined as "policies that include, but are not limited to: (a) instituting screening, security, inventory and other business practices to prevent thefts of qualified products as well as sales of qualified products to straw purchasers, traffickers,

persons prohibited from possessing firearms under state and federal law, or persons at risk of injuring themselves or others; and (b) preventing deceptive acts and practices and false advertising and otherwise ensuring compliance with all provisions of article twenty-two-A of this chapter." *Id.* § 898-a(2).

16.     New York law criminalizes multiple activities, including the manufacture, transport, shipment, or sale of any "semiautomatic" rifle, pistol, or shotgun with various defined characteristics such as a semiautomatic rifle that has "a pistol grip that protrudes conspicuously beneath the action of the weapon," N.Y. Penal Law § 265:00(21–22); 265.10(1–2).

17.     Ruger is permitted to manufacture and sell "semiautomatic" firearms of the type illegal under New York's Penal Law in multiple other states.

18.     I fear that, if a criminal illegally transports into New York one of the semiautomatic firearms defined by New York Penal Law to be illegal, Ruger would face liability under the Act even though the initial manufacture, transport, and shipment of the firearm by Ruger was lawful and complied with all applicable laws and regulations in the place undertaken.

19.     Ruger cannot eliminate liability under the Act's first prong because the behavior of third-party criminals is outside Ruger's control.

20.     I also fear that, even setting aside the above activities that New York criminalizes, Ruger could still face liability under the Act for any activity that New York deems to be "unreasonable under all the circumstances," even though in full compliance with all laws and regulations in the place undertaken.

21.     Ruger cannot eliminate liability under Act because "unreasonable under all the circumstances" is not defined, is highly subjective and vague, and because this provision again

creates liability for Ruger based on the behavior of third-party criminals who are outside Ruger's control.

22.     I also fear that Ruger also could face liability under the Act's vague and subjective requirement to "establish and utilize reasonable controls and procedures to prevent" firearms "from being possessed, used, marketed or sold unlawfully in New York state" even though multiple "controls and procedures" are already required by federal, state, and local laws and regulations.

23.     Ruger cannot eliminate liability under the Act because, again, liability is predicated on the behavior of third-party criminals outside Ruger's control.

24.     Drastic measures by Ruger could theoretically eliminate liability under the Act (discontinuing the manufacture of semiautomatic firearms entirely, for example), but the economic impact of such measures to Ruger would be irreparable and, regardless, the potential for litigation and liability under the Act would not be eliminated.  Because the Act is vague and broad and encompasses fully lawful conduct, there is no action that Ruger could take in order to insulate it from liability, other than ceasing operations altogether.

25.     If the Act is not enjoined, Ruger will be irreparably harmed by being forced to cease lawful, federally licensed operations or face liability, both of which would have a significant, harmful impact on the company's revenue.  In addition, because the Act's standards are vague and unattainable, and liability under the Act attaches based upon the behavior of third-party criminals outside Ruger's control, there is no way for Ruger to comply.  Ruger will continually be at risk of litigation and potential liability unless it ceases doing business as a federally licensed firearms manufacturer.

**SA5**

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of December, 2021.

By: _____
        Kevin B. Reid, Sr.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NATIONAL SHOOTING SPORTS FOUNDATION, Inc., et al., <br><br> Plaintiffs, <br><br> v. <br><br> KATHY HOCHUL, in her official capacity as Governor of New York, and LETITIA JAMES, in her official capacity as New York Attorney General, <br><br> Defendants. | 1:21-cv-1348 (MAD/CFH) |

DECLARATION OF EDWARD PEPPER ON BEHALF OF OSAGE COUNTY GUNS

I, Edward Pepper, hereby declare as follows:

1.      I am over the age of 18 years, and I am qualified to submit this declaration on behalf of Osage County Guns ("Osage County").

2.      I am the Chief Operating Officer and Owner of Osage County.

3.      I have personal knowledge of the facts set forth in this declaration through direct involvement and by personally reviewing Osage County's records and information.

4.      Osage County is a Missouri corporation operating a firearms, accessories, and ammunition sales business in Missouri.

5.      Osage County is a federal firearms licensee ("FFL") licensed by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").

6.      Osage County is a corporation engaged in the sale of firearms and so is a "gun industry member" as defined in New York's Act ("the Act") codified at N.Y. Gen. Bus. Law §§ 898-a–e.

7.      Osage County is also a "seller" as defined in the Protection of Lawful Commerce in Arms Act ("PLCAA").  15 U.S.C. § 7903(2).

8.      Osage County sells to civilians from its store in Missouri and also into other states online through FFLs as permitted by federal law.

9.      I understand the Act's preamble states that, "despite stringent state and local laws against the illegal possession of firearms [in New York] according to the Bureau of Alcohol, Tobacco, Firearms and Explosives statistics, 74% of firearms used in crimes in New York are purchased outside of New York."  NY LEGIS 237 (2021), 2021 Sess. Law News of N.Y. Ch. 237 (S. 7196).

10.     I understand the Act seeks to address "the ease at which legal firearms flow into the illegal market" and the criminal misuse of firearms in New York.  *Id.*

11.     The firearms industry is heavily regulated.  All firearms industry members must comply with multiple federal, state, and local laws and regulations that govern the manufacture, export, sale, and acquisition of firearms including:  the National Firearms Act, 26 U.S.C. §§ 5801 *et seq.*; the Federal Gun Control Act of 1968, 18 U.S.C. §§ 921 *et seq.*; the Arms Export Control Act, 22 U.S.C. § 2778; Importation of Arms, Ammunition and Implements of War, 27 C.F.R § 447; Commerce in Firearms and Ammunition, 27 C.F.R § 478; as well as numerous state and local laws and regulations.

12.     I understand the Act declares "No gun industry member, by conduct either unlawful in itself or unreasonable under all the circumstances shall knowingly or recklessly create, maintain or contribute to a condition in New York state [*i.e.*, a public nuisance] that endangers the safety or health of the public through the sale, manufacturing, importing or marketing of a qualified product."  N.Y. Gen. Bus. Law § 898-b(1).

13.    I understand "qualified products" are only those that have "been shipped or transported in interstate or foreign commerce." 15 U.S.C. § 7903(4).

14.    I understand the Act also declares that "All gun industry members who manufacture, market, import or offer for wholesale or retail sale any qualified product in New York state shall establish and utilize reasonable controls and procedures to prevent its qualified products from being possessed, used, marketed or sold unlawfully in New York state." N.Y. Gen. Bus. Law § 898-b(2). "Reasonable controls and procedures" are defined as "policies that include, but are not limited to: (a) instituting screening, security, inventory and other business practices to prevent thefts of qualified products as well as sales of qualified products to straw purchasers, traffickers, persons prohibited from possessing firearms under state and federal law, or persons at risk of injuring themselves or others; and (b) preventing deceptive acts and practices and false advertising and otherwise ensuring compliance with all provisions of article twenty-two-A of this chapter." *Id*. § 898-a(2).

15.    I also understand that New York law criminalizes multiple activities, including the sale of any "semiautomatic" rifle, pistol, or shotgun with various defined characteristics such as a semiautomatic shotgun that has a fixed magazine capacity in excess of seven rounds. N.Y. Penal Law § 265:00(21–22); 265.10(1–2).

16.    Osage County is lawfully permitted to sell "semiautomatic" firearms of the type illegal under New York's Panel law in multiple other states, including Missouri.

17.    I fear that, if a criminal illegally transports into New York one of the semiautomatic firearms defined by New York Penal Law to be illegal, Osage County would face liability under the Act even though the initial sale by Osage County was lawful and complied with all applicable laws and regulations in the place undertaken.

18.     Osage County cannot eliminate liability under this prong of the Act because the behavior of third-party criminals is outside Osage County's control.

19.     I also fear that, even setting aside the above activities that New York criminalizes, Osage County could still face liability under the Act for any activity that New York deems to be "unreasonable under all the circumstances," even though in full compliance with all laws and regulations in the place undertaken.

20.     Osage County cannot eliminate liability under this provision of the Act because "unreasonable under all the circumstances" is not defined, is highly subjective and vague and because this provision again creates liability for Osage County based on the behavior of criminals who are outside Osage County's control.

21.     I also fear that Osage County could face liability under the Act's vague and subjective requirement to "establish and utilize reasonable controls and procedures to prevent" firearms "from being possessed, used, marketed or sold unlawfully in New York state" even though multiple "controls and procedures" are already required by federal, state and local laws and regulations.

22.     Osage County cannot eliminate liability under this provision of the Act because, again, liability is predicated on the behavior of third-party criminals outside Osage County's control.

23.     Even if Osage County could theoretically undertake drastic measures in an attempt to lessen potential liability (entirely discontinuing the sale of semi-automatic firearms or ceasing all online sales into New York, for example), the economic impact to Osage County would be irreparable and the potential for liability under the Act regardless would not be eliminated. Because the Act is vague and broad and encompasses fully lawful conduct, there is no action that

Osage County could take in order to insulate it from liability, other than ceasing operations altogether.

24.     If the Act is not enjoined, Osage County will be irreparably harmed by being forced to cease lawful, federally licensed operations or face liability, both of which would have a significant, harmful impact on the company's revenue.  In addition, because the Act's standards are vague and unattainable, and liability under the Act relies on the behavior of third-party criminals outside Osage County's control, there is no way for Osage County to comply.  Osage County will continually be at risk of litigation and potential liability unless it ceases doing business as a federally licensed firearms dealer.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this **30**th day of __**November**__, 2021.

By: _____
               Edward Pepper

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NATIONAL SHOOTING SPORTS FOUNDATION, Inc., et al., <br><br> Plaintiffs, <br><br> v. <br><br> KATHY HOCHUL, in her official capacity as Governor of New York, and LETITIA JAMES, in her official capacity as New York Attorney General, <br><br> Defendants. | 1:21-cv-1348 (MAD/CFH) |

<u>DECLARATION OF JOSEPH H. BARTOZZI ON BEHALF OF NATIONAL SHOOTING
SPORTS FOUNDATION, INC.</u>

I, Joseph H. Bartozzi, hereby declare as follows:

1.      I am over the age of 18 years, and I am qualified to submit this declaration on behalf of National Shooting Sports Foundation, Inc. ("NSSF").

2.      I am the President and CEO of NSSF.

3.      I have personal knowledge of the facts set forth in this declaration through direct involvement and by personally reviewing NSSF records and information.

4.      NSSF is a Connecticut non-profit, tax-exempt, non-stock corporation with its principal place of business in Connecticut.  It is the trade association for the firearm, ammunition, and hunting and shooting sports industry.  It has a membership of more than 9,000 manufacturers, distributors, and retailers of Firearm and Ammunition Products and other industry members throughout the United States, including 213 New York members and more than 8,500 members outside of New York.

5.      Each Plaintiff in this lawsuit is a member of NSSF.

6.      The interests NSSF seeks to protect in this action are germane to its organizational

purpose.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2nd day of December 2021.

By: _____

Joseph H. Bartozzi

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NATIONAL SHOOTING SPORTS FOUNDATION, Inc., et al., | Case No.: 1:21-cv-1348 (MAD/CFH) |
| Plaintiffs, | |
| v. | |
| KATHY HOCHUL, in her official capacity as Governor of New York, and LETITIA JAMES, in her official capacity as New York Attorney General, | |
| Defendants. | |

DECLARATION OF MICHAEL CARGILL ON BEHALF OF
CENTRAL TEXAS GUN WORKS

I, Michael Cargill, hereby declare as follows:

1.      I am over the age of 18 years, and I am qualified to submit this declaration on behalf

of CTCHGC LLC d/b/a Central Texas Gun Works ("Central Texas").

