# 22-1374

## United States Court of Appeals
### for the Second Circuit

NATIONAL SHOOTING SPORTS FOUNDATION, INC., BERETTA U.S.A. CORP., DAVIDSON'S, INC., GLOCK INC., CENTRAL TEXAS GUN WORKS, HORNADY MANUFACTURING COMPANY, LIPSEY'S LLC, OSAGE COUNTY GUNS LLC, RSR GROUP, INC. SHEDHORN SPORTS, INC., SIG SAUER, INC., SMITH & WESSON, INC., SPORTS SOUTH LLC, SPRAGUE'S SPORTS INC., STRUM, RUGER & COMPANY, INC.,

*Plaintiffs- Appellants*,

*v.*

LETITIA JAMES, in her official capacity as New York Attorney General,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Northern District of New York

**BRIEF FOR AMICI CURIAE ILLINOIS, CALIFORNIA, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAI'I, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEW JERSEY, NEW MEXICO, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, WASHINGTON, AND WISCONSIN SUPPORTING DEFENDANT-APPELLEE AND AFFIRMANCE**

SARAH A. HUNGER
*Deputy Solicitor General*
ANNA W. GOTTLIEB
*Assistant Attorney General*
100 West Randolph Street
Chicago, Illinois 60601
(312) 814-5202
Sarah.Hunger@ilag.gov

January 13, 2023

**KWAME RAOUL**
Attorney General
State of Illinois

**JANE ELINOR NOTZ**
Solicitor General

Attorneys for State of Illinois

(*Additional counsel on signature page*)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ii

INTEREST OF AMICI STATES ................................................................ 1

SUMMARY OF ARGUMENT .................................................................. 3

ARGUMENT ............................................................................................ 5

I.       State Laws Providing A Remedy For The Unlawful Sale And Marketing Of Firearms Benefit The Public By Encouraging Responsible Business Practices ................................................... 5

II.     Public Nuisance Statutes Like § 898 Are A Permissible Exercise Of State Sovereign Authority. .................................. 12

      A.    The text and legislative history of PLCAA confirm that § 898 fits within the predicate exception ............................. 14

      B.    The dormant Commerce Clause does not limit the States' authority to enact measures like § 898 that are designed to protect their residents from gun violence within their borders. .................................................................. 19

CONCLUSION ...................................................................................... 31

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Beverage Ass'n v. Snyder,*
735 F.3d 362 (6th Cir. 2013) .......................................................23

*Am. Booksellers Found. v. Dean,*
342 F.3d 96 (2d Cir. 2003)...........................................................30

*Cipollone v. Liggett Grp., Inc.,*
505 U.S. 504 (1992) .....................................................................15

*City of N.Y. v. Beretta U.S.A. Corp.,*
524 F.3d 384 (2d Cir. 2008).........................................................17

*CTS Corp. v. Waldburger,*
573 U.S. 1 (2014) .........................................................................15

*Dep't of Revenue of Kentucky v. Davis,*
553 U.S. 328 (2008) .....................................................................21

*Empacadora de Carnes de Fresnillo, S.A. v. Curry,*
476 F.3d 326 (5th Cir. 2007) .......................................................27

*Energy & Env't Legal Inst. v. Epel,*
793 F.3d 1169 (10th Cir. 2015) .............................................22, 28

*Freedom Holdings, Inc. v. Spitzer,*
357 F.3d 205 (2d Cir. 2004).....................................................22, 29

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.,*
476 U.S. 573 (1986) .................................................................28, 29

*Healy v. Beer Inst. Inc.,*
491 U.S. 324 (1989) .....................................................................28

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Ileto v. Glock*,
    565 F.3d 1126 (9th Cir. 2009) ........................................................ 17

*Maine v. Taylor*,
    477 U.S. 131 (1986) ........................................ 5, 14, 20, 21

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996) ................................................ 13, 22

*Minnesota v. Clover Leaf Creamery Co.*,
    449 U.S. 456 (1981) ........................................................ 27

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*,
    272 F.3d 104 (2d Cir. 2001) ........................................ 29

*Online Merchants Guild v. Cameron*,
    995 F.3d 540 (6th Cir. 2021) ........................................ 22

*Or. Waste Sys., Inc. v. Dep't of Env't Quality of Or.*,
    511 U.S. 93 (1994) ........................................................ 20

*Osborn v. Ozlin*,
    310 U.S. 53 (1940) ........................................................ 22

*Plumley v. Massachusetts*,
    155 U.S. 461 (1894) ........................................................ 27

*Sligh v. Kirkwood*,
    237 U.S. 52 (1915) ........................................................ 23

*Soto v. Bushmaster Firearms Int'l, LLC*,
    202 A.3d 262 (Conn. 2019) ........................................ 11, 16

*South Dakota v. Wayfair, Inc.*,
    138 S. Ct. 2080, 2093-94 (2018) ................................ 20

iii

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Vizio, Inc. v. Klee,*
 886 F.3d 249 (2d Cir. 2018) ........................................................... 29

*Wos v. E.M.A. ex rel. Johnson,*
 568 U.S. 627 (2013) ...................................................................... 2

*Wyeth v. Levine,*
 555 U.S. 555 (2009) ...................................................................... 15

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 3 ........................................................... 19

**Statutes and Regulations**

Alaska Stat. Ann. § 46.03.715 ....................................................... 26

Ariz. Rev. Stat. § 36-1674(A)(3) ................................................... 25

Cal. Health & Safety Code:
 § 110552 .................................................................................... 24
 § 108555(a) ................................................................................ 24

2022 Cal. Legis. Serv. Ch. 98 (A.B. 1594) (eff. July 1, 2023) ................... 7

D.C. Code § 8-522 ....................................................................... 24

Del. Code Ann. tit. 10, § 3930 ........................................................ 7

Idaho Code Ann.
 § 6-1406 .................................................................................... 23
 § 39-2609 .................................................................................. 24

410 Ill. Comp. Stat. 45/4 ............................................................... 24

iv

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

415 Ill. Comp. Stat.:
    60/14 ..................................................................... 24
    92/5 ....................................................................... 24

430 Ill. Comp. Stat. 140/15 ................................................. 24

815 Ill. Comp. Stat. 385/3 .................................................. 24

La. Stat. Ann.:
    § 30:2572 ............................................................... 25
    § 30:2575(A) ........................................................... 26
    § 30:2576(A) ........................................................... 26

