# 22-1374-cv

## United States Court of Appeals
### for the
### Second Circuit

NATIONAL SHOOTING SPORTS FOUNDATION, INC., BERETTA U.S.A.
CORP., DAVIDSON'S, INC., GLOCK INC., CENTRAL TEXAS GUN
WORKS, HORNADY MANUFACTURING COMPANY, LIPSEY'S LLC,
OSAGE COUNTY GUNS LLC, RSR GROUP, INC., SHEDHORN SPORTS,
INC., SIG SAUER, INC., SMITH & WESSON INC., SPORTS SOUTH LLC,
SPRAGUE'S SPORTS INC., STURM, RUGER & COMPANY, INC.,

*Plaintiffs-Appellants,*

– v. –

LETITIA JAMES, in her official capacity as New York Attorney General,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

**BRIEF OF *AMICI CURIAE* EVERYTOWN FOR GUN SAFETY SUPPORT
FUND, GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE,
BRADY, AND NEW YORKERS AGAINST GUN VIOLENCE
IN SUPPORT OF APPELLEE**

CAITLIN HALLIGAN
ADAM K. HERSH
EKATERINA STYNES
ZACHARY SMITH
SELENDY GAY ELSBERG PLLC
*Attorneys for Amici Curiae*
1290 Avenue of the Americas
New York, New York 10104
(212) 390-9000

## CORPORATE DISCLOSURE STATEMENTS

Brady is a nonprofit organization.  It has no parent corporations.  It has no stock, and therefore no publicly held company owns l0% or more of its stock.

Everytown for Gun Safety Support Fund ("Everytown for Gun Safety") is a nonprofit organization.  It has no parent corporations.  It has no stock, and therefore no publicly held company owns l0% or more of its stock.

Giffords Law Center to Prevent Gun Violence is a nonprofit organization.  It has no parent corporations.  It has no stock, and therefore no publicly held company owns l0% or more of its stock.

New Yorkers Against Gun Violence (formally, New Yorkers Against Gun Violence, Inc.) is a nonprofit organization.  It has no parent corporations.  It has no stock, and therefore no publicly held company owns l0% or more of its stock.

# TABLE OF CONTENTS

**Pages**

CORPORATE DISCLOSURE STATEMENTS .......................................................i

INTERESTS OF AMICI CURIAE...........................................................1

INTRODUCTION .......................................................................2

ARGUMENT ...........................................................................6

I.  Well-Known and Simple Business Practices Can Reduce Diversion of
    Firearms to the Illegal Market .................................................6

II.  Section 898 Is Not Preempted by PLCAA ....................................12

    A.  PLCAA Was Not Intended to Insulate the Gun Industry From
        Regulation by Standards of Reasonable Conduct .............................14

    B.  Section 898 Expressly Regulates the Gun Industry by Requiring
        Reasonable Measures to Prevent Illegal Possession, Use, and
        Distribution..............................................................22

III.  Section 898 Is Not Unconstitutionally Vague ...............................25

CONCLUSION .........................................................................28

# TABLE OF AUTHORITIES

**Pages**

**Cases:**

*Barclays Bank PLC v. Franchise Tax Bd. of Cal.*,
    512 U.S. 298 (1994)......................................................................................12

*Brady v. Walmart Inc.*,
    No. 8:21 Civ. 1412, 2022 WL 2987078 (D. Md. July 28, 2022) .................21

*ChemSol LLC v. City of Sibley*,
    386 F. Supp. 3d 1000 (N.D. Iowa 2019) ......................................................27

*Chiapperini v. Gander Mountain Co.*,
    48 Misc. 3d 865 (N.Y. Sup. Ct., Monroe Cty. 2014) ...................................24

*City of Columbus v. Kim*,
    886 N.E.2d 217 (Ohio 2008) ........................................................................27

*City of Lincoln Center v. Farmway Co-Op, Inc.*,
    316 P.3d 707 (Kan. 2013).............................................................................27

*City of New York v. Beretta*,
    524 F.3d 384 (2d Cir. 2008) ............................................................ 1, 15, 20

*Corporan v. Wal-Mart Stores E., LP*,
    No. 16 Civ. 2305, 2016 WL 3881341 (D. Kan. July 18, 2016) ...................21

*D.C. v. Heller*,
    554 U.S. 570 (2008)......................................................................................16

*Delana v. CED Sales, Inc.*,
    486 S.W.3d 316 (Mo. 2016) ................................................................ 1, 16

*Est. of Kim ex rel. Alexander v. Coxe*,
    295 P.3d 380 (Alaska 2013) .........................................................................16

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972)......................................................................................28

*Ileto v. Glock, Inc.*,
    565 F.3d 1126 (9th Cir. 2009), *cert. denied* 560 U.S. 924 (2010) ......... 15, 20

*In re Luckygunner LLC*,
　　No. 14-21-00194-CV, slip op (Tex. Ct. App. May 12, 2021) *further mandamus review denied*, No. 21-0463 (Tex. Feb. 18, 2022) .................... 1-2

*Jake's, Ltd. v. City of Coates*,
　　284 F.3d 884 (8th Cir. 2002) .......................................................27

*King v. Klocek*,
　　187 A.D.3d 1614 (4th Dep't 2020) .............................................21

*Martell v. Dorchester Apt. Corp.*,
　　208 A.D.3d 1183 (2d Dep't 2022).................................................12

*NAACP v. AcuSport, Inc.*,
　　271 F. Supp. 2d 435 (E.D.N.Y. 2003).................................. *passim*

*Prescott v. Slide Fire Solutions, LP*,
　　410 F. Supp. 3d 1123 (D. Nev. 2019) ..................................... 1, 21

*Soto v. Bushmaster Firearms Int'l, LLC*,
　　331 Conn. 53 (2019).................................................. 15, 17, 18, 20

*State v. Primeau*,
　　422 P.2d 302 (Wash. 1966) .........................................................27

*Thibodeau v. Portuondo*,
　　486 F.3d 61 (2d Cir. 2007) ..........................................................25

*Tretta v. Osman*,
　　No. 20STCV48910, slip op. (Cal. Sup. Ct. L.A. Cty. June 28, 2021) ............1

*United States v. Salerno*,
　　481 U.S. 739 (1987).....................................................................25

*Williams v. Beemiller, Inc.*,
　　100 A.D.3d 143 (4th Dep't 2012), *opinion amended on reargument*,
　　103 A.D.3d 1191 (2013)...............................................................24

