

STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

LETITIA JAMES
ATTORNEY GENERAL

BARBARA D. UNDERWOOD
SOLICITOR GENERAL
DIVISION OF APPEALS & OPINIONS

February 1, 2024

Honorable Catherine O'Hagan Wolfe
Clerk of Court
U.S. Court of Appeals for the Second Circuit
40 Foley Square
New York, NY 10007

      Re:    *National Shooting Sports Foundation, Inc. v. James*, No. 22-1374

Dear Ms. Wolfe:

      I write pursuant to Federal Rule of Civil Procedure 28(j) to apprise the Court of the attached decision in *Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc.*, No. 22-1823 (1st Cir. Jan. 22, 2024), in which the First Circuit reversed the dismissal of a tort action brought by Mexico against several gun manufacturers and distributors, holding that the allegations fell within the predicate exception to the Protection of Lawful Commerce in Arms Act (PLCAA).

      The decision is relevant to this pending appeal in several respects. First, the court of appeals held that PLCAA's predicate exception permits "common law claims for injury proximately caused by a defendant's knowing violation of a predicate statute." Op. at 37. If the predicate exception applies to common law claims grounded in statutory violations, it necessarily applies to statutory claims containing direct rights of action such as General Business Law (GBL) § 898-a et seq. *See id.* at 35-36.

      Second, the court of appeals rejected the defendants' cramped readings of the predicate exception's knowledge and proximate-causation requirements, many of which have been raised in this appeal as well. For example, the court rejected the broad proposition that a knowledge requirement must be found in a predicate statute itself, though the court acknowledged that specific instances of unknowing statutory violations cannot serve as predicate violations that support a particular action. *Id.* at 37. The court further held that the mere "fact that one can fashion a multi-step descrip-

tion of the causal chain does not mean that the injurious conduct and the injury alleged are insufficiently connected" for purposes of the proximate-causation requirement. *Id.* at 51-52. The court's conclusion applies with even greater force in this facial challenge to the validity of the statute at issue here.

In all events, the First Circuit's decision underscores that the application of PLCAA (including application of its exceptions) is properly litigated in the context of specific actions containing actual allegations against which the court can apply the governing legal standards. Defendants' attempt in this case to secure an advisory opinion about the application of the predicate exception through a facial challenge is both improper and unnecessary.

Respectfully submitted,

*/s/ Dennis Fan*

Dennis Fan
Senior Assistant Solicitor General

# United States Court of Appeals
## For the First Circuit

No. 22-1823

ESTADOS UNIDOS MEXICANOS,

Plaintiff, Appellant,

v.

SMITH & WESSON BRANDS, INC.; BARRETT FIREARMS MANUFACTURING,
INC.; BERETTA U.S.A. CORP.; GLOCK, INC.; STURM, RUGER & COMPANY,
INC.; WITMER PUBLIC SAFETY GROUP, INC., d/b/a Interstate Arms;
CENTURY INTERNATIONAL ARMS, INC.; BARETTA HOLDINGS SPA; GLOCK
GES.M.B.H.; COLT'S MANUFACTURING COMPANY, LLC,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, U.S. District Judge]

Before

Kayatta, Gelpí, and Montecalvo,
Circuit Judges.

Steve D. Shadowen and Jonathan E. Lowy, with whom Richard M.
Brunell, Nicholas W. Shadowen, Shadowen PLLC, and Global Action on
Gun Violence were on brief, for appellant.
Sameer Advani, James C. Dugan, Gabrielle K. Antonello,
Ferdinand G. Suba, Jr., Willkie Farr & Gallagher LLP, Zainab Ali,
and Benita Yu on brief for Jorge Sánchez Cordero Dávila and Raúl
Contreras Bustamante, amici curiae.
Thomas M. Sobol and Hagens Berman Sobol Shapiro LLP on brief
for Scholars of International Law, amici curiae.
Lawson E. Fite, Michael B. Smith, and Marten Law LLP on brief
for Gun Violence Prevention Groups, amici curiae.

Roberta L. Horton, Lucy S. McMillan, and Arnold & Porter Kaye Scholer LLP on brief for Mexican Activists, Scholars, and Victims, amici curiae.

Donna M. Evans, Julie G. Reiser, Molly J. Bowen, Zachary R. Glubiak, and Cohen Milstein Sellers & Toll PLLC on brief for Law Enforcement Officers, amici curiae.

Andrea Joy Campbell, Attorney General of Massachusetts, Elizabeth N. Dewar, State Solicitor, Rob Bonta, Attorney General of California, William Tong, Attorney General of Connecticut, Kathleen Jennings, Attorney General of Delaware, Brian L. Schwalb, Attorney General for the District of Columbia, Anne E. Lopez, Attorney General of Hawai'i, Kwame Raoul, Attorney General of Illinois, Anthony G. Brown, Attorney General of Maryland, Dana Nessel, Attorney General of Michigan, Keith Ellison, Attorney General of Minnesota, Matthew J. Platkin, Attorney General of New Jersey, Raúl Torrez, Attorney General of New Mexico, Letitia James, Attorney General of New York, Ellen F. Rosenblum, Attorney General of Oregon, Michelle A. Henry, Attorney General of Pennsylvania, Peter F. Neronha, Attorney General of Rhode Island, and Charity R. Clark, Attorney General of Vermont, on brief for Massachusetts, California, Connecticut, Delaware, the District of Columbia, Hawai'i, Illinois, Maryland, Michigan, Minnesota, New Jersey, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, and Vermont, amici curiae.

Roberto J. Gonzalez, Jacob A. Braly, and Paul, Weiss, Rifkind, Wharton & Garrison LLP on brief for Latin American and Caribbean Nations and NGO, amici curiae.

Ellen V. Leonida, Matthew Borden, Kory J. DeClark, and Braunhagey & Borden LLP on brief for District Attorneys, amici curiae.

Edward V. Colbert III, Scott Harshbarger, and Casner & Edwards, LLP on brief for Professors of Transnational Litigation, amici curiae.

Noel J. Francisco, with whom Anthony J. Dick, Harry S. Graver, Andrew E. Lelling, Jones Day, James M. Campbell, Campbell Conroy & O'Neil, P.C., James W. Porter, II, Porter & Hassinger, P.C., Mark D. Sheridan, Squire Patton Boggs (US) LLP, Patricia A. Hartnett, Peter M. Durney, Smith Duggan Cornell & Gollub, Christopher Renzulli, Jeffrey Malsch, Renzulli Law Firm LLC, Jonathan I. Handler, Day Pitney LLP, James Vogts, Andrew A. Lothson, Swanson, Martin & Bell LLP, Nora R. Adukonis, S. Jan Hueber, Litchfield Cavo LLP, Joseph G. Yannetti, Morrison Mahoney LLP, Anthony M. Pisciotti, Danny C. Lallis, Ryan L. Erdreich, Pisciotti Lallis Erdreich, John G. O'Neill, Sugarman, Rogers, Barshak & Cohen, P.C., Michael L. Rice, Katie J. Colopy, and Harrison Law LLC were on brief, for appellees.

Peter M. Torstensen, Jr., Assistant Solicitor General, Austin

Knudsen, Montana Attorney General, Christian B. Corrigan, Solicitor General, Brent Mead, Deputy Solicitor General, Tanner Baird, Solicitor's Fellow, Steve Marshall, Attorney General of Alabama, Treg Taylor, Attorney General of Alaska, Tim Griffin, Attorney General of Arkansas, Ashley Moody, Attorney General of Florida, Christopher M. Carr, Attorney General of Georgia, Theodore E. Rokita, Attorney General of Indiana, Brenna Bird, Attorney General of Iowa, Daniel Cameron, Attorney General of Kentucky, Jeff Landry, Attorney General of Louisiana, Lynn Fitch, Attorney General of Mississippi, Andrew Bailey, Attorney General of Missouri, John M. Formella, Attorney General of New Hampshire, Alan Wilson, Attorney General of South Carolina, Marty J. Jackley, Attorney General of South Dakota, Ken Paxton, Attorney General of Texas, Sean D. Reyes, Attorney General of Utah, Jason Miyares, Attorney General of Virginia, Patrick Morrisey, Attorney General of West Virginia, and Bridget Hill, Attorney General of Wyoming, on brief for State of Montana and 19 Other States, amici curiae.

H. Christopher Bartolomucci, Kenneth A. Klukowski, and Schaerr Jaffe LLP on brief for U.S. Senator Ted Cruz, U.S. Representative Mike Johnson, and 37 other members of Congress, amici curiae.

Christopher A. Kenney, Kenney & Sams, P.C., and Paul B. Stephan on brief for National Shooting Sports Foundation, Inc., amicus curiae.

---

January 22, 2024

---

KAYATTA, Circuit Judge.  The government of Mexico brings this lawsuit against seven U.S. gun manufacturers and one gun distributor.[1]  The district court dismissed Mexico's complaint because it concluded that Mexico's common law claims were barred by the Protection of Lawful Commerce in Arms Act (PLCAA).  That act prohibits the bringing of certain types of lawsuits against manufacturers and sellers of firearms in federal and state courts.  We agree that the PLCAA's limitations on the types of lawsuits that may be maintained in the United States apply to lawsuits initiated by foreign governments for harm suffered outside the United States.  However, we also hold that Mexico's complaint plausibly alleges a type of claim that is statutorily exempt from the PLCAA's general prohibition.  We therefore reverse the district court's holding that the PLCAA bars Mexico's common law claims, and we remand for further proceedings.  Our reasoning follows.