2.      I am the owner of Central Texas.

3.      I have personal knowledge of the facts set forth in this declaration through direct

involvement and by personally reviewing Central Texas records and information.

4.      Central Texas is an LLC operating a firearms and ammunition sales business in

Texas.

5.      Central Texas is a federal firearms licensee ("FFL") licensed by the Bureau of

Alcohol, Tobacco, Firearms and Explosives ("ATF").

6.      Central Texas is a company engaged in the sale of firearms and so is a "gun industry

member" as defined in New York's Act ("the Act") codified at N.Y. Gen. Bus. Law §§ 898-a–e.

7.      Central Texas is also a "seller" as defined in the Protection of Lawful Commerce in Arms Act ("PLCAA").  15 U.S.C. § 7903(2).

8.      Central Texas sells firearms to civilians in Texas and also into other states online through FFLs as permitted by federal law.

9.      I understand the Act's preamble states that, "despite stringent state and local laws against the illegal possession of firearms [in New York] according to the Bureau of Alcohol, Tobacco, Firearms and Explosives statistics, 74% of firearms used in crimes in New York are purchased outside of New York."  NY LEGIS 237 (2021), 2021 Sess. Law News of N.Y. Ch. 237 (S. 7196).

10.     I understand the Act seeks to address "the ease at which legal firearms flow into the illegal market" and the criminal misuse of firearms in New York.  *Id*.

11.     The firearms industry is heavily regulated.  All firearms industry members must comply with multiple federal, state, and local laws and regulations that govern the manufacture, export, sale, and acquisition of firearms including:  the National Firearms Act, 26 U.S.C. §§ 5801 *et seq*.; the Federal Gun Control Act of 1968, 18 U.S.C. §§ 921 *et seq*.; the Arms Export Control Act, 22 U.S.C. § 2778; Importation of Arms, Ammunition and Implements of War, 27 C.F.R § 447; Commerce in Firearms and Ammunition, 27 C.F.R § 478; as well as numerous state and local laws and regulations.

12.     I understand the Act declares "No gun industry member, by conduct either unlawful in itself or unreasonable under all the circumstances shall knowingly or recklessly create, maintain or contribute to a condition in New York state [*i.e.*, a public nuisance] that endangers the safety or health of the public through the sale, manufacturing, importing or marketing of a qualified product."  N.Y. Gen. Bus. Law § 898-b(1).

13.     I understand "qualified products" are only those that have "been shipped or transported in interstate or foreign commerce."  15 U.S.C. § 7903(4).

14.     I understand the Act also declares that "All gun industry members who manufacture, market, import or offer for wholesale or retail sale any qualified product in New York state shall establish and utilize reasonable controls and procedures to prevent its qualified products from being possessed, used, marketed or sold unlawfully in New York state."  N.Y. Gen. Bus. Law § 898-b(2).  "Reasonable controls and procedures" are defined as "policies that include, but are not limited to: (a) instituting screening, security, inventory and other business practices to prevent thefts of qualified products as well as sales of qualified products to straw purchasers, traffickers, persons prohibited from possessing firearms under state and federal law, or persons at risk of injuring themselves or others; and (b) preventing deceptive acts and practices and false advertising and otherwise ensuring compliance with all provisions of article twenty-two-A of this chapter."  *Id*. § 898-a(2).

15.     I also understand that New York law criminalizes multiple activities, including the sale of any "semiautomatic" rifle, pistol, or shotgun with various defined characteristics such as a semiautomatic shotgun that has a fixed magazine capacity in excess of seven rounds. N.Y. Penal Law § 265:00(21–22); 265.10(1–2).

16.     Central Texas is lawfully permitted to sell "semiautomatic" firearms of the type illegal under New York's Penal law in multiple other states, including Texas.

17.     I fear that, if a criminal illegally transports into New York one of the semiautomatic firearms defined by New York Penal Law to be illegal, Central Texas would face liability under the Act even though the initial sale by Central Texas was lawful and complied with all applicable laws and regulations in the place undertaken.

18.    Central Texas cannot eliminate liability under this prong of the Act because the behavior of third-party criminals is outside Central Texas' control.

19.    I also fear that, even setting aside the above activities that New York criminalizes, Central Texas could still face liability under the Act for any activity that New York deems to be "unreasonable under all the circumstances," even though in full compliance with all laws and regulations in the place undertaken.

20.    Central Texas cannot eliminate liability under this provision of the Act because "unreasonable under all the circumstances" is not defined, is highly subjective and vague and because this provision again creates liability for Central Texas based on the behavior of criminals who are outside Central Texas' control.

21.    I also fear that Central Texas could face liability under the Act's vague and subjective requirement to "establish and utilize reasonable controls and procedures to prevent" firearms "from being possessed, used, marketed or sold unlawfully in New York state" even though multiple "controls and procedures" are already required by federal, state and local laws and regulations.

22.    Central Texas cannot eliminate liability under this provision of the Act because, again, liability is predicated on the behavior of third-party criminals outside Central Texas' control.

23.    Even if Central Texas could theoretically undertake drastic measures in an attempt to lessen potential liability (entirely discontinuing the sale of semi-automatic firearms or ceasing all online sales into New York, for example), the economic impact to Central Texas would be irreparable and the potential for liability under the Act regardless would not be eliminated. Because the Act is vague and broad and encompasses fully lawful conduct, there is no action that

Central Texas could take in order to insulate it from liability, other than ceasing operations altogether.

24.     If the Act is not enjoined, Central Texas will be irreparably harmed by being forced to cease lawful, federally licensed operations or face liability, both of which would have a significant, harmful impact on the company's revenue.  In addition, because the Act's standards are vague and unattainable, and liability under the Act relies on the behavior of third-party criminals outside Central Texas' control, there is no way for Central Texas to comply.  Central Texas will continually be at risk of litigation and potential liability unless it ceases doing business as a federally licensed firearms dealer.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 30th day of November, 2021.

By: _____

Michael Cargill

6

**SA21**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NATIONAL SHOOTING SPORTS FOUNDATION, Inc., et al., | |
| Plaintiffs, | 1:21-cv-1348 (MAD/CFH) |
| v. | |
| KATHY HOCHUL, in her official capacity as Governor of New York, and LETITIA JAMES, in her official capacity as New York Attorney General, | |
| Defendants. | |

DECLARATION OF RICHARD SPRAGUE ON BEHALF OF SPRAGUE'S SPORTS INC.

I, Richard Sprague, hereby declare as follows:

1.       I am over the age of 18 years, and I am qualified to submit this declaration on behalf of Sprague's Sports Inc. ("Sprague's").

2.       I am the owner of Sprague's.

3.       I have personal knowledge of the facts set forth in this declaration through direct involvement and by personally reviewing Sprague's records and information.

4.       Sprague's is an Arizona corporation operating a firearms and ammunition sales business in Arizona.

5.       Sprague's is a federal firearms licensee ("FFL") licensed by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").

6.       Sprague's is a corporation engaged in the sale of firearms and so is a "gun industry member" as defined in New York's Act ("the Act") codified at N.Y. Gen. Bus. Law §§ 898-a–e.

1
**SA22**

7.      Sprague's is also a "seller" as defined in the Protection of Lawful Commerce in Arms Act ("PLCAA").  15 U.S.C. § 7903(2).

8.      Sprague's sells firearms for civilian use in Arizona and also into other states online through FFLs as permitted by federal law.

9.      I understand the Act's preamble states that, "despite stringent state and local laws against the illegal possession of firearms [in New York] according to the Bureau of Alcohol, Tobacco, Firearms and Explosives statistics, 74% of firearms used in crimes in New York are purchased outside of New York."  NY LEGIS 237 (2021), 2021 Sess. Law News of N.Y. Ch. 237 (S. 7196).

10.      I understand the Act seeks to address "the ease at which legal firearms flow into the illegal market" and the criminal misuse of firearms in New York.  *Id*.

11.      The firearms industry is heavily regulated.  All firearms industry members must comply with multiple federal, state, and local laws and regulations designed to curb the illegal possession, use, marketing, and sale of firearms including:  the National Firearms Act, 26 U.S.C. §§ 5801 *et seq*.; the Federal Gun Control Act of 1968, 18 U.S.C. §§ 921 *et seq*.; the Arms Export Control Act, 22 U.S.C. § 2778; Importation of Arms, Ammunition and Implements of War, 27 C.F.R § 447; Commerce in Firearms and Ammunition, 27 C.F.R § 478; as well as numerous state and local laws and regulations.

12.      I understand the Act declares "No gun industry member, by conduct either unlawful in itself or unreasonable under all the circumstances shall knowingly or recklessly create, maintain or contribute to a condition in New York state [*i.e.*, a public nuisance] that endangers the safety or health of the public through the sale, manufacturing, importing or marketing of a qualified product."  N.Y. Gen. Bus. Law § 898-b(1).

13.     I understand "qualified products" are only those that have "been shipped or transported in interstate or foreign commerce." 15 U.S.C. § 7903(4).

14.     I understand the Act also declares that "All gun industry members who manufacture, market, import or offer for wholesale or retail sale any qualified product in New York state shall establish and utilize reasonable controls and procedures to prevent its qualified products from being possessed, used, marketed or sold unlawfully in New York state." N.Y. Gen. Bus. Law § 898-b(2). "Reasonable controls and procedures" are defined as "policies that include, but are not limited to: (a) instituting screening, security, inventory and other business practices to prevent thefts of qualified products as well as sales of qualified products to straw purchasers, traffickers, persons prohibited from possessing firearms under state and federal law, or persons at risk of injuring themselves or others; and (b) preventing deceptive acts and practices and false advertising and otherwise ensuring compliance with all provisions of article twenty-two-A of this chapter." *Id*. § 898-a(2).

15.     I also understand that New York law criminalizes multiple activities, including the sale of any "semiautomatic" rifle, pistol, or shotgun with various defined characteristics such as a semiautomatic shotgun that has a fixed magazine capacity in excess of seven rounds. N.Y. Penal Law § 265:00(21–22); 265.10(1–2).

16.     Sprague's is lawfully permitted to sell "semiautomatic" firearms of the type illegal under New York's Penal law in multiple other states, including Arizona.

17.     I fear that, if a criminal illegally transports into New York one of the semiautomatic firearms defined by New York Penal Law to be illegal, Sprague's would face liability under the Act even though the initial sale by Sprague's was lawful and complied with all applicable laws and regulations in the place undertaken.

18.     Sprague's cannot eliminate liability under this prong of the Act because the behavior of third-party criminals is outside Sprague's control.

19.     I also fear that, even setting aside the above activities that New York criminalizes, Sprague's could still face liability under the Act for any activity that New York deems to be "unreasonable under all the circumstances," even though in full compliance with all laws and regulations in the place undertaken.

20.     Sprague's cannot eliminate liability under this provision of the Act because "unreasonable under all the circumstances" is not defined, is highly subjective and vague and because this provision again creates liability for Sprague's based on the behavior of criminals who are outside Sprague's control.