Kan. Stat. Ann. § 60-3304 .................................................. 23

Ky. Rev. Stat. Ann. § 217.801 ............................................. 24

Me. Rev. Stat. tit. 22 § 13-16A ........................................... 24

Mich. Code § 324.8512b ..................................................... 24

Minn. Stat. Ann. § 325E.40 ................................................ 24

Nev. Rev. Stat. § 701.260 .................................................. 24

N.J. Stat. Ann. § 2C:58-34 ................................................. 7

N.J. Stat. Ann. §2C:58-35(a)(1) ........................................... 7

2021 Sess. Law News of N.Y., Ch. 237, § 1 (S. 7196) .............. 6

N.Y. Gen. Business:
    § 898-a ............................................................... 7, 12
    § 898-b ............................................................. *passim*
    § 898-c .................................................................. 3

Ohio Admin. Code § 3717-1-03.1 ......................................... 26

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

Tenn. Comp. R. & Regs. § 0080-04-08.03.................................................24

15 U.S.C:
    § 7901......................................................................................15,16
    § 7903..................................................................................15, 16, 17

Vt. Stat. Ann. tit. 9 § 2470f ....................................................................24

Wash. Rev. Code
    § 7.72.030 .............................................................................23
    § 70A.430.020 ......................................................................24

W. Va. Code:
    § 19-11A-3.............................................................................26
    § 19-11A-4.............................................................................26
    § 19-11A-5.............................................................................26
    § 19-11A-7.............................................................................26

**Rules**

F.R.A.P 29(a)(2) ....................................................................................1

**Other Authorities**

151 Cong. Rec. (July 26, 2005) ...............................................................18

151 Cong. Rec. (July 27, 2005) ...............................................................18

AFP, *US gunmaker unveils semi-automatic rifle marketed to kids*,
    BARRON'S, Feb. 18, 2022 ...............................................................11

Rachana Bhowmik, *Aiming for Accountability: How City Lawsuits Can
    Help Reform an Irresponsible Gun Industry*, 11 J.L. & POL'Y 67
    (2002) .........................................................................................9

City of Chicago, Gun Trace Report 2017 ................................................8

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

Philip J. Cook, et al., *Some Source of Crime Guns in Chicago: Dirty Dealers, Straw Purchasers, and Illegal Traffickers*, 104 J. OF CRIM. L. & CRIMINOLOGY 717 (2015) ................................................... 9, 10

Jack L. Goldsmith & Alan O. Sykes, *The Internet and the Dormant Commerce Clause*, 110 YALE L.J. 785 (2001) ................................ 23

Christopher S. Koper, Crime Gun Risk Factors: Buyer, Seller, Firearm, and Transaction Characteristics Associated with Gun Trafficking and Criminal Gun Use (2007) ........................................................ 8

James Madison, Vices of the Political System of the United States, April 1787, No. 4 ................................................................................. 20

Scott Malone, *States Settle With Mattel On Lead Toys*, REUTERS, Dec. 15, 2008 ....................................................................................... 25

Chairwoman Carolyn B. Maloney, The Committee's Investigation into Gun Industry Practices and Profits Mem. (July 27, 2022) ..... 11, 12

Mary Papenfuss, *Gun-maker posted chilling ad of child cradling firearm before Uvalde tragedy*, HUFFINGTON POST, May 27, 2022 ..................................................................................... 11

Nick Penzenstadler, *These 5 gun ads are alarming critics, changing law*, USA TODAY, Aug. 18, 2022 ..................................................... 11

Press Release, Illinois Attorney General, Attorney General Warns Consumers of New Potential Lead Poisoning Hazard in Fisher Price Toy Kits, Dec. 14, 2007 ........................................................ 25

Chris A. Reese et al., *Trends and Disparities in Firearm Fatalities in the United States, 1990-2021*, JAMA NETWORK OPEN, Nov. 29, 2022 ..................................................................................... 6

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

Thomas R. Simon et al., *Notes from the Field: Increases in Firearm Homicide and Suicide Rates — United States, 2020-2021*, 71 MORBIDITY AND MORTALITY WKLY. REP. 1286 (2022) .....................6

Daniel W. Webster et al., *Effects of a Gun Dealer's Change in Sales Practices on the Supply of Guns to Criminals*, 83 J. OF URBAN HEALTH 778 (2006) ........................................................................10

Daniel W. Webster et al., *Effects of Undercover Police Stings of Gun Dealers on the Supply of New Guns to Criminals*, 12 INJ. PREVENTION 225 (2006) ................................................................10

Garen J. Wintemute, *Firearm Retailers' Willingness to Participate in an Illegal Gun Purchase*, 87 J. URBAN HEALTH 865, 870 (2010) ........9

Garen J. Wintemute, *Frequency of and responses to illegal activity related to commerce in firearms: findings from the Firearms Licensee Survey*, BMJ INJ. PREVENTION, Mar. 11, 2013 ...........9, 10

Jeff Wagner, *How is a gun retailer supposed to stop straw purchases?*, CBS NEWS, Oct. 17, 2022 ................................................................9

## INTEREST OF AMICI STATES

Illinois, California, Connecticut, Delaware, District of Columbia, Hawai'i, Maryland, Massachusetts, Michigan, Minnesota, New Jersey, New Mexico, Oregon, Pennsylvania, Rhode Island, Vermont, Washington, and Wisconsin (collectively, "amici States") submit this brief in support of Defendant-Appellee New York Attorney General Letitia James ("New York") pursuant to Federal Rule of Appellate Procedure 29(a)(2). The amici States have a substantial interest in the public health, safety, and welfare. This includes an interest in preserving all lawful tools to deter and remediate the effects of gun violence within their borders, including by providing statutory remedies for misconduct by gun industry members that causes or contributes to such violence.

That interest is implicated by this case, in which Plaintiffs-Appellants challenge the validity of New York General Business Law §§ 898-a-e ("§ 898"). Section 898 creates a public nuisance cause of action that public officials or private citizens may use to bring suit against a gun industry member for the member's own, unlawful conduct—specifically, when the member either (1) knowingly or

recklessly creates or contributes to a condition in New York that endangers the safety or health of the public through the unlawful or unreasonable sale, manufacturing, importing, or marketing of firearms, or (2) fails to establish or utilize reasonable controls and procedures to prevent firearms from being unlawfully used, possessed, marketed, or sold in New York. N.Y. Gen. Business §§ 898-b-e.