**Statutes and Other Authorities:**

15 U.S.C. § 7901 ..............................................................................19

15 U.S.C. § 7902(a) .........................................................................13

15 U.S.C. § 7903 ..................................................................... *passim*

iv

18 U.S.C. § 924(h) .........................................................................17

151 Cong. Rec. S8908–11 (July 26, 2005) ..........................................21

151 Cong. Rec. S9059 (July 27, 2005) ................................................20

151 Cong. Rec. S9088 (July 27, 2005) ................................................20

151 Cong. Rec. S9226 (July 28, 2005) ................................................21

151 Cong. Rec. S9374 (July 29,2005) .................................................20

N.Y. Gen. Bus. L. § 898-a ................................................... 15, 23, 26

N.Y. Gen. Bus. L. § 898-b ..................................................... 5, 26, 27

New York Penal L. § 240.45.1 .............................................................27

Agreement Between Smith & Wesson and the Departments of the Treasury
    and Housing and Urban Development, Local Governments and States
    (Mar. 7, 2000).................................................................................7

American Outdoor Brands Corporation, *Shareholder Requested Report*
    *on Product Safety Measures and Monitoring of Industry Trends*
    (Feb. 8, 2019)..................................................................................3

Anthony A. Braga et al.*, Interpreting the Empirical Evidence on Illegal*
    *Gun Market Dynamics*, 89 J. of Urban Health 779 (2012) ...................3, 7, 11, 24

Anthony A. Braga, et al., *Underground Gun Markets and the Flow of Illegal*
    *Guns into the Bronx and Brooklyn: A Mixed Methods Analysis*,
    J. of Urban Health (2020) ..............................................................6

ATF, *Fact Sheet – National Tracing Center* (Sep. 2021)........................11

ATF, *Safety and Security Information for Federal Firearms Licensees*
    (June 2021) .....................................................................................7

Avi Selk, *A gunmaker once tried to reform itself. The NRA nearly*
    *destroyed it*, Washington Post (Feb. 27, 2018) .....................................8

Brady, *Gun Dealer Code of Conduct* (2019).........................................10

Daniel W. Webster et al., *Effects of a Gun Dealer's Change in Sales*
    *Practices on the Supply of Guns to Criminals*, 83 J. Urban Health 778
    (2006)..............................................................................................7

v

DOJ, *Gun Violence Reduction: National Integrated Firearms Violence Reduction Strategy* (Jan. 18, 2001) .................................................3, 6, 8

Everytown for Gun Safety, *Firearm Manufacturer & Seller Gun Safety Code of Conduct*............................................................................................10

Everytown Research & Policy, *Everystat: New York*, Centers for Disease Control and Prevention, National Center for Health Statistics. WONDER Online Database, Underlying Cause of Death. Yearly average from 2016 to 2020 .................................................................................................2

Gregor Aisch & Josh Keller, *How Gun Traffickers Get Around State Gun Laws*, N. Y. Times, Nov. 13, 2015 ................................................7

John Bocker, "Beware the Straw Purchase!," NSSF (Apr. 23, 2018).....................24

New York State Division of Criminal Justice Services, *Gun Involved Violence Elimination (GIVE) Initiative: Shooting Incidents, Shooting Victims, and Individuals Killed by Gun Violence* (Dec. 15, 2022) .......................3

NSSF, "NSSF, ATF Jointly Launch Operation Secure Store," (Jan. 23, 2018) ...............................................................................10

NSSF REAL SOLUTIONS, "Don't Lie For the Other Guy".......................................11

Off. of the N. Y. Att'y Gen., *Target on Trafficking: New York Crime Gun Analysis* (2016) .............................................................................7

Philip J. Cook, *Gun Markets*, 1 Annu. Rev. Criminology 359 (2018).....................6

Restatement (Third) of Torts: Phys. & Emot. Harm § 13 (2010)...........................12

Sturm, Ruger & Company, Inc., *Shareholder Report* (Feb. 8. 2019)........................3

U.S. Off. of Just. Programs , *Don't Lie for the Other Guy (Video)* (2002) .............11

## INTERESTS OF AMICI CURIAE[1]

Amici are gun violence prevention groups and advocates that operate in New York and nationwide. New Yorkers Against Gun Violence is an advocacy and community-based organization in New York that develops anti-violence initiatives, pursues policy solutions to gun violence, and provides support to survivors. New Yorkers Against Gun Violence sees firsthand the devastating effects of gun violence and has an intimate understanding of the connection between such violence and the flow of the gun industry's products into their communities.

Several other amici have extensive experience litigating cases under the Protection of Lawful Commerce in Arms Act ("PLCAA"). *See, e.g.*, *City of New York v. Beretta*, 524 F.3d 384 (2d Cir. 2008) (Brady serving as plaintiff's counsel in case involving the interpretation of PLCAA); *Prescott v. Slide Fire Solutions, LP*, 410 F. Supp. 3d 1123 (D. Nev. 2019) (same); *Delana v. CED Sales, Inc.*, 486 S.W.3d 316 (Mo. 2016) (same); *Tretta v. Osman*, No. 20STCV48910, slip op. at *2, *5 (Cal. Sup. Ct. L.A. Cty. June 28, 2021) (Everytown serving as plaintiff's counsel in case involving interpretation of PLCAA);[2] *In re Luckygunner LLC*, No. 14-21-00194-

---

[1] All parties have consented to the filing of this brief. *See* Fed. R. App. P. 29(a). No counsel for a party authored this brief in whole or in part; and no person other than amici and their counsel made a monetary contribution to fund the preparation or submission of the brief. Fed. R. App. P. 29(a)(4)(E); Local R. 29.1(b).

[2] Slip opinion available at https://tinyurl.com/mr2kryjh.

CV, slip op at *1-2 (Tex. Ct. App. May 12, 2021) (same),[3] *further mandamus review denied*, No. 21-0463 (Tex. Feb. 18, 2022).[4] They also conduct research on the causes of gun violence, as well as the role of the gun industry in contributing to such violence.

Amici are intimately familiar with the contours of PLCAA, and submit this brief to provide context regarding its intent and text, the type of litigation PLCAA preempts, and the type of litigation it allows. Amici also have developed in-depth knowledge about how gun industry business practices can reduce diversion of weapons to the criminal market. Those insights enable Amici to assist the Court in understanding how industry conduct may give rise to a public nuisance, and the varied tools available to gun industry members to avoid that outcome.

## **INTRODUCTION**

New York is burdened by an epidemic of gun violence. In an average year, 870 New Yorkers, including 31 children, die from gun violence, and 2,607 more are injured.[5] This problem is only getting worse — recent data show a thirty-eight

---

[3] Slip opinion available at https://tinyurl.com/bdz7ts5y.