## I.

"Because this appeal flows from the district court's order granting a motion to dismiss, we draw the relevant facts from the complaint, accepting all well-pleaded factual allegations

---

[1] Defendants are Smith & Wesson Brands, Inc.; Barrett Firearms Manufacturing, Inc.; Beretta U.S.A. Corp.; Century International Arms, Inc.; Colt's Manufacturing Company, LLC; Glock, Inc.; and Sturm, Ruger & Co., Inc. and Witmer Public Safety Group, Inc., doing business as Interstate Arms.  Mexico also initially named two foreign holding companies as defendants, but later voluntarily dismissed its claims against those companies.

- 4 -

as true."  Foisie v. Worcester Polytechnic Inst., 967 F.3d 27, 32
(1st Cir. 2020).

Mexico has strict gun laws that make it "virtually
impossible" for criminals to obtain firearms legally sourced in
the country.  It has one gun store in the entire nation and issues
fewer than fifty gun permits a year.  Despite these strong domestic
regulations, Mexico has the third-most gun-related deaths in the
world.  The number of gun-related homicides in Mexico grew from
fewer than 2,500 in 2003 to approximately 23,000 in 2019.  The
percentage of homicides committed with a gun similarly rose from
fifteen percent in 1997 to sixty-nine percent in 2021.

The increase in gun violence in Mexico correlates with
the increase of gun production in the United States, beginning
with the end of the United States' assault-weapon ban in 2004.[2]
The complaint details a steady and growing stream of illegal gun
trafficking from the United States into Mexico, motivated in large
part by the demand of the Mexican drug cartels for military-style
weapons.  For example, Mexico claims that between seventy and
ninety percent of the guns recovered at crime scenes in Mexico
were trafficked into the country from the United States.

Mexico's government has borne a variety of harms as a
result of this gun-violence epidemic, including but not limited

---

[2]  Violent Crime Control and Law Enforcement Act of 1994, Pub.
L. No. 103-222, 108 Stat. 1796, 1996-1998(expired 2004).

to: costs of additional medical, mental-health, and other services for victims and their families; costs of increased law enforcement, including specialized training for military and police; costs of the increased burden on Mexico's judicial system; diminished property values; and decreased revenues from business investment and economic activity.

In an attempt to redress these harms, Mexico brought this lawsuit in federal district court in Massachusetts, seeking both damages and injunctive relief. Combined, defendants produce more than sixty-eight percent of the U.S. guns trafficked into Mexico, which comes out to between 342,000 and 597,000 guns each year. Mexico alleges that defendants know that their guns are trafficked into Mexico and make deliberate design, marketing, and distribution choices to retain and grow that illegal market and the substantial profits that it produces.

Mexico alleges that one way defendants deliberately facilitate gun trafficking into Mexico is by designing their guns as military-style weapons, knowing that such weapons are particularly sought after by the drug cartels in Mexico. For instance, defendants make assault rifles with high rates of fire, low recoil, and the capacity to hold large amounts of ammunition. The guns can be easily converted into fully automatic weapons. Some of defendants' guns are "weapons of war," such as the "armor-penetrating" Barrett .50 caliber sniper rifle, which can be (and

has been) used to take down aircrafts and armored vehicles. Such weapons are especially attractive to Mexican drug cartels, which frequently engage in military-style combat against Mexican military and police personnel. Defendants also choose to forego safety features (such as allowing only recognized users to fire the weapon) that might decrease the guns' attractiveness to wrongdoers without diminishing their utility for law-abiding citizens. Similarly, Mexico alleges that defendants intentionally design their guns to have easily removable serial numbers, making them much more attractive to criminals both in the United States and abroad.

Mexico alleges that defendants not only design their guns as military-grade weapons; they also market them as such. Defendants' marketing materials depict their weapons in use by or in proximity to military and law enforcement personnel and contain other references to military and law enforcement. Advertisements include statements like "authentic Military & Police . . . design," "battle proven," and "transforms the military platform to fit civilian precision shooters." Mexico alleges that defendants engage in these marketing techniques knowing that they are disproportionately likely to attract groups harboring militaristic ambitions, like the Mexican cartels.

Mexico also alleges that defendants' distribution system facilitates illegal trafficking to Mexico. Defendants generally

use a three-tier distribution system. Manufacturers (most defendants) sell to distributors; distributors (one defendant) sell to dealers; and dealers sell to consumers. Guns flow from this distribution system into Mexico in multiple ways. The most common method of trafficking is through "straw sales" -- sales made to a buyer purchasing on behalf of somebody else who is not lawfully permitted to buy a gun. Often, straw sales occur in circumstances that clearly indicate to the dealer that the transaction is a straw sale and could be prevented if defendants required their dealers to be well-trained and follow the law.

Other types of transactions that pose a particularly high risk of trafficking include sales of multiple guns to the same buyer over a limited period of time; sales by "kitchen-table" dealers who deal online or in locations that make it easy to avoid regulations; and sales by non-licensed sellers at gun shows without background checks. In addition, many guns are stolen or simply "lost" from firearm companies' inventory, and frequently thereafter end up in Mexico. According to the complaint, some of these "lost" guns are actually sold off the books, with dealers choosing not to implement anti-theft measures to allow them to falsely claim the guns were stolen.

Mexico alleges that defendants are aware of these practices and the resulting trafficking of guns into Mexico, yet deliberately maintain a distribution system that facilitates

illegal sales, resisting calls for reform by the U.S. government and prominent gun industry insiders, among others.  Not only that, but defendants are aware that specific distributor and dealer networks are disproportionately associated with gun trafficking into Mexico.  Mexico alleges that defendants are on notice as to which dealers are responsible for the lion's share of gun trafficking.  Mexico points to data collected by the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and a 2010 news article naming twelve dealers that sold the most guns recovered in Mexico.  Despite having access to this information, defendants continue supplying guns to those same dealers.

Importantly, according to the complaint, the aspects of defendants' businesses that facilitate trafficking are not unfortunate and unintended byproducts of a lawful enterprise. Rather, they are the result of defendants' affirmative and deliberate efforts to create and maintain an illegal market for their weapons in Mexico.  Says Mexico, supplying guns to the illegal market in Mexico is "a feature, not a bug," of defendants' businesses.  And the motivation behind this feature is money. Mexico estimates that defendants collectively receive over $170 million a year from sales of guns trafficked into Mexico.  As a result of the profit potential of the Mexican market, gun dealers along the border have proliferated while elsewhere in the nation their numbers have decreased.  Gun dealers in border states now

sell twice as many guns as dealers in other parts of the country. As stated succinctly by Mexico, defendants "are not accidental or unintentional players in this tragedy; they are deliberate and willing participants, reaping profits from the criminal market they knowingly supply -- heedless of the shattering consequences to [Mexico] and its citizens."

## II.

Defendants filed multiple motions to dismiss Mexico's complaint. All defendants moved to dismiss for lack of Article III standing under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Rule 12(b)(6). Some defendants also moved to dismiss for lack of personal jurisdiction under Rule 12(b)(2). The district court held that Mexico had Article III standing, but it dismissed two counts for failure to state a claim on which relief could be granted.[3] It also found that litigation of the remaining counts was barred by the PLCAA, which prohibits the filing of a "qualified civil liability action" -- defined as "a civil action or proceeding . . . against a manufacturer or seller of a qualified product . . . for damages . . . resulting from the criminal or unlawful misuse of a qualified product by the person or a third party" -- in "any Federal or State court."

---

[3] The two counts were state statutory claims under the Connecticut Unfair Trade Practices Act and the Massachusetts Consumer Protection Act, respectively. Mexico does not, on appeal, challenge the dismissal of those counts.

15 U.S.C. §§ 7902(a), 7903(5)(A).  It therefore dismissed the complaint without addressing the motions to dismiss for lack of personal jurisdiction.  Mexico timely appealed, raising multiple challenges to the district court's application of the PLCAA to this lawsuit.

### III.

Mexico first contends that the PLCAA does not apply to lawsuits brought by foreign governments for harm suffered outside the United States.  It raises three arguments in support of this contention: first, that applying the PLCAA to such a lawsuit is an impermissible extraterritorial application of the statute; second, that the PLCAA's substantive terms must be interpreted to have only domestic scope; and third, that principles of international comity support Mexico's reading of the statute.  We address these arguments in turn, finding them ultimately unavailing.

### A.

"Courts presume that federal statutes 'apply only within the territorial jurisdiction of the United States.'" WesternGeco LLC v. ION Geophysical Corp., 138 S. Ct. 2129, 2136 (2018) (quoting Foley Bros. v. Filardo, 336 U.S. 281, 285 (1949)).  This rule, commonly called the presumption against extraterritoriality, is a "canon of construction" that guides our interpretation of federal statutes. Yegiazaryan v. Smagin, 599 U.S. 533, 541 (2023) (quoting Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. 247, 255 (2010)).

Under the presumption, we construe federal laws "to have only domestic application" unless we find "clearly expressed congressional intent to the contrary." Id. (quoting RJR Nabisco, Inc. v. European Cmty., 579 U.S. 325, 335 (2016)). The presumption "reflects concerns of international comity insofar as it 'serves to protect against unintended clashes between our laws and those of other nations which could result in international discord.'" Id. (quoting Kiobel v. Royal Dutch Petroleum Co., 569 U.S. 108, 115 (2013)). And it also embodies "the commonsense notion that Congress generally legislates with domestic concerns in mind." Id. (quoting Smith v. United States, 507 U.S. 197, 204 n.5 (1993)).

A two-step framework applies to questions of extraterritoriality. RJR Nabisco, 579 U.S. at 337. "At the first step, we ask whether the presumption against extraterritoriality has been rebutted -- that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially." Id. If so, then an extraterritorial application of the statute is permissible. Id. If not, we proceed to the second step and ask if the statute's application in the case at hand is truly extraterritorial or if, instead, "the case involves a domestic application of the statute." Id.