21.     I also fear that Sprague's could face liability under the Act's vague and subjective requirement to "establish and utilize reasonable controls and procedures to prevent" firearms "from being possessed, used, marketed or sold unlawfully in New York state" even though multiple "controls and procedures" are already required by federal, state and local laws and regulations.

22.     Sprague's cannot eliminate liability under this provision of the Act because, again, liability is predicated on the behavior of third-party criminals outside Sprague's control.

23.     Even if Sprague's could theoretically undertake drastic measures in an attempt to lessen potential liability (entirely discontinuing the sale of semi-automatic firearms or ceasing all online sales into New York, for example), the economic impact to Sprague's would be irreparable and the potential for liability under the Act regardless would not be eliminated.  Because the Act is vague and broad and encompasses fully lawful conduct, there is no action that Sprague's could take in order to insulate it from liability, other than ceasing operations altogether.

24.     If the Act is not enjoined, Sprague's will be irreparably harmed by being forced to cease lawful, federally licensed operations or face liability, both of which would have a significant, harmful impact on the company's revenue.  In addition, because the Act's standards are vague and unattainable, and liability under the Act relies on the behavior of third-party criminals outside Sprague's control, there is no way for Sprague's to comply.  Sprague's will continually be at risk of litigation and potential liability unless it ceases doing business as a federally licensed firearms dealer.

I declare under penalty of perjury that the foregoing is true and correct.


Executed this 30 th day of November, 2021.

By: _Richard Sprague_____
        Richard Sprague


6

**SA27**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NATIONAL SHOOTING SPORTS FOUNDATION, Inc., et al., <br><br> Plaintiffs, <br><br> v. <br><br> KATHY HOCHUL, in her official capacity as Governor of New York, and LETITIA JAMES, in her official capacity as New York Attorney General, <br><br> Defendants. | 1:21-cv-1348 (MAD/CFH) |

<u>DECLARATION OF RON GOSLIN ON BEHALF OF SIG SAUER, INC.</u>

I, Ron Goslin, hereby declare as follows:

1.     I am over the age of 18 years, and I am qualified to submit this declaration on behalf of SIG Sauer, Inc. ("SIG").

2.     I am the Chief Operating Officer at SIG.

3.     I have personal knowledge of the facts set forth in this declaration through direct involvement and by personally reviewing SIG records and information.

4.     SIG is privately owned company that designs and manufactures various types of firearms, including pistols and rifles, as well as firearm accessories. The Company sells its products to government, military, and law enforcement agencies in the United States and abroad, as well as to the commercial market through distributors and retailers throughout the United States.

5.     SIG is a federal firearms licensee ("FFL") licensed by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").

6.      SIG is a corporation engaged in the manufacture of firearms and so is a "gun industry member" as defined in New York's Act ("the Act") codified at N.Y. Gen. Bus. Law §§ 898-a–e.

7.      SIG is also a "manufacturer" as defined in the Protection of Lawful Commerce in Arms Act ("PLCAA").  15 U.S.C. § 7903(2).

8.      SIG firearms for civilian use are manufactured in New Hampshire.  SIG does not manufacture any firearm or component part in New York.  Some component suppliers are located in New York.

9.      SIG firearms for civilian use are generally sold to distributors and box stores, with some sales direct to dealers. SIG does not sell firearms directly to civilians in New York.

10.     I understand the Act's preamble states that, "despite stringent state and local laws against the illegal possession of firearms [in New York] according to the Bureau of Alcohol, Tobacco, Firearms and Explosives statistics, 74% of firearms used in crimes in New York are purchased outside of New York."  NY LEGIS 237 (2021), 2021 Sess. Law News of N.Y. Ch. 237 (S. 7196).

11.     I understand the Act seeks to address "the ease at which legal firearms flow into the illegal market" and the criminal misuse of firearms in New York.  *Id.*

12.     The firearms industry is heavily regulated.  All firearms industry members must comply with multiple federal, state, and local laws and regulations that govern the manufacture, export, sale, and acquisition of firearms including:  the National Firearms Act, 26 U.S.C. §§ 5801 *et seq.*; the Federal Gun Control Act of 1968, 18 U.S.C. §§ 921 *et seq.*; the Arms Export Control Act, 22 U.S.C. § 2778; Importation of Arms, Ammunition and Implements of War, 27 C.F.R §

447; Commerce in Firearms and Ammunition, 27 C.F.R § 478; as well as numerous state and local laws and regulations.

13.      I understand the Act declares "No gun industry member, by conduct either unlawful in itself or unreasonable under all the circumstances shall knowingly or recklessly create, maintain or contribute to a condition in New York state [*i.e.*, a public nuisance] that endangers the safety or health of the public through the sale, manufacturing, importing or marketing of a qualified product."  N.Y. Gen. Bus. Law § 898-b(1).

14.      I understand "qualified products" are only those that have "been shipped or transported in interstate or foreign commerce."  15 U.S.C. § 7903(4).

15.      I understand the Act also declares that "All gun industry members who manufacture, market, import or offer for wholesale or retail sale any qualified product in New York state shall establish and utilize reasonable controls and procedures to prevent its qualified products from being possessed, used, marketed or sold unlawfully in New York state."  N.Y. Gen. Bus. Law § 898-b(2).  "Reasonable controls and procedures" are defined as "policies that include, but are not limited to: (a) instituting screening, security, inventory and other business practices to prevent thefts of qualified products as well as sales of qualified products to straw purchasers, traffickers, persons prohibited from possessing firearms under state and federal law, or persons at risk of injuring themselves or others; and (b) preventing deceptive acts and practices and false advertising and otherwise ensuring compliance with all provisions of article twenty-two-A of this chapter."  *Id*. § 898-a(2).

16.      I also understand that New York law criminalizes multiple activities, including the manufacture, transport, shipment, or sale of any "semiautomatic" rifle, pistol, or shotgun with

various defined characteristics such as a semiautomatic shotgun that has a fixed magazine capacity in excess of seven rounds. N.Y. Penal Law § 265:00(21–22); 265.10(1–2).

17.     SIG is lawfully permitted to manufacture and sell "semiautomatic" firearms of the type illegal under New York's Penal law in multiple other states.

18.     I fear that, if a criminal illegally transports into New York one of the semiautomatic firearms defined by New York Penal Law to be illegal, SIG would face liability under the Act even though the initial manufacture and sale by SIG was lawful and complied with all applicable laws and regulations in the place undertaken.

19.     SIG cannot eliminate liability under this prong of the Act because the behavior of third-party criminals is outside SIG's control.

20.     I also fear that, even setting aside the above activities that New York criminalizes, SIG could still face liability under the Act for any activity that New York deems to be "unreasonable under all the circumstances," even though in full compliance with all laws and regulations in the place undertaken.

21.     SIG cannot eliminate liability under this provision of the Act because "unreasonable under all the circumstances" is not defined, is highly subjective and vague and because this provision again creates liability for SIG based on the behavior of third-party criminals who are outside SIG's control.

22.     I also fear that SIG could face liability under the Act's vague and subjective requirement to "establish and utilize reasonable controls and procedures to prevent" firearms "from being possessed, used, marketed or sold unlawfully in New York state" even though multiple "controls and procedures" are already required by federal, state and local laws and regulations.

23.    SIG cannot eliminate liability under the Act because, again, liability is predicated on the behavior of third party criminals outside SIG's control.

24.    Even if SIG could theoretically undertake drastic measures in an attempt to lessen potential liability (entirely discontinuing the manufacture of semi-automatic firearms, refusing to sell downstream to dealers located in New York, or refusing to buy from component suppliers in New York, for example), the economic impact to SIG would be irreparable and the potential for liability under the Act regardless would not be eliminated.  Because the Act is vague and broad and encompasses fully lawful conduct, there is no action that SIG could take in order to insulate it from liability, other than ceasing operations altogether.

25.    If the Act is not enjoined, SIG will be irreparably harmed by being forced to cease lawful, federally licensed operations or face liability, both of which would have a significant, harmful impact on the company's revenue.  In addition, because the Act's standards are vague and unattainable, and liability under the Act relies on the behavior of third-party criminals outside SIG's control, there is no way for SIG to comply.  SIG will continually be at risk of litigation and potential liability unless it ceases doing business as a federally licensed firearms manufacturer.

I declare under penalty of perjury that the foregoing is true and correct.


Executed this *i* th day of *December*, 2021.

By: _____

Ron Goslin

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| NATIONAL SHOOTING SPORTS FOUNDATION, Inc., et al., | |
| Plaintiffs, | 1:21-cv-1348 (MAD/CFH) |
| v. | |
| KATHY HOCHUL, in her official capacity as Governor of New York, and LETITIA JAMES, in her official capacity as New York Attorney General, | |
| Defendants. | |

---

<u>DECLARATION OF TRIPPER DICKSON ON BEHALF OF SPORTS SOUTH LLC</u>

I, Tripper Dickson, hereby declare as follows:

1.  I am over the age of 18 years, and I am qualified to submit this declaration on behalf of Sports South LLC ("Sports South").

2.  I am the President and CEO at Sports South.

3.  I have personal knowledge of the facts set forth in this declaration through direct involvement and by personally reviewing Sports South records and information.

4.  Sports South is a wholesale-distributor of firearms located in Louisiana.

5.  Sports South is a federal firearms licensee ("FFL") licensed by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").

6.  Sports South is a corporation engaged in the distribution of firearms and so is a "gun industry member" as defined in New York's Act ("the Act") codified at N.Y. Gen. Bus. Law §§ 898-a–e.

1

**SA34**

7.      Sports South is also a "seller" as defined in the Protection of Lawful Commerce in Arms Act ("PLCAA").  15 U.S.C. § 7903(2).

8.      Sports South is a wholesale-distributor that sells firearms for civilian use exclusively to dealers (retailers), including in New York.  Sports South does not sell firearms directly to consumers in any state.

9.      I understand the Act's preamble states that, "despite stringent state and local laws against the illegal possession of firearms [in New York] according to the Bureau of Alcohol, Tobacco, Firearms and Explosives statistics, 74% of firearms used in crimes in New York are purchased outside of New York."  NY LEGIS 237 (2021), 2021 Sess. Law News of N.Y. Ch. 237 (S. 7196).

10.     I understand the Act seeks to address "the ease at which legal firearms flow into the illegal market" and the criminal misuse of firearms in New York.  *Id.*

11.     The firearms industry is heavily regulated.  All firearms industry members must comply with multiple federal, state, and local laws and regulations that govern the manufacture, export, sale, and acquisition of firearms including:  the National Firearms Act, 26 U.S.C. §§ 5801 *et seq.*; the Federal Gun Control Act of 1968, 18 U.S.C. §§ 921 *et seq.*; the Arms Export Control Act, 22 U.S.C. § 2778; Importation of Arms, Ammunition and Implements of War, 27 C.F.R § 447; Commerce in Firearms and Ammunition, 27 C.F.R § 478; as well as numerous state and local laws and regulations.

12.     I understand the Act declares "No gun industry member, by conduct either unlawful in itself or unreasonable under all the circumstances shall knowingly or recklessly create, maintain or contribute to a condition in New York state [*i.e.*, a public nuisance] that endangers the safety or

**SA35**

health of the public through the sale, manufacturing, importing or marketing of a qualified product." N.Y. Gen. Bus. Law § 898-b(1).

13.     I understand "qualified products" are only those that have "been shipped or transported in interstate or foreign commerce." 15 U.S.C. § 7903(4).