Although the amici States have taken different approaches when enacting measures designed to curb and remediate the effects of gun violence, they agree that public nuisance causes of action like the one created by § 898—which addresses the gun industry members' own misconduct—fall well within the States' sovereign authority to protect their residents and to "provide tort remedies to their citizens as they see fit." *Wos v. E.M.A. ex rel. Johnson*, 568 U.S. 627, 639-40 (2013) (internal quotations omitted). The amici States further agree with the district court's determination that plaintiffs have not set forth any legal bases that would preclude the exercise of state sovereign authority in this context. On the contrary, as New York explains, *e.g.*, NY Br. 15-18, the district court correctly concluded that § 898 is not preempted by the Protection of Lawful Commerce in Arms Act ("PLCAA"), does not run

2

afoul of the dormant Commerce Clause, and comports with due process. Accordingly, the amici States urge this court to affirm the district court's order dismissing the complaint and denying preliminary injunctive relief.

## SUMMARY OF ARGUMENT

The State of New York enacted § 898 to promote responsible business practices and provide a remedy for harm inflicted by gun industry members through their own actions. N.Y. Gen. Business §§ 898-b-c; N.Y. Sponsors Mem., 2021 S.B. 7196. This legislation not only protects the health and safety of New York residents, but also falls well within the bounds of the States' longstanding police powers.

To start, public nuisance statutes like § 898 serve the vital purpose of protecting the public welfare. A number of studies suggest a direct link between the harmful effects of gun violence and the irresponsible actions of gun industry members, such as dealers failing to enact reasonable controls to prevent straw purchasing or manufacturers designing novel marketing schemes to target vulnerable youth. As explained below, *see infra* Section I, public nuisance statutes that apply to the sale, manufacturing, importing, and marketing of

3

firearms, such as § 898, respond to these well-documented public safety problems by promoting responsible business practices and providing a remedy when gun industry members engage in conduct that causes harm to the public.

These statutory schemes, moreover, are lawful exercises of state sovereign authority, notwithstanding plaintiffs' arguments to the contrary. The amici States thus agree with New York that § 898 is not preempted by PLCAA because it falls squarely within what is known as PLCAA's "predicate exception," *see* NY Br. 22-30; does not violate the dormant Commerce Clause because it is a nondiscriminatory regulation of conduct that endangers the health and safety of New York residents, *id.* at 36-51; and is not unconstitutionally vague, *id.* at 51-55.

The amici States write separately, however, to highlight the fact that plaintiffs' preemption and dormant Commerce Clause theories encroach upon the States' sovereign authority in ways that neither PLCAA nor the dormant Commerce Clause requires. As for PLCAA, there are numerous indications in the Act's plain text and legislative history demonstrating that Congress intended for States to continue regulating gun industry members in ways consistent with the

4

requirements of § 898.  And as to the dormant Commerce Clause, New York's decision to create a public nuisance statute to address certain gun violence occurring within its borders is consistent with the States' well-established "authority under their general police powers to regulate matters of legitimate local concern, even though interstate commerce may be affected." *Maine v. Taylor*, 477 U.S. 131, 138 (1986) (internal quotations omitted).  Indeed, § 898 is similar in relevant respects to myriad state statutes regulating goods and services that pose a safety risk to residents within state borders.  For these reasons and those outlined by New York, this court should reject plaintiffs' arguments and affirm the judgment of the district court.

## ARGUMENT

I. **State Laws Providing A Remedy For The Unlawful Sale And Marketing Of Firearms Benefit The Public By Encouraging Responsible Business Practices.**

State public nuisance statutes like § 898 serve the narrow but important purpose of deterring gun industry members from engaging in irresponsible practices that actively contribute to the increasing gun violence facing individual States and, where necessary, by holding those

who engage in such tactics accountable for their own actions.[1]  These laws address a number of well-documented and harmful practices by gun industry members that have been shown to contribute to gun violence, such as dealers failing to enact reasonable controls to prevent firearms from entering the illegal market and manufacturers designing false, misleading, or predatory marketing schemes to target vulnerable youth.

As the New York legislature explained, "given the ease at which legal firearms flow into the illegal market, and given the specific harm illegal firearm violence causes certain New Yorkers," it was necessary to enact legislation pursuant to which "those responsible for the illegal or unreasonable sale, manufacture, distribution, importing or marketing of firearms may be held liable for the public nuisance caused by such activities."  2021 Sess. Law News of N.Y., Ch. 237, § 1 (S. 7196)

---

[1]  In 2021 alone, firearms killed nearly 49,000 people, the highest number recorded since data collection began, and firearm fatalities at the hands of another individual increased by eight percent over the previous year.  *E.g.*, Chris A. Reese et al., *Trends and Disparities in Firearm Fatalities in the United States, 1990-2021*, JAMA NETWORK OPEN, Nov. 29, 2022, bit.ly/3IaOoXC; Thomas R. Simon et al., *Notes from the Field: Increases in Firearm Homicide and Suicide Rates — United States, 2020-2021*, 71 MORBIDITY AND MORTALITY WKLY. REP. 1286, 1286-87 (2022), bit.ly/3GXNyg2.

(McKinney's).[2]  One way that § 898 deters such conduct is by requiring that gun industry members "utilize reasonable controls and procedures" to prevent their firearms from "being possessed, used, marketed or sold unlawfully in New York."  N.Y. Gen. Bus. Law § 898-b(2).  The legislature provided examples of such reasonable controls, including "instituting screening, security, inventory and other business practices to prevent thefts," as well as engaging in practices that guard against the "sales of qualified products to straw purchasers, traffickers, persons prohibited from possessing firearms under state or federal law, or persons at risk of injury themselves or others."  *Id.* § 898-a(2).

Empirical evidence supports the determination that such measures will stem the flow of firearms into the illegal market.  Studies show that a large number of firearms in the illegal market originate from a small number of gun industry members and that those firearms are obtained through schemes that can be prevented by the institution of responsible business practices.  As one example, a 2017 report

---

[2]  Other States have also enacted public nuisance laws related to firearms.  *See* Del. Code Ann. tit. 10, § 3930; N.J. Stat. Ann. §§ 2C:58-34, 2C:58-35(a)(1); *see also* 2022 Cal. Legis. Serv. Ch. 98 (A.B. 1594) (eff. July 1, 2023).