[4] Order available at https://tinyurl.com/3cenre7j.

[5] Everytown Research & Policy, *Everystat: New York*, https://perma.cc/MBJ8-Q7B4; Centers for Disease Control and Prevention, National Center for Health Statistics. WONDER Online Database, Underlying Cause of Death. Yearly average from 2016 to 2020.

percent increase in gun deaths in 2022 versus the preceding five-year average.[6]  But that devastating violence is not inevitable.  For decades, firearms manufacturers and sellers have been aware that certain "head-in-the-sand" supply chain practices contribute to such violence by facilitating gun-trafficking and straw purchasing of guns, and that discrete, clear, and manageable procedures exist that would reduce the risk of their products being diverted to the criminal market.[7]  And yet, for decades, many industry players have failed to implement these common-sense practices, with the glib assertion that "the manufacturer of a firearm is not responsible in any way for its illegal misuse[.]"  American Outdoor Brands Corporation, *Shareholder Requested Report on Product Safety Measures and Monitoring of Industry Trends* at 15 (Feb. 8, 2019) (report by former parent company of Appellant Smith & Wesson).[8]

---

[6] New York State Division of Criminal Justice Services, *Gun Involved Violence Elimination (GIVE) Initiative: Shooting Incidents, Shooting Victims, and Individuals Killed by Gun Violence* (Dec. 15, 2022), https://tinyurl.com/3jzzt5hw.

[7] *See also* Anthony A. Braga et al.*, Interpreting the Empirical Evidence on Illegal Gun Market Dynamics*, 89 J. of Urban Health 779, 780, 782, 784 (2012) (concluding that criminals acquiring guns "rely on a diverse set of illegal pathways, including corrupt licensed dealers, unlicensed sellers, straw purchasers, residential theft, and theft from licensed dealers, common carriers, and firearm manufacturers"), https://tinyurl.com/56sp5ka5; DOJ, *Gun Violence Reduction: National Integrated Firearms Violence Reduction Strategy*, 29-30 (2001) ("Gun manufacturers and importers could substantially reduce the illegal supply of guns by taking similar steps to control the chain of distribution for firearms.").

[8] *See also* Sturm, Ruger & Company, Inc., *Shareholder Report* at 2 (Feb. 8. 2019) (report by Appellant Sturm, Ruger stating: "We respectfully disagree with those who seek to blame firearms themselves – and by extension firearms manufacturers – for the violent actions of criminals.")

That cannot stand. To remedy this dire situation, the New York Legislature enacted N.Y. Gen. Bus. L. 898-a–e ("Section 898"), which recognizes that the scourge of gun violence in New York constitutes a public nuisance, and requires the gun industry to implement reasonable steps in response.

Federally licensed gun companies and their industry trade organization (together, "NSSF") ask this Court to invalidate Section 898. But neither PLCAA nor the Constitution require that result. Congress enacted PLCAA to provide gun manufacturers and sellers with a defense to liability in certain civil actions. NSSF wants to transmogrify the statute far beyond that limited purpose — and far beyond its text — to permit the wholesale invalidation of statutes that NSSF deems insufficiently "concrete." NSSF Br. 27. But PLCAA expressly allows actions brought under a "State or Federal statute applicable to the sale or marketing" of firearms, such as Section 898, when those actions assert a knowing violation that is the proximate cause of a plaintiff's harm. 15 U.S.C. § 7903(5)(A)(iii). NSSF ignores the text of this exception, seeking instead to read into PLCAA a ban on state statutes that impose flexible standards of conduct or require fact-specific analyses by rewriting the statute's legislative history. NSSF's claim that gun industry participants cannot figure out how to comply with Section 898 — indeed, that "the only truly viable option to avoid liability under Section 898 is to get out of the industry altogether," NSSF Br. 51 — is nonsense. Gun manufacturers and sellers

4

have long been aware of baseline controls and procedures to reduce the risk of guns ending up in criminal hands.

NSSF's constitutional challenges fare no better. Though NSSF claims Section 898 is unconstitutionally vague, it utilizes long-established and well-recognized language found in numerous public nuisance statutes. Those statutes are constitutionally sound, as courts across the nation have confirmed for more than a century. Section 898-b(2) provides even greater clarity than many of those statutes by explicitly defining its key terms and providing specific examples of conduct that constitutes a violation. And though NSSF claims that Section 898 is unconstitutional under the dormant Commerce Clause, the statute targets practices that are directed at New York and have devastating effect within New York's borders, and in no way advantages intrastate commerce.

Amici address the preemption and due process arguments; the flaws in NSSF's Dormant Commerce Clause arguments are amply addressed in the briefs filed by New York State and other amici. *See* NYAG Br. 36–50.

NSSF's request that the Court invalidate Section 898 is the latest in a long line of attempts by the firearms industry to avoid taking its fair share of responsibility for preventing gun violence. But this challenge has no basis in law. Section 898 is the sort of common-sense state regulation that PLCAA expressly permits and that the Constitution has always allowed.

# ARGUMENT

## I.  Well-Known and Simple Business Practices Can Reduce Diversion of Firearms to the Illegal Market

Gun sellers and manufacturers are well-aware that they can save lives by preventing firearms from ending up in the hands of lawbreakers. But to date, they have largely declined to institute the types of controls and procedures that would minimize that risk.

It is no secret that many firearms used in crime "originate in the legal market." DOJ, *Gun Violence Reduction: National Integrated Firearms Violence Reduction Strategy*, 29 (Jan. 18, 2001); *see also* Philip J. Cook, *Gun Markets*, 1 Annu. Rev. Criminology 359, 363 (2018) ("Guns used in crime usually originate from a legal supply chain of manufacture (or import), distribution, and retail sale."). These firearms are primarily funneled into the criminal market via theft, gun trafficking, and straw-purchasing (illegally purchasing a firearm on behalf of someone else). Cook, *supra*, at 366-72; Anthony A. Braga, et al., *Underground Gun Markets and the Flow of Illegal Guns into the Bronx and Brooklyn: A Mixed Methods Analysis*, J. of Urban Health at 11–12 (2020). At the retail level, research shows that some unscrupulous or careless firearms dealers engage in practices that facilitate diversion, such as selling products off-the-books, failing to implement training and

policies to prevent straw sales,[9] and failing to implement reasonable security measures to prevent theft.[10] At the manufacturer and distributor level, companies may contribute to this diversion through their marketing practices and by failing to monitor their distribution channels. *NAACP v. AcuSport, Inc.*, 271 F. Supp. 2d 435, 446, 449–52 (E.D.N.Y. 2003).