The district court concluded that the PLCAA's prohibition of lawsuits by "any governmental entity" and various references to "foreign commerce" fell short of a clear expression

of congressional intent that the statute applies extraterritorially. It therefore held that the presumption against extraterritoriality had not been overcome at step one. Defendants do not object to this holding on appeal. Nor do we see any need to question it, given that we agree with the district court's conclusion at step two: that the application of the PLCAA in this case is permissibly domestic, not impermissibly extraterritorial.

Determining whether an application of a statute is domestic or extraterritorial requires us to

> look[] to the statute's "focus." If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory.

Id. "The ultimate question regarding permissible domestic application turns on the location of the conduct relevant to the focus." Abitron Austria GmbH v. Hetronic Int'l, Inc., 600 U.S. 412, 422 (2023). We therefore first ascertain the focus of the PLCAA and then determine where the conduct relevant to that focus occurred.

"The focus of a statute is the object of its solicitude, which can include the conduct it seeks to regulate, as well as the

parties and interests it seeks to protect or vindicate." Id. at 418 (internal quotation marks omitted) (quoting WesternGeco, 138 S. Ct. at 2136). The "conduct" that the PLCAA "seeks to regulate" is the filing and adjudication of certain lawsuits in domestic courts. See 15 U.S.C. § 7901(b)(1), (4) (stated purposes include "prohibit[ing] causes of action" and "prevent[ing] the use of such lawsuits to impose unreasonable burdens on interstate and foreign commerce"). Its operative provision states that "[a] qualified civil liability action may not be brought in any Federal or State court," and that any such pending actions "shall be immediately dismissed by the court." Id. § 7902. That is the only "conduct" that the statute "regulate[s]."

The PLCAA is also explicit about "the parties and interests it seeks to protect." Its stated "purposes" are, among other things, "[t]o prohibit causes of action against manufacturers, distributors, dealers, and importers of firearms . . . for the harm solely caused by the criminal or unlawful misuse of firearm products," and "[t]o preserve a citizen's access to a supply of firearms and ammunition for all lawful purposes." Id. § 7901(b)(1), (2); see also id. § 7901(a)(5)-(8) (finding that the firearm industry should not be liable for third parties' unlawful acts and that lawsuits seeking to impose such liability abuse the legal system); id. § 7901(a)(1)-(2) (invoking the Second Amendment). In short, it

seeks to protect (1) U.S. firearm companies and their interests in manufacturing, marketing, and selling guns to the public; and (2) U.S. citizens and their interests in having access to guns.

We therefore agree with the district court's conclusion that the PLCAA's focus is "regulat[ing] the types of claims that can be asserted against firearm manufacturers and sellers . . . to protect the interests of the United States firearms industry and the rights of gun owners." Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc., 633 F. Supp. 3d 425, 444 (D. Mass. 2022).

Mexico resists this conclusion by proposing a different focus of the PLCAA: "gun misuse and the resulting injury."  It argues that the district court erred by looking only at the PLCAA's operative provision -- which prohibits "qualified civil liability action[s]," 15 U.S.C. § 7902 -- and not its definitions section -- which defines such actions as "civil action[s] or proceeding[s] or . . . administrative proceeding[s]" for harm "resulting from the criminal or unlawful misuse of a qualified product by the person or a third party," id. § 7903(5)(A).

We agree that statutory provisions do not exist "in a vacuum" and "must be assessed in concert with . . . other provisions." WesternGeco, 138 S. Ct. at 2137.  In WesternGeco, for example, the Supreme Court determined that the focus of a statute providing a remedy for patent infringement was "the infringement." Id. (quoting 35 U.S.C. § 284).  But because the

statute identified several types of infringement, the Court looked to a separate provision to determine what "the infringement" was in the case at hand.  Id.  That provision "provide[d] that a company 'shall be liable as an infringer' if it 'supplies' certain components of a patented invention 'in or from the United States' with the intent that they 'will be combined outside of the United States in a manner that would infringe the patent if such combination occurred within the United States.'"  Id. at 2137-38 (quoting 35 U.S.C. § 271(f)(2)).  From this definition, the Court gleaned that the regulated conduct -- that is, "the infringement" -- was "the domestic act of 'suppl[ying] in or from the United States.'"  Id. at 2138 (alteration in original) (quoting 35 U.S.C. § 271(f)(2)).  So, because it was that domestic act "that infringed [the] patents," the "conduct . . . relevant to [the] focus clearly occurred in the United States."  Id.

Mexico contends that we should follow what it sees as a similar approach: treat the command of section 7902(a) (precluding "qualified civil liability action[s]" in any U.S. court) as insufficient to determine the focus; look at the definition of "qualified civil liability action" in section 7903(5)(A) (as meaning suits against defendants for damages resulting from unlawful use of certain firearms); and then declare that the statute's focus is actually on certain elements of that definition (damages and misuse).

But while WesternGeco makes clear that it is sometimes necessary to turn to a secondary provision to help give meaning to the statute's focus, it does not stand for the proposition that whenever a term is defined in a separate provision, all parts of that definition become the focus of the statute.  In WesternGeco, the portion of the secondary provision on which the Court concentrated was the very "infringement" that was the focus of the primary provision.  Other parts of the definition -- such as the requirement that the components be "especially made or especially adapted for use in the invention," id. at 2135 (quoting 35 U.S.C. § 271(f)(2)) -- were not the statute's focus because they did not constitute the act of infringement, which was the focus of the primary provision.  Here, "qualified civil liability action[s]" are the focus and we look to section 7903(5)(A) simply to define the scope of that term, not to find in the elements of that definition some other focus.

To drive this point home, imagine a law stating that "a qualified shirt may not be worn in any Federal or State court" and defining "qualified shirt" as "a collarless shirt made from cotton."  Under Mexico's logic, a focus of that statute would be the cotton industry.  And therefore the law would not prohibit the wearing of collarless shirts made from cotton grown outside the United States.  But no reasonable person would think that the statute would not apply with equal force regardless of the origin

of the cotton in a court attendee's shirt.  So too, here; Mexico cannot shift the focus of the PLCAA from "qualified civil liability action[s]" to something else merely because that term -- which Mexico concedes is the focus of the PLCAA's operative provision -- is defined in a separate provision.

At a more fundamental level, Mexico's argument that the statute's focus is "gun misuse and the resulting injury" has too little connection to the PLCAA's purpose or effect.  While curtailing gun misuse is a laudable goal (and one that may be the focus of other statutes), it is not the goal of the PLCAA.  That statute's purpose, and effect, is to insulate U.S. gun industry actors from certain types of lawsuits in domestic courts.  And that conduct is inherently domestic.

Mexico also argues that to say that the focus of the PLCAA is on regulating the types of claims that can be brought against U.S. gun industry actors "is so broad as to be tautological" because "[a]ll statutes 'regulate the type' of activity to which they are directed, and all such 'regulat[ion]' by definition occurs in the United States -- in the U.S. Courts that apply the statutes."  But this argument confuses the effect of a regulation with its focus; not all statutes are directed toward regulating lawsuits in the way the PLCAA is.  For example, the statute in WesternGeco in some sense "regulated" the conduct of U.S. courts by creating a cause of action that those courts can

adjudicate.   But the focus of that statute was clearly on regulating patent infringement, e.g., infringement said to occur by shipping components overseas for assembly.  138 S. Ct. at 2137–38.  Here, by contrast, the PLCAA seeks to regulate the lawsuits themselves.

Having thus determined the PLCAA's focus, we find it evident that the conduct relevant to that focus occurs domestically.   Both the conduct that the statute seeks to regulate -- the filing and adjudication of lawsuits -- as well as the conduct that it seeks to protect -- defendants' manufacturing, marketing, and selling of guns -- take place entirely within the United States.

Mexico argues finally, and mostly in passing, that defendants "engage in conduct in Mexico when they aid and abet trafficking guns into Mexico."  The Supreme Court has held that "suppl[ying] in or from the United States" components of a patented invention with the intent that they be assembled abroad is a "domestic act."  Id. (alteration in original).  Mexico develops no reason why selling guns in the United States with the intent that they be resold to persons in Mexico should not similarly be considered a domestic act.

For all these reasons, the presumption against extraterritoriality does not bar application of the PLCAA to this case.

**B.**

We now turn to Mexico's argument that the PLCAA nonetheless by its terms does not apply to a lawsuit brought by a foreign government based on damages occurring outside the United States caused by misuse outside the United States. Recall that the PLCAA prohibits lawsuits "brought by any person" (including "any governmental entity") "against a manufacturer or seller of a [firearm] . . . for damages . . . or other relief, resulting from the criminal or unlawful misuse of a [firearm] by the person or a third party." 15 U.S.C. § 7903(3), (5)(A). Mexico argues that (1) "criminal or unlawful misuse" means only misuse that occurs in the United States and is unlawful under U.S. law; (2) "damages . . . or other relief" covers only injury incurred in the United States; and (3) "any governmental entity" encompasses only domestic governmental entities.

The Supreme Court recently rejected a similar contention in Turkiye Halk Bankasi A.S. v. United States, which involved a section of the U.S. Criminal Code granting federal district courts exclusive jurisdiction over "all offenses against the laws of the United States." 598 U.S. 264, 268-69 (2023) (quoting 18 U.S.C. § 3231). The defendant, a bank owned by the Turkish government, argued that because the statute "refers generically to 'all' federal criminal offenses without specifically mentioning foreign states or their instrumentalities, . . . foreign states and their

instrumentalities do not fall within [the statute's] scope." Id.
at 269. The Court observed that the "text as written" "plainly
encompasses" the defendant's offenses. Id. It therefore
"decline[d] to graft an atextual limitation onto [the statute's]
broad jurisdictional grant over 'all offenses,'" or to "create a
new clear-statement rule requiring Congress to 'clearly indicat[e]
its intent' to include foreign states and their
instrumentalities." Id.