14.     I understand the Act also declares that "All gun industry members who manufacture, market, import or offer for wholesale or retail sale any qualified product in New York state shall establish and utilize reasonable controls and procedures to prevent its qualified products from being possessed, used, marketed or sold unlawfully in New York state." N.Y. Gen. Bus. Law § 898-b(2). "Reasonable controls and procedures" are defined as "policies that include, but are not limited to: (a) instituting screening, security, inventory and other business practices to prevent thefts of qualified products as well as sales of qualified products to straw purchasers, traffickers, persons prohibited from possessing firearms under state and federal law, or persons at risk of injuring themselves or others; and (b) preventing deceptive acts and practices and false advertising and otherwise ensuring compliance with all provisions of article twenty-two-A of this chapter." *Id*. § 898-a(2).

15.     I also understand that New York law criminalizes multiple activities, including the transport, shipment, or sale of any "semiautomatic" rifle, pistol, or shotgun with various defined characteristics such as a semiautomatic shotgun that has a fixed magazine capacity in excess of seven rounds. N.Y. Penal Law § 265:00(21–22); 265.10(1–2).

16.     Sports South is lawfully permitted to sell "semiautomatic" firearms of the type illegal under New York's Penal Law in multiple other states.

17.     I fear that, if a criminal illegally transports into New York one of the semiautomatic firearms defined by New York Penal Law to be illegal, Sports South would face liability under the

Act even though the initial transport, shipment, and sale by Sports South was lawful and complied with all applicable laws and regulations in the place undertaken.

18.    Sports South cannot eliminate liability under the Act's first prong because the behavior of third-party criminals is outside Sports South's control.

19.    I also fear that, even setting aside the above activities that New York criminalizes, Sports South could still face liability under the Act for any activity that New York deems to be "unreasonable under all the circumstances," even though in full compliance with all laws and regulations in the place undertaken.

20.    Sports South cannot eliminate liability under this provision of the Act because "unreasonable under all the circumstances" is not defined, is highly subjective and vague and because this provision again creates liability for Sports South based on the behavior of criminals who are outside Sports South's control.

21.    I also fear that Sports South could face liability under the Act's vague and subjective requirement to "establish and utilize reasonable controls and procedures to prevent" firearms "from being possessed, used, marketed or sold unlawfully in New York state" even though multiple "controls and procedures" are already required by federal, state and local laws and regulations.

22.    Sports South cannot eliminate liability under the Act because liability is again predicated on the behavior of third party criminals outside Sports South's control.

23.    Even if Sports South could theoretically undertake drastic measures in an attempt to lessen potential liability (entirely discontinuing the wholesale sale of semi-automatic firearms or refusing to sell firearms to dealers in New York, for example), the economic impact to Sports South would be irreparable and the potential for liability under the Act regardless would not be

4

**SA37**

eliminated.  Because the Act is vague and broad and encompasses fully lawful conduct, there is no action that Sports South could take in order to insulate it from liability, other than ceasing operations altogether.

24.     If the Act is not enjoined, Sports South will be irreparably harmed by being forced to cease lawful, federally licensed operations or face liability, both of which would have a significant, harmful impact on the company's revenue.  In addition, because the Act's standards are vague and unattainable, and liability under the Act relies on the behavior of third-party criminals outside Sports South's control, there is no way for Sports South to comply.  Sports South will continually be at risk of litigation and potential liability unless it ceases doing business as a federally licensed firearms wholesaler.

I declare under penalty of perjury that the foregoing is true and correct.


Executed this 2nd day of December, 2021.


By: _____

            Tripper Dickson

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NATIONAL SHOOTING SPORTS FOUNDATION, Inc., et al., | |
| Plaintiffs, | 1:21-cv-1348 (MAD/CFH) |
| v. | |
| KATHY HOCHUL, in her official capacity as Governor of New York, and LETITIA JAMES, in her official capacity as New York Attorney General, | |
| Defendants. | |

<u>DECLARATION OF MELISSA GLASER ON BEHALF OF SHEDHORN SPORTS</u>

I, Melissa Glaser, hereby declare as follows:

1.      I am over the age of 18 years, and I am qualified to submit this declaration on behalf of Shedhorn Sports Inc. ("Shedhorn").

2.      I am the Owner of Shedhorn.

3.      I have personal knowledge of the facts set forth in this declaration through direct involvement and by personally reviewing Shedhorn records and information.

4.      Shedhorn is a Montana corporation operating a firearms and ammunition sales business in Montana.

5.      Shedhorn is a federal firearms licensee ("FFL") licensed by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").

6.      Shedhorn is a corporation engaged in the sale of firearms and so is a "gun industry member" as defined in New York's Act ("the Act") codified at N.Y. Gen. Bus. Law §§ 898-a–e.

1

**SA40**

7.      Shedhorn is also a "seller" as defined in the Protection of Lawful Commerce in Arms Act ("PLCAA").  15 U.S.C. § 7903(2).

8.      Shedhorn sells firearms and ammunition for civilian use in Montana.

9.      I understand the Act's preamble states that, "despite stringent state and local laws against the illegal possession of firearms [in New York] according to the Bureau of Alcohol, Tobacco, Firearms and Explosives statistics, 74% of firearms used in crimes in New York are purchased outside of New York."  NY LEGIS 237 (2021), 2021 Sess. Law News of N.Y. Ch. 237 (S. 7196).

10.     I understand the Act seeks to address "the ease at which legal firearms flow into the illegal market" and the criminal misuse of firearms in New York.  *Id*.

11.     The firearms industry is heavily regulated.  All firearms industry members must comply with multiple federal, state, and local laws and regulations that govern the manufacture, export, sale, and acquisition of firearms including:  the National Firearms Act, 26 U.S.C. §§ 5801 *et seq*.; the Federal Gun Control Act of 1968, 18 U.S.C. §§ 921 *et seq*.; the Arms Export Control Act, 22 U.S.C. § 2778; Importation of Arms, Ammunition and Implements of War, 27 C.F.R § 447; Commerce in Firearms and Ammunition, 27 C.F.R § 478; as well as numerous state and local laws and regulations.

12.     I understand the Act declares "No gun industry member, by conduct either unlawful in itself or unreasonable under all the circumstances shall knowingly or recklessly create, maintain or contribute to a condition in New York state [*i.e.*, a public nuisance] that endangers the safety or health of the public through the sale, manufacturing, importing or marketing of a qualified product."  N.Y. Gen. Bus. Law § 898-b(1).

13.     I understand "qualified products" are only those that have "been shipped or transported in interstate or foreign commerce." 15 U.S.C. § 7903(4).

14.     I understand the Act also declares that "All gun industry members who manufacture, market, import or offer for wholesale or retail sale any qualified product in New York state shall establish and utilize reasonable controls and procedures to prevent its qualified products from being possessed, used, marketed or sold unlawfully in New York state." N.Y. Gen. Bus. Law § 898-b(2). "Reasonable controls and procedures" are defined as "policies that include, but are not limited to: (a) instituting screening, security, inventory and other business practices to prevent thefts of qualified products as well as sales of qualified products to straw purchasers, traffickers, persons prohibited from possessing firearms under state and federal law, or persons at risk of injuring themselves or others; and (b) preventing deceptive acts and practices and false advertising and otherwise ensuring compliance with all provisions of article twenty-two-A of this chapter." *Id*. § 898-a(2).

15.     I also understand that New York law criminalizes multiple activities, including the sale of any "semiautomatic" rifle, pistol, or shotgun with various defined characteristics such as a semiautomatic shotgun that has a fixed magazine capacity in excess of seven rounds. N.Y. Penal Law § 265:00(21–22); 265.10(1–2).

16.     Shedhorn is lawfully permitted to sell "semiautomatic" firearms of the type illegal under New York's Penal law in Montana.

17.     I fear that, if a criminal illegally transports into New York one of the semiautomatic firearms defined by New York Penal Law to be illegal, Shedhorn would face liability under the Act even though the initial sale by Shedhorn was lawful and complied with all applicable laws and regulations in Montana.

3

**SA42**

18.    Shedhorn cannot eliminate liability under this prong of the Act because the behavior of third-party criminals is outside Shedhorn's control.

19.    I also fear that, even setting aside the above activities that New York criminalizes, Shedhorn could still face liability under the Act for any activity that New York deems to be "unreasonable under all the circumstances," even though in full compliance with all laws and regulations in the place undertaken.

20.    Shedhorn cannot eliminate liability under this provision of the Act because "unreasonable under all the circumstances" is not defined, is highly subjective and vague and because this provision again creates liability for Shedhorn based on the behavior of criminals who are outside Shedhorn's control.

21.    Even if Shedhorn could theoretically undertake drastic measures in an attempt to lessen potential liability (entirely discontinuing the sale of semi-automatic firearms, for example), the economic impact to Shedhorn would be irreparable and the potential for liability under the Act regardless would not be eliminated.  Because the Act is vague and broad and encompasses fully lawful conduct, there is no action that Shedhorn could take in order to insulate it from liability, other than ceasing operations altogether.

22.    If the Act is not enjoined, Shedhorn will be irreparably harmed by being forced to cease lawful, federally licensed operations or face liability, both of which would have a significant, harmful impact on the company's revenue.  In addition, because the Act's standards are vague and unattainable, and liability under the Act relies on the behavior of third-party criminals outside Shedhorn's control, there is no way for Shedhorn to comply.  Shedhorn will continually be at risk of litigation and potential liability unless it ceases doing business as a federally licensed firearms dealer.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2nd th day of ___December___, 2021.

By: _____
                    Melissa Glaser

5

**SA44**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NATIONAL SHOOTING SPORTS FOUNDATION, INC., et al.,<br><br>　　　　　　　　　Plaintiffs,<br><br>　　v.<br><br>KATHY HOCHUL, in her official capacity as Governor of New York, and LETITIA JAMES, in her official capacity as New York Attorney General,<br><br>　　　　　　　　　Defendants. | 1:21-cv-1348 (MAD/CFH) |

<u>DECLARATION OF CARLOS GUEVARA ON BEHALF OF GLOCK, INC.</u>

I, Carlos Guevara, hereby declare as follows:

1.　　I am over the age of 18 years, and I am qualified to submit this declaration on behalf of GLOCK, Inc. ("GLOCK").

2.　　I am a Vice-President and the General Counsel and Secretary at GLOCK.

3.　　I have personal knowledge of the facts set forth in this declaration through direct involvement and by personally reviewing GLOCK records and information.

4.　　GLOCK is a manufacturer, importer, and U.S. distributor of GLOCK brand firearms.

5.　　GLOCK is a federal firearms licensee ("FFL") licensed by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").

6.　　GLOCK is a corporation engaged in the manufacture of firearms and so is a "gun industry member" as defined in New York's Act ("the Act") codified at N.Y. Gen. Bus. Law §§ 898-a.–e. *Id.* at § 898-a.4.

1

**SA45**

7.      GLOCK is also a "manufacturer" as defined in the Protection of Lawful Commerce in Arms Act ("PLCAA").  15 U.S.C. § 7903(2).

8.      GLOCK firearms are manufactured in Austria and Georgia.  GLOCK does not have any manufacturing operations in New York.

9.      GLOCK firearms for sale to the commercial market are generally sold to federally licensed wholesale distributors with whom it has Commercial Distributor Agreements.  One of the distributors to which GLOCK sells its firearms for resale to the commercial market is AmChar Wholesale, Inc., which is located in Rochester, New York.  GLOCK does not sell firearms directly to civilians in New York.