7

determined that a quarter of all firearms recovered at crime scenes in Chicago between 2013 and 2016 were purchased at just ten dealers.[3]  In fact, two of those stores accounted for ten percent of all crime guns recovered during that same period.[4]  Similarly, a California study showed that 12 percent of gun dealers were responsible for selling 86 percent of the firearms recovered from the scene of violent firearm-related offenses committed in the State between 1996 and 2000.[5]  Finally, the Bureau of Alcohol, Tobacco, Firearms and Explosives reported that 14 percent of federally licensed gun dealers sold all of the firearms recovered in gun crimes nationwide in 1998.[6]

It is also well-documented that gun dealers contribute to the harm caused by firearms entering the illegal market when they engage in unlawful or irresponsible business practices, such as by selling firearms to known straw purchasers (that is, someone purchasing on behalf of

---

[3] CITY OF CHICAGO, GUN TRACE REPORT 2017, at 4, bit.ly/3ItoLS2.

[4] *Id*.

[5] Christopher S. Koper, Crime Gun Risk Factors: Buyer, Seller, Firearm, and Transaction Characteristics Associated with Gun Trafficking and Criminal Gun Use 12 (2007), bit.ly/3G6uMkO.

[6] *Id*.

another person) or to individuals who do not provide appropriate documentation.[7]  As to the former, studies confirm that most dealers are confronted at one time or another with individuals whom they believe may be a straw purchaser:  In 2011, for example, two-thirds of surveyed gun dealers admitted that they had been approached by possible straw purchasers.[8]  While the vast majority of dealers do not sell firearms to such individuals, one study concluded that one in five dealers would sell a firearm to an individual whom they suspected was purchasing it on behalf of someone else, including for those who may not legally be allowed to buy it.[9]  One consequence of this conduct in the aggregate is that a large number of firearms enter the illegal market; indeed, by some estimates, nearly half of all guns that are trafficked on

---

[7]  *E.g.*, Philip J. Cook et al., *Some Source of Crime Guns in Chicago:  Dirty Dealers, Straw Purchasers, and Illegal Traffickers*, 104 J. OF CRIM. L. & CRIMINOLOGY 717, 723 (2015); Rachana Bhowmik, *Aiming for Accountability: How City Lawsuits Can Help Reform an Irresponsible Gun Industry*, 11 J.L. & POL'Y 67, 108-09 (2002).

[8]  Jeff Wagner, *How is a gun retailer supposed to stop straw purchases?*, CBS NEWS, Oct. 17, 2022, bit.ly/3IlT0ue; Garen J. Wintemute, *Frequency of and responses to illegal activity related to commerce in firearms: findings from the Firearms Licensee Survey*, BMJ INJ. PREVENTION, Mar. 11, 2013, at 2, bit.ly/3WQgOL1.

[9]  Garen J. Wintemute, *Firearm Retailers' Willingness to Participate in an Illegal Gun Purchase*, 87 J. URBAN HEALTH 865, 870 (2010), bit.ly/3QCeSUn.

the secondary market began as straw purchases.[10]  But studies show that when gun dealers either are held accountable for their sales to straw purchasers or choose to engage in more responsible business practices that prevent such sales, there is a significant decrease in the flow of firearms into the illegal market.[11]

Studies also show that some gun dealers do not record sales in the manner required under state and federal law.  According to one report, there were no records of the requisite federal forms for five percent of firearms recovered at crime scenes, even though those firearms were traced to a specific seller, suggesting that the sales were "off the books."[12]  When an undocumented sale occurs, the firearms may enter the illegal secondary market or, alternatively, may be used by the purchasers themselves to harm others.[13]

---

[10]  Wintemute, *supra* note 8, at 6.

[11]  *See, e.g.*, Daniel W. Webster et al., *Effects of Undercover Police Stings of Gun Dealers on the Supply of New Guns to Criminals*, 12 INJ. PREVENTION 225, 225-30 (2006); Daniel W. Webster et al., *Effects of a Gun Dealer's Change in Sales Practices on the Supply of Guns to Criminals*, 83 J. OF URBAN HEALTH 778, 778-87 (2006).

[12]  Cook, *supra* note 7, at 744-45.

[13]  Wintemute, *supra* note 8, at 6.

In addition to addressing irresponsible sales practices, § 898 includes provisions that address another harmful practice: predatory, false, or misleading marketing campaigns by firearms manufacturers aimed at children and teenagers.[14] Gun makers, for example, have promoted "assault weapons for offensive, military style missions" and touted them as "the ultimate combat weapons system," complete with extensive combat-oriented iconography.[15] Others have used advertising showing children handling firearms or have released military-style weapons that are specifically marketed to children.[16]

Among other relevant requirements, § 898 requires gun industry members to institute reasonable controls to prevent deceptive acts and practices, as well as false advertising, under New York's consumer

---

[14] *Cf.* Chairwoman Carolyn B. Maloney, The Committee's Investigation into Gun Industry Practices and Profits Mem. 3 (July 27, 2022), bit.ly/3CwSXIa (observing that such marketing has been linked to gun violence, particularly mass shootings).

[15] *See Soto v. Bushmaster Firearms Int'l, LLC*, 202 A.3d 262, 277 (Conn. 2019), *cert. denied sub. nom., Remington Arms Co., LLC v. Soto*, 140 S. Ct. 513 (2019); *see also* Nick Penzenstadler, *These 5 gun ads are alarming critics, changing law*, USA TODAY, Aug. 18, 2022, bit.ly/3C6tK7e.

[16] Mary Papenfuss, *Gun-maker posted chilling ad of child cradling firearm before Uvalde tragedy*, HUFFINGTON POST, May 27, 2022, bit.ly/3vpRj7f; AFP, *US gunmaker unveils semi-automatic rifle marketed to kids*, BARRON'S (Feb. 18, 2022), bit.ly/3WzmJnx.

protection laws. N.Y. Gen Bus. Law § 898-a(2). And as with the sales practices just discussed, there are documented links between prohibited advertisements and the increase in certain types of gun violence. Indeed, these tactics and advertising materials have been connected to the mass shooters (all under the age of 21) who killed children in Parkland, Florida; Sandy Hook, Connecticut; and Uvalde, Texas, to name a few.[17]

All told, public nuisance statutes like § 898 provide States with critical tools to deter and remediate irresponsible business practices by firearms manufacturers and dealers that cause or contribute to the gun violence that continues to harm their residents.