Over the years, government actors, researchers, and even gun industry trade organizations themselves have identified tactics that members of the industry could undertake to prevent this illegal diversion. For example, twenty-two years ago, Smith & Wesson — one of the largest gun manufacturers in the country — and numerous federal, state, and local government agencies developed a detailed protocol as part of a settlement "to reduce the criminal misuse of firearms, combat the illegal acquisition possession and trafficking of firearms, reduce the incidence of firearms accidents, and educate the public on the safe handling and storage of firearms."[11]

Smith & Wesson agreed to, among other things, require sellers of its products

---

[9] *See* Off. of the N. Y. Att'y Gen., *Target on Trafficking: New York Crime Gun Analysis* at 2, 7–8 (2016), https://perma.cc/MR6D-JFUM Gregor Aisch & Josh Keller, *How Gun Traffickers Get Around State Gun Laws*, N. Y. Times, Nov. 13, 2015; *see also* Daniel W. Webster et al., *Effects of a Gun Dealer's Change in Sales Practices on the Supply of Guns to Criminals*, 83 J. Urban Health 778 (2006), https://perma.cc/VD7F-XCM5.

[10] *See* ATF, *Safety and Security Information for Federal Firearms Licensees* at 3, 6-13 (June 2021),https://tinyurl.com/5da5ssne; Off. of the N. Y. Att'y Gen., *supra* n.7 at 2, 7-8; Aisch & Keller, *supra* n.9; Braga , *supra* n.7; *see also* Webster, *supra* n.9.

[11] Agreement Between Smith & Wesson and the Departments of the Treasury and Housing and Urban Development, Local Governments and States at 1 (Mar. 7, 2000) ("S&W Settlement").

to track dealers who sold disproportionate numbers of guns that were ultimately used in crimes, sell firearms at guns shows only when every seller agreed to use a background check system for buyers, implement a theft prevention security plan, and place limits on multiple handgun purchases by the same individual within a short period. S&W Settlement at 7–13.[12]

The following year, the Department of Justice ("DOJ") published a gun violence reduction strategy that recommended similar specific safeguards to prevent firearm diversion. DOJ, *Gun Violence Reduction*, *supra* n.7 at 29–30. These safeguards included "identify[ing] and refus[ing] to supply dealers and distributors that have a pattern of selling guns to criminals and straw purchasers" and developing a "training program for dealers and distributors covering compliance with firearms laws, identifying straw purchase scenarios and securing inventory." *Id.*

The gun industry thus had several examples of clear and manageable procedures and controls that were widely acknowledged to reduce the risk that guns sold would be used in acts of violence. Thereafter, in 2003, a six-week trial was held in the Eastern District of New York which focused on whether certain members of the gun industry had created a public nuisance in the state. *NAACP*, 271 F. Supp.

---

[12] After Smith & Wesson signed the agreement, Glock Inc., one of the largest supplier of handguns in the country, "announced that it was considering joining the settlement." Avi Selk, *A gunmaker once tried to reform itself. The NRA nearly destroyed it*, Washington Post (Feb. 27, 2018), available at https://tinyurl.com/2uk5hvkv. Thereafter, the NRA declared Smith & Wesson "a sellout," and the industry organized a boycott against the company. *Id.*

2d at 446.  After hearing from experts and interested parties, the court found that "defendants … could — voluntarily and through easily implemented changes in marketing and more discriminating control of the sales practices of those to whom they sell their guns — substantially reduce the harm occasioned by the diversion of guns to the illegal market and by the criminal possession and use of those guns." *Id.* [13] The court identified practices that, if followed, could reduce the prevalence of unlawful gun possession and gun violence.  *Id.* at 450.  This list of reasonable controls and procedures was remarkably similar to those identified in the Smith & Wesson settlement. They included: "requiring dealers and distributors to report the number of trace requests upstream to manufacturers and distributors; development of a management code that would establish standards of conduct on the part of members of the distribution system, including guidelines regarding sales to types of dealers, such as stocking dealers with storefront establishments; requiring minimum inventory; imposing liability insurance standards; limiting sales at gun shows; limiting multiple sales; limiting how the consumer gun transaction can be conducted

---

[13] The court ultimately dismissed the case on grounds irrelevant to this case — concluding that the plaintiff had failed to demonstrate the requisite standing to bring a public nuisance tort claim.  271 F. Supp. 2d at 499.

to insure security; education and training of dealers; and monitoring dealers through visitation and other regular interaction." *Id.* at 523.[14]

Even Appellant National Shooting Sports Foundation — the firearm industry trade group — recognizes that members of the gun industry can play an important role in preventing theft and straw-purchasing of firearms. For example, in 2018, the Foundation and the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") launched "Operation Secure Store," a training program for gun stores to prevent thefts. *See* "NSSF, ATF Jointly Launch Operation Secure Store," NSSF (Jan. 23, 2018), https://tinyurl.com/ye227r69). As the ATF deputy director announced, "firearms stolen from FFL retailers are a serious threat to public safety," and ATF "welcome[d] the opportunity to collaborate with the NSSF to educate and inform FFL retailers" on how to "mitigate this threat." *Id*.

Similarly, the Foundation acknowledges the critical role that retailers have in preventing straw-purchasing and partners with ATF to "educat[e] firearms retailers

---

[14] Several signatories to this brief developed model codes of conduct grounded in these findings. For example, Everytown for Gun Safety's "Firearm Manufacturer & Seller Gun Safety Code of Conduct" lays out specific techniques designed to "[p]revent sales to prohibited individuals and other suspect transactions." Everytown for Gun Safety, *Firearm Manufacturer & Seller Gun Safety Code of Conduct*, https://tinyurl.com/2n656jd2. These measures include refraining from making sales to individuals who appear intoxicated or unstable; selling at gun shows that require sellers to conduct background checks; deterring straw purchases with basic questions about the buyer's purpose and video records of transactions; preventing theft by storing firearms in a locked manner; and maintaining electronic records of all firearms in the seller's inventory. *See id*. Brady advises nearly identical measures to achieve those goals. *See* Brady, *Gun Dealer Code of Conduct* (2019), https://tinyurl.com/269m539t.

to be better able to identify and deter illegal straw purchases" — for example, by asking customers questions to identify suspicious purchasers. NSSF, http://www.dontlie.org/ (last visited Jan. 13, 2023); NSSF REAL SOLUTIONS, "Don't Lie For the Other Guy," https://tinyurl.com/5mvt87tp (last visited Jan. 13, 2023).[15]