Similarly, in Pfizer, Inc. v. Government of India, the
Supreme Court considered a provision of the Clayton Act allowing
"any person" injured by a violation of U.S. antitrust laws to sue
in U.S. district court. 434 U.S. 308, 311-12 (1978) (quoting 15
U.S.C. § 15(a)). The Court held that "any person" includes foreign
governments, in part because that interpretation furthered the
"two purposes" of the provision: "to deter violators and deprive
them of 'the fruits of their illegality,' and 'to compensate
victims of antitrust violations for their injuries.'" Id. at 314
(quoting Ill. Brick Co. v. Illinois, 431 U.S. 720, 746 (1977)).
The Court reasoned that "[t]o deny a foreign plaintiff injured by
an antitrust violation the right to sue would defeat these
purposes" because "[i]t would permit a price fixer or a monopolist
to escape full liability for his illegal actions and would deny
compensation to certain of his victims, merely because he happens
to deal with foreign customers." Id. at 314-15.

Taken together, Turkiye and Pfizer guide our approach to interpreting the PLCAA.  Here, as in Turkiye, the "text as written" does not contain the exceptions Mexico proposes.  Nothing in the text of the PLCAA limits its scope to misuse or injury that occurs in the United States, or to U.S. plaintiffs.  And, as in Pfizer, the context and purpose of the PLCAA weigh against such a limitation.  Congress quite clearly enacted the PLCAA to insulate the U.S. gun industry from certain lawsuits.  See 15 U.S.C. § 7901(a)(5)-(8); id. § 7901(b)(1), (4).  Limiting that protection to lawsuits brought for harm occurring in the United States, thereby exposing the U.S. gun industry to identical lawsuits for harm suffered abroad, would run directly contrary to that purpose.  We also think it unlikely that Congress intended to allow recovery for victims of gun violence occurring abroad but preclude that same recovery for victims of gun violence occurring within U.S. borders.

Nevertheless, Mexico urges us to read into the PLCAA an implicit domestic restriction on the statute's scope.  It likens this case to Small v. United States, which involved a statute criminalizing possession of a firearm by "any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year."  544 U.S. 385, 387 (2005) (quoting 18 U.S.C. § 922(g)(1)).  There the Supreme Court held that the phrase "convicted in any court" encompasses only domestic, not

foreign, convictions.  _Id._  But at the same time the Court made clear that its conclusion would be different "should statutory language, context, history, or purpose show the contrary." _Id._ at 391.  Finding "no convincing indication to the contrary" in the statute, the Court applied an assumption "similar" to the presumption against extraterritoriality because "Congress generally legislates with domestic concerns in mind." _Id._ at 388, 391 (quoting _Smith_ v. _United States_, 507 U.S. 197, 204 n.5 (1993)).

The holding in _Small_ provides no succor to Mexico.  As we have explained, the PLCAA was also undoubtedly enacted with domestic concerns in mind; i.e., the impact of certain types of lawsuits filed in domestic courts against domestic firearm companies.  So prohibiting all such lawsuits regardless of who brings them perfectly aligns with that domestic concern.  The fact that a statute is focused on domestic concerns (here, lawsuits in U.S. courts) does not mean that every term in the statute need be read as somehow domestically limited.  _See, e.g., Turkiye_, 598 U.S. at 269; _Pfizer_, 434 U.S. at 314–15.  And that is especially so where, as here, limiting the statute in this way would run directly contrary to its stated purposes.

Mexico begs to differ.  It points to four "clues" that the PLCAA does not apply to lawsuits arising out of the use of guns in violation of foreign laws.  We address each in turn.

First, Mexico points out that the definition of the term "seller" in the PLCAA explicitly includes "importer[s]" but does not explicitly mention "exporters."   15 U.S.C. § 7903(6)(A). Similarly, "importers," but not "exporters," are specifically identified as a category of business that the PLCAA seeks to protect.  Id. § 7901(b)(1).  Mexico argues that this "confirms" that Congress only intended the PLCAA to be domestic in scope. But this is too slender a reed on which to support the interpretation Mexico seeks to advance.  Even assuming Congress intended to exclude from the PLCAA's coverage the export of guns (an issue we do not decide here), that does not alter our conclusion that Congress certainly intended to include all lawful domestic sales of guns -- even when those domestically sold guns end up causing harm abroad.  There are plausible reasons why Congress might have wanted to protect domestic sellers more than exporters, including Congress's stated purpose of "preserv[ing] a citizen's access to a supply of firearms and ammunition for all lawful purposes." 15 U.S.C. § 7901(b)(2) (emphasis added).  If a domestic seller goes out of business, that hampers U.S. citizens' access to guns more than if an exporter goes out of business. Thus, the lack of any express mention of "exporters" does not mean that the PLCAA does not apply to actions against domestic manufacturers and sellers for harm suffered in another country.

Second, Mexico points out that the PLCAA applies only to actions "resulting from the criminal or unlawful misuse" of a firearm, and excludes any action in which the manufacturer or seller knowingly violated a "State or Federal statute" applicable to gun sales or marketing.  Mexico argues that "criminal or unlawful misuse" should be read as referring only to violations of domestic laws, just as "convicted in any court" was read to encompass only domestic convictions in Small.  Otherwise, Mexico says, the exception for knowing violations of law would presumably not be limited to state and federal statutes.  We disagree.  Given the basic concern motivating Congress, it makes perfect sense to read "criminal or unlawful misuse" broadly as including the violation of any law.  Otherwise, Congress would have favored foreign plaintiffs over domestic plaintiffs and left a gaping hole in the shield that was the object of the legislation.

Mexico replies that Congress would not have required U.S. courts to interpret foreign criminal law in determining whether the use of a gun was "criminal or unlawful."  Again, we disagree.  Courts in the United States are capable of interpreting foreign law, and commonly do so.  See, e.g., Piper Aircraft Co. v. Reyno, 454 U.S. 235, 245 (1981) ("[T]he mere fact that the court is called upon to determine and apply foreign law does not present a legal problem of the sort which would justify the dismissal of a case otherwise properly before the court." (internal quotations

omitted)).  Indeed, Mexico asks the court to interpret foreign law in this very case by arguing that Mexican law applies.  To the extent Mexico is concerned that incorporating foreign law into the meaning of "criminal or unlawful use" will introduce "extreme" variations, the phrase already reflects the varied laws of fifty different states.  See, e.g., Cynthia V. Ward, "Stand Your Ground" and Self-Defense, 42 Am. J. Crim. L. 89, 90 (2015) (describing contrasting state approaches to "stand your ground" laws).  The PLCAA precludes certain lawsuits against firearm companies premised only on others' unlawful use of firearms -- regardless of which jurisdiction's law determines that the use was unlawful.

It also makes perfect sense that in crafting a specific and defined exception for knowing violations of law by a defendant, Congress would limit the exception to instances in which the defendant knowingly violated a "State or Federal statute."  To do otherwise and except from the limitations of the PLCAA cases in which a manufacturer violated a law of a foreign country would grant foreign governments the ability to define the scope of that exception.  See Small, 544 U.S. at 389-90 (finding Congress not to have granted foreign governments the ability to determine who could not own a gun in the United States).  The PLCAA is designed to protect domestic firearm companies that operate lawfully in the United States under the numerous federal and state laws regulating their operations.  See, e.g., 15 U.S.C. § 7901(a)(4) (finding that

the U.S. gun industry is "heavily regulated by Federal, State, and local laws").   That goal would be hampered if the PLCAA's protections fell away whenever a plaintiff alleged a violation of only foreign laws -- which may be significantly more restrictive than domestic regulations.

Third, Mexico argues that RJR Nabisco supports its claim that "damages . . . or other relief" covers only injury in the United States.  RJR Nabisco involved the private right of action for "[a]ny person injured . . . by reason of a violation of" the Racketeer Influenced and Corrupt Organizations Act (RICO).  579 U.S. at 346 (quoting 18 U.S.C. § 1964(c)).  The Supreme Court held that the presumption against extraterritoriality precluded RICO's private right of action from applying to injuries suffered abroad. Id.  But here, as discussed above, the focus of the PLCAA is not on redressing injury but rather on preventing certain lawsuits against U.S. firearm companies.  So it is not an extraterritorial application of the PLCAA to bar a lawsuit in a U.S. court against a U.S. company for harm suffered abroad.  See also WesternGeco, 138 S. Ct. at 2138 (distinguishing "injury," a "substantive element of a cause of action" in RJR Nabisco, from "damages -- a separate legal concept").

Finally, Mexico argues that the term "any governmental entity" excludes foreign governmental entities because the PLCAA's factual findings refer to actions "commenced or contemplated by

the Federal Government, States, municipalities, private interest
groups and others," and do not expressly mention foreign
governments.    15 U.S.C. § 7901(a)(8); id. § 7901(a)(7).    This
argument stumbles at the starting line.    The statements in the
findings of fact merely reflect that Congress enacted the PLCAA in
response to actions that had been "commenced or contemplated" by
the listed entities.    They do not suggest that Congress did not
intend for the PLCAA to apply to identical lawsuits by others that
would have the same impact on the U.S. firearm industry.

In sum, the text, context, and purpose of the PLCAA all
point toward a conclusion that "[q]ualified civil liability
action[s]" include those filed in United States' federal and state
courts by foreign governments for injury incurred abroad.

### c.

The foregoing brings us to Mexico's last
extraterritoriality argument:    Its contention that our reading of
the statute should give way to Mexico's invocation of international
comity.    Mexico argues that it is for Congress, not the courts, to
decide whether to preclude a foreign-law claim for injuries
incurred abroad -- especially when the plaintiff is a foreign
sovereign.    It therefore urges application of a clear-statement
rule before reading a statute like the PLCAA to bar such lawsuits.