10.     The Act's preamble states that, "despite stringent state and local laws against the illegal possession of firearms [in New York] according to the Bureau of Alcohol, Tobacco, Firearms and Explosives statistics, 74% of firearms used in crimes in New York are purchased outside of New York."  NY LEGIS 237 (2021), 2021 Sess. Law News of N.Y. Ch. 237 (S. 7196).

11.     The Act seeks to address the alleged "ease at which legal firearms flow into the illegal market" and the criminal misuse of firearms in New York.  NY LEGIS 237 (2021), 2021 Sess. Law News of N.Y. Ch. 237 (S. 7196).

12.     The firearms industry is heavily regulated.  All firearms industry members must comply with multiple federal, state, and local laws and regulations that govern the manufacture, export, sale and acquisition  of firearms including: the National Firearms Act, 26 U.S.C. §§ 5801 *et seq.*; the Gun Control Act, 18 U.S.C. §§ 921 *et seq.*; the Arms Export Control Act, 22 U.S.C. § 2778; Importation of Arms, Ammunition and Implements of War, 27 C.F.R § 447; Commerce in Firearms and Ammunition, 27 C.F.R § 478; Machineguns, Destructive Devices, and Certain Other Firearms, 27 C.F.R. § 479; as well as numerous state and local laws and regulations.

2

**SA46**

13.     The Act declares "No gun industry member, by conduct either unlawful in itself or unreasonable under all the circumstances shall knowingly or recklessly create, maintain or contribute to a condition in New York state [*i.e.*, a public nuisance] that endangers the safety or health of the public through the sale, manufacturing, importing or marketing of a qualified product." N.Y. Gen. Bus. Law § 898-b.1.

14.     "Qualified products" are only those that have "been shipped or transported in interstate or foreign commerce." N.Y. Gen. Bus. Law § 898-a.6.; 15 U.S.C. § 7903(4).

15.     The Act also declares that "All gun industry members who manufacture, market, import or offer for wholesale or retail sale any qualified product in New York state shall establish and utilize reasonable controls and procedures to prevent its qualified products from being possessed, used, marketed or sold unlawfully in New York state." N.Y. Gen. Bus. Law § 898-b.2. "Reasonable controls and procedures" are defined as "policies that include, but are not limited to: (a) instituting screening, security, inventory and other business practices to prevent thefts of qualified products as well as sales of qualified products to straw purchasers, traffickers, persons prohibited from possessing firearms under state and federal law, or persons at risk of injuring themselves or others; and (b) preventing deceptive acts and practices and false advertising and otherwise ensuring compliance with all provisions of article twenty-two-A of this chapter." *Id*. § 898-a.2.

16.     New York law criminalizes multiple activities, including the manufacture, transport, shipment, or sale of any "semiautomatic" rifle, pistol, or shotgun with various defined characteristics. N.Y. Penal Law §§ 265:00(21–22); 265.10(1–2).

17.     Even though GLOCK does not manufacture, import, or sell any firearms that are illegal in New York pursuant to N.Y. Penal Law §§ 265:00(21–22); 265.10(1–2), I fear that

3

**SA47**

GLOCK could still face liability under the Act for any activity that New York deems to be "unreasonable under all the circumstances," even though in full compliance with all laws and regulations in the place undertaken.

18.    GLOCK cannot eliminate potential liability under this provision of the Act because "unreasonable under all the circumstances" is not defined, is highly subjective and vague, and because this provision again creates liability for GLOCK based on the behavior of criminals who are outside of GLOCK's control.

19.    I also fear that GLOCK a could face liability under the Act's vague and subjective requirement to "establish and utilize reasonable controls and procedures to prevent" firearms "from being possessed, used, marketed or sold unlawfully in New York state," even though multiple "controls and procedures" are already required by federal, state and local laws and regulations.

20.    GLOCK cannot eliminate liability under the Act because, again, liability is predicated on the behavior of third party criminals outside of GLOCK's control.

21.    Even if GLOCK could theoretically undertake drastic measures in an attempt to lessen potential liability (ceasing sales to AmChar Wholesale, Inc., for example), the economic impact to GLOCK would be irreparable and, regardless, the potential for litigation and liability under the Act would not be eliminated.  Because the Act is vague and broad and encompasses fully lawful conduct, there is no action that GLOCK could take in order to insulate it from liability, other than ceasing operations altogether.

22.    If the Act is not enjoined, GLOCK will be irreparably harmed by being forced to cease lawful, federally licensed operations or face liability, both of which would have a significant, harmful impact on the company's revenue.  In addition, because the Act's standards are vague and

unattainable, and liability under the Act attaches based upon the behavior of third-party criminals outside of GLOCK's control, there is no way for GLOCK to comply.  GLOCK will continually be at risk of litigation and potential liability unless it ceases doing business as a federally licensed firearms manufacturer.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 3rd day of December, 2021.

By: _____

Carlos Guevara

5

**SA49**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

---

NATIONAL     SHOOTING     SPORTS
FOUNDATION, INC., et al.,

                          Plaintiffs,

        v.                                              1:21-cv-1348 (MAD/CFH)

KATHY HOCHUL, in her official capacity as
Governor of New York, and LETITIA
JAMES, in her official capacity as New York
Attorney General,

                          Defendants.

---

DECLARATION OF JOHN SLOGAR ON BEHALF OF RSR GROUP, INC.

I, John Slogar, hereby declare as follows:

1.      I am over the age of 18 years, and I am qualified to submit this declaration on behalf of RSR Group, Inc. ("RSR Group").

2.      I am a Senior Vice-President and the Chief Financial Officer at RSR Group.

3.      I have personal knowledge of the facts set forth in this declaration through direct involvement and by personally reviewing RSR Group's records and information.

4.      RSR Group is a Delaware corporation with its principal place of business in Florida. RSR Group distributes its products from a warehouse in Texas, and is a nationwide distributor of firearms and shooting sports accessories.

5.      RSR Group is a federal firearms licensee ("FFL") licensed by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").

6.      RSR Group is a corporation engaged in the distribution of firearms and so is a "gun industry member" as defined in New York's Act ("the Act") codified at N.Y. Gen. Bus. Law §§ 898-a.–e. *Id.* at § 898-a.4.

1

**SA50**

7.    RSR Group is also a "seller" as defined in the Protection of Lawful Commerce in Arms Act ("PLCAA").  15 U.S.C. § 7903(6).

8.    RSR Group's firearms for sale to the commercial market are generally sold to federally licensed firearms dealers, including dealers located in the State of New York.  RSR Group does not sell firearms directly to civilians in New York.

9.    The majority of the firearms RSR Group sells are not manufactured in New York.

10.    The Act's preamble states that, "despite stringent state and local laws against the illegal possession of firearms [in New York] according to the Bureau of Alcohol, Tobacco, Firearms and Explosives statistics, 74% of firearms used in crimes in New York are purchased outside of New York."  NY LEGIS 237 (2021), 2021 Sess. Law News of N.Y. Ch. 237 (S. 7196).

11.    The Act seeks to address the alleged "ease at which legal firearms flow into the illegal market" and the criminal misuse of firearms in New York.  NY LEGIS 237 (2021), 2021 Sess. Law News of N.Y. Ch. 237 (S. 7196).

12.    The firearms industry is heavily regulated.  All firearms industry members must comply with multiple federal, state, and local laws and regulations that govern the manufacture, export, sale and acquisition of firearms including: the National Firearms Act, 26 U.S.C. §§ 5801 *et seq*.; the Gun Control Act, 18 U.S.C. §§ 921 *et seq*.; the Arms Export Control Act, 22 U.S.C. § 2778; Importation of Arms, Ammunition and Implements of War, 27 C.F.R § 447; Commerce in Firearms and Ammunition, 27 C.F.R § 478; Machineguns, Destructive Devices, and Certain Other Firearms, 27 C.F.R. § 479; as well as numerous state and local laws and regulations.

13.    The Act declares "No gun industry member, by conduct either unlawful in itself or unreasonable under all the circumstances shall knowingly or recklessly create, maintain or contribute to a condition in New York state [*i.e.*, a public nuisance] that endangers the safety or

2

**SA51**

health of the public through the sale, manufacturing, importing or marketing of a qualified product." N.Y. Gen. Bus. Law § 898-b.1.

14.     "Qualified products" are only those that have "been shipped or transported in interstate or foreign commerce." N.Y. Gen. Bus. Law § 898-a.6.; 15 U.S.C. § 7903(4).

15.     The Act also declares that "All gun industry members who manufacture, market, import or offer for wholesale or retail sale any qualified product in New York state shall establish and utilize reasonable controls and procedures to prevent its qualified products from being possessed, used, marketed or sold unlawfully in New York state." N.Y. Gen. Bus. Law § 898-b.2. "Reasonable controls and procedures" are defined as "policies that include, but are not limited to: (a) instituting screening, security, inventory and other business practices to prevent thefts of qualified products as well as sales of qualified products to straw purchasers, traffickers, persons prohibited from possessing firearms under state and federal law, or persons at risk of injuring themselves or others; and (b) preventing deceptive acts and practices and false advertising and otherwise ensuring compliance with all provisions of article twenty-two-A of this chapter." *Id.* § 898-a.2.

16.     New York law criminalizes multiple activities, including the transport, shipment, or sale of any "semiautomatic" rifle, pistol, or shotgun with various defined characteristics, such as a semiautomatic shotgun that has a fixed magazine capacity in excess of seven rounds, N.Y. Penal Law §§ 265:00(21–22); 265.10(1–2).

17.     RSR Group is lawfully permitted to sell "semiautomatic" firearms of the type illegal under New York's Penal Law in the vast majority of other states.

18.     I fear that, if a criminal illegally transports into New York one of the semiautomatic firearms defined by New York Penal Law to be illegal, RSR Group would face liability under the

3

Act even though the initial transport, shipment, and sale by RSR Group was lawful and complied with all applicable laws and regulations in the place undertaken.

19.     RSR Group cannot eliminate liability under this provision of the Act because the behavior of third-party criminals is outside of RSR Group's control.

20.     I also fear that, even setting aside the above activities that New York criminalizes, RSR Group could still face liability under the Act for any activity that New York deems to be "unreasonable under all the circumstances," even though in full compliance with all laws and regulations in the place undertaken.

21.     RSR Group cannot eliminate liability under this provision of the Act because "unreasonable under all the circumstances" is not defined, is highly subjective and vague, and because this provision again creates liability for RSR Group based on the behavior of criminals who are outside of RSR Group's control.

22.     I also fear that RSR Group could face liability under the Act's vague and subjective requirement to "establish and utilize reasonable controls and procedures to prevent" firearms "from being possessed, used, marketed or sold unlawfully in New York state," even though multiple "controls and procedures" are already required by federal, state and local laws and regulations.

23.     RSR Group cannot eliminate liability under the Act because, again, liability is predicated on the behavior of third party criminals outside of RSR Group's control.

24.     Drastic measures by RSR Group could theoretically lessen potential liability (entirely ceasing the sale of sale of all semi-automatic firearms or ceasing the sale of all firearms to dealers located in New York, for example), but the economic impact of such measures to RSR Group would be irreparable and, regardless, the potential for litigation and liability under the Act

4

**SA53**

would not be eliminated.  Because the Act is vague and broad and encompasses fully lawful conduct, there is no action that RSR Group could take in order to insulate it from liability, other than ceasing operations altogether.