## II. Public Nuisance Statutes Like § 898 Are A Permissible Exercise Of State Sovereign Authority.

As explained, the purpose of New York's law is to protect its residents from actions by firearms manufacturers and dealers that create or contribute to gun violence within the State's borders and to hold those businesses accountable for their harmful conduct. It is well established that measures of this nature are well within the States'

---

[17] Maloney, *supra* note 14, at 2, 11, 15.

12

longstanding authority to enact legislation targeted to ensuring the health and safety of their residents. *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996). Nevertheless, plaintiffs assert that the New York legislature has exceeded its authority in several respects, two of which are addressed here. First, plaintiffs maintain that the legislature improperly legislated in an area preempted by PLCAA. Second, plaintiffs argue that New York's law impermissibly regulates interstate commerce in violation of the dormant Commerce Clause. *E.g.*, NSSF Br. 19-20. Neither argument is correct.

To start, § 898 is not preempted because although PLCAA limits the availability of certain civil remedies against gun industry members, the Act's plain text and legislative history make clear that Congress intended for States to continue to enact laws like § 898, which regulate the marketing and sale of firearms and allow civil lawsuits where gun manufacturers and sellers violate state regulations through their own conduct. Section 898 also does not violate the dormant Commerce Clause because, like countless other state laws, it permissibly regulates conduct that endangers the health and safety of New York residents, and any effects on interstate commerce are only incidental.

13

**A.**     **The text and legislative history of PLCAA confirm that § 898 fits within the predicate exception.**

Plaintiffs argue that the district court erred in dismissing their preemption claim because by enacting PLCAA, Congress intended to "stamp out" the kinds of civil actions that § 898 authorizes—specifically, "lawsuits based on the criminal misuse of (or even mere illegal possession of) firearms by third parties." NSSF Br. 18, 37. But plaintiffs are incorrect. At the threshold, plaintiffs misstate the purpose and scope of § 898. Section 898 holds gun industry members accountable for their own wrongdoing—for example, engaging in irresponsible sales practices or creating marketing campaigns that target children—and not for misconduct attributable solely to third parties. And the text and legislative history of PLCAA make clear that Congress intended to allow States to continue to enact laws like § 898, which serve the narrow but important purpose of holding gun industry members responsible for their own unlawful or unreasonable conduct.

States have inherent police powers to govern for the benefit of their citizens, including "broad regulatory authority to protect the health and safety of [their] citizens." *Taylor*, 477 U.S. at 151. States likewise may exercise their "traditional authority to provide tort

14

remedies to their citizens as they see fit." *CTS Corp. v. Waldburger*, 573 U.S. 1, 19 (2014) (internal quotations omitted).  But in enacting PLCAA—which preempts certain state-level causes of action against gun manufacturers and sellers—Congress limited that longstanding authority by restricting the availability of certain tort remedies under state law.  15 U.S.C. §§ 7901, 7903.

When Congress intrudes on state authority in this way, courts facing questions about the scope of the preempted causes of action must apply a "presumption against the pre-emption of state police power regulations," *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 518 (1992), only to be overcome if "the clear and manifest purpose of Congress" was to supersede the historic police powers of the States, *Wyeth v. Levine*, 555 U.S. 555, 565 (2009).  And here, PLCAA's text and legislative history show that Congress intended for the States to retain their authority to create laws like § 898, which hold gun industry members accountable for their own wrongdoing.

To start, the plain text indicates that Congress did not intend to extinguish state authority to enact laws like § 898.  Although PLCAA prohibits civil actions against certain gun industry members for "harm

15

*solely* caused by the criminal or unlawful misuse of [the members']
firearms," Congress did not intend to provide immunity from all
lawsuits brought under state law. 15 U.S.C. § 7901(b)(1) (emphasis
added). Indeed, Congress emphasized in its statement of findings and
purpose that "[t]he possibility of imposing liability on an entire industry
for harm that is *solely* caused by others is an abuse of the legal system"
that, among other things, "erodes public confidence in our Nation's
laws." *Id.* § 7901(a)(6) (emphasis added). The repeated use of the word
"solely" indicates that Congress sought to protect firearms
manufacturers and sellers from civil liability under circumstances
where the harm was entirely the result of others' unlawful conduct.
But there is no indication that Congress intended to foreclose remedies,
such as those created by § 898, against manufacturers and sellers for
their own conduct. *See, e.g.*, *Soto*, 202 A.3d at 321 ("At no time and in
no way does the congressional statement [of facts and purposes]
indicate that firearm sellers should evade liability for the injuries that
result if they promote the illegal use of their products.").

To that end, Congress carved out six exceptions to PLCAA
immunity. 15 U.S.C. § 7903(5)(A). Relevant here, Congress explicitly

16

exempted actions in which a manufacturer or seller of firearms "knowingly violated a State or Federal statute applicable to the sale or marketing of the product." *Id.* § 7903(5)(A)(iii). This exception has "come to be known as the 'predicate exception,' because a plaintiff . . . must allege a knowing violation of a 'predicate statute.'" *Ileto v. Glock*, 565 F.3d 1126, 1132 (9th Cir. 2009).

The operative phrase in the predicate exception is whether the statute at issue is one that is "applicable to" the sale or marketing of firearms. *City of N.Y. v. Beretta U.S.A. Corp.*, 524 F.3d 384, 399-401, 404 (2d Cir. 2008). This court has interpreted that language to require that the predicate statute regulate the firearms industry. *Id.* at 402. And as New York explains, *see* NY Br. 23-24, it is clear that § 898—which applies only to gun industry members—regulates the firearm industry.

But even if PLCAA's text were not clear, the Act's legislative history confirms that Congress did not intend to preempt state authority to hold gun industry members accountable for their own actions. Two of PLCAA's sponsors, Senator Larry Craig of Idaho and Senator Jeff Sessions of Alabama, underscored this point repeatedly

17

when explaining the scope of PLCAA.  Senator Craig emphasized that
PLCAA "is not a gun industry immunity bill" and "does not prevent
[gun manufacturers and sellers] from being sued for their own
misconduct."  151 Cong. Rec. S9061, 9088 (July 27, 2005); *see also, e.g.*,
*id.* at S9089 ("if a gun dealer or manufacturer violates the law, this bill
is not going to protect them from a lawsuit brought against them for
harm resulting from that misconduct").  Instead, the law "only stops one
extremely narrow category of lawsuits":  those that "attempt to force the
gun industry to pay for the crimes of third parties over whom they have
no control."  *Id.* at S9088; *see also id.* (stating that PLCAA's drafters
"tried to make that limitation as clear as we possibly can").