Manufacturers and distributors can reduce diversion of guns via their own practices, as well as throughout the distribution chain. *See NAACP*, 271 F. Supp. 2d at 450 (describing "thousands" of illegal diversions that could be prevented by gun manufacturer monitoring of sales). When law enforcement agencies recover a gun in connection with crime, they can request that the ATF "trace" the firearm's path through the entire chain of distribution, from its manufacturer through the first retail sale.[16] Gun industry participants can monitor these requests to identify patterns of diversion and can require that distributors and retailers downstream report up to them regarding the trace requests they receive. *See, e.g.*, S&W Settlement at 10 (Part II.A.1.k). And as industry participants know, these data are essential in identifying negligent and/or unlawful practices that divert firearms to criminals.[17]

---

[15] *See* U.S. Off. of Just. Programs, *Don't Lie for the Other Guy (Video)* (2002) (providing overview of Don't Lie for the Other Guy training video made available to firearms dealers by NSSF), https://tinyurl.com/46wv4x69. The *Don't Lie* campaign represents a valuable tool for straw purchase screening, but it is only one component of safeguards responsible dealers should use.

[16] ATF, *Fact Sheet – National Tracing Center* (Sep. 2021), https://tinyurl.com/3c3467tv.

[17] *See NAACP*, 271 F. Supp. 2d at 521-22 (accepting expert testimony that "the industry knows that crime gun traces are indicators of problems at the dealer level and are adequate notice to all up-stream distribution partners of these problems"; *see also* Braga, *supra* n.7, at 780 ("Firearm

These clearly established and well-understood practices give the lie to NSSF's purported confusion about what steps gun industry participants could take to avoid creating a danger to New Yorkers. In complying with Section 898, gun manufacturers and sellers can draw on decades of experience and expert research to develop common-sense practices that reduce the risk that their products will end up in the illegal market. As with myriad other types of cases that turn on a determination of "reasonableness," courts and juries can appropriately consider those standards as benchmarks in assessing the reasonableness of defendants' conduct in cases brought under Section 898.[18]

## II.    Section 898 Is Not Preempted by PLCAA

Section 898 is not preempted by PLCAA. Op. at 11. NSSF's contrary argument falls at the first hurdle, because by its terms PLCAA *does not preempt statutes*, but rather applies to prevent a "qualified *civil liability action*" from

---

tracing makes it possible, at least in principle, to determine the chain of commerce for a firearm from the point of import or manufacture to the first retail sale.")

[18] *See Barclays Bank PLC v. Franchise Tax Bd. of Cal.*, 512 U.S. 298, 315 (1994) ("'[R]easonableness' is a guide admitting effective judicial review in myriad settings, from encounters between the police and the citizenry . . . to the more closely analogous federal income tax context."); *Martell v. Dorchester Apt. Corp.*, 208 A.D.3d 1183, 1185 (2d Dep't 2022) (Parties may introduce evidence "as to whether [certain] standards represented the general custom or usage in the industry, and the jury could have considered any deviation from those standards as some evidence of negligence."); Restatement (Third) of Torts: Phys. & Emot. Harm § 13 (2010) ("In some cases, the actor has complied with or departed from a standard issued by a private organization, or a recommendation issued by a government agency. … [S]uch a standard or recommendation can bear on the issue of negligence.").

proceeding.[19]  15 U.S.C. § 7902(a) (emphasis added).  PLCAA exempts from the definition of "qualified civil liability action" "an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought."  15 U.S.C. § 7903(5)(A)(iii).  Any lawsuit brought under Section 898 must be assessed against the standards imposed by this "predicate exception."  But PLCAA provides no basis for invalidating Section 898 itself.

Even if this Court were to accept NSSF's mistaken premise that PLCAA permits a facial challenge here, there is no justification for invalidating Section 898. Section 898 is a statute "applicable to the sale or marketing" of firearms products under a plain-English reading of that phrase and this Court's precedent.  NSSF scrambles to avoid this conclusion by inventing a new, extra-textual test of "concreteness" that would prohibit state legislatures from enacting broad or flexible statutes regulating the firearms industry.  This supposed requirement is contradicted

---

[19] A "qualified civil liability action" is "a civil action or proceeding or an administrative proceeding brought by any person against a manufacturer or seller of a qualified product, or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party." 15 U.S.C. § 7903(5).  A "qualified product" is "a firearm … including any antique firearm…, or ammunition…, or a component part of a firearm or ammunition, that has been shipped or transported in interstate or foreign commerce."  *Id.* § 7903(4).

by PLCAA's text and derives from a misreading of its purposes and findings and a selective retelling of its legislative history.

Properly understood, the predicate exception embraces Section 898. Despite NSSF's feigned ignorance, the industry knows well the actions available to work towards complying with those requirements. And contrary to NSSF's mischaracterization of Section 898, it in no way "eliminates" the requirement that a plaintiff establish that a gun seller or manufacturer acted knowingly and proximately caused his or her injury.

## A. PLCAA Was Not Intended to Insulate the Gun Industry From Regulation by Standards of Reasonable Conduct

Section 898 is a predicate statute under the plain text of PLCAA, as NSSF all but concedes. *See* NSSF Br. 2–3 (acknowledging Section 898 "'expressly' appl[ies] to firearms commerce"). NSSF thus tries to divert the Court's attention away from PLCAA's text, trotting out supposed clues dredged up from other portions of the statute, PLCAA's purposes and findings, and its legislative history to argue that PLCAA preempts any statute that does not "impose concrete obligations and prohibitions directly on manufacturers and sellers." NSSF Br. 25. But each of those sources only confirms that Congress was comfortable with state statutes like Section 898 that directly regulate gun sellers and manufacturers using flexible, case-specific standards.

This Court made clear in *Beretta* that PLCAA allows actions brought under three categories of "predicate statutes": those that "expressly regulate firearms"; those that "courts have applied to the sale and marketing of firearms;" and those that "do not expressly regulate firearms but that clearly can be said to implicate the purchase and sale of firearms." 524 F.3d at 396, 404; *see also Soto v. Bushmaster Firearms Int'l, LLC*, 331 Conn. 53, 125–27 (2019) (citing *Beretta* as support for conclusion that PLCAA did not preempt state consumer protection statutes which courts have applied to firearms industry); *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1134 (9th Cir. 2009), *cert. denied* 560 U.S. 924 (2010) (stating that a statute is "applicable" to the firearms industry if it "has—at the very least—a direct connection with sales or manufacturing"). NSSF's argument (at 31) that this Court required predicate statutes to regulate firearms in any specific way is simply a mischaracterization of the opinion.