In making its comity argument, Mexico turns again to RJR
Nabisco and its holding that RICO did not create a private cause

of action for injuries suffered abroad.  579 U.S. at 346.  In so holding, the Supreme Court reasoned that "providing a private civil remedy for foreign conduct creates a potential for international friction" because it risks "upsetting a balance of competing considerations that [foreign countries'] own . . . laws embody." Id. at 346–47 (quoting F. Hoffmann-La Roche Ltd. v. Empagran S.A., 542 U.S. 155, 167 (2004)).  Mexico contends that this case is the "mirror image" of RJR Nabisco:  "[P]recluding a claim under [foreign] law for injury incurred [abroad]" interferes with foreign sovereigns' application of their laws just as much as "granting a claim under U.S. law for injury incurred abroad." Cf. Nestlé USA, Inc. v. Doe, 141 S. Ct. 1931, 1948 (2021) (Sotomayor, J., concurring in part and concurring in the judgment) ("Closing the courthouse doors . . . gives rise to foreign-policy concerns just as invariably as leaving them open." (cleaned up)). Therefore, Mexico argues, absent a clear statement from Congress, courts should not apply the PLCAA to claims arising under foreign law for conduct that occurs in the United States but causes injuries abroad.

We decline to adopt this clear-statement rule for the PLCAA.  As should be abundantly clear by now, the PLCAA's focus is on protecting U.S. firearm companies from certain costly lawsuits, thereby also preserving U.S. citizens' access to firearms. Creating an atextual exception for lawsuits by foreign governments

would expose U.S. firearm companies to the very type of lawsuit the PLCAA seeks to prohibit, thereby running contrary to its stated goals. In at least this respect, this case is different from RJR Nabisco, in which limiting RICO's private cause of action to exclude injuries suffered abroad did not undermine any stated purposes of the statute.

The practical consequence of applying the PLCAA to this case is not lost on us. It may be that Mexico, as it claims, would be unable to pursue its lawsuit in the only forum that could provide effective injunctive relief. But that is a necessary consequence of Congress's decision to protect the U.S. firearm industry by regulating the types of lawsuits that can be adjudicated by U.S. courts. And the prohibition applies to lawsuits filed by domestic entities and individuals on an equal basis. Cf. Pfizer, 434 U.S. at 318–19 ("[A] foreign nation is generally entitled to prosecute any civil claim in the courts of the United States upon the same basis as a domestic corporation or individual might do.").

In sum, we hold that the PLCAA applies to lawsuits by foreign governmental entities for harm suffered outside this country, just as it applies to lawsuits by domestic governmental entities for harm suffered in this country. We turn next to Mexico's contention that, even if the PLCAA applies generally to

suits by foreign governments for foreign harms, it also excepts from its ban claims of the type presented in Mexico's complaint.

**IV.**

As the title of the Protection of Lawful Commerce in Arms Act suggests, the statute is designed to protect only "lawful" commerce in arms. It contains various exceptions to ensure that it does not insulate firearm companies against lawsuits resulting from their unlawful behavior. One of those exceptions, known as the predicate exception, exempts from the PLCAA's clutches "an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought." 15 U.S.C. § 7903(5)(A)(iii). Mexico contends that its lawsuit meets this description.

Defendants advance three arguments for rejecting Mexico's contention: first, defendants say that Mexico's claims are not for violations of "statute[s]"; second, they contend that Mexico's complaint does not adequately plead violations of predicate statutes; and third, they assert that Mexico has not adequately alleged proximate cause. We conclude that Mexico survives each of these threshold challenges at this stage of the litigation. We therefore hold that the PLCAA does not prevent this case from moving forward. Our reasoning follows.

**A.**

The district court held that Mexico's common law claims did not qualify for the predicate exception because, it thought, the exception applies only to "statutory claims," not "common-law causes of action." Estados Unidos Mexicanos, 633 F. Supp. 3d at 446. Said differently, the district court thought that the "State or Federal statute" that the defendant violated, rather than the common law, must also provide the private right of action under which the plaintiff sues.

Mexico tells us that no other court has construed the PLCAA this way, and points to a variety of decisions applying the predicate exception to common law claims alleging knowing violations of statutes.[4] Defendants do not contest this assertion, nor do they cite any cases construing the PLCAA as the district court did in this case.

---

[4] See, e.g., Brady v. Walmart Inc., No. 8:21-cv-1412-AAQ, 2022 WL 2987078, at *6-10 (D. Md. July 28, 2022); Prescott v. Slide Fire Sols., LP, 410 F. Supp. 3d 1123, 1139-40 & 1139 n.9 (D. Nev. 2019); Corporan v. Wal-Mart Stores E., LP, No. 16-2305-JWL, 2016 WL 3881341, at *3-4 & *4 n.4 (D. Kan. July 18, 2016); City of New York v. A-1 Jewelry & Pawn, Inc., 247 F.R.D. 296, 353 (E.D.N.Y. 2007); King v. Klocek, 187 A.D.3d 1614, 1616 (N.Y. App. Div. 2020); Englund v. World Pawn Exch., LLC, No. 16CV00598, 2017 WL 7518923, at *4 (Or. Cir. Ct. June 30, 2017); Chiapperini v. Gander Mountain Co., 13 N.Y.S.3d 777, 787 (N.Y. Sup. Ct. 2014); Williams v. Beemiller, Inc., 100 A.D.3d 143, 150-51 (N.Y. App. Div. 2012), amended by 103 A.D.3d 1191 (N.Y. App. Div. 2013); Smith & Wesson Corp. v. City of Gary, 875 N.E.2d 422, 434-35 (Ind. Ct. App. 2007).

We, too, conclude that the predicate exception encompasses common law claims in addition to statutory claims, as long as there is a predicate statutory violation that proximately causes the harm. The text of the PLCAA compels this conclusion. While other PLCAA exceptions exempt suits "for" specific causes of action, 15 U.S.C. § 7903(5)(A)(ii), (iv), (v) ("an action . . . for negligent entrustment or negligence per se"; "an action for breach of contract or warranty"; "an action for [harm arising from a product defect]"), the predicate exception more broadly exempts actions "in which" the manufacturer or seller violated a statute, id. § 7903(5)(A)(iii). If Congress had wanted to limit the predicate exception to claims for violating a predicate statute, it could have simply phrased this exception the same as the others. See Keene Corp. v. United States, 508 U.S. 200, 208 (1993) ("[W]here Congress includes particular language in one section of a statute but omits it in another . . ., it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (omission in original) (quoting Russello v. United States, 464 U.S. 16, 23 (1983))).

Defendants reply that "in which" means that the statutory violation must be contained "in" the cause of action, such that it must be an element of the claim. Certainly to prevail Mexico would need to prove a manufacturer or seller liable for the knowing violation of a statute applicable to the sale or marketing

of a qualified product.  So proof of a statutory violation is a condition to prevailing on, for example, a cause of action for negligence.  But that does not mean that a lawsuit for negligence cannot be "an action in which . . . a seller . . . knowingly violated" a requisite statute.

The predicate exception's proximate cause requirement harmonizes well with this understanding.  The requisite proximate cause serves as a nexus between the predicate statutory violation and common law claims that otherwise might bear no relation to a seller's transgression of firearm statutes.  This ensures that -- contrary to defendants' protestations -- our reading of the predicate exception does not allow any claim at all to proceed merely because it is alleged in the same case as an unrelated statutory violation.

The proximate cause requirement makes less sense under the district court's reading.  Courts "generally presume that a statutory cause of action is limited to plaintiffs whose injuries are proximately caused by violations of the statute." Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 132 (2014).  And for any statutory cause of action containing a proximate cause requirement (as most do), the district court's reading would render the identical requirement of the predicate exception entirely superfluous.  See Consumer Data Indus. Ass'n v. Frey, 26 F.4th 1, 7 (1st Cir. 2022) ("A statute . . . ought to be

construed in a way that 'no clause, sentence, or word shall be superfluous, void, or insignificant.'" (quoting Duncan v. Walker, 533 U.S. 167, 174 (2001))).  Of course, as defendants point out, not all statutory causes of action have a built-in proximate cause requirement.  But even with this caveat, proximate cause makes far more sense as a nexus between a predicate statutory violation and other causes of action than as a catchall designed to graft a proximate cause requirement onto rare statutory causes of action with alternative causation frameworks.

The examples Congress provided of lawsuits that fit within the exception dispel any doubt that the exception allows for more than purely statutory causes of action.  The predicate exception expressly encompasses, as an example of allowed lawsuits, "any case in which the manufacturer or seller aided, abetted, or conspired with any other person to sell or otherwise dispose of a qualified product, knowing, or having reasonable cause to believe, that the actual buyer of the qualified product was prohibited from possessing or receiving a firearm or ammunition under subsection (g) or (n) of section 922 of title 18, United States Code" -- conduct made unlawful by the Gun Control Act, 18 U.S.C. § 922(d).  15 U.S.C. § 7903(5)(A)(iii)(II).  Yet, nothing in section 922 seems to create any private right of action.  Nor does any party suggest that it does.  To the contrary, Mexico cites various cases holding that the Gun Control Act contains no

statutory private right of action, and defendants do not dispute this characterization.[5]  And given that agreed-upon reading, it would make no sense for Congress to have listed such a case as an example if only statutory actions could survive under the predicate exception.

Defendants argue that, read to include non-statutory causes of action, the predicate exception would "wholly subsume" a different exception in the PLCAA for "action[s] brought against a seller for . . . negligence per se." 15 U.S.C. § 7903(5)(A)(ii). Generally speaking, negligence per se requires violation of "a statute that is designed to protect against the type of accident the actor's conduct causes" and that the "victim is within the class of persons the statute is designed to protect." Restatement (Third) of Torts § 14.  Defendants complain that our reading of the predicate exception would allow plaintiffs to bring any common law claim based on any statutory violation, thereby rendering these restrictions superfluous.