25.    If the Act is not enjoined, RSR Group will be irreparably harmed by being forced to cease lawful, federally licensed operations or face liability, both of which would have a significant, harmful impact on the company's revenue.  In addition, because the Act's standards are vague and unattainable, and liability under the Act attaches based upon the behavior of third-party criminals outside of RSR Group's control, there is no way for RSR Group to comply.  RSR Group will continually be at risk of litigation and potential liability unless it ceases doing business as a federally licensed firearms dealer.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 6th day of December, 2021.

By: _____
        John Slogan

5

**SA54**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

NATIONAL   SHOOTING   SPORTS
FOUNDATION, INC., et al.,

                        Plaintiffs,

      v.

KATHY HOCHUL, in her official capacity as
Governor of New York, and LETITIA
JAMES, in her official capacity as New York
Attorney General,

                     Defendants.

1:21-cv-1348 (MAD/CFH)

---

<u>DECLARATION OF BRYAN L. TUCKER ON BEHALF OF DAVIDSON'S, INC.</u>

I, Bryan L. Tucker, hereby declare as follows:

1.     I am over the age of 18 years, and I am qualified to submit this declaration on behalf of Davidson's, Inc. ("Davidson's").

2.     I am the Chief Executive Officer of Davidson's.

3.     I have personal knowledge of the facts set forth in this declaration through direct involvement and by personally reviewing Davidson's records and information.

4.     Davidson's is an Arizona corporation with its principal place of business in Arizona. Davidson's is a wholesale distributor of sporting goods, including firearms, ammunition, and related accessories.

5.     Davidson's is a federal firearms licensee ("FFL") licensed by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").

6.     Davidson's is a corporation engaged in the distribution of firearms and so is a "gun industry member" as defined in New York's Act (the "Act") codified at N.Y. Gen. Bus. Law §§ 898-a.–e. *Id.* at § 898-a.4.

1



7.      Davidson's is also a "seller" as defined in the Protection of Lawful Commerce in Arms Act ("PLCAA").  15 U.S.C. § 7903(6).

8.      Davidson's firearms for sale to the commercial market are generally sold to federally licensed firearms dealers, including dealers located in the State of New York.  Davidson's does not sell firearms directly to civilians in New York.

9.      The majority of the firearms Davidson's sells are not manufactured in New York.

10.     The Act's preamble states that, "despite stringent state and local laws against the illegal possession of firearms [in New York] according to the Bureau of Alcohol, Tobacco, Firearms and Explosives statistics, 74% of firearms used in crimes in New York are purchased outside of New York."  NY LEGIS 237 (2021), 2021 Sess. Law News of N.Y. Ch. 237 (S. 7196).

11.     The Act seeks to address the alleged "ease at which legal firearms flow into the illegal market" and the criminal misuse of firearms in New York.  NY LEGIS 237 (2021), 2021 Sess. Law News of N.Y. Ch. 237 (S. 7196).

12.     The firearms industry is heavily regulated.  All firearms industry members must comply with multiple federal, state, and local laws and regulations that govern the manufacture, export, sale and acquisition of firearms including: the National Firearms Act, 26 U.S.C. §§ 5801 *et seq.*; the Gun Control Act, 18 U.S.C. §§ 921 *et seq.*; the Arms Export Control Act, 22 U.S.C. § 2778; Importation of Arms, Ammunition and Implements of War, 27 C.F.R § 447; Commerce in Firearms and Ammunition, 27 C.F.R § 478; Machineguns, Destructive Devices, and Certain Other Firearms, 27 C.F.R. § 479; as well as numerous state and local laws and regulations.

13.     The Act declares "No gun industry member, by conduct either unlawful in itself or unreasonable under all the circumstances shall knowingly or recklessly create, maintain or contribute to a condition in New York state [*i.e.*, a public nuisance] that endangers the safety or

2



**SA56**

health of the public through the sale, manufacturing, importing or marketing of a qualified product." N.Y. Gen. Bus. Law § 898-b(1).

14.    "Qualified products" are only those that have "been shipped or transported in interstate or foreign commerce." N.Y. Gen. Bus. Law § 898-a.6.; 15 U.S.C. § 7903(4).

15.    The Act also declares that "All gun industry members who manufacture, market, import or offer for wholesale or retail sale any qualified product in New York state shall establish and utilize reasonable controls and procedures to prevent its qualified products from being possessed, used, marketed or sold unlawfully in New York state." N.Y. Gen. Bus. Law § 898-b.2. "Reasonable controls and procedures" are defined as "policies that include, but are not limited to: (a) instituting screening, security, inventory and other business practices to prevent thefts of qualified products as well as sales of qualified products to straw purchasers, traffickers, persons prohibited from possessing firearms under state and federal law, or persons at risk of injuring themselves or others; and (b) preventing deceptive acts and practices and false advertising and otherwise ensuring compliance with all provisions of article twenty-two-A of this chapter." *Id.* § 898-a.2.

16.    New York law criminalizes multiple activities, including the transport, shipment, or sale of any "semiautomatic" rifle, pistol, or shotgun with various defined characteristics, such as a semiautomatic shotgun that has a fixed magazine capacity in excess of seven rounds, N.Y. Penal Law §§ 265:00(21–22); 265.10(1–2).

17.    Davidson's is lawfully permitted to sell "semiautomatic" firearms of the type illegal under New York's Penal Law in the vast majority of other states.

18.    I fear that, if a criminal illegally transports into New York one of the semiautomatic firearms defined by New York Penal Law to be illegal, Davidson's would face liability under the

3



Act even though the initial transport, shipment, and sale by Davidson's was lawful and complied with all applicable laws and regulations in the place undertaken.

19.    Davidson's cannot eliminate liability under this provision of the Act because the behavior of third-party criminals is outside of Davidson's control.

20.    I also fear that, even setting aside the above activities that New York criminalizes, Davidson's could still face liability under the Act for any activity that New York deems to be "unreasonable under all the circumstances," even though in full compliance with all laws and regulations in the place undertaken.

21.    Davidson's cannot eliminate liability under this provision of the Act because "unreasonable under all the circumstances" is not defined, is highly subjective and vague, and because this provision again creates liability for Davidson's based on the behavior of criminals who are outside of Davidson's control.

22.    I also fear that Davidson's could face liability under the Act's vague and subjective requirement to "establish and utilize reasonable controls and procedures to prevent" firearms "from being possessed, used, marketed or sold unlawfully in New York state," even though multiple "controls and procedures" are already required by federal, state and local laws and regulations.

23.    Davidson's cannot eliminate liability under the Act because, again, liability is predicated on the behavior of third party criminals outside of Davidson's control.

24.    Drastic measures by Davidson's could theoretically lessen potential liability (entirely ceasing the sale of sale of all semi-automatic firearms or ceasing the sale of all firearms to dealers located in New York, for example), but the economic impact of such measures to Davidson's would be irreparable and, regardless, the potential for liability under the Act would

not be eliminated.  Because the Act is vague and broad and encompasses fully lawful conduct, there is no action that Davidson's could take in order to insulate it from liability, other than ceasing operations altogether.

25.     If the Act is not enjoined, Davidson's will be irreparably harmed by being forced to cease lawful, federally licensed operations or face liability, both of which would have a significant, harmful impact on the company's revenue.  In addition, because the Act's standards are vague and unattainable, and liability under the Act attaches based upon the behavior of third-party criminals outside of Davidson's control, there is no way for Davidson's to comply. Davidson's will continually be at risk of litigation and potential liability unless it ceases doing business as allowed under its federal firearms license.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 3rd day of December, 2021.

By Bryan L. Tucker

Bryan L. Tucker

5

**SA59**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL     SHOOTING     SPORTS FOUNDATION, Inc., et al.,<br><br>                                    Plaintiffs,<br><br>        v.<br><br>KATHY HOCHUL, in her official capacity as Governor of New York, and LETITIA JAMES, in her official capacity as New York Attorney General,<br><br>                                    Defendants. | 1:21-cv-1348 (MAD/CFH) |

DECLARATION OF STEVE HORNADY ON BEHALF OF
HORNADY MANUFACTURING COMPANY

I, Steve Hornady, hereby declare as follows:

1.      I am over the age of 18 years, and I am qualified to submit this declaration on behalf of Hornady Manufacturing Company ("Hornady").

2.      I am the President of and one of the owners of Hornady.

3.      I have personal knowledge of the facts set forth in this declaration through direct involvement and by personally reviewing Hornady records and information.

4.      Hornady is a family-owned business that manufactures bullets, ammunition, related tools, and accessories.

5.      Hornady is a federal firearms licensee ("FFL") licensed by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").

6.      Hornady is engaged in the manufacture and sale of ammunition and so is a "gun industry member" as defined in New York's Act ("the Act") codified at N.Y. Gen. Bus. Law §§ 898-a–e.

1

**SA60**

7.      Hornady is also a "manufacturer" as defined in the Protection of Lawful Commerce in Arms Act ("PLCAA").  15 U.S.C. § 7903(2).

8.      Hornady ammunition is manufactured in Nebraska.  Hornady does not manufacture any ammunition in New York.

9.      Hornady primarily sells ammunition to distributors who sell to dealers.

10.      I understand the Act declares "No gun industry member, by conduct either unlawful in itself or unreasonable under all the circumstances shall knowingly or recklessly create, maintain or contribute to a condition in New York state [*i.e.*, a public nuisance] that endangers the safety or health of the public through the sale, manufacturing, importing or marketing of a qualified product."  N.Y. Gen. Bus. Law § 898-b(1).

11.      I understand "qualified products" include ammunition that has "been shipped or transported in interstate or foreign commerce."  15 U.S.C. § 7903(4).

12.      I fear Hornady could face liability under the Act for the manufacture or sale of ammunition that New York deems to be "unreasonable under all the circumstances," even though in full compliance with all laws and regulations in the place where the manufacture and sale took place.

13.      Hornady cannot eliminate liability under this provision of the Act because "unreasonable under all the circumstances" is not defined, is highly subjective and vague and because this provision creates liability for Hornady based on the behavior of third-party criminals who are outside Hornady's control.

14.      I understand the Act also declares that "All gun industry members who manufacture, market, import or offer for wholesale or retail sale any qualified product in New York state shall establish and utilize reasonable controls and procedures to prevent its qualified

products from being possessed, used, marketed or sold unlawfully in New York state." N.Y. Gen. Bus. Law § 898-b(2). "Reasonable controls and procedures" are defined as "policies that include, but are not limited to: (a) instituting screening, security, inventory and other business practices to prevent thefts of qualified products as well as sales of qualified products to straw purchasers, traffickers, persons prohibited from possessing firearms under state and federal law, or persons at risk of injuring themselves or others; and (b) preventing deceptive acts and practices and false advertising and otherwise ensuring compliance with all provisions of article twenty-two-A of this chapter." *Id*. § 898-a(2).

15.   I fear that Hornady could face liability under the Act's vague and subjective requirement to "establish and utilize reasonable controls and procedures to prevent" qualified products "from being possessed, used, marketed or sold unlawfully in New York state" even though multiple "controls and procedures" are already required by federal, state and local laws and regulations.

16.   Hornady cannot eliminate liability under this provision of the Act because, again, liability is predicated on the behavior of third-party criminals outside Hornady's control.