Senator Sessions similarly characterized PLCAA's preemption as
"incredibly narrow," 151 Cong. Rec. S8908-01, S8911 (July 26, 2005),
and made clear that "[p]laintiffs are not prevented from having a day in
court," *id.* at S8911.  On the contrary, they "can go to court if the gun
dealers do not follow the law, if they negligently sell the gun, if they
produce a product that is improper or they sell to someone they know
should not be sold to or did not follow steps to determine whether the
individual was [eligible] to bu[y] a gun."  *Id.*  In short, Senator Sessions

18

noted, "[m]anufacturers and sellers are still responsible for their own negligent or criminal conduct." *Id.* at S8911.

Thus, § 898, which creates a cause of action directed at the harmful conduct of gun industry members (and not harms caused solely by third parties), fits squarely within the parameters outlined in the statutory text and envisioned by PLCAA's sponsors. The district court's determination that § 898 is not preempted should thus be affirmed.

**B.     The dormant Commerce Clause does not limit the States' authority to enact measures like § 898 that are designed to protect their residents from gun violence within their borders.**

In addition to falling within the predicate exception to PLCAA, public nuisance laws like § 898 respect the dormant Commerce Clause. Plaintiffs make three arguments to the contrary:  that § 898 discriminates against interstate commerce, impermissibly regulates extraterritorial transactions, and unduly burdens interstate commerce. NSSF Br. 39-50.  The amici States agree with New York that none of these arguments is persuasive, *see* NY Br. 36-51, but write separately to highlight how plaintiffs' second theory—that § 898 is impermissibly extraterritorial because it regulates out-of-state transactions, NSSF Br.

19

43-49—does not align with the States' longstanding authority to, and practice of, permissibly regulating matters of local concern.

The Commerce Clause grants Congress the power "[t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. In addition to this affirmative grant of authority, the Clause "has long been understood to have a 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Or. Waste Sys., Inc. v. Dep't of Env't Quality of Or.*, 511 U.S. 93, 98 (1994).

As the Supreme Court has explained, this negative aspect of the Commerce Clause balances dual objectives: on the one hand, it "prevent[s] States from engaging in economic discrimination so they [do] not divide into isolated, separable units," *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2093-94 (2018), and, on the other, it protects the sovereign authority of States to "regulate matters of legitimate local concern," *Taylor*, 477 U.S. at 138 (internal quotations omitted). The former objective recognizes that the Framers sought "to prevent a State from retreating into the economic isolation that had plagued relations among the Colonies and later among the States under the Articles of

20

Confederation." *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008) (cleaned up); *see also* James Madison, Vices of the Political System of the United States, April 1787, No. 4 (noting that trade barriers against out-of-state products were "destructive of the general harmony" among the States under the Articles of Confederation). This "distrust of economic Balkanization," however, is tempered by the latter objective, which reflects that the Framers favored a substantial "degree of local autonomy." *Davis*, 553 U.S. at 338.

In other words, the "limitation imposed by the Commerce Clause on state regulatory power is by no means absolute"; on the contrary, "the States retain authority under their general police powers to regulate matters of legitimate local concern, even though interstate commerce may be affected." *Taylor*, 477 U.S. at 138 (cleaned up). Therefore, so "long as a State does not needlessly obstruct interstate trade or attempt to place itself in a position of economic isolation, it retains broad regulatory authority under the commerce clause to protect the health and safety of its citizens." *Id.* at 151 (cleaned up).

As New York explains, *see* NY Br. 46-47, § 898 does not run afoul of these principles. On the contrary, § 898 is a permissible exercise of

21

the States' traditional sovereign authority to redress a serious public

safety problem facing New York residents—irresponsible business

practices that create or contribute to gun violence.  To be sure, ensuring

compliance with § 898 may impact some out-of-state conduct.  But, as

just discussed, "the mere fact that state action may have repercussions

beyond state lines is of no judicial significance so long as the action is

not within that domain which the Constitution forbids." *Freedom*

*Holdings, Inc. v. Spitzer*, 357 F.3d 205, 220-21 (2d Cir. 2004) (citing

*Osborn v. Ozlin*, 310 U.S. 53, 62 (1940)); *see also, e.g.*, *Online Merchants*

*Guild v. Cameron*, 995 F.3d 540, 559 (6th Cir. 2021) ("in a modern

economy just about every state law will have some 'practical effect' on

extraterritorial commerce").

Indeed, countless nondiscriminatory laws that govern in-state

activities or conditions—including in areas such as this one where

States are exercising their core sovereign authority to protect the health

and safety of their residents, *Medtronic*, 518 U.S. at 475—can have

incidental effects on conduct, operations, and markets outside of a

State's borders, *e.g., Online Merchants Guild*, 995 F.3d at 559; *Energy &*

*Env't Legal Inst. v. Epel*, 793 F.3d 1169, 1175 (10th Cir. 2015) (Gorsuch,

22

J.); *Am. Beverage Ass'n v. Snyder*, 735 F.3d 362, 378-79 (6th Cir. 2013) (Sutton, J., concurring).

Perhaps most relevant here, States routinely regulate the sale or use of goods within their borders to ensure that their residents are not exposed to unsafe conditions, much in the way that § 898 deters irresponsible business practices related to the sale, marketing, and manufacturing of firearms and creates liability for conduct that creates or contributes to unsafe conditions in New York.  *See* N.Y. Gen. Bus. § 898-b.  For instance, States have long imposed products-liability standards by creating and regulating tort actions authorizing their residents to sue manufacturers for defective product design and manufacturing to the extent such design or manufacturing causes in-state harm—no matter where that design or manufacturing took place.[18]

---

[18]  *See, e.g.*, Idaho Code Ann. § 6-1406 (setting out governing standards for product liability cases); Kan. Stat. Ann. § 60-3304 (defining when a product is defective); Wash. Rev. Code Ann. § 7.72.030 (identifying when a manufacturer may be held liable); Jack L. Goldsmith & Alan O. Sykes, *The Internet and the Dormant Commerce Clause*, 110 YALE L.J. 785, 795 (2001) ("Nuisance actions against polluters across the border," for example, "will assuredly affect their costs; so too will products liability actions against out-of-state manufacturers, local obscenity

States also regularly establish safety standards on the manufacture or sale of toys, health care products, and household goods to prevent harm to purchasers and, in many instances, to the public more broadly.[19] By way of one example, some States prohibit the sale of toys and other children's products containing toxic substances like lead or cadmium.[20] These laws protect children in those States from toys that pose unique dangers to them, and have allowed States to pursue actions against manufacturers that produce, sell, or otherwise introduce these products into the stream of commerce. But because toys are not

---

restrictions on real-space pornography providers, and state blue-sky registration requirements on multijurisdictional issuers.").