Section 898 is a predicate statute under *Beretta*, because it regulates the conduct of "gun industry member[s]" with respect to "qualified product[s]." Indeed, in defining its scope Section 898 uses the exact same definition of "qualified product" (i.e., firearms and accessories) set forth in PLCAA itself, N.Y. Gen. Bus. L. 898-a(6), and then sets out rules for the sale and marketing of those products. Section 898, therefore, "expressly regulates firearms" and is a predicate statute under PLCAA. Op. at 8.

NSSF attempts to wriggle out of the predicate exception by claiming that Section 898 does not regulate firearms in sufficiently elaborate detail. Citing PLCAA's preamble and legislative history, NSSF contends (at 27) that the predicate exception requires not only that a plaintiff allege that "a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of" firearms, 15 U.S.C. § 7903(5)(A)(iii), but requires that the subject statute impose "concrete obligations or prohibitions" — whatever that might mean.

But it is unnecessary to turn to PLCAA's preamble or its legislative history to decipher Congress's intent, because PLCAA's text is clear: its predicate exception applies to statutes that, like Section 898, are "applicable to" the sale or marketing of firearms. *See, e.g.*, *Delana v. CED Sales, Inc.*, 486 S.W.3d 316, 322 (Mo. 2016) ("The general statement of the purpose of the PLCAA does not redefine the plain language of a statute."); *Est. of Kim ex rel. Alexander v. Coxe*, 295 P.3d 380, 387 (Alaska 2013) (refusing to "elevate the PLCAA's preamble over the substantive portion's clear language"); *accord D.C. v. Heller*, 554 U.S. 570, 578 (2008) ("[A] prefatory clause does not limit or expand the scope of the operative clause."). That is the only requirement for a predicate statute. Beyond that, PLCAA provides no indication that some category of statute is out-of-bounds.

To avoid the express language of the predicate exception, NSSF misreads the illustrative examples set forth in the exception. PLCAA notes that circumstances

where manufacturers or sellers fail to abide by Federal or State law recordkeeping requirements, or where they aid, abet, or conspire to distribute firearms to prohibited buyers, would fall within the exception, 15 U.S.C. § 7903(5)(A)(iii)(I)–(II), and NSSF says (at 26) these examples indicate that the exception does not reach statutes that impose broader duties of care.  Not so.  To begin, PLCAA nowhere purports to limit the universe of potential predicate statutes to these two examples.  *See Soto*, 331 Conn. at 142–43 ("[T]he record keeping and unlawful buyer illustrations were [not] included in the final version of PLCAA … to define, clarify, or narrow the universe of laws that qualify as predicate statutes.").[20]

In addition, NSSF's argument that PLCAA disallows statutes that impose broad standards of conduct cannot be reconciled with the multiple provisions of PLCAA that *require* fact-specific reasonableness assessments as part of a liability determination.  At least three other exceptions to PLCAA's liability bar incorporate the sort of reasonableness assessment that NSSF claims is prohibited.  *See* 15 U.S.C. § 7903(5)(A)(i) (permitting actions for violations of 18 U.S.C. § 924(h), which makes it unlawful to "transfer[] a firearm or ammunition … knowing or *having reasonable cause to believe* that such firearm or ammunition will be used to commit

---

[20] These examples were added to address concerns that PLCAA would bar actions arising out of the then-recent Beltway sniper attacks.  *Soto*, 331 Conn. at 142–43.

a felony" or other crime (emphasis added)); *id.* § 7903(5)(A)(ii) (permitting actions for negligent entrustment, defined as "supplying of a qualified product by a seller for use by another person when the seller knows, *or reasonably should know*, the person to whom the product is supplied is likely to, and does, use the product in a manner involving *unreasonable risk* of physical injury." (emphasis added)); *id.* § 7903(5)(A)(v) (permitting actions for "an action for death, physical injuries or property damage resulting directly from a defect in design or manufacture of the product, when used as intended or *in a reasonably foreseeable manner*." (emphasis added)); *see also Soto*, 331 Conn. at 129 ("[W]rongful marketing of dangerous items such as firearms for unsafe or illegal purposes traditionally has been and continues to be regulated primarily by consumer protection and unfair trade practice laws" with flexible standards). Given that Congress repeatedly required judicial assessments of "reasonable" conduct in PLCAA, it is not plausible that (as NSSF argues), it prohibited state statutes that require such assessments.

Finding no help in PLCAA's operative provisions, NSSF takes refuge in its prefatory findings and statements of purpose. NSSF Br. 19–20. But those provisions provide still more evidence that Congress did not intend to bar statutes like Section 898. Instead, Congress stated that it intended the statute to bar causes of action against the gun industry "for the harm *solely* caused by the criminal or unlawful misuse of firearm products or ammunition products by others." 15 U.S.C. §

7901(b)(1) (emphasis added).  Such suits, Congress said, would impinge on federal objectives by expanding liability beyond well-established common law principles like fair notice and proximate causation.  *See id.* § 7901(a)(7).

Nothing in PLCAA's text or legislative history suggests that Congress also meant to bar liability where gun industry conduct breached duly enacted state gun laws, even broadly drawn ones.  To the contrary, the statute's findings establish that PLCAA was intended to prevent what Congress perceived to be inappropriate *judicial* innovation, and to instead ensure that *legislatures* have the primary role in regulating the firearms industry.  PLCAA states that it was enacted to address "attempt[s] to use the judicial branch to circumvent the Legislative branch of government," 15 U.S.C. § 7901(a)(8), and to prevent "a maverick judicial officer or petit jury" from "expand[ing] civil liability in a manner never contemplated by the framers of the Constitution, by Congress, or by the legislatures of the several States," *id.* § 7901(a)(7).  Congress's findings expressly acknowledge the important role that legislation, including state laws, plays in gun regulation across the country.  *Id.* § 7901(a)(4) ("The manufacture, importation, possession, sale, and use of firearms and ammunition in the United States are heavily regulated by Federal, State, and local laws….").

Comments by PLCAA's sponsors provide further evidence that, far from attempting to preclude state efforts to regulate the gun industry, Congress intended to ensure the legislative process would be the primary form of firearm regulation:

- Senator Larry Craig: "Advocates of gun control are trying to usurp State power by circumventing the legislative process through judgements and judicial decrees. Allowing activist judges to legislate from the bench will destroy state sovereignty. This bill will protect it." 151 Cong. Rec. S. 9059 (July 27, 2005) (statement of Sen. Craig).