---

[5]  The cases that Mexico cites are not from this circuit. See Bannerman v. Mountain State Pawn, Inc., No. 3:10-CV-46, 2010 WL 9103469 (N.D. W. Va. Nov. 5, 2010), aff'd, 436 F. App'x 151 (4th Cir. 2011); Est. of Pemberton v. John's Sports Ctr., Inc., 135 P.3d 174 (Kan. Ct. App. 2006); T & M Jewelry, Inc. v. Hicks ex rel. Hicks, 189 S.W.3d 526 (Ky. 2006).  We do not decide here whether the Gun Control Act provides a private right of action. For purposes of the present case, we merely accept the parties' apparent agreement that it does not.

Defendants' argument glosses over the heightened mens rea requirement in the predicate exception, which applies only when the defendant "knowingly" violates a statute.  So there are statutory violations -- i.e., those that are not "knowing" -- that may be actionable under the doctrine of negligence per se but do not serve as predicate violations.  So, there is no superfluousness in our reading of the statute.  And it is perfectly sensible for Congress to allow claims satisfying the negligence per se standard to proceed, while at the same time creating a separate exception for knowing violations of statutes regulating the sale or marketing of firearms.[6]

For these reasons, we conclude that the predicate exception allows common law claims for injury proximately caused by a defendant's knowing violation of a predicate statute.  We turn next to defendants' contention that Mexico has not adequately alleged such a violation.

**B.**

Mexico alleges that defendants knowingly violated predicate statutes in two ways: by aiding and abetting illegal downstream sales, and by selling unlawful "machineguns."

---

[6]  In fact, the district court in this very case found the negligence per se exception inapplicable because Massachusetts does not recognize the negligence per se doctrine.  See Estados Unidos Mexicanos, F. Supp. 3d at 449.

**1.**

First, Mexico reasons that by deliberately facilitating the unlawful trafficking of their guns into Mexico, defendants aid and abet violations of various federal statutes that prohibit selling guns without a license, exporting guns without a license, and selling to straw purchasers.  Resting on their position that the predicate exception is limited to statutory causes of action (which we have rejected), defendants do not contend that the complaint fails to allege widespread sales of firearms by dealers in knowing violation of several state and federal statutes.  Nor do defendants dispute that the predicate exception of section 7903(5)(A)(iii) would apply if Mexico were to prove that a defendant aided and abetted any such violation.  Instead, defendants contend that even for pleading purposes the complaint fails to allege facts plausibly supporting the theory that defendants have aided and abetted such unlawful sales.

We disagree, finding instead that Mexico's complaint adequately alleges that defendants have been aiding and abetting the sale of firearms by dealers in knowing violation of relevant state and federal laws.  "[T]he essence of aiding and abetting" is "participation in another's wrongdoing that is both significant and culpable enough to justify attributing the principal wrongdoing to the aider and abettor."  Twitter, Inc. v. Taamneh, 598 U.S. 471, 504 (2023).

Reduced to its essence, aiding-and-abetting liability rests on "twin requirements" that the assistance provided to the principal wrong-doer be both (1) "knowing" and (2) "substantial." Id. at 491-92. These requirements "work[] in tandem, with a lesser showing of one demanding a greater showing of the other." Id. They "'should be considered relative to one another' as part of a single inquiry designed to capture conscious and culpable conduct." Id. at 504 (quoting Camp v. Dema, 948 F.2d 455, 459 (8th Cir. 1991)).

Defendants argue that Mexico has at best alleged defendants' knowing indifference to the downstream illegal trafficking of their guns into Mexico. They argue that "because Defendants themselves are not alleged to 'participate' in this wrongful conduct at all, much less with any plausible intent of facilitating it, they cannot be deemed accomplices."

This argument reflects a fundamental misunderstanding of the complaint. Fairly read, the complaint alleges that defendants are aware of the significant demand for their guns among the Mexican drug cartels, that they can identify which of their dealers are responsible for the illegal sales that give the cartels the guns, and that they know the unlawful sales practices those dealers engage in to get the guns to the cartels. The complaint further alleges that even with all this knowledge, and even after warnings from the U.S. government, defendants continue to supply the very

dealers that they know engage in straw sales and large-volume sales to traffic guns into Mexico, that they design military-style weapons and market them as such knowing that this makes them more desirable to the cartels, and that they place serial numbers on their weapons in a manner that facilitates their removal, as is preferred by cartels. And the complaint alleges that as a result of this conduct, defendants collectively reap $170 million per year in revenue from this illegal market. It is therefore not implausible that, as the complaint alleges, defendants engage in all this conduct <u>in order to</u> maintain the unlawful market in Mexico, and not merely in spite of it.

Notionally, imagine a dealer, a distributor, and a manufacturer standing abreast of one another at the border. The manufacturer hands the distributor ten guns, the distributor hands them to the dealer, and the dealer then hands them to a group of ten customers, among whom there are eight well-known agents of the cartel acting as straw purchasers. Rather than refusing to fill an order for ten more guns by that dealer, the manufacturer tweaks its advertisements to better appeal to the cartel, supplies them more guns, and so on over and over again. We think it clear that by passing along guns knowing that the purchasers include unlawful buyers, and making design and marketing decisions targeted towards those exact individuals, the manufacturer is aiding and abetting

illegal sales. And this scenario, in substance, is fairly analogous to what Mexico alleges.

The allegations here are also remarkably analogous to the facts in Direct Sales Co. v. United States, 319 U.S. 703 (1943). In that case, the defendant company conducted from New York a business providing mail-order prescription drugs to doctors around the country. Id. at 704-06. One customer was a doctor in South Carolina who was illegally reselling morphine sulfate supplied to him by the defendant. Id. at 704. The defendant was convicted of criminally conspiring with the doctor. Id. at 704-05. In affirming the conviction, the Supreme Court pointed to evidence that the doctor was ordering the product in large volumes incompatible with lawful use by legitimate patients, that the defendant facilitated this behavior through mass advertising and offering bulk sales at steep discounts (even after the U.S. government warned it that it was a source of supply for an illegal market), and that the company had a "stake in the venture" in the form of profits from the illegally sold drugs. Id. at 706-07, 712-13. From this evidence, the Court concluded, the jury could have found beyond a reasonable doubt that the defendant supplier "not only kn[ew] and acquiesce[d]" in the illegal enterprise, but also "join[ed] both mind and hand . . . to make its accomplishment possible." Id. at 713.

Here, similarly, the complaint alleges that defendants have resisted taking measures that would make it more difficult for their firearms to fall into the cartels' hands (despite warnings from the U.S. government), that they design and market their guns in such a way as to make them attractive to the illegal market, and that they benefit financially as a result. And unlike in Direct Sales, the defendants here are alleged to know that they supply dealers who sell illegally, making the inference that they are working in concert with these unlawful actors even stronger. Neither must we determine whether there is evidence of these facts sufficient to support a criminal conviction as in Direct Sales; we ask only whether the facts alleged in the complaint plausibly support an aiding-and-abetting theory of liability in this civil case. Direct Sales strongly supports our conclusion that they do.

Defendants attempt to distinguish Direct Sales by relying on the Court's observation that given the quantities sold the drugs could not have all been used for any lawful purpose. Id. at 710-12. In contrast, they assert, the "vast majority of retailers" are law-abiding and "only 2%" of U.S. firearms end up in Mexico. But in Direct Sales the Court distinguished morphine -- a product "incapable of further legal use except by compliance with rigid regulations" -- from other commodities "not restricted as to sale by order form, registration, or other requirements." Id. at 710. The defendant's sales methods and

volumes, which might be perfectly innocuous for everyday items, were evidence of illicit intent when employed to sell a dangerous item whose legitimate market is highly restricted. Id. at 711-12. "The difference," the Court said, "is like that between toy pistols or hunting rifles and machine guns." Id. at 710.

And so in Direct Sales the defendant must have known that the sales volume meant there were likely illegal sales, and by encouraging volume sales, the defendant could have been found to have intended to supply the products for the illegal sales. Here we also have a highly regulated product[7] allegedly being sold in an illegal manner, and an allegation that defendants know what is going on and take steps to facilitate it. In this important respect, Direct Sales again provides a close and instructive analogy.

Defendants also point out that Direct Sales rejected the proposition that a seller could be held liable for a buyer's illegal acts based merely on their knowledge or lack of concern as to the buyer's unlawful plans. But for all the reasons described above, the complaint adequately alleges that defendants make deliberate design and distribution choices to facilitate the illegal trafficking of their guns to Mexico. Thus they are not

---

[7] As Congress observed in enacting the PLCAA, "[t]he manufacture, importation, possession, sale, and use of firearms and ammunition in the United States are heavily regulated." 15 U.S.C. § 7901(a)(4).

mere passive observers of the buyer's illegal activity, but more akin to a calculated and willing participant in the supply chain that ends with a profitable illegal firearm market in Mexico.

Defendants argue that the Supreme Court's recent opinion in Twitter calls for a different result. We disagree. In Twitter, the Supreme Court held that major social media platforms used by ISIS to enlist recruits and raise funds were not liable under the Justice Against Sponsors of Terrorism Act for aiding and abetting an ISIS terrorist attack on a nightclub in Turkey. 598 U.S. at 505-07. The defendants in Twitter had no meaningful stake in ISIS's use of their platforms and had an undisputed lack of intent to support ISIS. Id. The only affirmative conduct that the defendants engaged in was creating their platforms and making them available to the public, which was not alleged to have been done with ISIS in mind or to support terrorism. Id. at 498. There was also no allegation that ISIS even used the platforms to plan or coordinate the attack. Id.