17.   Even if Hornady could theoretically undertake drastic measures in an attempt to lessen potential liability under the Act (refuse to sell ammunition into New York, for example), the economic impact to Hornady would be irreparable and the potential for liability under the Act regardless would not be eliminated. Because the Act is vague and broad and encompasses fully lawful conduct, there is no action that Hornady could take in order to insulate it from liability, other than ceasing operations altogether.

18.   If the Act is not enjoined, Hornady will be irreparably harmed by being forced to cease lawful, federally licensed operations or face liability, both of which would have a significant,

harmful impact on the company's revenue.  In addition, because the Act's standards are vague and unattainable, and liability under the Act relies on the behavior of third-party criminals outside Hornady's control, there is no way for Hornady to comply.  Hornady will continually be at risk of litigation and potential liability unless it ceases doing business as a federally licensed ammunition manufacturer.

I declare under penalty of perjury that the foregoing is true and correct.


Executed this 6th day of December 2021.

By: _____
            Steve Hornady

4

**SA63**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NATIONAL SHOOTING SPORTS FOUNDATION, Inc., et al., | |
| Plaintiffs, | |
| v. | 1:21-cv-1348 (MAD/CFH) |
| KATHY HOCHUL, in her official capacity as Governor of New York, and LETITIA JAMES, in her official capacity as New York Attorney General, | |
| Defendants. | |

DECLARATION OF SUSAN CUPERO ON BEHALF OF SMITH & WESSON INC.

I, Susan Cupero, hereby declare as follows:

1.      I am over the age of 18 years, and I am qualified to submit this declaration on behalf of Smith & Wesson Inc. ("Smith & Wesson").

2.      I am the Vice President, Sales at Smith & Wesson.

3.      I have personal knowledge of the facts set forth in this declaration through direct involvement and by personally reviewing Smith & Wesson's records and information.

4.      Smith & Wesson is a Delaware corporation with its principal place of business in Massachusetts. Smith & Wesson primarily manufactures firearms and parts for firearms. Smith & Wesson sells its products to government and law enforcement agencies in the United States and abroad, as well as to the commercial market through distributors and retailers throughout the United States.

5.      Smith & Wesson is a federal firearms licensee ("FFL") licensed by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").

1

**SA64**

6.      Smith & Wesson is a corporation engaged in the manufacture of firearms and so is a "gun industry member" as defined in New York's Act ("the Act") codified at N.Y. Gen. Bus. Law §§ 898-a–e.

7.      Smith & Wesson is also a "manufacturer" as defined in the Protection of Lawful Commerce in Arms Act ("PLCAA").  15 U.S.C. § 7903(2).

8.      Smith & Wesson firearms and firearms components for civilian use are manufactured in Massachusetts, Maine, and Connecticut.  Smith & Wesson does not manufacture any firearm or component part in New York.

9.      Smith & Wesson sells firearms in compliance with applicable federal, state and local firearms laws to independent federally-licensed wholesale distributors; strategic retailers; buying groups consisting of certain large, national retailers; federal, state, and municipal law enforcement agencies; and government and military agencies (collectively "federally-licensed entities"), who in turn sell them in compliance with applicable firearms laws.  Smith & Wesson does not sell firearms directly to civilians.

10.      I understand the Act's preamble states that, "despite stringent state and local laws against the illegal possession of firearms [in New York] according to the Bureau of Alcohol, Tobacco, Firearms and Explosives statistics, 74% of firearms used in crimes in New York are purchased outside of New York."  NY LEGIS 237 (2021), 2021 Sess. Law News of N.Y. Ch. 237 (S. 7196).

11.      I understand the Act seeks to address "the ease at which legal firearms flow into the illegal market" and the criminal misuse of firearms in New York. *Id.*

12.      The firearms industry is heavily regulated.  All firearms industry members must comply with multiple federal, state, and local laws and regulations that govern the manufacture,

export, import, sale, and acquisition of firearms including:  the National Firearms Act, 26 U.S.C. §§ 5801 *et seq*.; the Federal Gun Control Act of 1968, 18 U.S.C. §§ 921 *et seq*.; the Arms Export Control Act, 22 U.S.C. § 2778; Importation of Arms, Ammunition and Implements of War, 27 C.F.R § 447; Commerce in Firearms and Ammunition, 27 C.F.R § 478; as well as numerous state and local laws and regulations.

13.    I understand the Act declares "No gun industry member, by conduct either unlawful in itself or unreasonable under all the circumstances shall knowingly or recklessly create, maintain or contribute to a condition in New York state [*i.e.*, a public nuisance] that endangers the safety or health of the public through the sale, manufacturing, importing or marketing of a qualified product." N.Y. Gen. Bus. Law § 898-b(1).

14.    I understand "qualified products" are only those that have "been shipped or transported in interstate or foreign commerce." 15 U.S.C. § 7903(4).

15.    I understand the Act also declares that "All gun industry members who manufacture, market, import or offer for wholesale or retail sale any qualified product in New York state shall establish and utilize reasonable controls and procedures to prevent its qualified products from being possessed, used, marketed or sold unlawfully in New York state." N.Y. Gen. Bus. Law § 898-b(2).  "Reasonable controls and procedures" are defined as "policies that include, but are not limited to: (a) instituting screening, security, inventory and other business practices to prevent thefts of qualified products as well as sales of qualified products to straw purchasers, traffickers, persons prohibited from possessing firearms under state and federal law, or persons at risk of injuring themselves or others; and (b) preventing deceptive acts and practices and false advertising and otherwise ensuring compliance with all provisions of article twenty-two-A of this chapter." *Id*. § 898-a(2).

3

**SA66**

16.     I also understand that New York law criminalizes multiple activities, including the manufacture, transport, shipment, or sale of any "semiautomatic" rifle, pistol, or shotgun with various defined characteristics such as a semiautomatic rifle that has "a pistol grip that protrudes conspicuously beneath the action of the weapon," N.Y. Penal Law § 265:00(21–22); 265.10(1–2).

17.     Smith & Wesson is lawfully permitted to sell "semiautomatic" firearms of the type illegal under New York's Penal Law in multiple other states.

18.     I fear that, if a criminal illegally transports into New York one of the semiautomatic firearms defined by New York Penal Law to be illegal, Smith & Wesson would face liability under the Act even though the initial manufacture, transport, and shipment of the firearm by Smith & Wesson was lawful and complied with all applicable laws and regulations in the place undertaken.

19.     Smith & Wesson cannot eliminate liability under the Act's first prong because the behavior of third-party criminals is outside Smith & Wesson's control.

20.     I also fear that, even setting aside the above activities that New York criminalizes, Smith & Wesson could still face liability under the Act for any activity that New York deems to be "unreasonable under all the circumstances," even though in full compliance with all laws and regulations in the place undertaken.

21.     Smith & Wesson cannot eliminate liability under this provision of the Act because "unreasonable under all the circumstances" is not defined, is highly subjective and vague and because this provision again creates liability for Smith & Wesson based on the behavior of criminals who are outside Smith & Wesson's control.

22.     I also fear that Smith & Wesson could face liability under the Act's vague and subjective requirement to "establish and utilize reasonable controls and procedures to prevent" firearms "from being possessed, used, marketed or sold unlawfully in New York state," even

4

**SA67**

though multiple "controls and procedures" are already required by federal, state, and local laws and regulations.

23.     Smith & Wesson cannot eliminate liability under the Act because, again, liability is predicated on the behavior of third-party criminals outside Smith & Wesson's control.

24.     Even if Smith & Wesson could theoretically undertake drastic measures in an attempt to lessen potential liability (discontinuing the manufacture of semi-automatic firearms entirely, for example), the economic impact to Smith & Wesson would be irreparable and, regardless, the potential for litigation and liability under the Act would not be eliminated. Because the Act is vague and broad and encompasses fully lawful conduct, there is no action that Smith & Wesson could take in order to insulate it from liability, other than ceasing operations altogether.

25.     If the Act is not enjoined, Smith & Wesson will be irreparably harmed by being forced to cease lawful, federally licensed operations or face liability, both of which would have a significant, harmful impact on the company's revenue.  In addition, because the Act's standards are vague and unattainable, and liability under the Act attaches based upon the behavior of third-party criminals outside Smith & Wesson's control, there is no way for Smith & Wesson to comply. Smith & Wesson will continually be at risk of litigation and potential liability unless it ceases doing business as a federally licensed firearms manufacturer.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 6th day of December, 2021.

By:  _____
         Susan Cupero

5

**SA68**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NATIONAL SHOOTING SPORTS FOUNDATION, INC., et al., | |
| Plaintiffs, | |
| v. | 1:21-cv-1348 (MAD/CFH) |
| KATHY HOCHUL, in her official capacity as Governor of New York, and LETITIA JAMES, in her official capacity as New York Attorney General, | |
| Defendants. | |

DECLARATION OF LAURIE LIPSEY ARONSON ON BEHALF OF LIPSEY'S, LLC

I, Laurie Lipsey Aronson, hereby declare as follows:

1.      I am over the age of 18 years, and I am qualified to submit this declaration on behalf of Lipsey's, LLC ("Lipsey's").

2.      I am the Chairwoman and CEO of Lipsey's.

3.      I have personal knowledge of the facts set forth in this declaration through direct involvement and by personally reviewing Lipsey's records and information.

4.      Lipsey's is a Louisiana limited liability company with its principal place of business in Louisiana. Lipsey's is a national sporting goods and firearms wholesaler.

5.      Lipsey's is a federal firearms licensee ("FFL") licensed by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").

6.      Lipsey's is a corporation engaged in the distribution of firearms and so is a "gun industry member" as defined in New York's Act ("the Act") codified at N.Y. Gen. Bus. Law §§ 898-a.–e. *Id.* at § 898-a.4.

7.      Lipsey's is also a "seller" as defined in the Protection of Lawful Commerce in Arms Act ("PLCAA"). 15 U.S.C. § 7903(6).

8.      Lipsey's firearms for sale to the commercial market are generally sold to federally licensed firearms dealers, including dealers located in the State of New York. Lipsey's does not sell firearms directly to civilians in New York.

9.      The majority of the firearms Lipsey's sells are not manufactured in New York.

10.     The Act's preamble states that, "despite stringent state and local laws against the illegal possession of firearms [in New York] according to the Bureau of Alcohol, Tobacco, Firearms and Explosives statistics, 74% of firearms used in crimes in New York are purchased outside of New York." NY LEGIS 237 (2021), 2021 Sess. Law News of N.Y. Ch. 237 (S. 7196).

11.     The Act seeks to address the alleged "ease at which legal firearms flow into the illegal market" and the criminal misuse of firearms in New York. NY LEGIS 237 (2021), 2021 Sess. Law News of N.Y. Ch. 237 (S. 7196).

12.     The firearms industry is heavily regulated. All firearms industry members must comply with multiple federal, state, and local laws and regulations that govern the manufacture, export, sale and acquisition: the National Firearms Act, 26 U.S.C. §§ 5801 *et seq*.; the Gun Control Act, 18 U.S.C. §§ 921 *et seq*.; the Arms Export Control Act, 22 U.S.C. § 2778; Importation of Arms, Ammunition and Implements of War, 27 C.F.R § 447; Commerce in Firearms and Ammunition, 27 C.F.R § 478; Machineguns, Destructive Devices, and Certain Other Firearms, 27 C.F.R. § 479; as well as numerous state and local laws and regulations.