[19] *E.g.*, D.C. Code § 8-522 (disposable wipes); Idaho Code Ann. § 39-2609 (banning sale and use of fireworks in certain places); 415 Ill. Comp. Stat. 60/14 (fertilizers); 415 Ill. Comp. Stat. 92/5 (phosphorous detergents); 815 Ill. Comp. Stat. 385/3 (requiring specific disclosures by eyewear sellers in their advertisements); Mich. Code § 324.8512b (fertilizers); Minn. Stat. Ann. § 325E.40 (petroleum-based sweeping compounds); Nev. Rev. Stat. § 701.260 (incandescent lamps); Tenn. Comp. R. & Regs. § 0080-04-08.03 (antifreeze).

[20] *E.g.*, Ariz. Rev. Stat. § 36-1674(A)(3) (toys with lead-based paint); Cal. Health & Safety Code § 108555(a) (toys "contaminated with any toxic substance"); *id.* § 110552 (lead in candy); 410 Ill. Comp. Stat. 45/4 (children's products that contain a lead-bearing substance); 430 Ill. Comp. Stat. 140/15 (children's jewelry containing certain levels of cadmium); Ky. Rev. Stat. Ann. § 217.801 (lead paint on toys and children's furniture); Me. Rev. Stat. tit. 22 § 13-16A ("lead-containing children's product"); Vt. Stat. Ann. tit. 9 § 2470f (children's product containing lead); Wash. Rev. Code § 70A.430.020 (children's products containing lead, cadmium, or phthalates).

24

always manufactured and distributed within the States that impose such requirements, the implementation and enforcement of these standards can affect conduct occurring out of state, just like public nuisance statutes like § 898.[21]

By way of another, similar example, States also ban the sale and use of certain toxic or hazardous materials within their borders, regardless of whether the products were manufactured or sold within the State. For example, Louisiana passed a series of laws in 2006 to reduce the amount of mercury in the environment after determining that controlling the amount of "mercury release[d] to the environment is essential for the reduction of human health risks."[22] To accomplish this goal, the State severely limited the sale, distribution, and, in many

---

[21] *See, e.g.*, Press Release, Illinois Attorney General, Attorney General Warns Consumers of New Potential Lead Poisoning Hazard in Fisher Price Toy Kits, Dec. 14, 2007, https://bit.ly/3Nz0OYy (an investigation by the Illinois Attorney General lead to an out-of-state manufacturer agreed to remove toys from retail stores in Illinois); Scott Malone, *States Settle With Mattel On Lead Toys*, REUTERS, Dec. 15, 2008, https://reut.rs/3ysjBQR (a settlement between a toy manufacturer and 39 state attorneys general for using paint containing lead in several toy lines in violation of each state's laws).

[22] La. Stat. Ann. § 30:2572(A).

instances, the use of items containing mercury.[23]  Similarly, Alaska prohibits the use and sale of a particular type of marine antifouling paint that contains a toxic substance originally used to eliminate algae and other marine organisms from growing on ships.[24]  In fact, Alaska prohibits the import into the State or use of a vessel with this paint in any State water, without regard for where the vessel or paint had been originally sold.  *Id.*

Finally, States establish standards governing the food supply within their borders, including for food products that are produced or manufactured either in-state or in other States.[25]  The Supreme Court has long upheld these types of evenhanded regulations, as well as others, as valid exercises of state sovereign authority—even though

---

[23] *See, e.g.*, La. Stat. Ann. § 30:2575(C) (prohibit the use of mercury compounds in Louisiana schools); La. Stat. Ann. § 30:2576(A) (prohibiting products that exceed a particular mercury level from being "offered for final sale or use or distributed for promotional purposes").

[24] Alaska Stat. Ann. § 46.03.715.

[25] *E.g.*, Ohio Admin. Code § 3717-1-03.1 (regulating the harvesting and processing conditions for fish and wild mushrooms sold in the State); W. Va. Code §§ 19-11A-3, 19-11A-4, 19-11A-5, 19-11A-7 (regulating labelling, packaging, and distribution standards for dairy products).

they have some incidental effects on business decisions and operations outside of the regulating State.[26]

Plaintiffs attempt to distinguish these examples by asserting that § 898 is impermissibly extraterritorial because it *regulates* conduct that occurs out of state, as opposed to imposing conditions that merely *affect* out-of-state activities. NSSF Br. 47. At the threshold, this position is incorrect because it relies on a mistaken view of § 898. Like the examples just discussed, § 898 addresses in-state conduct—specifically "condition[s] *in New York state* that endanger[] the safety or health of the public" and firearms that are "possessed, used, marketed, or sold unlawfully *in New York state*." N.Y. Gen. Business Law § 898-b (emphases added). This kind of indirect, upstream effect is not sufficient to show a violation of the Commerce Clause.

---

[26] *E.g.*, *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 458, 470 (1981) (upholding a state law "banning the retail sale of milk in plastic . . . containers," while "permitting such sale in . . . paperboard milk cartons," against Commerce Clause challenge); *Sligh v. Kirkwood*, 237 U.S. 52, 57, 60 (1915) (rejecting Commerce Clause challenge to Florida law prohibiting the delivery of citrus fruits that are "immature and unfit for consumption"); *Plumley v. Massachusetts*, 155 U.S. 461, 479-480 (1894) (rejecting Commerce Clause challenge and upholding conviction for fraudulently selling margarine manufactured in Illinois as butter in Massachusetts); *see also, e.g.*, *Empacadora de Carnes de Fresnillo, S.A. v. Curry*, 476 F.3d 326, 335-36 (5th Cir. 2007) (rejecting Commerce Clause challenge to Texas law prohibiting processing, sale, or transfer of horsemeat for human consumption).