- Senator Thomas Coburn: "These lawsuits are part of an anti-gun activist effort to make an end run around the legislative system. … When you can't pass it in the legislature, you get an activist judge to get done what you wanted to do in the first place." 151 Cong. Rec. S. 9059 (July 27, 2005) (statement of Sen. Coburn).

- Senator Orrin Hatch: "These abusive gun liability actions usurp the authority of the Congress and State legislators." 151 Cong. Rec. S. 9059 (July 27, 2005) (statement of Sen. Hatch).

This Court's own consideration of PLCAA's legislative history is in accord. In *Beretta*, the Court surveyed PLCAA's legislative history, and emphasized statements like those of Senator Sessions that "[t]his bill allows lawsuits … for violating *any law or regulation that is part of the complex rules* that control sellers and manufacturers of firearms." 524 F.3d at 403 (quoting 151 Cong. Rec. S9374–01, S9378 (July 29, 2005) (emphasis added));[21] *see also Ileto*, 565 F.3d at 1135; *Soto*, 331 Conn. at 150.

---

[21] Other similar statements abound. *See, e.g.*, 151 Cong. Rec. S9088 (July 27, 2005) (statement of Sen. Craig) ("[This bill] does not prevent [gun manufacturers and sellers] from being sued for their

Given these strong indications that PLCAA was not meant to preempt statutes merely because they incorporate or allow liability based on determinations of reasonableness, it is little surprise that courts around the country have permitted negligence claims — which, by their nature, apply a reasonableness standard — to proceed under the predicate exception. *See, e.g.*, *Prescott v. Slide Fire Sols., LP*, 410 F. Supp. 3d 1123, 1138 (D. Nev. 2019) (denying dismissal of negligence claim against bump stock manufacturer where plaintiffs alleged manufacturer's predicate violation of Nevada's Deceptive Trade Practices Act); *King v. Klocek*, 187 A.D.3d 1614, 1615 (4th Dep't 2020) (permitting negligence claims against licensed dealer where plaintiff alleged dealer's predicate violations of statutes regulating ammunition sales); *Brady v. Walmart Inc.*, No. 8:21 Civ. 1412, 2022 WL 2987078, at *10 (D. Md. July 28, 2022) (denying motion to dismiss negligence claims where plaintiff alleged violation of statute prohibiting firearms possession by individuals with certain mental health disorders); *Corporan v. Wal-Mart Stores E., LP*, No. 16 Civ. 2305, 2016 WL 3881341, at *3–4 (D. Kan. July 18, 2016) (holding that

own misconduct. This bill only stops one *extremely narrow* category of lawsuits[:] lawsuits that attempt to force the gun industry to pay for the crimes of third parties over whom they have no control.") (emphasis added); 151 Cong. Rec. S8908–11 (July 26, 2005) (statement of Sen. Sessions) ("If [gun manufacturers] knew, if they had reason to know, if they were negligent in going through the requirements of the law or failed to do the requirements of the law, they can [still] be sued "); 151 Cong. Rec. S9226 (July 28, 2005) (statement of Sen. Graham) ("What … [this bill will prohibit are suits that seek] under a gross negligence or simple negligence standard [to] create a duty on the part of sellers and manufacturers for an event that they can't control which is the intentional misuse of a weapon to commit a crime.").

negligence claims could survive motion to dismiss where plaintiff also alleged predicate violation of federal Gun Control Act).

**B.    Section 898 Expressly Regulates the Gun Industry by Requiring Reasonable Measures to Prevent Illegal Possession, Use, and Distribution**

Section 898 fits cleanly into the predicate exception.  It is a state statute that expressly regulates firearms.  It does so by requiring gun industry members to refrain from acting unlawfully or unreasonably to create, maintain, or contribute to a condition in New York state that endangers public safety or health, and requiring gun industry members who manufacture, market, import or sell firearms products in New York to establish and utilize reasonable controls and procedures to prevent those products from being diverted to the illegal market.  A statute requiring gun sellers and manufacturers to take these reasonable steps is no less an express regulation of the sale and marketing of firearms than a law imposing a more detailed scheme.

Seeking to take Section 898 outside of the bounds of the predicate exception, NSSF claims that gun industry members have "no guidance whatsoever" as to what such obligations might be.  NSSF Br. 52.  NSSF provides no explanation as to why that factual assessment might be relevant to a preemption claim or the requirements of the predicate exception (especially on a facial challenge).  Regardless, there is nothing esoteric or complicated about complying with Section 898's requirements.

The statute sets out specific examples of controls, such as "instituting screening, security, inventory and other business practices to prevent thefts of qualified products as well as sales of qualified products to straw purchasers, traffickers, persons prohibited from possessing firearms under state or federal law, or persons at risk of injuring themselves or others," and "preventing deceptive acts and practices and false advertising." N.Y. Gen. Bus. L. §898-a(2).

Nor can NSSF claim it is unaware of at least some benchmarks for reasonable conduct or reasonable controls and procedures to reduce the risk that their products end up in the illegal market. As described in Section I, firearms manufacturers and sellers have long been aware of basic steps they can take to prevent the diversion of guns into the illegal market and thereby reduce unlawful gun violence. The body of expert recommendations and responsible industry practices that has developed in the decades since the Smith & Wesson settlement provides significant guidance to the industry on reasonable measures it can take to avoid creating a danger to the public in New York.

Thus, the requirements imposed by Section 898 are consistent with PLCAA's purpose of allowing liability for knowing violations of state or federal statutes that proximately cause harm. For example, straw purchases constitute one of the largest pathways for illegal diversion of guns, and the industry knows that training employees to identify and respond to potential straw purchases is essential to reduce

illegal gun ownership and use. *See* Braga, *supra* n.7 at 782 (41.3% of ATF investigations into illegal gun diversion focused on straw purchasing); John Bocker, "Beware the Straw Purchase!," NSSF (Apr. 23, 2018), tinyurl.com/4dwp77v9 (advising gun retailers to train employees to spot and prevent straw sales). That basic control is specific to the firearms industry, can plainly be violated in a knowing manner, and could be the proximate cause of an actionable harm. *See, e.g.*, *Williams v. Beemiller, Inc.*, 100 A.D.3d 143, 149, 152 (4th Dep't 2012), *opinion amended on reargument*, 103 A.D.3d 1191 (2013) (negligence claim against seller who knew or should have known of an illegal straw purchase for an improper buyer); *Chiapperini v. Gander Mountain Co.*, 48 Misc. 3d 865, 869 (N.Y. Sup. Ct., Monroe Cty. 2014) (same).