Here, by contrast, Mexico alleges that defendants engage in conduct -- design decisions, marketing tactics, and repeated supplying of dealers known to sell guns that cross the border -- with the intent of growing and maintaining an illegal market in Mexico from which they receive substantial revenues. And for Rule 12(b)(6) purposes we assume that defendants' conduct in fact helped incite the unlawful sales. See, e.g., SBT Holdings,

LLC v. Town of Westminster, 547 F.3d 28, 35 (1st Cir. 2008) ("[W]e draw all rational inferences from the facts alleged in favor of the plaintiffs."). Defendants are therefore alleged to be much more active participants in the alleged activity than were the Twitter defendants, and the holding in that case does not compel a different result in this one.

Of course, the complaint does not allege defendants' awareness of any particular unlawful sale. But neither did the convicted mail-order company in Direct Sales have such specific knowledge. The Supreme Court clarified in Twitter that such a "strict nexus" is not always required. 598 U.S. at 497. "[I]n appropriate circumstances, a secondary defendant's role in an illicit enterprise can be so systemic that the secondary defendant is aiding and abetting every wrongful act committed by that enterprise." Id. at 496. Here, defendants operate at a systemic level, allegedly designing, marketing, and distributing their guns so that demand by the cartels continues to boost sales. In these circumstances, defendants need not know about any particular unlawful sale that funnels their guns into Mexico.

In sum, we conclude that the complaint adequately alleges that defendants aided and abetted the knowingly unlawful downstream trafficking of their guns into Mexico. Defendants' arguments to the contrary are premised either on an inaccurate reading of the complaint or on a misapplication of the standard of

review on a motion to dismiss under Rule 12(b)(6). Whether plaintiffs will be able to support those allegations with evidence at summary judgment or at trial remains to be seen. At this stage, though, we must "accept all well-pleaded allegations of [Mexico] as true and afford all inferences in [Mexico's] favor." Vázquez-Ramos v. Triple-S Salud, Inc., 55 F.4th 286, 291 (1st Cir. 2022) (cleaned up) (quoting Arroyo-Melecio v. P.R. Am. Ins. Co., 398 F.3d 56, 65 (1st Cir. 2005)).

### 2.

Mexico's argument that defendants unlawfully sold "machineguns" fares less well. The Gun Control Act prohibits selling a "machinegun" without specific authorization. 18 U.S.C. § 922(b)(4). "Machinegun" is defined as follows:

> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b).

Mexico claims that defendants' semiautomatic weapons meet this definition because they can easily be modified to fire

automatically.  It cites a 1982 ATF administrative ruling stating
that this definition "includes those weapons which have not
previously functioned as machineguns but possess design features
which facilitate full automatic fire by a simple modification or
elimination of existing component parts."  ATF Rul. 82-8, 1982-2
A.T.F.Q.B. 49 (1982).

Binding precedent from the Supreme Court and this court
forecloses Mexico's interpretation.  In Staples v. United States,
the Supreme Court held that the National Firearms Act -- which
prohibits possession of an unregistered "machinegun" (as defined
above) -- requires that the defendant knew that the possessed
weapon "had the characteristics that brought it within the
statutory definition of a machinegun."  511 U.S. 600, 602 (1994).
The defendant in that case possessed an AR-15 rifle, in which
certain components had been swapped out or filed down to enable
automatic firing.  Id. at 603.  The Supreme Court held that to be
properly convicted the defendant must have known that his rifle
had been so modified.  Id. at 619.  It rejected a reading of the
statute under which "any person who has purchased what he believes
to be a semiautomatic rifle or handgun . . . can be subject to
imprisonment, despite absolute ignorance of the gun's firing
capabilities, if the gun turns out to be an automatic."  Id.
at 615.  And the majority also rejected the dissent's argument
based on a class of "readily convertible semiautomatics" because

"that class bears no relation to the definitions in the Act." Id. at 612 n.6.

Similarly, in United States v. Nieves-Castaño, we reversed the conviction of a defendant who knew that she possessed an AK-47 but did not know that it had been modified to allow automatic firing.  480 F.3d 597, 602 (1st Cir. 2007).  We stated that "[w]hile an automatic weapon meets the definition of a machine gun, a semi-automatic weapon does not."  Id. at 600 (citing Staples, 511 U.S. at 602 & n.1).

Mexico argues that Staples and Nieves-Castaño are inapposite because those cases were about the mens rea requirement for a possession crime, not the definition of "machinegun."  It cites a district court case from Nevada distinguishing Staples on this basis.  See Parsons v. Colt's Mfg. Co., No. 19-cv-01189, 2020 WL 1821306, at *5 (D. Nev. Apr. 10, 2020), modified on reconsideration, No. 19-cv-01189, 2020 WL 2309259 (D. Nev. May 8, 2020).  But critical to the holdings of both Staples and Nieves-Castaño was that knowing possession of a readily convertible semiautomatic weapon does not constitute de facto knowing possession of a "machinegun."  In other words, a readily convertible semiautomatic weapon is not, without more, the same as an automatic weapon.  Mexico's reading would erase this distinction -- creating an equivalency that the holdings of Staples and Nieves-Castaño do not allow.  It would also effectively outlaw

the knowing possession of any semiautomatic weapon, since "virtually any semiautomatic weapon may be converted . . . into a machinegun within the meaning of the Act." See Staples, 511 U.S. at 615. Whether convertible semiautomatic weapons are to be prohibited in their entirety is not an issue presented by this appeal.

## C.

The final hurdle that Mexico must clear is the predicate exception's proximate cause requirement. A violation of a predicate statute allows a lawsuit to proceed only if "the violation was a proximate cause of the harm for which relief is sought." 15 U.S.C. § 7903(5)(A)(iii).

Proximate cause "demand[s] 'some direct relation between the injury asserted and the injurious conduct alleged.'" United States v. Kilmartin, 944 F.3d 315, 330 (1st Cir. 2019) (quoting Paroline v. United States, 572 U.S. 434, 444 (2014)). "Proximate cause is commonly understood as a function of the foreseeability of the harm," id. at 331, although in certain contexts foreseeability alone may be insufficient, see, e.g., Bank of Am. Corp. v. City of Miami, 581 U.S. 189, 202 (2017) (Fair Housing Act).[8]

---

[8] Neither party proposes a definition of proximate cause specific to the predicate exception of the PLCAA. In the absence of any such suggestions, we apply traditional understandings of proximate cause.

Mexico's claim of proximate cause is straightforward: defendants aid and abet the trafficking of guns to the Mexican drug cartels, and this trafficking has foreseeably required the Mexican government to incur significant costs in response to the increased threats and violence accompanying drug cartels armed with an arsenal of military-grade weapons.

Defendants attempt to complicate this causal theory. They maintain that the chain of causation actually has eight steps: (1) manufacturers sell guns to distributors; (2) distributors sell the guns to dealers; (3) dealers sell the guns to buyers with illegal intentions; (4) those buyers sell the guns to smugglers or smuggle them into Mexico themselves; (5) the cartels buy the guns; (6) the cartels use the guns; (7) the cartels' use of the guns injures people and property in Mexico; and (8) the Mexican government suffers derivative financial harm from those injuries. There are at least two fatal flaws in this argument.

First, the starting point for the predicate exception's causation analysis is the "violation" of "a State or Federal statute applicable to the sale or marketing" of firearms. We ask whether "the violation" proximately caused the plaintiff's harm. 15 U.S.C. § 7903(5)(A)(iii). Here, the violation that defendants allegedly aid and abet occurs when a dealer knowingly violates the law in selling guns intended for cartels. Viewed in this light, the relevant chain of causation starts at step 3 of the defendants'

list.  And from that point, the Mexican government's expenditure of funds to parry the cartels is a foreseeable and direct consequence.

Second, the fact that one can fashion a multi-step description of the causal chain does not mean that the injurious conduct and the injury alleged are insufficiently connected. Consider a defendant who falls asleep at the helm of a large ship, leaning on the helm, so as to move the tiller, which turns the rudder, which then turns the ship off course, hitting and weakening a dike, and thereby causing a reasonably cautious downstream farmer to build a levee.  Surely the ability to describe this causation in multiple steps would not mean that, as a matter of law, the negligent helmsperson did not foreseeably cause the farmer compensable harm.  Rather, one would more reasonably say that negligently steering the ship foreseeably caused the need to shore-up flood defenses.  So, too, here, the complaint plausibly alleges that aiding and abetting the illegal sale of a large volume of assault weapons to the cartels foreseeably caused the Mexican government to shore-up its defenses.

Defendants nevertheless claim that the Third Circuit adopted their view of proximate cause in City of Philadelphia v.

Beretta U.S.A. Corp., 277 F.3d 415, 423–24 (3d Cir. 2002).[9]  In that case, though, Philadelphia alleged "[a]t most . . . awareness of the means by which prohibited purchasers end up possessing handguns."  Id. at 424 & n.14.  The "trace request information" available at that time "d[id] not put a gun manufacturer on notice that a specific distributor or dealer [wa]s engaged in unlawful firearm trafficking."  Id. at 424 n.14.  Thus all gun manufacturers knew was that "some handguns reach prohibited purchasers."  Id. And without more, the plaintiffs could not show "intent on the part of the gun manufacturers."  Id.  Here, by contrast, Mexico expressly alleges that the defendants did know which dealers were making illegal sales.