13.     The Act declares "No gun industry member, by conduct either unlawful in itself or unreasonable under all the circumstances shall knowingly or recklessly create, maintain or contribute to a condition in New York state [*i.e.*, a public nuisance] that endangers the safety or

health of the public through the sale, manufacturing, importing or marketing of a qualified

product." N.Y. Gen. Bus. Law § 898-b.1.

14.     "Qualified products" are only those that have "been shipped or transported in

interstate or foreign commerce." N.Y. Gen. Bus. Law § 898-a.6.; 15 U.S.C. § 7903(4).

15.     The Act also declares that "All gun industry members who manufacture, market,

import or offer for wholesale or retail sale any qualified product in New York state shall establish

and utilize reasonable controls and procedures to prevent its qualified products from being

possessed, used, marketed or sold unlawfully in New York state." N.Y. Gen. Bus. Law § 898-b.2.

"Reasonable controls and procedures" are defined as "policies that include, but are not limited to:

(a) instituting screening, security, inventory and other business practices to prevent thefts of

qualified products as well as sales of qualified products to straw purchasers, traffickers, persons

prohibited from possessing firearms under state and federal law, or persons at risk of injuring

themselves or others; and (b) preventing deceptive acts and practices and false advertising and

otherwise ensuring compliance with all provisions of article twenty-two-A of this chapter." *Id*. §

898-a.2.

16.     New York law criminalizes multiple activities, including the transport, shipment,

or sale of any "semiautomatic" rifle, pistol, or shotgun with various defined characteristics, such

as a semiautomatic shotgun that has a fixed magazine capacity in excess of seven rounds, N.Y.

Penal Law § 265:00(21–22); 265.10(1–2).

17.     Lipsey's is lawfully permitted to sell "semiautomatic" firearms of the type illegal

under New York's Penal Law in the vast majority of other states.

18.     I fear that, if a criminal illegally transports into New York one of the semiautomatic

firearms defined by New York Penal Law to be illegal, Lipsey's would face liability under the Act

even though the initial transport, shipment, and sale by Lipsey's was lawful and complied with all applicable laws and regulations in the place undertaken.

19.     Lipsey's cannot eliminate liability under this provision of the Act because the behavior of third-party criminals is outside of Lipsey's control.

20.     I also fear that, even setting aside the above activities that New York criminalizes, Lipsey's could still face liability under the Act for any activity that New York deems to be "unreasonable under all the circumstances," even though in full compliance with all laws and regulations in the place undertaken.

21.     Lipsey's cannot eliminate liability under this provision of the Act because "unreasonable under all the circumstances" is not defined, is highly subjective and vague, and because this provision again creates liability for Lipsey's based on the behavior of criminals who are outside of Lipsey's control.

22.     I also fear that Lipsey's could face liability under the Act's vague and subjective requirement to "establish and utilize reasonable controls and procedures to prevent" firearms "from being possessed, used, marketed or sold unlawfully in New York state," even though multiple "controls and procedures" are already required by federal, state and local laws and regulations.

23.     Lipsey's cannot eliminate liability under the Act because, again, liability is predicated on the behavior of third party criminals outside of Lipsey's control.

24.     Drastic measures by Lipsey's could theoretically lessen potential liability (entirely ceasing the sale of sale of all semi-automatic firearms or ceasing the sale of all firearms to dealers located in New York, for example), but the economic impact of such measures to Lipsey's would be irreparable and, regardless, the potential for litigation and liability under the Act would not be

eliminated.  Because the Act is vague and broad and encompasses fully lawful conduct, there is no

action that Lipsey's could take in order to insulate it from liability, other than ceasing operations

altogether.

25.     If the Act is not enjoined, Lipsey's will be irreparably harmed by being forced to

cease lawful, federally licensed operations or face liability, both of which would have a significant,

harmful impact on the company's revenue.  In addition, because the Act's standards are vague and

unattainable, and liability under the Act attaches based upon the behavior of third-party criminals

outside of Lipsey's control, there is no way for Lipsey's to comply. Lipsey's will continually be

at risk of litigation and potential liability unless it ceases doing business as a federally licensed

firearms dealer.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 7th day of December, 2021.

By:  *Laurie L Aronson*
_____
              Laurie Lipsey Aronson

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

NATIONAL     SHOOTING     SPORTS
FOUNDATION, Inc., et al.,

      Plaintiffs,

v.

KATHY HOCHUL, in her official capacity as
Governor of New York, and LETITIA JAMES,
in her official capacity as New York Attorney
General,

      Defendants.

Case No.: 1:21-cv-1348 (MAD/CFH)

---

<u>DECLARATION OF FRANCESCO VALENTE ON BEHALF OF BERETTA U.S.A. CORP.</u>

    I, Francesco Valente, hereby declare as follows:

    1. I am over the age of 18 years, and I am qualified to submit this declaration on behalf of Beretta U.S.A. Corp. ("Beretta").

    2. I am the General Manager and Chief Operating Officer at Beretta.

    3. I have personal knowledge of the facts set forth in this declaration through direct involvement and by personally reviewing Beretta records and information.

    4. Beretta is a Maryland corporation with its principal place of business in Maryland. Beretta began operations in 1977 and was the supplier of the standard sidearm for the U.S. Armed Forces from 1985 to 2020. In addition to its sales to the U.S. Government, the company makes and sells firearms to numerous law enforcement agencies throughout the United States and sells sporting shotguns, rifles, handguns, and firearms used for civilian self-defense to thousands of federally and locally licensed firearm distributors and dealers in all 50 states.

    5. Beretta is a federal firearms licensee ("FFL") licensed by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").

    6. Beretta is a corporation engaged in the manufacture of firearms and so is a "gun industry member" as defined in New York's Act ("the Act") codified at N.Y. Gen. Bus. Law §§ 898-a-e. *Id.* at 898-a(4).

    7. Beretta is also a "manufacturer" as defined in the Protection of Lawful Commerce in Arms Act ("PLCAA"). 15 U.S.C. § 7903(4)(4).

    8. Beretta firearms for civilian use are manufactured in Tennessee, Italy, and Finland. Beretta does not manufacture any firearm or component part in New York.

    9. Beretta firearms for civilian use are generally sold either direct to dealers (retailers) or to licensed distributors who, in turn, sell to dealers (retailers), including in New York. Beretta sells directly to citizens in two states. Beretta has one store in New York (the "Beretta Gallery") from which it sells firearms directly to citizens.

    10. I understand the Act's preamble states that, "despite stringent state and local laws against the illegal possession of firearms [in New York] according to the Bureau of Alcohol, Tobacco, Firearms and Explosives statistics, 74% of firearms used in crimes in New York are purchased outside of New York." NY LEGIS 237 (2021), 2021 Sess. Law News of N.Y. Ch. 237 (S. 7196).

    11. I understand the Act seeks to address "the ease at which legal firearms flow into the illegal market" and the criminal misuse of firearms in New York.

    12. The firearms industry is heavily regulated. All firearms industry members must comply with multiple federal, state, and local laws and regulations that govern the manufacture, export, sale, and acquisition of firearms including: the National Firearms Act, 26 U.S.C. §§ 5801 *et seq.*; the Federal Gun Control Act of 1968, 18 U.S.C. §§ 921 *et seq.*; the Arms Export Control Act, 22 U.S.C. § 2778; Importation of Arms, Ammunition and Implements of War, 27 C.F.R § 447; Commerce in Firearms and Ammunition, 27 C.F.R § 478; as well as numerous state



and local laws and regulations.

13. I understand the Act declares "No gun industry member, by conduct either unlawful in itself or unreasonable under all the circumstances shall knowingly or recklessly create, maintain or contribute to a condition in New York state [*i.e.*, a public nuisance] that endangers the safety or health of the public through the sale, manufacturing, importing or marketing of a qualified product." N.Y. Gen. Bus. Law § 898-b(1).

14. I understand "qualified products" are only those that have "been shipped or transported in interstate or foreign commerce." 15 U.S.C. § 7903(4).

15. I understand the Act also declares that "All gun industry members who manufacture, market, import or offer for wholesale or retail sale any qualified product in New York state shall establish and utilize reasonable controls and procedures to prevent its qualified products from being possessed, used, marketed or sold unlawfully in New York state." *Id.* § 898-b(2). "Reasonable controls and procedures" are defined as "policies that include, but are not limited to: (a) instituting screening, security, inventory and other business practices to prevent thefts of qualified products as well as sales of qualified products to straw purchasers, traffickers, persons prohibited from possessing firearms under state and federal law, or persons at risk of injuring themselves or others; and (b) preventing deceptive acts and practices and false advertising and otherwise ensuring compliance with all provisions of article twenty-two-A of this chapter." *Id.* § 898-a(2).

16. I also understand that New York law criminalizes multiple activities, including the manufacture, transport, shipment, or sale of any "semiautomatic" rifle, pistol, or shotgun with various defined characteristics such as a semiautomatic shotgun that has a fixed magazine capacity in excess of seven rounds. N.Y. Penal Law § 265:00(21–22); 265.10(1–2).

17. Beretta is lawfully permitted to manufacture and sell "semiautomatic" firearms of the type illegal under New York's Penal law in multiple other states.

18. I fear that, if a criminal illegally transports into New York one of the semiautomatic firearms defined by New York Penal Law to be illegal, Beretta would face liability under the Act even though the initial manufacture, transport, shipment, and sale by Beretta was lawful and complied with all applicable laws and regulations in the place undertaken.

19. Beretta cannot eliminate liability under this provision of the Act because the behavior of third-party criminals is outside Beretta's control.

20. I also fear that, even setting aside the above activities that New York criminalizes, Beretta could still face liability under the Act for any activity that New York deems to be "unreasonable under all the circumstances," even though in full compliance with all laws and regulations in the place undertaken.

21. Beretta cannot eliminate liability under this provision of the Act because "unreasonable under all the circumstances" is not defined, is highly subjective and vague and because this provision again creates liability for Beretta based on the behavior of third-party criminals who are outside Beretta's control.

22. I also fear that Beretta could face liability under the Act's vague and subjective requirement to "establish and utilize reasonable controls and procedures to prevent" firearms "from being possessed, used, marketed or sold unlawfully in New York state" even though multiple "controls and procedures" are already required by federal, state and local laws and regulations.

23. Beretta cannot eliminate liability under the Act because the Act does not indicate what "controls and procedures" will suffice and liability is again predicated on the behavior of third party criminals outside Beretta's control.

24. Even if Beretta could theoretically undertake drastic measures in an attempt to lessen potential liability (entirely discontinuing the manufacture of semi-automatic firearms or closing its New York store, for example), the economic impact to Beretta would be irreparable and the potential for liability under the Act regardless would not be eliminated. Because the Act is vague and broad and encompasses fully lawful conduct, there is no action that Beretta could take in order to insulate it from liability, other than ceasing operations altogether.

25. If the Act is not enjoined, Beretta will be irreparably harmed by being forced to cease lawful, federally licensed operations or face liability, both of which would have a significant, harmful impact on the company's revenue. In addition, because the Act's standards are vague and unattainable, and liability under the Act relies on the behavior of third-party criminals outside Beretta's control, there is no way for Beretta to comply. Beretta will continually be at risk of litigation and potential liability unless it ceases doing business as a federally licensed firearms manufacturer.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 9th day of December, 2021.

By: _____
Francesco Valente

5

**SA76**