27

Additionally, plaintiffs' argument finds no support in relevant precedent. Plaintiffs rely heavily on the Supreme Court's decisions in *Healy v. Beer Institute Inc.*, 491 U.S. 324 (1989), and *Brown-Forman Distillers Corporation v. New York State Liquor Authority*, 476 U.S. 573 (1986), for the proposition that a State may not enact a statute that "directly controls" commerce in another State or that has the "practical effect [of] regulating commerce occurring wholly outside of the State's borders." NSSF Br. at 43-44 (cleaned up). But these cases are inapposite because they each involved a price control or price affirmation statute that linked in-state pricing to out-of-state prices, which had the "effect of raising costs for out-of-state consumers or rival businesses." *Epel*, 793 F.3d at 1173; *see also Healy*, 491 U.S. at 332, 337 (invalidating Connecticut law requiring beer producers to certify that their in-state price was no higher than their prices in nearby States); *Brown-Forman Distillers*, 476 U.S. at 579-82 (invalidating New York statute requiring liquor distillers to certify that their in-state prices would be no higher than out-of-state princes for any 30-day period). Because § 898 does not impose a price control or price affirmation

28

scheme on other States, it does not implicate the principles articulated in *Healy* and *Brown-Forman*.

Nor does § 898 violate the dormant Commerce Clause under any of this court's decisions. On the contrary, this court has noted the narrowness of the Supreme Court's extraterritoriality cases, as well as the principles they articulate, on multiple occasions. *See, e.g.*, *Vizio, Inc. v. Klee*, 886 F.3d 249, 255 (2d Cir. 2018) (rejecting extraterritoriality challenge to a law that imposed the cost of an electronics recycling program on manufacturers, including those that operate out of state, because the law did not "make specific reference to the terms of pricing or attach in-state consequences where the pricing terms violate the statute" (cleaned up)); *Freedom Holdings*, 357 F.3d at 220-21 (upholding law requiring a stamp on certain tobacco products because it did not "regulate prices or otherwise [] control the terms of out-of-state transactions"); *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 110 (2d Cir. 2001) (rejecting extraterritoriality challenge to Vermont statute requiring light bulb manufacturers to label products containing mercury "because the statute does not inescapably require manufacturers to label all lamps wherever distributed").

Even in *American Booksellers Foundation v. Dean*, 342 F.3d 96 (2d Cir. 2003), which plaintiffs cite as support for their theory, NSSF Br. 48-49, this court did not base its decision to strike down the challenged law—a prohibition on disseminating indecent materials to minors via the internet—on the distinction between regulating and affecting commerce that plaintiffs advance here. Instead, the court concluded, the statute was impermissibly extraterritorial because it was applicable to anyone due to "boundary-less nature" of the internet and thus had no geographic bounds. *Id.* at 103. Because § 898 contains clear geographic bounds (by its plain terms, it applies only to conduct occurring in New York or that causes or contributes to harmful conditions in New York), it does not run afoul of any lines drawn by this court in *American Booksellers Foundation*.

All told, § 898 respects the bounds of the dormant Commerce Clause by regulating a matter of pressing local concern—the harmful misconduct of gun industry members—in a manner that does not violate any principles of extraterritoriality. For these reasons and those offered by New York, this court should affirm the dismissal of plaintiffs' dormant Commerce Clause claim.

30

## CONCLUSION

This Court should affirm the district court's judgment.

Dated:  Chicago, Illinois
        January 13, 2023

                            Respectfully submitted,

                            **KWAME RAOUL**
                            Attorney General
                            State of Illinois

                            **JANE ELINOR NOTZ**
                            Solicitor General

                    By:  s/ Sarah A. Hunger
                            SARAH A. HUNGER
                            *Deputy Solicitor General*
                            ANNA W. GOTTLIEB
                            *Assistant Attorney General*
                            100 West Randolph Street
                            Chicago, Illinois 60601
                            (312) 814-5202
                            Sarah.Hunger@ilag.gov

ROB BONTA
*Attorney General*
*State of California*
1300 I Street
Sacramento, CA 95814

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*
820 N. French Street
Wilmington, DE 19801

ANNE E. LOPEZ
*Attorney General*
*State of Hawai'i*
425 Queen Street
Honolulu, HI 96813

ELIZABETH N. DEWAR
*Acting Attorney General*
*Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA 02108

KEITH ELLISON
*Attorney General*
*State of Minnesota*
102 State Capitol
75 MLK Blvd.
St. Paul, MN 55155

RAÚL TORREZ
*Attorney General*
*State of New Mexico*
408 Galisteo Street
Santa Fe, NM 87501

WILLIAM TONG
*Attorney General*
*State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

BRIAN L. SCHWALB
*Attorney General*
*District of Columbia*
400 6th Street NW, Suite 8100
Washington, DC 20001

ANTHONY G. BROWN
*Attorney General*
*State of Maryland*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202

DANA NESSEL
*Attorney General*
*State of Michigan*
P.O. Box 30212
Lansing, Michigan 48909

MATTHEW J. PLATKIN
*Attorney General*
*State of New Jersey*
Richard J. Hughes
Justice Complex
25 Market Street
Trenton, NJ 08625

ELLEN F. ROSENBLUM
*Attorney General*
*State of Oregon*
1162 Court Street NE
Salem, OR 97301

32

JOSH SHAPIRO
*Attorney General*
*Commonwealth of Pennsylvania*
Strawberry Square
Harrisburg, PA 17120

CHARITY R. CLARK
*Attorney General*
*State of Vermont*
109 State Street
Montpelier, VT 05609

JOSHUA L. KAUL
*Attorney General*
*State of Wisconsin*
17 W. Main Street
Madison, WI 53703

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Main Street
Providence, RI 02903

ROBERT W. FERGUSON
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief was prepared using Microsoft Word 2016, and according to that software, it contains 6,223 words, not including the table of contents, table of authorities, this certificate, and the cover.

s/ Sarah A. Hunger

SARAH A. HUNGER

## CERTIFICATE OF SERVICE

I hereby certify that, on January 13, 2023, an electronic copy of the foregoing was filed with the Clerk of Court using the ECF system and thereby served upon all counsel appearing in this case.

_____ s/ Sarah A. Hunger _____
SARAH A. HUNGER

35