Finally, NSSF is wrong (at 33–38) that Section 898 is preempted because it somehow attempts to "do away with" PLCAA's *mens rea* or proximate cause requirements. Nothing in PLCAA states that a predicate *statute* must include a proximate cause or knowledge standard. Rather, PLCAA's predicate exception applies to *actions* that allege a violation of a predicate statute that was both "knowingly" committed and "a proximate cause of the harm." 15 U.S.C. § 7903(5)(A)(iii). Indeed, neither of PLCAA's own examples — knowingly making a false entry or failing to make an entry in required records, and aiding or abetting a disposition of a firearms product to a prohibited person — includes a proximate

cause requirement, and the second lacks a knowledge requirement. *See* 15 U.S.C. §7903(5)(A)(iii)(I)–(II).

Section 898 is "a State or Federal statute applicable to the sale or marketing of the [firearm] product." 15 U.S.C. § 7903(5)(A)(iii). Accordingly, it is a predicate statute, and if a Section 898 plaintiff satisfies PLCAA's *mens rea* and proximate cause requirements, then that plaintiff can proceed. NSSF's assertion that PLCAA goes further and imposes requirements on the content of the statute itself, on pain of facial preemption, is incorrect.

### III.        Section 898 Is Not Unconstitutionally Vague

Neither prong of Section 898 is unconstitutionally vague, because both provide "the person of ordinary intelligence a reasonable opportunity to know what is prohibited," and apply to a sufficiently broad range of conduct to remain valid in at least some applications. *Thibodeau v. Portuondo*, 486 F.3d 61, 65 (2d Cir. 2007); As the District Court correctly held, NSSF's vagueness challenge cannot succeed unless it can establish that Section 898 uniformly fails to provide the gun industry with fair notice of required or prohibited conduct. Op. at 19, 23–25. It is therefore not sufficient for NSSF to speculate about some conceivable set of circumstances where the statute's dictates would be unclear; rather, they must show that the law is unclear in its every application. *United States v. Salerno*, 481 U.S. 739, 745 (1987). Because NSSF cannot make that showing, their vagueness challenge fails.

Section 898's requirements that gun industry members refrain from acting unlawfully or unreasonably to contribute to dangerous conditions through gun sales, N.Y. Gen. Bus. L. 898-b(1), and that they institute "reasonable controls and procedures" to prevent unlawful possession, use, sale, or marketing of firearms, N.Y. Gen. Bus. L. 898-b(2), provide ample guidance to the firearms industry. Section 898 permissibly calls for a case-by-case assessment of the actions or inaction of a seller or manufacturer whose products have created a dangerous condition or been diverted to the illegal market in New York.

As a threshold matter, NSSF conflates Section 898's multiple provisions, focusing on the supposed vagueness of the requirement that a gun industry member not "contribute to a condition in New York state that endangers the safety or health of the public." NSSF Br. 51–54. NSSF barely addresses Section 898-b(2)'s requirement of reasonable controls and procedures, except to offhandedly assert (at 52) that this provision "gives no guidance whatsoever as to what controls are or are not reasonable." This is false. "Reasonable controls and procedures" is a defined term in the statute, and that definition lists specific examples of the conduct required. *See* N.Y. Gen. Bus. L. 898-a(2). NSSF does not so much as mention that definition in its vagueness challenge.

Further, as NSSF readily admits (at 12), Section 898-b(1) resembles New York's longstanding criminal public nuisance provision, which imposes criminal

liability on any person who, "[b]y conduct either unlawful in itself or unreasonable under all the circumstances, [] knowingly or recklessly creates or maintains a condition which endangers the safety or health of a considerable number of persons." New York Penal L. § 240.45.1. Public nuisance statutes containing language similar to Section 898-b(1) have long been a part of American law, and have been repeatedly upheld against vagueness challenges. *See, e.g.*, *ChemSol LLC v. City of Sibley*, 386 F. Supp. 3d 1000, 1009, 1019-23 (N.D. Iowa 2019 (rejecting vagueness challenge to public nuisance provision prohibiting "unreasonably noxious exhalations, unreasonably offensive smells[,] or other unreasonable annoyances"); *City of Lincoln Center v. Farmway Co-Op, Inc.*, 316 P.3d 707, 714-16 (Kan. 2013) (upholding against vagueness challenge statute prohibiting "by act, or by failure to perform a legal duty, intentionally causing or permitting a condition to exist which injures or endangers the public health, safety or welfare"); *City of Columbus v. Kim*, 886 N.E.2d 217, 218–19 (Ohio 2008) (upholding, against vagueness challenge, city ordinance prohibiting the harboring of "unreasonably loud or disturbing" animals); *State v. Primeau*, 422 P.2d 302, 304–05 (Wash. 1966) ("Statutes purporting to denounce public nuisances are usually couched in general language, but if the wording apprises a person of common understanding of the conduct sought to be proscribed, then it is not too vague or indefinite to meet the constitutional tests."); *Jake's, Ltd. v. City of Coates*, 284 F.3d 884, 890 (8th Cir. 2002) ("[W]e reject as

27

frivolous the contention that an ordinance authorizing revocation if the licensee is 'a menace to the health, safety, or general welfare of the community' confers unbridled discretion."). Even if Section 898's standards lack "mathematical certainty," the Due Process Clause permits states to enact rules with "flexibility and reasonable breadth." *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972). Such rules are not only constitutionally permissible, but imperative to address the crisis of gun violence flowing from many different and continually shifting sources.

## CONCLUSION

For these reasons, Amici respectfully submit that the Court should affirm the District Court's judgment dismissing this case.

Dated:  New York, NY
        January 13, 2023

Respectfully submitted,

SELENDY GAY ELSBERG PLLC

By: /s/ Caitlin Halligan
    Caitlin Halligan
    Adam K. Hersh
    Ekaterina Stynes
    Zachary Smith
    SELENDY GAY ELSBERG PLLC
    1290 Avenue of the Americas
    New York, NY 10104
    (212) 390 9000

    *Counsel for Amici Curiae Brady,
    Everytown for Gun Safety Support Fund,
    Giffords Law Center to Prevent Gun
    Violence, and New Yorkers Against
    Gun Violence*

**CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(5) and the word limit of Local Rule 29.1(c) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 6,957 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Time New Roman.

Dated: January 13, 2023       Respectfully submitted,

                         /s/ Caitlin Halligan
                         Caitlin Halligan
                         SELENDY GAY ELSBERG PLLC
                         1290 Avenue of the Americas
                         New York, NY 10104
                         (212) 390 9000