Defendants further contend that there is no proximate cause because the causal chain contains multiple criminal acts by third parties.  They argue that "an 'intervening criminal act of a third party' is the textbook intervening act," Copithorne v. Framingham Union Hosp., 520 N.E.2d 139, 141 (Mass. 1988).  But the complete sentence in Copithorne from which defendants' brief cherry-picks actually states:  "The intervening criminal act of a third party is a superseding cause which breaks the chain of proximate causation only where the original wrongdoer reasonably

---

[9]  The Third Circuit decided City of Philadelphia before Congress enacted the PLCAA, so it analyzed proximate cause under negligence law, not the PLCAA.  277 F.3d at 422–26.

could not have foreseen such act." Id.; see also, e.g., Restatement (Second) of Torts § 448 (intervening crime is superseding cause "unless the actor at the time of his negligent conduct realized or should have realized the likelihood . . . that a third person might avail himself of the opportunity to commit such a . . . crime"); id. § 449 ("If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby."). Here, the complaint alleges not only that it was foreseeable that defendants' guns would end up in the hands of Mexican cartels, but also that defendants actually intended to bring about that result. And it is certainly foreseeable that Mexican drug cartels -- armed with defendants' weapons -- would use those weapons to commit violent crimes. The acts of these third parties are therefore properly considered as part of the proximate causation chain.

Defendants' superseding-criminal-act argument is especially unconvincing in the context of the PLCAA, which precludes only those claims "resulting from the criminal or unlawful misuse of a qualified product" by someone other than the defendant. 15 U.S.C. § 7903(5)(A). If a third party's unlawful act always undercuts proximate cause, the predicate exception would be meaningless. See Abramski v. United States, 573 U.S.

169, 183 n.8 (2014) (rejecting an interpretation of a gun-control statute that "would render the statute all but useless").

Defendants then shift focus from the conduct to the injury.  They argue that the Mexican government's alleged harms are wholly derivative of injuries suffered by the direct victims of cartel violence, citing a "general tendency of the law" not to stretch proximate causation "beyond [its] first step" to reach indirect victims.  Holmes v. Sec. Inv. Prot. Corp., 503 U.S. 258, 271 (1992) (quoting Associated Gen. Contractors v. Cal. State Council of Carpenters, 459 U.S. 519, 534 (1983)).  Under this principle, "a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts was generally said to stand at too remote a distance to recover."  Id. at 268-69; see also Lexmark, 572 U.S. at 133.

Some courts have applied this principle to bar similar lawsuits by cities against gun manufacturers.  For example, the Third Circuit held that Philadelphia had not alleged proximate cause because it sought "reimbursement for expenses that arise only because of the use of firearms to injure or threaten City residents," even though some of the alleged damages were "different from the damages suffered by direct victims of gun violence" -- like costs to "investigate and prosecute gun trafficking[ and] to patrol gun infested neighborhoods."  City of

Philadelphia, 277 F.3d at 425; see also Ganim v. Smith & Wesson Corp., 780 A.2d 98, 124 (Conn. 2001) (applying similar reasoning).

On the other hand, some courts have recognized that selling guns into an illegal market may cause direct harm to a governmental entity that is not derivative of harm to its residents. A court in Massachusetts allowed the city of Boston to proceed in its lawsuit against firearm companies where the city alleged various direct harms resulting from the defendants' "fueling an illicit market" of guns. City of Boston v. Smith & Wesson Corp., No. 199902590, 2000 WL 1473568, at *6 (Mass. Super. July 13, 2000). Such harms included costs of increased security at public schools, costs of increased law enforcement, lower property values, and diminished tax revenues. Id. The Supreme Court of Ohio adopted this reasoning, finding direct injuries in the form of "significant expenses for police, emergency, health, prosecution, corrections and other services." Cincinnati v. Beretta U.S.A. Corp., 768 N.E.2d 1136, 1148 (Ohio 2002). Similarly, a New Jersey court rejected a remoteness argument with respect to expenditures associated with "deterrence, investigation of gun crimes, and other related services." James v. Arms Tech., Inc., 820 A.2d 27, 41 (N.J. Super. Ct. App. Div. 2003); see also In re JUUL Labs, Inc., Mktg., Sales Practices & Prods. Liab. Litig., 497 F. Supp. 3d 552, 664-65 (N.D. Cal. 2020) (finding

proximate cause where government entities "do not seek to recover costs expended by . . . any other third party").

We find the reasoning of the latter cases persuasive. When faced with an epidemic of unlawful gun trafficking into its country, a government will foreseeably -- indeed inexorably -- incur costs of its own that are not merely derivative of those borne by the direct victims of gun violence.  One obvious example is the cost of increased law enforcement personnel and training to mitigate the flow of illegal weapons and to combat drug cartels that -- armed with defendants' weapons -- are essentially hostile military operations.  The government directly and uniquely bears these costs as a direct result of defendants' alleged facilitation of gun trafficking to the Mexican cartels.

Imagine that a U.S. company sent a mercenary unit of combat troops to attack people in Mexico City.  Such an attack would directly cause Mexico itself the expense of paying soldiers to defend the city.  Proximate cause would be quite clear.  So, too, here, where the defendants are alleged to have armed the attackers for their continuing assaults.

Mexico may also be able to show that other of its alleged harms are proximately caused by defendants' actions, and not merely derivative of harms to its citizens.  For example, if Mexico can prove that it had to proactively spend more funds to bolster its healthcare facilities, social services, and judicial system in

response to the cartels' accumulation of defendants' guns, these expenses might also not be merely derivative of the injuries suffered by individual victims.  On the other hand, other alleged harms, such as lower economic efficiency due to the decreased size of the working population, are derivative because the harm to the government flows only from prior harm inflicted upon its citizens. The bottom line is that Mexico has plausibly alleged at least some injuries that it has suffered directly from the illegal trafficking of guns into Mexico, and that are not merely derivative of the harm suffered by the victims of gun violence.

This conclusion is consistent with Supreme Court precedent.  In Holmes (a RICO case), the Court held that there was no proximate cause linking the defendants' manipulation of stock prices, which caused broker-dealers who purchased the stock to experience financial distress, to the harm suffered by the broker-dealers' customers when the broker-dealers could not pay the customers' claims.  503 U.S. at 271-74.  In that case, the only path from the stock manipulation to the customers' harm was through the broker-dealers' harm.  Id. at 271 ("[T]he conspirators have allegedly injured these customers only insofar as the stock manipulation first injured the broker-dealers and left them without the wherewithal to pay customers' claims.").

Contrast the situation in Holmes from one contemplated by the Court in Lexmark:

> Consider two rival carmakers who purchase airbags for their cars from different third-party manufacturers.  If the first carmaker, hoping to divert sales from the second, falsely proclaims that the airbags used by the second carmaker are defective, both the second carmaker and its airbag supplier may suffer reputational injury, and their sales may decline as a result.  In those circumstances, there is no reason to regard either party's injury as derivative of the other's; each is directly and independently harmed by the attack on its merchandise.

572 U.S. at 138–39.

This case is more like the airbag example in Lexmark than the stock manipulation in Holmes.  Unlike in Holmes, the causal path from the gun trafficking to the Mexican government's expenditures does not flow solely through the harm suffered by victims of gun violence.  Rather, like in the airbag example, the harm caused by the trafficking goes in multiple directions -- both directly to the victims of gun violence and directly to the Mexican government.  Admittedly, the government's expenditures are presumably in large part for the purpose of preventing and mitigating the harm from gun violence to its citizens.  But that does not make it "purely derivative" in the sense that sometimes defeats proximate cause.  See id. at 133.

Defendants' final attack on proximate cause is a pragmatic one.  Defendants point to two "functional factors" that courts apply while analyzing proximate cause under RICO: the feasibility of "ascertain[ing] the amount of a plaintiff's damages

attributable to the violation, as distinct from other, independent, factors"; and the "administrability" of apportioning damages without "multiple recoveries." <u>Sterling Suffolk Racecourse, LLC</u> v. <u>Wynn Resorts, Ltd.</u>, 990 F.3d 31, 35-36 (1st Cir. 2021) (quoting <u>In re Neurontin Mktg. & Sales Pracs. Litig.</u>, 712 F.3d 21, 35-36 (1st Cir. 2013)).

Assuming these considerations apply outside of the RICO context, they would not require the dismissal of the complaint in this case. The foregoing discussion concerning Mexico's non-derivative harm disposes of defendants' concern about multiple recoveries. We are also not persuaded that determining the damages attributable to each defendant will be as difficult as defendants suggest. And in this case any such difficulties are best resolved once Mexico has had an opportunity to engage in discovery and submit expert reports bearing on damages. <u>Accord</u> <u>City of Boston</u>, 2000 WL 1473568, at *7 n.33 ("The difficulty in ascertaining damages in this case is best assessed when the case has gone beyond the pleading stage."). In any event, Mexico seeks injunctive relief in addition to damages, and defendants' concerns about double recoveries and apportioning damages do not apply to injunctive relief. <u>Cf.</u> <u>Lexmark</u>, 572 U.S. at 135 ("Even when a plaintiff cannot quantify its losses with sufficient certainty to recover damages, it may still be entitled to injunctive relief . . . .").

We conclude that Mexico has adequately alleged proximate causation, thereby satisfying the final demand of the predicate exception. Of course, our holding at this stage is based on the allegations in the complaint, construed favorably to Mexico. Mexico will have to support its theory of proximate causation with evidence later in the proceedings.

**V.**

The parties' briefing touches on certain issues beyond the PLCAA, including which jurisdiction's law governs Mexico's tort claims and whether defendants owe a duty to Mexico under whichever tort law does apply. The district court did not reach these issues because it found the PLCAA dispositive. Having concluded that the PLCAA does not bar Mexico's lawsuit at this stage of the proceedings, we think it prudent to allow the district court to address the remaining issues in the first instance, rather than deciding them ourselves without the benefit of the district court's analysis or focused briefing from the parties.

**VI.**

For the foregoing reasons, we <u>reverse</u> the district court's conclusion that the PLCAA bars Mexico's tort claims and <u>remand</u> to the district court for further proceedings consistent with this opinion.